IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SAMSUNG ELECTRONICS CO., LTD.,　）
SAMSUNG SEMICONDUCTOR, INC. and　）
SAMSUNG ELECTRONICS AMERICA,　）
INC.,　）
　）
　　　　　Plaintiffs,　）　　C.A. No. _____
　）
　　v.　）　　**DEMAND FOR JURY TRIAL**
　）
NETLIST, INC.,　）
　）
　　　　　Defendant.　）
　）

**COMPLAINT FOR DECLARATORY JUDGMENT OF
NON-INFRINGEMENT; BREACH OF CONTRACT**

Plaintiffs Samsung Electronics Co., Ltd. ("SEC"), Samsung Semiconductor, Inc.

("SSI") and Samsung Electronics America, Inc. ("SEA," and together with SEC and SSI,

"Samsung") seek a declaration that Samsung does not directly or indirectly infringe United States

Patent No. 11,386,024 (the "'024 patent") (Exhibit 1), either literally or under the doctrine of

equivalents; and, alternatively, a ruling that Defendant Netlist, Inc. ("Netlist") has breached

contractual obligations owed to Samsung, including obligations to license its allegedly essential

'024 patent to Samsung and its affiliates on reasonable and non-discriminatory ("RAND") terms

and conditions, as follows:

**NATURE OF THE ACTION**

1.　　　This is an action for a declaratory judgment and breach of contract arising

under the patent laws of the United States, Title 35 of the United States Code, and the Declaratory

Judgment Act, 28 U.S.C. § 2201 *et seq.*, and state contract law.

2.      This action arises out of Netlist's repeated assertions of patents against Samsung after Netlist unilaterally attempted to terminate, without justification, an agreement in which Netlist granted Samsung a perpetual, paid-up, worldwide license to Netlist patents, including the '024 patent. The U.S. Patent and Trademark Office ("Patent Office") recently invalidated, in *inter partes* reviews filed by Samsung, all claims of two patents that Netlist accused Samsung of infringing in a related action in this Court. *Samsung Elecs. Co., Ltd. v. Netlist, Inc.*, No. 21-1453-RGA-JLH (D. Del.) ("Delaware -1453 Litigation"). Netlist missed the deadline to appeal these decisions, and the Patent Office rejected Netlist's request to excuse its failure to file timely appeals. Although the Patent Office's rulings will prevent Netlist from pursuing its infringement claims against Samsung on those two patents, Netlist recently obtained a continuation patent—the '024 patent—from the same patent family as the invalidated patents.

3.      Samsung seeks a declaratory judgment that it does not infringe the '024 patent. Alternatively, Samsung seeks relief for Netlist's breaches of contractual obligations owed to Samsung, including obligations to license the '024 patent to Samsung and its affiliates on RAND terms and conditions. Netlist has insisted that patents in the same family as the '024 patent are necessarily infringed by the practice of certain standards promulgated by the Joint Electron Device Engineering Council ("JEDEC") and implemented by the Samsung memory modules at issued in this case. Netlist's position on the essentiality of these related patents would likewise apply to the '024 patent.

**THE PARTIES**

4.      Samsung Electronics Co., Ltd. is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129, Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, 443-742, Republic of Korea.

5.      Samsung Semiconductor, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business at 3655 North First Street, San Jose, California 95134.

6.      Samsung Electronics America, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

7.      On information and belief, Netlist, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the claims for declaratory judgments of non-infringement (Counts I) under 28 U.S.C. §§ 1331, 1338(a), and 2201(a).

9.      This Court has subject matter jurisdiction over the breach of contract claim (Count II) pursuant to 28 U.S.C. § 1367. The breach of contract claim forms part of the same case or controversy as the claims for declaratory judgment of non-infringement asserted by Samsung in this action.

10.     This Court has personal jurisdiction over Netlist, a corporation organized and existing under the laws of the State of Delaware.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)–(c) because Netlist is subject to personal jurisdiction in this District. In addition, this action arises in part out of Netlist's allegations in a related case in this District that Samsung infringes two patents related to the '024 patent.

12.     An immediate, real, and justiciable controversy exists between Samsung and Netlist as to whether Samsung has infringed the '024 patent.

13.     For example, shortly after Netlist unilaterally declared that Samsung was no longer licensed to Netlist's patent portfolio, Netlist issued a "Notice of Infringement" letter to Samsung, in which Netlist asserted that certain Samsung memory modules infringe, among others, U.S. Patent Nos. 9,858,218 (the "'218 patent") and 10,474,595 (the "'595 patent"). The '024 patent is in the same family as, and claims priority to, the '595 and '218 patents. The '024 patent is a continuation of the '595 patent, which is a continuation of the '218 patent.

14.     On October 15, 2021, Samsung filed a declaratory judgment action against Netlist in the District of Delaware seeking a declaration that, *inter alia*, the same Samsung products at issue in this case, Load-Reduced Dual Inline Memory Modules ("LRDIMMs") and Registered Dual Inline Memory Modules ("RDIMMs"), do not infringe the '218 and '595 patents. Delaware -1453 Litigation, D.I. 1. Netlist moved to dismiss Samsung's declaratory judgment claims for lack of jurisdiction, arguing that no case or controversy existed because there was no imminent threat of Netlist filing suit against Samsung on the '218 and '595 patents. *Id.*, D.I. 11 at 3–4. The Court concluded that there was jurisdiction on the '218 and '595 patents, *id.*, D.I. 37 at 4–5, and Netlist subsequently counterclaimed for infringement of both patents, *id.*, D.I. 40.

15.     On October 15, 2021, Samsung filed for *inter partes* review ("IPR") of the '218 and '595 patents with Patent Trial and Appeal Board ("PTAB"). IPR2022-00062; IPR2022-00064. On May 8 and 9, 2023, the PTAB issued its Final Written Decisions for the '218 and '595 patents, finding all claims in both patents unpatentable. IPR2022-00062, Paper No. 54; IPR2022-00064, Paper No. 54. Netlist attempted to appeal the Final Written Decisions—and continue to pursue its infringement claims—but missed the deadline to appeal. Netlist requested that the PTAB allow Netlist's belated appeal, IPR2022-00062, Paper No. 55; IPR2022-00064, Paper No. 56, but the PTAB rejected Netlist's arguments.

16.     On October 2, 2023, Netlist's counsel in the Delaware -1453 Litigation sent an email to Samsung's counsel proposing the filing of (a) "[a]n unopposed motion to dismiss the '218 and '595 patents" from that litigation and (b) a stipulated motion to dismiss the appeals of the PTAB's Final Written Decisions on both patents.

17.     On December 20, 2021, the same day Netlist moved to dismiss Samsung's declaratory judgment claims in the Delaware -1453 Litigation for lack of subject matter jurisdiction, Netlist began a patent litigation campaign against Samsung in the U.S. District Court for the Eastern District of Texas, alleging that some of the same Samsung memory modules at issue in the Delaware -1453 Litigation and in this case infringed three other Netlist patents. *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:21-cv-463-JRG (E.D. Tex.) (the "EDTX I Action"), D.I. 1 ¶ 36. Netlist amended its complaint in the EDTX I Action to allege infringement of additional patents.

18.     Netlist later filed a second infringement suit against Samsung in the Eastern District of Texas, asserting patents that Netlist had not asserted in the EDTX I Action. *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:22-cv-293-JRG, D.I. 1 (E.D. Tex.) (the "EDTX II Action"). Netlist alleged that the same Samsung memory modules at issue in the Delaware -1453 Litigation and in this case infringed certain Netlist patents. *See id.* D.I. 12 ¶ 34. In both the EDTX I Action and the EDTX II Action, Netlist relied on JEDEC LRDIMM and RDIMM standards to allege infringement. *See, e.g.*, EDTX I, D.I. 1 ¶ 46 (relying on "JEDEC JESD82-32A Standard"); EDTX II, D.I. 12 ¶ 45 (relying on "JEDEC 82-32A Data Buffer Standard").

19.     Netlist has also filed suit against Samsung in Germany, asserting two patents against some of the same products at issue in this case. *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, No. 4c O 31/22, 4c O 45/22 (Düsseldorf Regional Court).

20.   Netlist previously asserted the '218 and '595 patents in litigation against a competitor of Samsung, SK hynix, alleging that the same type of memory modules at issue in the Delaware -1453 Litigation and in this case infringed the '218 and '595 patents.

21.   Netlist has also recently asserted patents in multiple litigations against Micron Technology, Inc. and its affiliates (collectively, "Micron"), which are competitors of Samsung with respect to at least certain of the memory products at issue. *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 6:21-cv-430 (W.D. Tex.) (the "Micron -430 Litigation"); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 6:21-cv-431 (W.D. Tex.) (the "Micron -431 Litigation"); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:22-cv-203-JRG (E.D. Tex.) (the "Micron -203 Litigation"); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:22-cv-294-JRG (E.D. Tex.) (the "Micron -294 Litigation"). Netlist also filed suit against Micron in Germany.

22.   Netlist has also filed infringement suits against Google, LLC ("Google") in the Northern District of California, *Netlist, Inc. v. Google LLC*, No. 3:090-cv-05718-RS (N.D. Cal.), and in Germany.

23.   Furthermore, between May 2020 and the present, Netlist has made demands that Samsung take a second license to Netlist's portfolio of patents based on Netlist's claim that it terminated the fully paid-up, worldwide patent license granted in the Agreement.

24.   Netlist has continued to prosecute patent applications with the same family as the '024, '218, and '595 patents on similar subject matter. For instance, on August 30, 2023, the Patent Office issued a Notice of Allowance for U.S. Application No. 17/840,593 ('593 application"), a continuation application of the '024 patent.

25.   Accordingly, as set forth herein, Netlist has sought to enforce patents in the same patent family as the '024 patent against Samsung products currently being sold and used

throughout the United States, and Netlist has accused the same Samsung products of infringing additional patents not related to the '024 patent. Netlist's unsuccessful attempt to appeal the PTAB's Final Written Decisions invalidating the '218 and '595 patents demonstrates Netlist's intent to continue asserting patents in this same family, which includes the '024 patent, against Samsung notwithstanding the PTAB's findings of invalidity. Netlist's prosecution of the '593 application further suggests that Netlist's patent campaign against Samsung concerning this patent family is not over.

26.     Because this action presents an actual controversy with respect to the '024 patent, the Court may grant the declaratory relief sought pursuant to 28 U.S.C. § 2201 *et seq*.

## BACKGROUND

A.     **Netlist's Extraordinary License Demand and Infringement Threats**

27.     On November 12, 2015, Netlist and SEC entered into a Joint Development and License Agreement (the "Agreement"). The Agreement contains cross-license, joint development, and product supply provisions.

28.     In the Agreement, Netlist granted SEC and its subsidiaries, including SSI and SEA, a perpetual, paid-up, worldwide, non-exclusive license to all patents owned or controlled by Netlist or any of its subsidiaries having an effective first filing date on or prior to November 12, 2020. The license extends through the expiration of the last to expire of the licensed patents.

29.     SEC similarly granted Netlist and its subsidiaries a perpetual, paid-up, worldwide, non-exclusive license to all patents owned or controlled by SEC or any of its subsidiaries having an effective first filing date on or prior to November 12, 2020.

30.     The Agreement required SEC to make a payment to Netlist of $8 million subject to the terms and conditions therein. SEC made this payment to Netlist, except for a portion

that was remitted as tax withholding to the Korean tax authorities, which later refunded the withheld portion to Netlist.

31.     Since 2020, Netlist has taken extraordinary actions to back out of its grant of a patent license to Samsung.

32.     On May 27, 2020, Netlist's Chief Licensing Officer, Marc J. Frechette, wrote to Mr. Seung Min Sung of SEC, and alleged that Samsung materially breached the Agreement by "repeatedly fail[ing] to fulfill Netlist's request for NAND and DRAM products throughout the term of the Agreement" and, allegedly, by improperly deducting withholding taxes. Netlist did not allege, and has never alleged, that Samsung breached the Agreement in any way related to the patent cross-license. In the same letter—which was the first time Netlist raised its breach allegations—Mr. Frechette informed Mr. Sung that Netlist had filed a complaint in U.S. District Court for the Central District of California with respect to the alleged breach by Samsung and provided a copy of the complaint for reference.

33.     On May 28, 2020, the U.S. District Court for the Central District of California docketed Netlist's breach of contract complaint against SEC. *Netlist Inc. v. Samsung Elec. Co., Ltd.*, No. 8:20-cv-00993-MCS (C.D. Cal.) ("Breach Action").

34.     Netlist subsequently wrote to SEC to terminate the Agreement, including the patent license to SEC and its subsidiaries. On July 15, 2020, Netlist's Chief Licensing Officer, Marc J. Frechette, wrote to Mr. Seung Min Sung of SEC and stated that "Netlist is hereby terminating, effective immediately, the Agreement including the patent license granted to Samsung . . . ."

35.     One week later, on July 22, 2020, Netlist amended its complaint in the Breach Action, seeking a declaration that the license it granted Samsung, but not the license

Samsung granted Netlist, was terminated. In the Breach Action, Netlist sought monetary damages and a declaration "that Netlist has terminated the Agreement pursuant to Section 13.2 and that Samsung's licenses and rights under the agreement have ceased."

36.     Netlist then issued a "Notice of Infringement" to Samsung and a demand that Samsung take a second license to Netlist's patents. Specifically, on October 15, 2020, Netlist stated that because it had terminated the Agreement, "Samsung is no longer licensed to any of Netlist's portfolio of patents." Netlist further asserted that its patents relate to LRDIMMs and/or RDIMMs. Netlist then alleged: "Despite the termination of the Joint Development and License Agreement, Samsung continues to unlawfully utilize Netlist's innovations and to infringe Netlist's patents, including United States Patent Nos. 10,217,523, 10,474,595, and 9,858,218." Netlist concluded the letter by demanding that "Samsung and its subsidiaries honor third-party intellectual property rights" and engage in "formal licensing discussions." Netlist further stated that it "reserves all rights and remedies" with respect to the alleged infringement.

37.     Netlist resumed its communications with Samsung in 2021. On February 2, 2021, Netlist's Chief Licensing Counsel, Mr. Marc J. Frechette, indicated by email that Samsung must take a *second* license, coupled with the demand that Netlist "be made whole" for any alleged breach asserted in the Breach Action.

38.     Accordingly, Netlist seeks to double-dip, with a demand that Samsung take a second license to Netlist's patents.

39.     On October 14, 2021, the court in the Breach Action issued a confidential order granting summary judgment in favor of Netlist on Netlist's Third Claim for Relief, which sought a declaration that Netlist terminated Samsung's license effective July 20, 2020. *See Netlist Inc. v. Samsung Elec. Co., Ltd.*, No. 8:20-cv-00993-MCS, D.I. 186 (C.D. Cal.). The court also

granted summary judgment in Netlist's favor that Samsung was liable for certain alleged breaches of other provisions in the Agreement. *See id.*

40.     Beginning on December 1, 2021, the court in the Breach Action held a jury trial on damages for one of the alleged breaches, the alleged failure to fulfill Netlist's orders for NAND and DRAM products. On December 3, 2021, the jury returned a verdict in Samsung's favor, finding that Netlist failed to prove that it suffered any damages for this alleged breach. *See* Breach Action, D.I. 276. The court in the Breach Action concluded that Netlist was not entitled to damages for the remaining alleged breach (the withholding of taxes) as a matter of law and awarded to Netlist nominal damages of $1.00 for each alleged breach (for a total of $2.00). *Id.*, D.I. 306, ¶¶ 1–2.

41.     Despite losing at trial, Netlist issued a press release claiming to be "very pleased with the overall outcome of the case as it confirmed that Samsung no longer has a valid license to Netlist patents and therefore requires a licensing agreement." Netlist Provides Update on Action in Federal Court Against Samsung, https://investors.netlist.com/websites/netlist/English/2120/us-press-release.html?airportNewsID=a661884d-0025-46ea-a055-bae8d8e4570b (last visited October 3, 2023).

42.     SEC has challenged the summary judgment ruling in the Breach Action on appeal to the Ninth Circuit. *Netlist Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 22-55209 & 22-55247 (9th Cir.). SEC maintains that it did not breach the Agreement, that the Agreement has not been terminated, and that it continues to hold a paid-up, worldwide, non-exclusive license to Netlist's patents, including the '024 patent. Further, regardless of whether the Agreement was properly terminated (which Samsung disputes), Samsung, its customers, and its end users are not liable for

infringement of the '024 patent for any memory modules made, used, sold, offered for sale, or imported before July 20, 2020, the date of which the purported termination became effective.

### B.   Netlist's Patent Infringement Lawsuits

43.   Over the past decade, Netlist has pursued a litigation campaign against Samsung and other suppliers of JEDEC standard-compliant memory modules, component suppliers, and users of memory modules (aside from Samsung). During this campaign, Netlist has alleged infringement of numerous patents, including patents related to the '024 patent, based on the practice of JEDEC memory standards.

### 1.   Netlist's Lawsuits Against Samsung

44.   As noted, on October 15, 2021, Samsung filed a declaratory judgment action against Netlist in this District for a declaration that, *inter alia*, certain Samsung LRDIMM and RDIMM products did not infringe the '218 and '595 patents. Delaware -1453 Litigation, D.I. 1. Netlist moved to dismiss Samsung's declaratory judgment claims, arguing that no case or controversy existed because there was no imminent threat of Netlist filing suit against Samsung on the '218 and '595 patents. *Id.*, D.I. 11 at 3–4. Samsung later amended its complaint, *id.*, D.I. 14, and Netlist moved to dismiss Samsung's First Amended Complaint, *id.*, D.I. 24.

45.   On August 1, 2022, the Court in the Delaware -1463 Litigation denied in part and granted in part Netlist's motion to dismiss Samsung's declaratory judgment claims. The Court found jurisdiction on the '218 and '595 patents because, once the Central District of California granted summary judgment in favor of Netlist in the Breach Action, "Netlist's threats became more immediate." *Id.* D.I. 37 at 4. However, the Court dismissed, *inter alia*, Samsung's declaratory judgment claim of non-infringement related to U.S. Patent No. 7,619,912 (the "'912 patent"). *Id.*, D.I. 37. The Court reasoned that the patent had been "the subject of litigation in [the

Northern District of California] for over a decade," so Samsung's declaratory judgment claim regarding that patent in Delaware was not "an efficient use of judicial resources." *Id.* at 6.

46.     Following the court's order in the Delaware -1453 Litigation, Netlist counterclaimed against Samsung for infringement of the '218 and '595 patents. Netlist alleged that Samsung infringed the '218 and '595 patents by making, using, selling, offering to sell, and/or importing DDR4 LRDIMM and DDR4 RDIMM products. *Id.*, D.I. 40, ¶ 30. Netlist later asserted counterclaims against Google in the Delaware -1453 Litigation for infringement of, *inter alia*, the '218 and '595 patents. *Id.*, D.I. 45. Netlist's infringement allegations relate to Google's use of Samsung's LRDIMM and RDIMM products.

47.     On December 20, 2021, Netlist filed a lawsuit against SEC, SSI, and SEA in the Eastern District of Texas alleging direct and indirect infringement of three patents. EDTX I Action, D.I. 1. Netlist alleged that the defendants infringe in connection with the making, selling, using, and/or importing of DDR4 LRDIMM memory modules, *see id.* ¶¶ 40, 53, and DDR5 LRDIMM, RDIMM, SODIMM, and UDIMM memory modules, *see id.* ¶ 68.

48.     Netlist filed the EDTX I Action the same day that it moved to dismiss the Delaware Litigation based on, *inter alia*, an alleged lack of any case or controversy over Samsung's declaratory judgment claims. *See* Delaware -1453 Litigation, D.I. 11 at 3 (arguing that the case did not involve a "substantial controversy of sufficient immediacy").

49.     Netlist's Complaint in the EDTX I Action stated that Netlist intended to assert against Samsung a patent resulting from a then-pending patent application once it issued from the Patent Office. *See* EDTX I Action, D.I. 1 ¶ 32. The application issued on January 25, 2022, and Netlist subsequently amended its complaint to include the newly issued patent and two additional patents. *Id.*, D.I. 23.

50.     Netlist also filed a second suit against Samsung in Texas. The same day the court in the Delaware -1453 Litigation dismissed Samsung's declaratory judgment claims involving the '912 patent—reasoning that litigating the patent in the Northern District of California would be the most efficient use of judicial resources—Netlist filed suit against Samsung on the '912 patent in the Eastern District of Texas. *See* EDTX II Action, D.I. 1. Netlist later amended its complaint to include three additional patents. Netlist alleged that Samsung infringed its patents by making, using, selling, offering to sell, and/or importing DDR4 LRDIMM and DDR4 RDIMM memory modules, the same Samsung LRDIMM and RDIMM memory modules at issue in this action. *Id.* ¶¶ 34.

51.     Netlist also filed suit against Samsung in Germany, asserting two patents against Samsung's DDR4 LRDIMM, also at issue in this case and the Delaware -1453 Litigation. Delaware -1453 Litigation, D.I. 1. *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, No. 4c O 31/22, 4c O 45/22 (Düsseldorf Regional Court).

52.     On October 15, 2021, Samsung filed IPRs on the patents at issue in the Delaware -1453 Litigation, including the '218 and '595 patents. IPR2022-00062; IPR2022-00064. In May 2022, the PTAB found all claims of both the '218 and '595 patents unpatentable in Final Written Decisions. IPR2022-00062, Paper No. 54; IPR2022-00064, Paper No. 54. Netlist attempted to appeal the PTAB's Final Written Decisions for both patents, but Netlist missed the deadline to file a notice of appeal. Netlist requested that the PTAB allow Netlist's late appeal, IPR2022-00062, Paper No. 55; IPR2022-00064, Paper No. 56, but the PTAB determined that Netlist had failed to demonstrate excusable neglect for missing the deadline.

### 2.     Netlist's Lawsuits Against Third Parties

53.     Netlist has also pursued a litigation campaign against other suppliers of JEDEC standard-compliant memory modules, component suppliers, and users of memory

modules. For instance, Netlist engaged in a years-long, multi-forum litigation campaign against SK hynix, a competitor of Samsung. Between 2016 and 2020, Netlist filed six patent infringement suits against SK hynix, the first two in the Central District of California. *See Netlist, Inc. v. SK hynix America Inc. et al.*, No. 8:16-cv-1605 (C.D. Cal. 2016); *Netlist, Inc. v. SK hynix, Inc. et al.*, No. 8:17-cv-1030 (C.D. Cal. 2017). Netlist also filed two complaints against SK hynix with the International Trade Commission. *See In re Certain Memory Modules and Components Thereof, and Products Containing the Same*, No. 337-TA-1023 (U.S.I.T.C. 2016); *In re Certain Memory Modules and Components Therefore*, No. 337-TA-1089 (U.S.I.T.C. 2017). Finally, Netlist filed two infringement suits against SK hynix in the Western District of Texas, *Netlist, Inc. v. SK hynix Inc. et al.*, No. 6:20-cv-194 (W.D. Tex. 2020); *Netlist, Inc. v. SK hynix America. et al.*, No. 6:20-cv-525 (W.D. Tex. 2020).

54.     In these suits, Netlist accused SK hynix RDIMM and LRDIMM memory modules of infringing certain Netlist patents—including the '218 and '595 patents—based on the practice of certain JEDEC memory standards.

55.     Netlist has also accused Google of infringing the '912 patent in connection with DDR4 LRDIMM and RDIMM products. *See Netlist, Inc. v. Google Inc.*, No. 3:09-cv-05718-RS (N.D. Cal.). Netlist seeks an injunction in that case, which would preclude Google from using the JEDEC-compliant LRDIMM and RDIMM memory modules supplied by SSI to Google. Netlist has seeks an injunction against Google in the Delaware -1453 Litigation. D.I. 127 at 11.

56.     Netlist has also asserted the '912 patent against Inphi, a chip supplier, based on the practice of certain JEDEC memory standards. *See Netlist, Inc. v. Inphi Corp.*, No. 2:09-cv-6900 (C.D. Cal. 2009).

57.     As noted above, Netlist has also recently asserted patents in multiple litigations in Texas against Micron, which is a competitor of Samsung with respect to at least certain of the memory products at issue. *See* Micron -430 Litigation; Micron -431 Litigation; Micron -203 Litigation; Micron -294 Litigation. In the Micron litigations, Netlist accuses the same type of memory modules at issue in this case implementing the same JEDEC standards.

### C.     Netlist Patents and Standard Essential Allegations

58.     As noted above, the '024 patent is a continuation patent of the '218 and '595 patents and all share a common specification. During prosecution, the examiner rejected the then-pending claims of the '024 patent for double patenting over the claims of the '595 and '218 patents, and Netlist filed a terminal disclaimer to overcome the rejection.  Netlist has asserted that the '218 and '595 patents are essential to one or more of (a) JEDEC standards JESD79-4C, JESD82-31, and JEDEC82-31A, ("the DDR4 Standards"), which were developed by the JEDEC JC-40 committee (JESD82-31), JC-40.4 committee (JESD82-31A), and JC-42.3C committee (JESD79-4C), and (b) JESD301.1, JESD82-511, and JESD79-5 ("the DDR5 Standards"), which were developed by the JEDEC JC-40.1 committee (JESD301.1), JC-40.4 committee (JESD82-511), and JC-42.3 committee (JESD79-5). Netlist has further asserted that the '218 and '595 patents are essential to one or more of the standards encompassed by JESD21-C (together with the DDR4 Standards and the DDR5 Standards, "the JEDEC Standards").

59.     In its October 15, 2020 "Notice of Infringement" letter, Netlist asserted that it owns "over 100 patents and patent applications related to memory technologies," including LRDIMM and RDIMM, and accused Samsung of infringing the '218 and '595 patents. Further, Netlist has contended in the Delaware -1453 Litigation that the '218 and '595 patents are essential to JEDEC DDR4 LRDIMM and RDIMM and DDR5 RDIMM standards, as Netlist's infringement contentions mapped various claim limitations to the JEDEC DDR4 and DDR5 Standards and

contended that the '218 and '595 patent would necessarily be infringed by any DDR4 LRDIMM or RDIMM or DDR5 RDIMM products "made, sold, offered for sale, imported and/or used by Samsung that are JEDEC-standard compliant memory modules." *Delaware -1453 Litigation*, D.I. 132-1 at 1.

60.     Netlist also contended that each of the patents asserted in previous litigation against SK hynix is essential to certain DDR4 Standards. *See Netlist, Inc. v. SK hynix Inc.*, No. 6:20-cv-00194 (W.D. Tex.), D.I. 1, ¶¶ 27, 37; *id.*, D.I. 1-5 ('218 Claim Chart for DDR4 LRDIMM); *id.*, D.I. 1-6 ('218 Claim Chart for DDR4 RDIMM); *id.*, D.I. 1-10 ('595 Claim Chart for DDR4 LRDIMM); *id.*, D.I. 1-11 ('595 Claim Chart for DDR4 RDIMM). In asserting the '218 and '595 patents against SK hynix, Netlist's complaint included claim charts for each patent, in which Netlist similarly mapped various claim limitations to the DDR4 Standards. *See id*.

61.     In the present action, Samsung seeks declarations that Samsung's LRDIMM and RDIMM memory modules that comply with the DDR4 Standards or any standard requiring materially similar functionality ("Samsung DDR4 Memory Modules"), and Samsung's RDIMM memory modules that comply with the DDR5 Standards or any standard requiring materially similar functionality ("Samsung DDR5 Memory Modules" and together with the Samsung DDR4 Memory Modules, the "Samsung Memory Modules"), do not infringe the '024 patent.

62.     If, as Netlist contends, the '024 patent is essential to any of the JEDEC Standards (which it is not), Netlist is obligated to license the patent on RAND terms. As discussed below, Netlist has failed to offer such a license to Samsung.

D.     **Overview of the '024 Patent**

63.     The '024 patent issued on July 12, 2022, from U.S. Appl. No. 16/680,060, which was filed on November 11, 2019. The '024 patent claims priority to a chain of continuation applications, including the applications leading to the issuance of the aforementioned '218 and

'595 patents. The first full patent application was U.S. Appl. No. 12/815,339, which was filed on June 14, 2010, and claimed priority to a provisional application that was filed on June 12, 2009.

64.     The '024 patent describes "a method of establishing a handshake mechanism based on notification signaling" that "can be implemented by adding a new interface (notifying) signal between the MCH [i.e., system memory controller] and the memory subsystem controller," Ex. 1 ('024 Patent) at 4:48–55, and this interface "can be an open drain signaling from the memory subsystem controller to the MCH." *Id*. at 4:55–59.

65.     According to the '024 patent, "there [was] no existing method of handshaking between the MCH (*e.g.*, system memory controller) and a memory subsystem (*e.g.*, memory module) during initialization." *Id*. at 3:40–43. And "in conventional systems, the system memory controller does not monitor the error-out signal from the memory subsystem." *Id*. at 3:43–46. The '024 patent states that "[i]n a typical server (e.g., an Intel or AMD or other chipset based server), the lack of any handshaking between the MCH and the memory subsystem during the server initialization period has not been a serious issue since the MCH generally has complete control over the initialization procedure." *Id*. at 3:46–51.

66.     Figure 1 shows a computer system including memory module 10, coupled to a memory controller 14 via "output 12," which is driven by notification circuit 20 of controller circuit 18.



Figure 1

*Id*. at 4:66–5:17, FIG. 1. Memory module 26 is also shown, and has essentially the same structure as module 10, having "output 24" driven by notification circuit 30 of controller circuit 28. *Id*. at 9:55–10:21.

67.    In one specific example of handshaking, the interface between the memory controller (MCH) and memory subsystem controller is implemented using a technique called open drain signaling. *Id*. at 4:55–59, 10:24–28, Figs. 2–3. Specifically, output 12 of module 10 and output 24 of module 26 are both tied to the same bus 32 using an open drain configured transistor. *Id*.

68.    In that configuration, when starting an initialization procedure, each memory module will drive the gate of the transistor of its open drain output high, placing a logic level low (low impedance) signal on bus 32. When the initialization is complete, the memory module can drive the gate of the transistor, placing a logic level high (high impedance) signal on bus 32. However, because all of the outputs of multiple memory modules are tied to the same bus 32 in an open drain configuration, the state of bus 32 will remain logic level low (low impedance) until each memory module drives the gate of the transistor of its open drain output low, placing a logic level high (high impedance) on its output, which then allows "the bus 32 [to] be pulled high by the internal pull-up configuration 40 of the system memory controller 14." *Id*. at 10:57–61. In this manner, the system memory controller may be provided a notification signal, notifying that the module is currently executing or has completed initialization. *Id*. at 10:63–66.

69.    Netlist alleges that the Clock-to-CA training, as described in JESD82-31, practices one or more claims of the '218 and '595 patents, the parents to the '024 patent. Delaware -1453 Litigation, D.I. 40 ¶¶ 57, 59, 74–75, and 78 (Aug. 22, 22) (identifying Clock-to-CA training as one of the accused modes). According to the JEDEC standard, "[i]n Clock-to-CA training mode

the DDR4RCD01 ORs all enabled Dn inputs <u>every other cycle</u> together and loops back the result to the ALERT_n output pin." Ex. 2 (JESD82-31) at 44 (emphasis in original). "In this mode, the DPAR input is sampled at the same time as the other Dn inputs," and "[t]he ALERT_n latency relative to the DQn inputs is the same 3 cycles as in the normal parity mode." *Id.*

70.     As explained above, the '024 patent claims priority to the applications leading to the '595 and '218 patents.  Claim 1 of the '024, '595, and '218 patents are directed a "memory module operable with a memory controller of a host system."  All three patents include the same structural elements:  "a printed circuit board having edge connections that fit into a corresponding slot of the host system," "dynamic random access memory elements on the printed circuit board," and "a module controller on the printed circuit board" with "an open drain . . . coupled to the error edge connection."  In addition, the claims of all three patents require the module controller to use the open drain to indicate a "parity error" during a "normal memory read or write operation" or a signal "related to one or more training sequences" "when the memory module performs operations associated with one or more training sequences."

71.     Netlist filed U.S. Patent App. No. 17/840,593 as a continuation of the that resulted in the '024 patent. On August 30, 2023, the Patent Office issued a Notice of Allowance and Fees Due for the '593 application.  The allowed claim 1 contains the same structural elements as the '024 patent and include substantially the same operations.[1]

72.     For at least the reasons explained in Count I, the Samsung Memory Modules do not infringe the claims of the '024 patent.

---

[1]      Samsung intends to seek a declaration of non-infringement on the claims that issue from the '593 application, consistent with any decision the Ninth Circuit may issue in Samsung's appeal of the summary judgment ruling in the Breach Action.

### E.       Netlist Has Breached Contractual Obligations Owed to Samsung

#### 1.       JEDEC and Semiconductor Memory Standards

73.       JEDEC is an independent, non-profit semiconductor engineering trade association and standardization body based in the United States. Over 300 companies in the computer and electronics industries are currently members of JEDEC, including Samsung and Netlist.

74.       JEDEC has become the global leader in developing open standards and publications for a broad range of semiconductor technologies, including memory products. As relevant here, JEDEC develops standards for semiconductor memory chips and modules, including standards implemented by Samsung's products.

75.       JEDEC's semiconductor memory standards enable interoperability, *i.e.*, the ability of memory products made by different manufacturers to work together with computer and electronic devices made by others. JEDEC standards are widely implemented, and, for many types of semiconductor memory products, it is imperative that they comply with JEDEC standards in order to be commercially viable.

76.       Member companies participate in JEDEC's standard-setting process through over 50 committees and subcommittees that address various technological areas. Through a collaborative process, members contribute to and vote on technical proposals for incorporation into JEDEC standards. Upon committee and board approval, new standards are promulgated and made available to the public.

77.       In some cases, JEDEC members own patents covering the technology they or others seek to have included in a JEDEC standard. A patent that includes a claim or claims that would necessarily be infringed by the use, sale, offer for sale, or disposition of a portion of a

product in order to be compliant with an industry standard is referred to as a "standard essential patent" or an "SEP."

78.     Each owner of an SEP can, unless restrained, demand and obtain exorbitant royalties for the use of its patent, far in excess of the value, if any, that the patented technology would command had it not been incorporated into a standard. If unwilling to pay such excessive royalties, firms wishing to implement the standard face the risk of being foreclosed from using any portion of the standard, including unpatented and public domain technologies. This threat of foreclosure, if left unchecked, puts a manufacturer's investment in developing standard-compliant products at risk and, in effect, permits the possibility that the SEP holder may capture up to the value of the standard as a whole for each unique implementer, rather than the true value of its specific contribution to the standard, independent of the incorporation of the technology into the standard. The exploitation of SEPs to extract unreasonable or discriminatory royalties is referred to as patent "hold-up."

79.     The problem of "hold-up" is exacerbated in the context of standards, like those at issue here, as to which there are large numbers of SEPs and many different firms that claim to hold SEPs. The problem is likewise compounded when the products at issue, like those at issue here, may be required to implement multiple standards. The resulting problem of excessive aggregate royalties is referred to as "royalty stacking."

80.     In order to mitigate these risks, JEDEC—like many other standard-setting organizations—has adopted a Patent Policy that seeks to ensure that owners of SEPs license those patents to manufacturers of standard-compliant products on RAND terms and conditions. Every firm that is a member of a JEDEC committee or a participant in a JEDEC committee meeting, including Netlist, agrees to abide by the JEDEC Patent Policy.

> *All Committee Members, as a condition of committee membership or committee Participation, agree to abide by JEDEC rules and procedures, including this JEDEC patent policy ("Patent Policy").*

Ex. 3 (JEDEC Manual No. 21T) § 8.2.2.1.

81.    Pursuant to the JEDEC Patent Policy, as a condition of committee membership or participation, all JEDEC committee members agree to disclose "Potentially Essential Patents" relevant to the work of the committee:

> *All Committee Members must Disclose Potentially Essential Patents, known to their Representative(s) to be Potentially Essential Patents that are owned or controlled by that Committee Member . . . .*

*Id.* § 8.2.3.

82.    The requirement to disclose "Potentially Essential Patents" extends to disclosing pending patent applications. *Id.* § 8.2.1.

83.    JEDEC committee members also agree to license "Essential Patent Claims" on RAND terms and conditions:

> *All Committee Members, as a condition of committee membership or committee Participation, agree to Disclose Potentially Essential Patents, as set forth more fully in 8.2.3, and to offer to license their Essential Patent Claims to all Potential Licensees on RAND terms and conditions, if and as consistent with 8.2.3 and 8.2.4.*

*Id.* § 8.2.2.1.

84.    JEDEC committee members also agree to license on RAND terms any "Essential Patent Claims" included in their patent applications:

> For any Essential Patent Claims held or controlled by the entity, *pending[,] or anticipated to be filed*, which are or may be required to implement a Standard that may result from the JEDEC Standard Activity, the entity hereby makes one of the following commitments: . . . A license will be offered . . . under reasonable terms and conditions that are free of any unfair discrimination.

*Id.* § 8.2.5 (emphasis added).

85.     The JEDEC Patent Policy defines "Potentially Essential Patent" as a patent that is reasonably believed to contain one or more Essential Patent Claims. *Id*. § 8.2.1. "Essential Patent Claim" is further defined as those "Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard." *Id.*

86.     The JEDEC Patent Policy provides that the disclosure of Potentially Essential Patents "shall be made as early as reasonably possible" and documented by submission to JEDEC of either a "License Assurance/Disclosure Form" or a "Notice of Refusal." *Id*. § 8.2.3.

87.     A License Assurance/Disclosure Form (also known as a "Letter of Assurance" or "LOA") states that the committee member commits to license its SEPs to all potential licensees on RAND terms. On the contrary, a Notice of Refusal states that the member is not "willing to offer to license Essential Patent Claims . . . on RAND terms to all Potential Licensees." *Id*. § 8.2.3.1. In order to be effective, any such LOA or Notice of Refusal must be delivered to the JEDEC Legal Department within thirty (30) calendar days of a draft specification's completion. *Id.*

88.     Member companies who disclose and agree to license their patents on RAND terms do so via the aforementioned "LOA" identifying the relevant JEDEC standard(s) and making one of the two following commitments specified by the JEDEC Patent Policy:

> *For any Essential Patent Claims held or controlled by the entity, pending or anticipated to be filed, which are or may be required to implement a Standard that may result from the JEDEC Standard Activity, the entity hereby makes one of the following commitments:*
>
> *(i)     A license will be offered, without compensation, under reasonable terms and conditions that are free of any unfair discrimination to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard, subject to the terms and conditions in 8.2.4; or*

> (ii)    *A license will be offered, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are free of any unfair discrimination, subject to the terms and conditions in 8.2.4.*

*Id*. § 8.2.5.

89.    According to JEDEC's Patent Policy, disclosures and commitments with respect to one patent are deemed to include all patents claiming priority to the same filing. *Id*. § 8.2.1. Committee members are therefore obligated to license on RAND terms later-issuing SEPs that claim priority to patents disclosed to JEDEC.

90.    If a committee member who owns or controls patents essential (or potentially essential) to JEDEC standards does not disclose and agree to license them before the ballot closes, or notify the committee of an intention not to license through a "Notice of Refusal," the committee member will be deemed to have agreed to offer licenses on RAND terms:

> *If a Committee Member, at its discretion, elects not to submit a License Assurance/Disclosure Form (see Annex A.3) at or before the time the ballot closes and does not otherwise provide notice of an unwillingness to license in accordance with 8.2.3.1, the Committee Member and its Affiliates will be deemed to have agreed to offer to grant licenses on RAND terms and conditions for all of its Essential Patent Claims of the balloted Standard, if and as consistent with 8.2.4.*

*Id*. § 8.2.5.

91.    The JEDEC Patent Policy provides that it is to be interpreted and governed under the laws of the State of New York. *Id*. § 8.2.10. Although the JEDEC Manual 21 has been updated and amended from time to time, upon information and belief, all of the relevant provisions of the JEDEC Patent Policy have been materially the same at all times relevant hereto.

## 2.     Netlist's RAND Commitments

92.     Netlist alleges that it owns over 100 patents and patent applications related to memory technologies.

93.     Netlist is also a member of JEDEC and has joined a number of JEDEC technical committees over time. After years of membership in JEDEC, Netlist withdrew from membership in JEDEC briefly in 2011 after submitting Notices of Refusal for a number of Netlist patents. JEDEC reinstated Netlist later in 2011 following Netlist's submission of LOAs for the same patents Netlist had previously refused to license on RAND terms.

94.     Netlist again withdrew from membership in JEDEC committees JC-40, JC-42, and JC-45 in 2015, after submitting notices of refusal for many of its patents. In May 2018, Netlist requested from the JEDEC board of directors that Netlist be reinstated in those committees. The JEDEC board of directors approved the request on the condition that Netlist would agree to be bound by the JEDEC Patent Policy regarding work conducted in JC-40, JC-42, and JC-45 during the time Netlist had not participated in the committees, since and including February 27, 2015. Netlist agreed in writing to the JEDEC board of directors' terms, and JEDEC reinstated Netlist on August 14, 2018, retroactive to February 27, 2015.

95.     Upon information and belief, therefore, at the time that the JEDEC Standards were drafted and approved by JEDEC, Netlist was a member, attended the meetings, and/or was deemed a member of the JC-40, JC-42, and JC-45 committees that developed those standards.

96.     To date, and on information and belief, Netlist has disclosed that at least 42 of its patents are essential or potentially essential to JEDEC standards.

97.     Netlist is obligated to license the '024 patent on RAND terms to implementers of certain DDR4 and DDR5 Standards, to the extent the patent is essential to those

standards. In fact, Netlist committed to license the '024 patent on RAND terms to implementers of certain DDR4 Standards. Upon information and belief, Netlist submitted a Letter of Assurance for U.S. Patent No. 8,489,837 (the "'837 patent") on April 7, 2016, related to JEDEC committee JC-40 and DDR4 LRDIMM and RDIMM components. Ex. 4 ('837 LOA). The '024 patent is a continuation of the '837 patent. Therefore, under the JEDEC Patent Policy, the commitments in the '837 Letter of Assurance extend to the '024 patent. Ex. 3 (JEDEC Manual No. 21T) § 8.2.1.

98.     The commitments that Netlist has made to license its SEPs on RAND terms constitute binding contractual obligations that may be enforced by firms seeking to implement the JEDEC standards, such as Samsung.

### 3.     Netlist's Failure to Comply with Its RAND Obligations

99.     Although Netlist accepted the benefits of its membership in JEDEC in order to induce JEDEC to incorporate technologies over which Netlist claims to have patents into JEDEC standards, Netlist has failed to fulfill its corresponding contractual commitments. Despite voluntarily undertaking the obligation to license its alleged SEPs on RAND terms, Netlist has made licensing demands of Samsung that violate its RAND commitment.

100.    For instance, by email dated February 2, 2021, Netlist demanded that Samsung enter a second license to patents that Samsung previously licensed from Netlist, coupled with a demand to "be made whole" for any alleged breach under the Agreement. Specifically, Netlist stated that "Samsung will require a new license to our patent portfolio" and requested "[d]amages that Netlist has incurred as a result of Samsung's material decrease of product supply to Netlist following Q1 2017 and how Netlist might be made whole."

101.    Further, Netlist has brought counterclaims against Google in Delaware based on Google's use of Samsung DDR4 Memory Modules. Netlist has also stated that it seeks an injunction against Google for infringement of the '218 and '595 patents in the Delaware -1453

Litigation. *See* D.I. 127 at 11. Such an injunction request violates Netlist's commitment to license its alleged SEPs on RAND terms and conditions.

102. Accordingly, and as discussed elsewhere herein, Netlist has breached its obligations under the JEDEC Patent Policy.

## <u>COUNT I</u>
### (Declaration of Non-Infringement of the '024 Patent)

103. Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

104. The Patent Office issued the '024 patent, titled "Memory Module Having an Open-Drain Output for Parity Error and for Training Sequences," on July 12, 2022. On information and belief, Netlist claims to own all rights, title, and interest in the '024 patent. A true and correct copy of the '024 patent is attached hereto as Exhibit 1.

105. The '024 patent has three independent claims: 1, 10, and 19. For example, claim 1 reads as follows:

| Element | Claim Language |
| --- | --- |
| preamble | A memory module operable with a memory controller of a host system, comprising: |
| (a) | a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections, second edge connections, and an error edge connection in addition to the first edge connections and the second edge connections; |
| (b) | a module controller on the printed circuit board and configured to receive address and control signals associated with normal memory read or write operations via the first edge connections; and |
| (c) | dynamic random access memory elements on the printed circuit board and configured to communicate data signals with the memory controller via the second edge connections in accordance with the address and control signals; and |

| Element | Claim Language |
|---------|----------------|
| (d) | wherein the module controller includes a transistor having an open drain coupled to the error edge connection, a source coupled to ground, and a gate; |
| (e) | wherein the module controller is configured to apply a first signal to the gate of the transistor to indicate a parity error having occurred when the memory module is being accessed for a normal memory read or write operation; and |
| (f) | wherein the module controller is further configured to apply a second signal related to one or more training sequences to the gate of the transistor when the memory module performs operations associated with the one or more training sequences and when the dynamic random access memory elements are not accessed for any normal memory read or write operations. |

106. Samsung has not directly or indirectly infringed any claim of the '024 patent, either literally or under the doctrine of equivalents, at least because the Samsung Memory Modules do not employ, incorporate, or otherwise make use of all of the limitations of the claims of the '024 patent.

107. For example, claims 1, 10, and 19 require a "corresponding slot of the host system." Samsung Memory Modules do not include the required "host system" or its "corresponding slot." Thus, the accused Samsung Memory Modules do not meet the limitations of at least claims 1–20.

108. As another example, claim 1 requires "wherein the module controller is further configured to apply a second signal related to one or more training sequences to the gate of the transistor when the memory module performs operations associated with the one or more training sequences." Similarly, claim 10 requires "applying a second signal related to the one or more training sequences to the gate of the transistor while the memory module performs the training operations." Claim 19 requires "wherein the module controller is further configured to apply a second signal related to one or more training sequences to the gate of the transistor when the memory module performs operations associated with the one or more training sequences." To

the extent Netlist argues that the signal on the ALERT_n output pin meets these limitations during Clock-to-CA training, there is no "second signal related to the one or more training sequences" as required by the claims. In addition, the ALERT_n output is polled by the system memory controller during Clock-to-CA training. Thus, the accused signal on the ALERT_n output pin does not satisfy the requirements of claims 1–20.

109.    The Samsung Memory Modules do not infringe any of claims 2–9, 11–18, and 20 at least because these claims depend directly or indirectly from claims 1, 10, or 19.

110.    Samsung, its customers, and its end users are not liable for infringement of the '024 patent for any Samsung Memory Modules made, imported, or sold under license from Netlist.

111.    A substantial, immediate, and real controversy exists between Samsung and Netlist regarding whether Samsung or its customers or end users infringe the '024 patent by making, using, selling, and/or offering for sale the Samsung Memory Modules in the United States, or by importing the Samsung Memory Modules into the United States. A judicial declaration is necessary to determine the parties' respective rights regarding the '024 patent.

112.    Samsung seeks a judgment declaring that Samsung and its customers and end users do not infringe the '024 patent, either literally or under the doctrine of equivalents, by making, using, selling, and/or offering for sale the Samsung Memory Modules in the United States, or by importing the Samsung Memory Modules into the United States, either directly under 35 U.S.C. § 271(a) or indirectly under 35 U.S.C. § 271(b)–(c).

**COUNT II**
**(Breach of Contract)**

113.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

29

114.     Under the JEDEC Patent Policy, Netlist has a contractual commitment to offer implementers of the JEDEC Standards, including Samsung, licenses to any Essential Patent Claims (as defined in the JEDEC Patent Policy) on RAND terms and conditions. This contractual commitment is on-going. Netlist continues to have an obligation to license its SEPs to Samsung on RAND terms, notwithstanding any breach of the Agreement or any termination of the license contained therein. Having entered the Agreement, Samsung showed that it is a willing licensee.

115.     Netlist submitted Letters of Assurance to the JC-40, JC-42, and JC-45 committees in which Netlist promised to make available to implementers of the DDR4 Standards a license to the '837 patent "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." Ex. 4 ('837 LOA). Under the JEDEC Patent Policy, those commitments extend to the '024 patent, to the extent it is essential to the DDR4 Standards.

116.     The JEDEC Patent Policy and/or Letters of Assurance constitute a valid and binding contract between Netlist and JEDEC.

117.     Samsung is a third-party beneficiary to the JEDEC Patent Policy and/or Letters of Assurance, and to Netlist's RAND obligations thereunder. Participation in JEDEC committees and the standard-setting process is expressly conditioned on a commitment to license essential patents to third-party implementers on RAND terms. Ex. 3 (JEDEC Manual No. 21T) § 8.2.2.1. The JEDEC Patent Policy is therefore intended to benefit third-party implementers of JEDEC standards, such as Samsung, and the obligations under the JEDEC Patent Policy, including the RAND obligations, are intended to be enforceable by third-party implementers of the JEDEC standards. Third-party implementers, such as Samsung, are also the only parties who could recover for Netlist's breach of its obligations under the JEDEC Patent Policy.

118.    Samsung has relied on the JEDEC Patent Policy and/or Letters of Assurance, including the RAND obligations set forth therein, in designing, manufacturing, and selling standard-compliant products, including the Samsung Memory Modules, and Samsung has supported the JEDEC standard based on its understanding and expectation that JEDEC members, including Netlist, will abide by their obligations.

119.    In ongoing litigation, Netlist and Samsung dispute whether Samsung has a license to Netlist's patents, including the '024 patent, under the Agreement. Netlist has taken the position that Samsung's license under the Agreement has been terminated, while Samsung maintains that the termination was not effective and that it has a license to the '024 patent. In any event, Netlist has failed to offer Samsung a license to patents that Netlist alleges are essential to the JEDEC Standards, including the '024 patent, on RAND terms and conditions. To the extent the '024 patent is essential to any of the JEDEC Standards (which Samsung submits they are not), Netlist has breached its contractual obligations to license such patent to Samsung on RAND terms and conditions.

120.    As a result of Netlist's breaches of contract, Samsung has been injured in its business or property because it has been denied access to a license to Netlist's claimed SEP on RAND terms, a license that can only be obtained from Netlist. Netlist's conduct threatens Samsung with imminent loss of customers and potential customers, loss of goodwill and product image, loss of sales, litigation costs, uncertainty in business planning, and uncertainty among customers and potential customers.

## **JURY DEMAND**

Samsung demands a jury trial on all issues and claims so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Samsung prays for judgment and relief as follows:

(a)    Declare that Samsung does not directly or indirectly infringe the '024 patent, either literally or under the doctrine of equivalents, and that it is not liable for damages or injunctive relief based on any claim in the '024 patent;

(b)    Declare that Netlist is liable for breach of contract;

(c)    Grant injunctive relief requiring Netlist to offer a license to the '024 patent—to the extent it is found to be essential to the JEDEC standards—on reasonable terms and conditions that are demonstrably free from any unfair discrimination;

(d)    Enjoin Netlist from further demanding excessive, non-RAND royalties from Samsung for alleged infringement of the '024 patent;

(e)    Declare that Netlist is barred from seeking and/or enforcing injunctive relief against Samsung (including its affiliates) or its direct or indirect customers and end-users in any jurisdiction with respect to any alleged infringement of the '024 patent;

(f)    Enjoin Netlist from seeking and/or enforcing injunctive relief against Samsung (including its affiliates) or its direct or indirect customers and end users in any jurisdiction with respect to any alleged infringement of the '024 patent;

(g)    Compensate Samsung for all damages caused by Netlist's breaches of contract, including breaches of its RAND obligations;

(h)    Declare that judgment be entered in favor of Samsung and against Netlist on each of Samsung's claims;

(i)      Find that this is an exceptional case under 35 U.S.C. § 285;

(j)      Award Samsung pre-judgment and post-judgment interest;

(k)      Award Samsung its costs and attorneys' fees in connection with this action;

         and

(l)      Such further and additional relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Brian Nester
Peter Swanson
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
(202) 662-6000

Alice J. Ahn
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA  94105-2533
(415) 591-6000

October 9, 2023