IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG SEMICONDUCTOR, INC. and SAMSUNG ELECTRONICS AMERICA, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | **Redacted - Public Version** |
| v. | ) ) ) | C.A. No. 23-1122-RGA |
| NETLIST, INC., | ) ) ) | ███████████████ |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF NETLIST, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**

Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Netlist, Inc.*

OF COUNSEL:
Jason Sheasby
H. Annita Zhong
Andrew J. Strabone
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Dated: November 6, 2023

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..........................................................................................................1

STAGE AND NATURE OF PROCEEDINGS ...........................................................1

SUMMARY OF ARGUMENT ....................................................................................4

STATEMENT OF FACTS AND ARGUMENT .........................................................5

    I.   COUNT 1 SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER
        JURISDICTION ...............................................................................................5

        A.  This Court Does Not Have Subject Matter Jurisdiction Because There Is
            No Case or Controversy of Sufficient Immediacy Related to the '024
            patent ...........................................................................................................5

            1.   Samsung Has Not Alleged Any Words or Actions By Netlist Demonstrating
                Sufficient Immediacy .........................................................................6

            2.   The Parties' Litigation History Demonstrates There is No Immediacy ...........9

            3.   Netlist's Litigation History With Other Parties Does Not Establish An
                Immediate Case or Controvery .........................................................11

         B.  Alternatively, this Court Should Exercise Its Discretion and Decline to Exercise
            Jurisdiction over Samsung's Count 1 ....................................................12

    II.  SAMSUNG'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED .....14

        A.  This Court Does Not Have Jurisdiction Over Samsung's State Law Breach of
            Contract Claims .........................................................................................14

        B.  Samsung's Breach Of Contract Claim Must Be Dismissed Under 12(b)(6) ..........15

    III. CONCLUSION.......................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Atlas Global Techs. LLC v. TP-Link Techs. Co.*,
  2023 U.S. Dist. LEXIS 145331 (E.D. Tex. July 28, 2023) ...................................... 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................

*Bendix Comm. Vehicle, Sys. LLC v. Haldex Brake Prods. Corp.*,
  2010 WL 3221972 (N.D. Oh. Aug. 13, 2010) ......................................................... 11

*Benitec Austl., Ltd. v. Nucleonics, Inc.*,
  495 F.3d 1340 (Fed. Cir. 2007) ................................................................................... 5

*Bon-Aire Industries, Inc. v. Viatek Consumer Products Group, Inc.*,
  2014 U.S. Dist. LEXIS 66445 (D. Idaho 2014) ........................................................ 8

*Cat Tech LLC v. TubeMaster, Inc.*,
  528 F.3d 871 (Fed. Cir. 2008) ................................................................................... 12

*Citizen Elecs. Co. v. Osram GmbH*,
  377 F. Supp. 2d 149 (D.D.C. 2005) ............................................................................ 7

*Edmunds Holding Co. v. Autobytel Inc.*,
  598 F. Supp. 2d 606 (D. Del. 2009) ........................................................................... 7

*Fowler v. UPMC Shadyside*,
  578 F.3d 203, 210–11 (3d Cir. 2009) ....................................................................... 18

*Hewlett–Packard Co. v. Acceleron LLC*,
  587 F.3d 1358 (Fed. Cir. 2009) ................................................................................... 6

*In re Trusteeships Created by Tropic CDO I Ltd.*,
  92 F. Supp. 3d 163 (S.D.N.Y. 2015) ......................................................................... 15

*Lincoln Ben. Life Co. v. AEI Life, LLC*,
  800 F.3d 99 (3d Cir. 2015) ........................................................................................ 14

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) .................................................................................................... 5

*Microsoft Corp. v. DataTern, Inc.*,
  755 F.3d 899 (Fed. Cir. 2014) ................................................................................... 10

**Page(s)**

*Microsoft Corp. v. SynKloud Techs., LLC*,
484 F. Supp. 3d 171 ................................................................ 11

*Mylan Pharms. Inc v. Merck & Co.*,
2005 U.S. Dist. LEXIS 29160 (M.D. Pa. Oct. 28, 2005)............................................ 9

*Netlist Inc. v. Inphi Corp.*,
No. 9-cv-6900, D.I. 15 (C.D. Cal. Dec. 23, 2009)..................................... 12

*Netlist Inc. v. Samsung Elecs. Co., Ltd.*,
8:20-cv-00993-MCS-ADS, D.I. 186 (C.D. Cal. Oct. 14, 2021) ................................ 2

*Netlist v. Samsung Elecs. Co., Ltd.*,
No. 2:22-cv-00294-JRG, D.I. 187 (E.D. Tex. Oct. 23, 2023) ................................... 3

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016)................................................................ 16

*Panavise Prod., Inc., v. Nat'l Prod., Inc.*,
306 F. App'x 570 (Fed. Cir. 2009) .......................................................... 10

*Prasco, LLC v. Medicis Pharm. Corp.*,
537 F.3d 1329 (Fed. Cir. 2008)............................................................... 5

*Reifer v. Westport Ins. Corp.*,
751 F.3d 129 (3d Cir. 2014)................................................................ 14

*Ricatto v. M3 Innovations Unlimited, Inc.*,
2019 U.S. Dist. LEXIS 210777 (S.D.N.Y. Dec. 6, 2019) ........................................ 15

*Salmon Spawning & Recovery All. V. U.S. Customs & Border Prot.*,
550 F.3d 1121 (Fed. Cir. 2008)............................................................... 15

*Samsung Elecs. Co., Ltd. v. Netlist, Inc.*,
No. 21-1453-RGA-JLH (D.

*SanDisk Corp. v. STMicroelectronics, Inc.*,
480 F.3d 1372 (Fed. Cir. 2007)................................................................ 5

*Unisense Fertilitech A/S v. Auxogyn, Inc.*,
896 F. Supp. 2d 822 (N.D. Cal. 2012) ........................................................ 5

*W.L. Gore & Assocs., Inc. v. AGA Med. Corp.* is instructive.
2012 U.S. Dist. LEXIS 36640 (D. Del. Mar. 19, 2012). ............................................ 7

**Page(s)**

*Wm. Wrigley Jr. Co v. Cadbury Adams USA, LLC,*
　　2004 U.S. Dist. LEXIS 23461(N.D. Ill. Nov. 17, 2004)................................................. 9

**<u>Statutes</u>**

28 U.S.C. § 1332............................................................................................................... 14

28 U.S.C. § 1367(a) .......................................................................................................... 15

## INTRODUCTION

Samsung's declaratory judgment claim should be dismissed because its Complaint fails to allege a case or controversy with sufficient immediacy concerning the '024 patent. Samsung does not, and cannot, allege that Netlist has taken any affirmative action giving rise to an immediate case or controversy concerning this Patent. Samsung bases its claim almost entirely on a separate declaratory judgment action it brought over a year ago concerning two patents related to the '024 patent, notwithstanding that (1) these patents are no longer at issue in that case; (2) the '024 patent had issued by the time Netlist asserted its counterclaims in that action and neither Samsung nor Netlist sought to add it to the case; and (3) Samsung now seeks an indefinite stay of that action and all other patent litigation between the parties. Samsung's efforts to delay the resolution of all patent litigation between the parties, including its own declaratory judgment action, belie any suggestion that it believes there is an immediate and concrete dispute between the parties requiring timely judicial resolution. Thus, this claim should be dismissed for lack of subject matter jurisdiction, and if not, the Court should exercise its discretion to decline to hear this case.

Samsung's state law breach of contract claim should also be dismissed based on this Court's dismissal of the declaratory judgment claim, without which there is no diversity jurisdiction. Additionally, and independently, the Court should dismiss this claim for failure to satisfy the pleading standard of Rule 12(b)(6). Samsung's breach of contract claim fails because its complaint does not allege any facts showing that Netlist breached any contractual obligations under the JEDEC Patent Policy and because its interpretation of this contract is likewise not supported by fact.

## STAGE AND NATURE OF PROCEEDINGS

Netlist and Samsung were parties to a Joint Development License Agreement ("JDLA"). The JDLA involved access to Netlist's newly developed product designs, as well as a long-term

product-supply commitment and payment from Samsung. According to Samsung, the JDLA granted Samsung certain rights to Netlist patents. D.I. 1, ¶¶ 2, 27–29. On October 14, 2021, Judge Scarsi in the Central District of California entered a summary judgment order finding that Netlist properly terminated the JDLA after Samsung materially breached § 6.2 of the Agreement. Ex. 1, *Netlist Inc. v. Samsung Elecs. Co., Ltd.*, 8:20-cv-00993-MCS-ADS, D.I. 186 at 20–21 (C.D. Cal. Oct. 14, 2021). The next day, Samsung filed a declaratory judgment action in this district seeking a declaration of non-infringement for four Netlist patents: United States Patent Nos. 10,217,523 ("'523 patent"), 10,474,595 ("'595 patent"), 9,858,218 ("'218 patent"), and 7,619,912 ("'912 patent"). *Samsung Elecs. Co., Ltd. v. Netlist, Inc.*, No. 21-1453-RGA-JLH (D. Del.) ("*Delaware I*"). As part of this action, Samsung also brought a claim, as it does here, that Netlist had breached a contractual obligation to license the asserted patents on RAND terms. *Delaware I*, D.I. 1, ¶ 313.

On December 20, Netlist moved to dismiss Samsung's declaratory judgment claims in *Delaware I*, arguing that no case or controversy existed because there was no imminent threat of Netlist filing suit against Samsung on the '218 and '595 patents. *Delaware I*, D.I. 11 at 3–4. On January 18, 2022, Samsung amended its complaint, *Delaware I,* D.I. 14. On January 25, 2022, Samsung moved for leave to file a Second Amended Complaint, which Netlist opposed. *Delaware I*, D.I. 18, 21. Netlist then moved to dismiss Samsung's First Amended Complaint on February 16, 2022. *Delaware I*, D.I. 24.

The '024 patent issued on July 12, 2022. On August 1, 2022, the Court in *Delaware I* denied in part and granted in part Netlist's motion to dismiss Samsung's declaratory judgment claims and denied Samsung's Motion for Leave to File a Second Amended Complaint. *Delaware I*, D.I. 37 at 2. On August 22, 2022, over a month after the '024 patent issued, Netlist filed its Answer and brought counterclaims alleging that Samsung infringed the '218 and '595 patents by

making, using, selling, offering to sell, and/or importing DDR4 LRDIMM and DDR4 RDIMM products. *Delaware I,* D.I. 40, ¶ 30 (page 37). Netlist could have, but did not assert the '024 patent, nor did Netlist accuse any Samsung DDR5 products of infringing the patents asserted in that case. Netlist filed its First Amended Answer and Counterclaims on September 12, 2022. *Delaware I,* D.I. 45. It did not assert the '024 patent or accused any Samsung DDR5 products of infringement. Netlist filed its Second Amended Answer and Counterclaims on November 1, 2022. *Delaware I,* D.I. 58. It did not assert the '024 patent or accused any Samsung DDR5 products of infringement.

In May, 2023, the PTAB found all claims of the '218 and '595 patents unpatentable. Ex. 2, IPR2022-00062, Paper No. 54; Ex. 3, IPR2022-00064, Paper No. 54. The PTAB found Samsung had not demonstrated that any of the claims of the '523 Patent were unpatentable. Ex. 4, IPR2022-0063, Paper No. 53. Samsung moved to stay its own declaratory judgment action on *all* of the patents based on these decisions on June 1, 2023. *Delaware I*, D.I. 115. Netlist informed Samsung of its intent to drop its claims as to the '218 and '595 patents on October 2, 2023. D.I. 1, ¶ 16. At no point did Netlist communicate any belief that Samsung infringed the '024 patent, as it had done with the '218 and '595 patents, and every other patent that it has asserted against Samsung. D.I. 1, ¶¶ 13, 36.

On October 17, 2023, the Ninth Circuit remanded the Central District action for further consideration of whether there is a genuine issue of material fact as to whether Samsung materially breached § 6.2 of the JDLA. Ex. 5 (Dkt. 77-1 at 5). Since this decision, Samsung has moved to stay all pending patent litigation between the parties except this case. *Delaware I*, D.I. 203 at 2 ("It would be inefficient and a waste of party and judicial resources to continue to litigate this case unless and until Netlist prevails in the License Action"); Ex. 6, *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-00294-JRG, D.I. 187 at 1 (E.D. Tex. Oct. 23, 2023) ("*EDTX II*") (same).

Samsung's motions to delay the resolution of patent disputes between the parties sharply contrasts with its suggestion that there is an "immediate" case or controversy between the parties concerning the '024 patent.

Accordingly, Netlist seeks to dismiss the Complaint for lack of subject matter jurisdiction based on a lack of any sufficiently concrete or imminent case or controversy. For these reasons and reasons further explained below, Netlist's motion should be granted.

## SUMMARY OF ARGUMENT

1.  This Court lacks subject matter jurisdiction over this case because Samsung's Complaint does not demonstrate a case or controversy with sufficient immediacy between Netlist and Samsung. Netlist has never accused Samsung or any party of infringing the '024 patent. Netlist and Samsung each had an opportunity to bring claims related to the '024 patent in the prior ongoing case in this District (*Delaware I*) and chose not to do so. Samsung's motion to stay its other declaratory judgment action in this district based on the recent Ninth Circuit decision demonstrates that this Action is not intended to provide Samsung with streamlined resolution of any contested rights (of which there are none).

2.  Samsung's breach of contract claim should be dismissed because this Court has no diversity or supplemental jurisdiction. Additionally, this claim should be dismissed under Rule 12(b)(6) because Samsung has failed to plead the elements of a breach of contract claim. Samsung's claim is based on a contractual obligation arising as to standard essential patents. Samsung's complaint states that the patent-at-issue is ***not*** standard essential.  D.I. 1, ¶ 119.  Thus, there cannot be a contractual obligation to license the patent-at-issue on RAND terms. Samsung also does not plead any sufficiently plausible facts demonstrating that Netlist has ever contended the '024 patent is standard essential (and Netlist has not ever done so). Additionally, Samsung's claim is based on a misinterpretation of the JEDEC Patent Policy. Thus, Samsung

has not pled that a contract exists with respect to the '024 patent, nor that Netlist has breached it.

3.  Alternatively, this case should be dismissed by discretion.

## STATEMENT OF FACTS AND ARGUMENT

### I.   COUNT 1 SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

#### A.   This Court Does Not Have Subject Matter Jurisdiction Because There Is No Case or Controversy of Sufficient Immediacy Related to the '024 patent.

To establish declaratory judgment jurisdiction, Samsung has the burden to prove the existence of a case or controversy based on a real and immediate injury or threat of future injury caused by Netlist. *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1339 (Fed. Cir. 2008); *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1343 (Fed. Cir. 2007).

In the patent-infringement context, an actual controversy exists "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007). In other words, the Declaratory Judgment Act gives a potential infringer the right to seek "a declaration of its actively contested legal rights" to make, use or sell a product rather than "bet the farm, or . . . risk treble damages and the loss . . . of business." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 13 (2007). Courts have found that, where there is no allegation that a product infringes a patent, there is no "case or controversy" for patent infringement. *Unisense Fertilitech A/S v. Auxogyn, Inc.*, 896 F. Supp. 2d 822, 830 (N.D. Cal. 2012) (dismissing declaratory relief action based on lack of jurisdiction).

1.      **Samsung Has Not Alleged Any Words or Actions By Netlist Demonstrating Sufficient Immediacy**

"The test [for declaratory judgment jurisdiction in patent cases], however stated, is *objective* . . . . Indeed, it is the objective **words and actions** of the patentee that are controlling. Thus, conduct that can be reasonably inferred as demonstrating intent to enforce a patent can create declaratory judgment jurisdiction." *Hewlett–Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009) (alteration, omission, and first emphasis in original) (second emphasis added) (quotations omitted) . Samsung's complaint provides no evidence or even allegations of any words or actions by Netlist from which a reasonable inference can be drawn that it intends to enforce the '024 patent against Samsung.

Samsung has not pointed to any occasion on which Netlist or its counsel ever asserted that any Samsung product infringes the '024 patent. Unlike in *Delaware I*, Samsung has not alleged that Netlist ever sent Samsung a letter accusing it of infringing the '024 patent, nor that Netlist has sent such letter or otherwise pursued enforcement of this patent against any Samsung customer or competitor. *Cf.* D.I. 1, ¶ 13 ("Netlist issued a 'Notice of Infringement' letter to Samsung, in which Netlist asserted that certain Samsung memory modules infringe, among others, [the '218 patent] and [the '595 patent]."); *id.*, ¶ 20 ("Netlist previously asserted the '218 and '595 patents in litigation against a competitor of Samsung, SK hynix, alleging that the same type of memory modules at issue in the Delaware -1453 Litigation . . . ."). Samsung has failed to plead any facts supporting this crucial element of jurisdiction because they do not exist—Netlist has never made any such statement nor taken any action suggesting it intended to enforce the '024 patent against anyone. Thus, this is not a case where there are "actively contested rights" associated with Samsung's LRDIMM and/or RDIMM products. Nor is this a case where Netlist has affirmatively "asserted rights" with respect to the '024 patent.

Samsung's only basis for a case or controversy with respect to the '024 patent is that it is related to the '218 and '595 patents, which **Samsung** brought a Declaratory Judgment Action on previously. But the '024 patent issued before Netlist filed its Answer to Samsung's Complaint in *Delaware I*. Samsung did not seek to amend its Complaint to add the '024 patent to its case in *Delaware I* when it issued. While Netlist brought compulsory counterclaims of infringement for each patent in that action, it likewise did not choose to assert the '024 patent. If Samsung really felt there was a "substantial, immediate, and real controversy" between Samsung and Netlist with respect to the '024 patent, and that "[a] judicial declaration is necessary to determine the parties' respective rights," it is unclear why they did not seek to add this claim to the *Delaware I* action at any point. If Samsung wanted resolution as to this patent, it could have raised this issue previously. This fact evidences Samsung's strategic decision to bombard Netlist with a Declaratory Judgment action on a patent Netlist evinced no intent to assert, which "cuts against [Samsung's] argument that its alleged controversy with [Netlist] is sufficiently immediate as to require adjudication now." *Edmunds Holding Co. v. Autobytel Inc.*, 598 F. Supp. 2d 606, 610–11 (D. Del. 2009) (dismissing declaratory judgment because circumstances allegedly supporting plaintiff's declaratory judgment complaint had been in existence but plaintiff delayed in bringing suit). Samsung's deliberate "failure to take prompt action in the face of what it claims to be a real threat of an infringement suit" makes clear there is no substantial controversy of sufficient immediacy. *Id.* at 611 (quoting *Citizen Elecs. Co. v. Osram GmbH*, 377 F. Supp. 2d 149, 157 (D.D.C. 2005)).

The Court's reasoning in *W.L. Gore & Assocs., Inc. v. AGA Med. Corp.* is instructive. 2012 U.S. Dist. LEXIS 36640 (D. Del. Mar. 19, 2012). There, the Declaratory Judgment plaintiff argued that there was a sufficient controversy as to one of the asserted patents because the patentee had asserted claims of a patent "relate[d] to similar technology" against the plaintiff in another action.

*Id.* at *17. The plaintiff also argued that because the patentee marked its own products with both patents, "[plaintiff] believes that [defendant] would likely include both patents in future infringement litigation." *Id.* The Court dismissed the declaratory judgment claims with respect to this patent, concluding that litigation over a related patent was "insufficient to create subject matter jurisdiction over the '552 Patent because '[t]he [mere] existence of a patent is not sufficient to establish declaratory judgment jurisdiction.' . . . and Plaintiff's subjective belief, absent any action taken by Defendant, is insufficient to generate a substantial controversy." *Id.* at *17–18 (second alteration in original). As in *Gore*, "[Netlist] has not asserted the ['024] Patent against [Samsung] in any action, nor threatened such action on the basis of the ['024] patent." *Id.* at *17; *see also Bon-Aire Industries, Inc. v. Viatek Consumer Products Group, Inc.*, 2014 U.S. Dist. LEXIS 66445, at *11–12 (D. Idaho 2014) (finding no declaratory judgment jurisdiction where patentee identified in its complaint that it had ten patents on the technology but had actually sued on only two patents, and thereafter the accused infringer filed declaratory judgment counterclaims on all ten patents).

In fact, Netlist's behavior indicates that if it was going to assert the '024 patent against Samsung, it would have provided Samsung with a notice of infringement and would have done so when it had the opportunity in *Delaware I*. For example, Netlist's Complaint in the *EDTX I* Action stated that Netlist intended to assert against Samsung a patent resulting from a then-pending patent application once it issued from the Patent Office. *See* Ex. 8, *Netlist, Inc. Samsung Elecs. Co. Ltd. Et al.,* No. 2:21-cv-463-JRG (E.D. Tex.) ("*EDTX I*"), D.I. 1, ¶ 32. The application issued on January 25, 2022, and Netlist subsequently amended its complaint to include the newly issued patent. Ex. 9, *Netlist, Inc. Samsung Elecs. Co. Ltd. Et al.,* No. 2:21-cv-463-JRG (E.D. Tex.), D.I. 23, ¶ 3. Netlist's behavior demonstrates that if it planned to bring a claim of infringement with respect to a continuation of an asserted patent, it would have done so in that Action. There is no

reason Netlist would decline to include the '024 patent in its *Delaware I* counterclaims, risking a delay in the potential damages period, only to assert it now in a new action after its parent patents have been invalidated.

Additionally, Samsung requests a declaration that its DDR5 Memory Modules do not infringe the '024 patent, but provides no evidence that there is any case or controversy with respect to these products. Netlist has not ever asserted the '218 or '595 patent against DDR5 products. *See* D.I. 1 at ¶¶ 2, 14 (*Delaware I* allegations); *id.*, ¶¶ 53-54, 60 (SK Hynix allegations). Accordingly, even Samsung's empty statements that it anticipates litigation based on Netlist's previous assertions of these prior patents against Samsung do not support a case or controversy with respect to DDR5 products.

## 2. The Parties' Litigation History Demonstrates There Is No Immediacy

The fact that Netlist and Samsung have engaged in prior litigation (some of which has been initiated by Samsung) is also not sufficient evidence to establish a case or controversy. *Mylan Pharms. Inc v. Merck & Co.*, 2005 U.S. Dist. LEXIS 29160, at *16 (M.D. Pa. Oct. 28, 2005) (In determining whether an actual controversy exists in a suit seeking a declaration of patent non-infringement. "[A patent owner's] infringement litigation history is relevant but not dispositive. The determination of whether there is an actual controversy between the parties turns on the U.S. Const. Art. III mandate that the injury in fact be concrete, and actual or imminent, not conjectural or hypothetical."); *Wm. Wrigley Jr. Co v. Cadbury Adams USA, LLC*, 2004 U.S. Dist. LEXIS 23461, at *9(N.D. Ill. Nov. 17, 2004) ("[B]eing competitors and engaging in prior litigation, without more, does not establish the existence of a case or controversy.").

Samsung's Complaint lists the history between the parties, but provides no nexus between any prior action and an actual or imminent threat of litigation as to the '024 patent. D.I. 1, ¶¶ 14-

26. At most, Samsung claims the two actions Netlist filed against Samsung in E.D. Tex. over a year ago demonstrate the beginning of "a patent litigation campaign against Samsung." *Id.*, ¶ 17. This allegation is nothing more than rank speculation and conjecture; it does not establish a concrete, actual, and imminent controversy between the parties. *See Panavise Prod., Inc., v. Nat'l Prod., Inc.*, 306 F. App'x 570, 573 (Fed. Cir. 2009) (lawsuits filed more than one year prior to the declaratory judgment action are insufficient to support subject matter jurisdiction). Samsung's argument that Netlist's counterclaims in *Delaware I* establish an actual controversy has been rejected by the Federal Circuit. *See Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 906 (Fed. Cir. 2014) ("The district court reasoned that [patentee's] conditional counterclaims weighed in favor of jurisdiction because [patentee] was required to make them in compliance with Rule 11 of [FRCP]. This analysis is logically flawed because [patentee's] counterclaims were conditioned on the court's denying [patentee's] motion to dismiss, i.e., on the court's determining that there was a substantial controversy of sufficient immediacy and reality regarding Appellees' infringement.") Similarly, Netlist only asserted counterclaims in *Delaware I* after the Court denied its Motion to Dismiss.

In fact, Netlist's behavior in the other actions between the parties further demonstrates the **lack** of controversy concerning the '024 patent. As discussed above, *supra* at 9-10, Netlist's actions thus far throughout its litigation with Samsung and other parties demonstrate that if it planned to bring a claim of infringement with respect to a continuation of an asserted patent, it would have done so in one of those Actions. See *Datatern*, 755 F.3d at 907 (finding patentee's "litigation strategy" "cut[] against [defendant's] arguments that they might somehow be next . . ."). Netlist's pattern of behavior thus far also demonstrates that it would notice Samsung of its infringement of any patent it believed to be infringed before bringing suit. *See supra* at 3 (citing evidence showing

"[a]t no point did Netlist communicate any belief that Samsung infringed the '024 patent, as it had done with the '218 and '595 patents, and every other patent that it has asserted against Samsung."). Thus, "[e]ven with substantial litigation history between the parties, [Samsung] must prove an actual controversy exists regarding the non-asserted claims, which [it] has not done." *Bendix Comm. Vehicle, Sys. LLC v. Haldex Brake Prods. Corp.*, 2010 WL 3221972 (N.D. Oh. Aug. 13, 2010) (dismissing declaratory judgment claims).

Samsung's argument that Netlist's effort to appeal the PTAB's findings of invalidity of the '218 and '595 patents and its efforts to prosecute other patents in the family of the '024 patent somehow has to do with an intent to bring further action against Samsung is not based in reality. It is well established that "the existence of a patent is not sufficient to establish declaratory judgment jurisdiction." *Prasco*, 537 F.3d 1329, 1338.

### 3. Netlist's Litigation History With Other Parties Does Not Establish An Immediate Case Or Controversy

Samsung also alleges that Netlist has brought litigation on other patents against other parties. Netlist's general litigation history with other parties does not establish a case or controversy. Samsung does not allege that Netlist has ever asserted the '024 patent, nor that Netlist has ever claimed that the '024 patent is standard essential. Mere allegations of a "litigation campaign" do not confer jurisdiction. *Microsoft Corp. v. SynKloud Techs., LLC*, 484 F. Supp. 3d 171, 181–83 ("SynKloud's . . . litigation against Microsoft's competitors Adobe and Dropbox [for related patents] is insufficient to create jurisdiction in this case between Microsoft and SynKloud"). Furthermore, all of the actions Samsung identifies were brought by Netlist over a year ago. These actions thus do not support a finding that there is any immediate controversy Samsung is attempting to resolve. *See Panavise*, 306 F. App'x at 573 (lawsuits filed more than one year prior to the declaratory judgment action are insufficient to support subject matter jurisdiction).

Indeed, Netlist's most recent affirmative actions against Samsung and Micron were in August of 2022, and did not involve any patents Samsung contends are related to the '024 patent. Additionally, Netlist has never asserted the '218 or '595 patents against Micron.

Samsung's allegations regarding the *SK Hynix* litigations and *Inphi* litigation suffer from even more extreme defects. Netlist asserted the '523, '595, and '218 patents against SK Hynix on June 15, 2020 and March 17, 2020 respectively, in the Western District of Texas, where Samsung has its manufacturing facilities. D.I. at ¶ 53-4. It has now been nearly three years since these assertions; there is no connection between that action (which did not involve the '024) and any immediacy in connection with Samsung and the patent-in-suit. *See Panavise*, 306 F. App'x at 573; *supra* at 6. The same holds for the *Inphi* suit regarding the '912 patent, which was asserted 12 years ago in the Central District. *Netlist Inc. v. Inphi Corp.*, No. 9-cv-6900, D.I. 15 (C.D. Cal. Dec. 23, 2009) (attached as Ex. 10).

### B.    Alternatively, this Court Should Exercise Its Discretion and Decline to Exercise Jurisdiction over Samsung's Count 1.

"The Declaratory Judgment Act provides that a court '*may* declare the rights and other legal relations of any interested party,' 28 U.S.C. § 2201(a) (emphasis added), not that it *must* do so. This text has long been understood 'to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'" *MedImmune*, 549 U.S. at 136. Further, "[i]n deciding whether to entertain a declaratory judgment request, a court must determine whether resolving the case serves the objectives for which the Declaratory Judgment Act was created." *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 883 (Fed. Cir. 2008) (citations omitted). Samsung's Complaint does not demonstrate "that the level of conflict … is such that the Court can say the Counterclaims present the type of dilemma that the Declaratory Judgment Act was promulgated to ameliorate. … As it currently stands, the record here also does not show that [Samsung] will be

forced into choosing between engaging in illegal activities or abandoning that which [Samsung] argues it has a right to pursue absent a declaratory judgment." *Bon-Aire*, 2014 WL 1910000, *6 (dismissing case for lack of subject matter jurisdiction and also concluding that even if case or controversy did exist, Court would not exercise discretion because purpose of Act was not met). Samsung's behavior makes clear that this is not the kind of case the Declaratory Judgment Act was created to resolve.

This Court should exercise its discretion to dismiss this case because as discussed above, *supra* at 12, there is no sufficiently immediate case or controversy between the parties with respect to the '024 patent. Further, this Court should decline to exercise its jurisdiction over this action because Samsung has demonstrated that it does not genuinely believe "[a] judicial declaration is necessary to determine the parties' respective rights" or that any "immediate, and real controversy" exists. D.I. 1 at ¶ 111. Rather, Samsung has consistently attempted to impede the resolution of the parties' patent infringement disputes whenever possible and at whatever time is most convenient to Samsung. For example, Samsung has sought to stay its other Declaratory Judgment Action, allegedly filed to resolve an "immediate" controversy, on multiple occasions. *Delaware I*, D.I. 115, 202. Samsung has argued at length that the infringement disputes between the parties should be stayed pending resolution of the Ninth Circuit's review of the JDLA dispute. Now that the appellate decision has issued, Samsung has again sought to stay all pending litigation between the parties aside from this case. Indeed, Samsung again moved to stay its own Declaratory Judgment action on October 26, 2023, based on the Ninth Circuit's opinion. *Id.*, D.I. 202. There is no reason that every argument Samsung makes in support of staying that case does not apply here to undermine any suggestion by Samsung that there is an "immediate" case or controversy that needs to be resolved. *See, e.g., id.*, D.I. 203 at 2 ("It would be inefficient and a waste of party and judicial

resources to continue to litigate this case unless and until Netlist prevails in the License Action . . .."). Thus, Samsung is not seeking to prevent avoidable damages or resolve uncertainty; rather, it is seeking to cause expense and delay by filing a needless action.

It is highly likely that Samsung will ultimately move to stay this case indefinitely pending the outcome of the Contract Dispute between the parties, as it has done with its other Declaratory Judgment Action. Indeed, Samsung's counsel has already proposed "oppose staying Netlist's deadline for responding to Samsung's complaint." Ex. 7, (Ahn Email). Given that Samsung's claims here were brought only a few weeks ago, with allegations of a threat of suit requiring speedy resolution, this strongly weighs against the Court's exercise of discretion to hear this case. *See Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 140 (3d Cir. 2014) (district court properly considered purpose of bringing declaratory judgment action and whether action was used "as a method of procedural fencing, or as a means to provide another forum in a race for res judicata" in exercising its discretion to withhold jurisdiction.)

## II.  SAMSUNG'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED

### A.  This Court Does Not Have Jurisdiction Over Samsung's State Law Breach of Contract Claims

As an initial matter, because there is no jurisdiction over Samsung's declaratory judgment claims, Samsung's state law claim for breach of contract should also be dismissed. No diversity jurisdiction exists between the parties in this action—Samsung Semiconductor, Inc. is a California corporation; Samsung Electronics America, Inc. is a New York corporation; Samsung Electronics Co., Ltd. is a foreign entity; and Netlist is a California resident with its principal place of business located in Irvine, California. *Delaware I*, D.I. 14, ¶ 5; *id.*, D.I. 21-2, ¶¶ 3-5; *see Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 104 (3d Cir. 2015) (28 U.S.C. § 1332 provides that "no plaintiff [may] be a citizen of the same state as any defendant"). Nor can Samsung rely on supplemental

jurisdiction. *Salmon Spawning & Recovery All. V. U.S. Customs & Border Prot.*, 550 F.3d 1121, 1133 (Fed. Cir. 2008) ("[S]upplemental jurisdiction cannot be exercised when a court does not have original jurisdiction over at least one claim in the suit, 28 U.S.C. § 1367(a).").

### B.   Samsung's Breach Of Contract Claim Must Be Dismissed Under 12(b)(6)

Samsung's breach of contract claim must also be dismissed under 12(b)(6), which provides that "only a complaint that states a ***plausible*** claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added). "[I]f the allegations of a pleading are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." *In re Trusteeships Created by Tropic CDO I Ltd.*, 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015) (internal quotes omitted). Thus, "[i]f the operative contract" underlying a breach of contract claim "unambiguously contradict[s] Plaintiff's representations regarding the obligations [it] place[s] on Defendants[] . . . the Court must reject Plaintiff's breach of contract claim." *Ricatto v. M3 Innovations Unlimited, Inc.*, 2019 U.S. Dist. LEXIS 210777 at *12 (S.D.N.Y. Dec. 6, 2019) (dismissing breach of contract claim because it was "premised on a faulty interpretation of the contracts").

Samsung plainly fails to state a plausible breach of contract claim. Samsung contends that Netlist made "binding contractual obligations" "to license its [Standard Essential Patents] on RAND terms" based on its membership in JEDEC, the global standard-setting organization for semiconductors and memory products. D.I. 1, ¶ 98. Samsung's Complaint states that JEDEC defines "Essential Patent Claims" as "[p]atent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard." D.I. 1, ¶ 85. Samsung's Complaint also "submits" that "the '024 patent is [not] essential to any of the JEDEC Standards."

D.I. 1, ¶ 119.

As an initial matter, Samsung's complaint fails to state a claim because it has not alleged that there is a valid contract. The JEDEC Patent Policy is clear that a contractual RAND obligation only applies to Essential Patent Claims.[1] D.I. 1-3, § 8.2.2.1. Samsung's Complaint admits that JEDEC defines "Essential Patent Claims" as "[p]atent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard." D.I. 1, ¶ 85. Thus, if a patent claim is not essential, there is no obligation to license it on RAND terms. Samsung has expressly alleged that the claims of the '024 patent are **_not_** essential. D.I. 1, ¶ 119. Under Samsung's own allegations, there cannot be a contractual obligation attached to the '024 patent. *See Atlas Global Techs. LLC v. TP-Link Techs. Co*., 2023 U.S. Dist. LEXIS 145331 at *13-14 (E.D. Tex. July 28, 2023) (dismissing with prejudice breach of contract claim where standard-setting organization bylaws did not impose the obligation Defendant claimed patentee breached).

Samsung attempts to evade the plain terms of the JEDEC Patent Policy by pointing to: 1) Netlist's disclosures of other patents to JEDEC as potentially essential to certain JEDEC standards; and 2) Netlist's contention that related patents to the '024 patent are essential to certain JEDEC standards. Neither of these allegations suffices to state a claim.

First, Samsung alleges that "Netlist has disclosed that at least 42 of its patents are essential or potentially essential to JEDEC standards." D.I. 1, ¶ 96. Samsung also alleges that:

> Upon information and belief, Netlist submitted a Letter of Assurance for U.S. Patent No. 8,489,837 (the "'837 patent") on April 7, 2016, related to JEDEC committee JC-40 and DDR4 LRDIMM and RDIMM components. Ex. 4 ('837

---

[1] *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (where a document is "an embodiment of" an alleged contract and "integral to the complaint," it is "incorporated into the complaint by reference" even if not attached to the complaint and may be considered on motion to dismiss for failure to state a claim).

> LOA). The '024 patent is a continuation of the '837 patent. Therefore, under the
> JEDEC Patent Policy, the commitments in the '837 Letter of Assurance extend to
> the '024 patent.

D.I. 1, ¶ 97.  These allegations cannot state a claim because Samsung admits that JEDEC only

requires that committee members "license on RAND terms later-issuing ***SEPs*** that claim priority

to patents disclosed." D.I. 1, ¶ 89 (emphasis added).  In other words, it is irrelevant that Netlist

disclosed earlier patents to JEDEC; it only matters whether the ***claims*** of the '024 patent are

actually essential.  Samsung alleges they are not.

    Second, Samsung alleges that "Netlist contends[] the '024 patent is essential" because

"Netlist has contended in [previous litigation] that the '218 and '595 patents are essential to JEDEC

DDR4 LRDIMM and RDIMM and DDR5 RDIMM standards." D.I. 1, ¶ 59, 62. Even assuming

this is true, Samsung does not plead sufficient facts to show statements regarding the '218 and

'595 patents could be imputed to the '024 patent.[2] In fact, the JEDEC Patent Policy forecloses this

argument. The JEDEC Patent Policy requires that JEDEC committee members "agree to license

'Essential Patent ***Claims***' on RAND terms and conditions." D.I. 1, ¶ 83 (emphasis added).

Essential Patent Claims are defined as "[p]atent ***claims*** the use of which would necessarily be

infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be

compliant with the required portions of a final approved JEDEC standard." D.I. 1, ¶ 85 (emphasis

added). Thus, essentiality is determined based on the specific claims of a patent.

    Samsung does not identify a single claim of the '024 patent that Netlist contends (or that

Samsung alleges) is essential. Rather, Samsung vaguely alleges that Netlist "contends that '024

---

[2] Samsung's allegations regarding a double-patenting rejection provide no support for its claim, as Samsung again has not identified any specific claim of the '024 that Netlist has ever contended is essential. Moreover, those allegations are belied by the fact that Samsung is seeking declaratory judgment with respect to DDR5 DIMMs.  Netlist has never asserted that the '218 or '595 patents are essential to DDR5 standards.

patent is essential to . . . JEDEC Standards." D.I. 1, ¶ 62. In addition to being irrelevant as it does not identify any specific claim, this single sentence is a legal conclusion that cannot state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) ("The District Court . . . may disregard any legal conclusions.").

For these reasons, Samsung's breach of contract claim must be dismissed.

## III.   <u>CONCLUSION</u>

For the reasons stated above, Netlists' motion should be granted.

<table>
<tr><td></td><td>/s/ Emily S. DiBenedetto</td></tr>
<tr><td></td><td>Karen E. Keller (No. 4489)</td></tr>
<tr><td></td><td>Emily S. DiBenedetto (No. 6779)</td></tr>
<tr><td>OF COUNSEL:</td><td>SHAW KELLER LLP</td></tr>
<tr><td>Jason Sheasby</td><td>I.M. Pei Building</td></tr>
<tr><td>H. Annita Zhong</td><td>1105 North Market Street, 12th Floor</td></tr>
<tr><td>Andrew J. Strabone</td><td>Wilmington, DE 19801</td></tr>
<tr><td>IRELL & MANELLA LLP</td><td>(302) 298-0700</td></tr>
<tr><td>1800 Avenue of the Stars, Suite 900</td><td>kkeller@shawkeller.com</td></tr>
<tr><td>Los Angeles, CA 90067</td><td>edibenedetto@shawkeller.com</td></tr>
<tr><td>(310) 277-1010</td><td>*Attorneys for Netlist, Inc.*</td></tr>
</table>

Dated: November 6, 2023

## CERTIFICATE OF SERVICE

I, Emily S. DiBenedetto, hereby certify that on November 6, 2023, this document was served on the persons listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Rodger D. Smith, II
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com

Peter A. Swanson
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
pswanson@cov.com

Brian R. Nester
COVINGTON & BURLING LLP
One CityCenter 850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
bnester@cov.com

Alice J. Ahn
Thomas Garten
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
aahn@cov.com
tgarten@cov.com

/s/ Emily S. DiBenedetto
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Netlist, Inc.*

- 19 -

EXHIBIT 1

Notice has been delivered by First Class U.S. Mail
to all counsel (or parties) at their last known address
of record in this action on this date

Date:  Oct 14 2021, 5:53 pm

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETLIST INC., | Case No. 8:20-cv-00993-MCS-ADS |
| Plaintiff, | |
| v. | **ORDER RE: MOTIONS FOR SUMMARY JUDGMENT AND RELATED APPLICATIONS (ECF NOS. 141, 143, 145–47, 149–50, 169)** |
| SAMSUNG ELECTRONICS CO., LTD., | |
| Defendant. | |

Plaintiff Netlist Inc. and Defendant Samsung Electronics Co., Ltd., both move for summary judgment. (PMSJ, ECF No. 145; DMSJ, ECF No. 150.)[1] Each party opposes the other's motion and filed a reply in support of its own. (PMSJ Opp'n, ECF No. 168; DMSJ Opp'n, ECF No. 171; PMSJ Reply, ECF No. 178; DMSJ Reply, ECF No. 179.) The Court heard oral argument on September 20, 2021.

I.   **PRELIMINARY ISSUES**

Both parties filed applications to seal documents related to the motions. (ECF Nos. 141, 143, 146–47, 149, 169.) The public has a "general right to inspect and copy

---

[1] Where appropriate, the Court cites redacted documents filed on the public docket.

public records and documents, including judicial records and documents." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (internal quotation marks omitted). Consequently, there is a "strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). A party who seeks to seal court documents supporting a dispositive motion bears the burden of overcoming this presumption by presenting "compelling reasons supported by specific factual findings." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (internal quotation marks omitted).

With the following exceptions, the Court grants the applications, which set forth compelling reasons to seal the documents and information the parties designated confidential.

Netlist applied to seal documents in support of its motion pursuant to Samsung's designation of the documents as confidential. (Appl., ECF No. 141.) In response, Samsung agreed to permit some documents to be filed publicly, and some documents to be filed publicly in redacted form. (Choi Decl., ECF No. 163.) Exhibits 15 and 18 may be filed on the public docket subject to Netlist's proposed redactions. Exhibits 16, 33, 43, and 49 may be filed on the public docket subject to Samsung's proposed redactions. Samsung does not address whether there are compelling reasons to seal Exhibits 19–23, 31, 36, 40, 44, 48, and 50–53, so the documents may be filed publicly. C.D. Cal. R. 79-5.2.2(b)(i).

Netlist indicates that its application at ECF No. 143 is "surplus and may be disregarded." (Notice of Errata, ECF No. 160.) The Court denies the application but considers and grants the replacement application at ECF No. 146.

Samsung applied to seal documents in support of its motion pursuant to Netlist's designation of the documents as confidential. (Appl., ECF No. 149.) In response, Netlist agreed to permit some documents to be filed publicly, and some documents to be filed publicly in redacted form. (LaMagna Decl., ECF No. 164.) Exhibits 2, 5, 7, 11–12, 40, 51, 54, 65, and 72 may be filed on the public docket without redaction. Exhibits 13, 32,

and 34 may be filed on the public docket subject to Netlist's proposed redactions.

Netlist applied to seal documents in support of its opposition to Samsung's motion pursuant to Samsung's designation of the documents as confidential. (Appl., ECF No. 169.) In response, Samsung agreed to permit one document to be filed publicly in redacted form. (Choi Decl., ECF No. 177.) Exhibit 79 may be filed on the public docket subject to Samsung's proposed redactions.

The parties' memoranda of points and authorities, statements of uncontroverted facts, and statements of genuine disputes of material fact redact information derived from the documents the Court has determined may be filed on the public docket. The papers also redact quotes from the Court's order denying Samsung's motion for judgment on the pleadings, which is now unsealed on the public docket. The redactions should be removed.

In the interest of judicial economy, the Court has considered the provisionally sealed documents already on file in evaluating the motion. Within seven days, the parties shall (1) file the documents permitted to be sealed under seal, (2) file the documents not permitted to be sealed on the public docket, and (3) submit revised redacted versions of documents containing information the Court declines to seal.

Each party submitted objections to the other's evidence. (Pl.'s Evid. Objs., ECF No. 172; Def.'s Evid. Objs., ECF No. 168-3.) The Court need not resolve most of the objections to decide the motion. To the extent the Court relies on objected-to evidence in this Order, the relevant objections are overruled. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1118–19 (E.D. Cal. 2006) (lamenting overuse of evidentiary objections in motions for summary judgment).

## II. BACKGROUND

This is a contract dispute between two sophisticated business entities. Netlist is in memory module technology business; Samsung creates and sells memory components and modules. (*E.g.*, PMSJ GDMF ¶¶ 2–3, 6–8, ECF No. 168-1; DMSJ GDMF ¶¶ 1–2, ECF No. 171-1.) On November 12, 2015, the parties entered a Joint

Development and License Agreement. ("JDLA," ECF No. 144-1.) The JDLA obliges Samsung to "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price," (*id.* § 6.2), and to pay Netlist $8 million in nonrefundable, non-recurring engineering ("NRE") fees, (*id.* § 3.1). The agreement permits Samsung to deduct from the NRE fees "any applicable withholding taxes due or payable under the laws of Korea" "[t]o the extent that any withholding taxes are required by applicable law." (*Id.* § 3.2.) Samsung agreed to "reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes." (*Id.*) The JDLA authorizes either party to terminate the agreement upon written notice that the other party is in material breach if the breach is not cured within 30 days from the terminating party's written demand. (*Id.* § 13.2.)

After entering the JDLA, Samsung deducted $1.32 million (16.5%) of the NRE fees to pay to the Korean tax authority. (PMSJ GDMF ¶ 46; DMSJ GDMF ¶ 73.) Samsung responded to Netlist's requests for assistance in seeking a refund, though Samsung referred Netlist to appeal directly to the Korean tax authority, and its arguments before the tax tribunal were adverse to Netlist's interests. (PMSJ GDMF ¶¶ 48–52; DMSJ GDMF ¶¶ 75–77.) The Korean tax authority ultimately determined that the NRE fees were not subject to tax withholding. (PMSJ GDMF ¶ 53; *see* DMSJ GDMF ¶ 78.)

Beginning in 2017, Samsung declined to fulfill all of Netlist's forecasts, requests, and orders for NAND and DRAM products, putting some on backlog and rejecting others. (*E.g.*, PMSJ GDMF ¶¶ 61–66, 74–82, 106–08, 114–18; DMSJ GDMF ¶¶ 7–8.)

On May 27, 2020, Netlist sent a letter to Samsung claiming Samsung materially breached the JDLA. (PMSJ GDMF ¶¶ 125–27.) On July 15, 2020, Netlist sent another letter to Samsung purporting to terminate the JDLA. (PMSJ GDMF ¶¶ 128.)

Netlist asserts three claims: (1) breach of Samsung's NAND and DRAM supply obligation; (2) breach of Samsung's obligations to (a) pay the NRE fees without withholding taxes and (b) reasonably cooperate with Netlist's efforts to recover the

withheld amount from the Korean tax authority; and (3) declaratory relief confirming Netlist terminated the JDLA. (FAC ¶¶ 25–41, ECF No. 23.)

## III. LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A fact is material when, under the governing law, the resolution of that fact might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007). To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* at 587.

## IV. DISCUSSION

### A. Breach of Supply Obligation

The JDLA is governed by New York law. (JDLA § 14.) To prevail on a breach of contract claim under New York law, a plaintiff must show: (1) the existence of a contract, (2) performance by one party, (3) breach by another party, and (4) damages.

*Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000).

In its first claim, Netlist contends Samsung breached the JDLA by failing to fulfill orders for NAND and DRAM products. (FAC ¶¶ 12–14, 26–29.) Netlist seeks partial summary judgment as to liability, with damages to be determined at trial, on the basis that the undisputed facts show the JDLA is an enforceable contract, Netlist performed, and Samsung breached § 6.2 by failing to fulfill NAND and DRAM product orders. (PMSJ 12–18.) Samsung seeks summary judgment in its favor, arguing: (1) the provision should be interpreted as an obligation limited to the supply and pricing of NAND and DRAM products for the NVDIMM-P joint development project; (2) even if § 6.2 is consistent with Netlist's interpretation, the JDLA does not provide a definite supply obligation and is not a valid requirements contract or options contract; (3) Netlist did not perform its obligations under the JDLA; and (4) Netlist should be judicially estopped from asserting its position on the supply obligation. (DMSJ 12–29.)

1. JDLA § 6.2 Unambiguously Requires Samsung to Supply Products on Netlist's Request at a Competitive Price

The parties advance contrasting interpretations of the obligation at the heart of this claim: "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)." (JDLA § 6.2.) Each party contends the provision is unambiguous, but the parties advance dramatically contrasting interpretations of the provision. (*E.g.*, PMSJ 15; PMSJ Opp'n 11.)[2]

_____

[2] In its order denying Samsung's motion for judgment on the pleadings, the Court declined to conclude that the provision was an unambiguous term governing price only. (MJOP Order 4–5, ECF No. 120.) Samsung does not advance that interpretation here. Nonetheless, Samsung understands the MJOP Order to have determined that JDLA § 6.2 is ambiguous. (DMSJ Reply 8 (citing MJOP Order 4).) In rejecting Samsung's argument that § 6.2 is an unambiguous price obligation, the Court did not intend to render a decision on whether the provision is ambiguous. The MJOP Order is abrogated to the extent it is inconsistent with this Order.

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere De CIC Et De L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Id.* "Under New York law, . . . the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). The Court must decide whether a provision is ambiguous from within the four corners of the contract; "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *S. Rd. Assocs., LLC v. IBM Corp.*, 4 N.Y.3d 272, 278 (2005) (citation and internal quotation marks omitted); *accord JA Apparel Corp.*, 568 F.3d at 396.

Ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *JA Apparel Corp.*, 568 F.3d at 396 (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)). In contrast, "[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks omitted).

JDLA § 6.2 contains unadorned, straightforward language: "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price." The meaning of the provision could not be expressed in any simpler terms. As Netlist argues,

this provision unambiguously creates a mandatory obligation on Samsung to supply certain types of products to Netlist on request. (PMSJ 15 (citing *Zheng v. City of New York*, 19 N.Y.3d 556, 580 (2012)).) The obligation is clear and complete. The Court sees no reason to stray from the obvious meaning of the sophisticated contracting parties' simple, concise language. *See Ashwood Cap., Inc. v. OGT Mgmt., Inc.*, 99 A.D.3d 1, 7 (2012) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. We apply this rule with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople." (internal quotation marks and citations omitted)).

The provision is not reasonably susceptible to a different meaning, including the one Samsung champions. Samsung contends that the provision obliges it to supply products to Netlist only with respect to the parties' NVDIMM-P joint development project. (DMSJ 12.) Samsung's briefs rely almost exclusively on extrinsic evidence to reach this interpretation. (*See, e.g.*, DMSJ 12–24; PMSJ Opp'n 11–22.) But the Court may not examine extrinsic evidence in determining whether the provision is ambiguous. *S. Rd. Assocs.*, 4 N.Y.3d at 278.

The JDLA simply does not support Samsung's preferred reading. At oral argument, Samsung argued that its favored interpretation may be extracted from the preamble's statement of the agreement's goal of joint development, and the scope of certain preceding sections, which are limited to the NVDIMM-P project. If anything, these other components of the contract confirm that § 6.2 is unambiguously unrestricted to the NVDIMM-P joint development project. In light of the purposes stated in the preamble, which extend beyond the NVDIMM-P project, the JDLA contains obligations that pertain specifically to the NVDIMM-P project and generally to the parties' overarching business relationship. For example, JDLA § 2.1 obliges the parties to perform work on the joint development project, and § 5.2 grants Samsung a right of first refusal to acquire Netlist's NVDIMM-P technology, whereas § 7 provides broad

8

releases for conduct predating the agreement, and § 8 governs intellectual property licenses unrestricted to use on the NVDIMM-P development project. The coexistence of project-specific provisions and project-nonspecific provisions signals that the parties intended not to restrict the NAND and DRAM supply obligation to the NVDIMM-P project by omitting any mention of it in § 6.2. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms[,] . . . the inescapable conclusion is that the parties intended the omission.").

Most damaging to Samsung's interpretation is § 6.2's foil, the supply obligation of § 6.1. Whereas § 6.2 obliges Samsung to "supply NAND and DRAM products" to Netlist, § 6.1 obliges Netlist to "provide Samsung any NVDIMM-P controller" technology. (JDLA §§ 6.1–.2.) The parties used language specific to NVDIMM-P when designing Netlist's memory controller supply obligation, but they declined to use language specific to NVDIMM-P in crafting Samsung's memory supply obligation. In other words, these mirror obligations demonstrate that the contracting parties intended not to limit § 6.2 to NVDIMM-P development. Samsung asks the Court to read the NVDIMM-P language from § 6.1 into § 6.2. (DMSJ 15–16.) But New York law counsels the Court to "be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Ashwood Cap.*, 99 A.D.3d at 7 (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)). "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Id.* (alteration in original) (quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001)).

Nothing in the text of the JDLA gives the Court pause about enforcing the § 6.2 according to its unambiguous meaning, especially given that both contracting parties are sophisticated business entities. *See Ashwood Cap.*, 99 A.D.3d at 7. Samsung was obliged to "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price." (JDLA § 6.2.) Samsung does not dispute that it declined to fulfill

all of Netlist's orders for NAND and DRAM products. (*E.g.*, PMSJ GDMF ¶¶ 61–66, 74–82, 106–08, 114–18; DMSJ GDMF ¶¶ 7–8.) There is no genuine dispute that Samsung breached JDLA § 6.2.

> 2.    The JDLA Is a Valid Contract Sufficiently Definite to Be Enforced

Thus far, the Court has assumed the JDLA is an enforceable contract. Samsung argues that, if consistent with Netlist's interpretation, the supply provision would render the JDLA insufficiently definite to be enforceable, and the contract would not be a valid options or requirements contract. (DMSJ 26–29; PMSJ Opp'n 22–24.) Netlist disagrees. (DMSJ Opp'n 18–20.)[3]

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. N.Y. State Dept. of Transp.*, 93 N.Y.2d 584, 589 (1999) (citation omitted). "[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991) (citation and quotation marks omitted). "Of course, not all terms of a contract need be fixed with absolute certainty"; parties "should be held to their promises and courts should not be pedantic or meticulous in interpreting contract expressions." *Express Indus.*, 93 N.Y.2d at 590 (internal quotation marks and citation omitted). "[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement . . . ." *RES Exhibit Servs., LLC v. Genesis Vision, Inc.*, 155 A.D.3d 1515, 1518 (2017) (internal quotation marks omitted). "Striking down a contract as indefinite and in essence meaningless is at best a last resort." *166 Mamaroneck Ave.*, 78 N.Y.2d at 91 (internal quotation marks and citation omitted).

---

[3] Netlist contends the Court already considered and rejected these arguments in its MJOP Order. (DMSJ Opp'n 18.) Netlist misreads the Court's ruling. (MJOP Order 5 ("[T]he Court declines to decide on this motion whether any of the theories of contract Netlist proposes is valid.").)

The parties are sophisticated business entities, and there is no genuine dispute that extensive negotiations supported a meeting of the minds as to the material terms of the JDLA. (*E.g.*, DMSJ GDMF ¶ 13.) As Samsung notes, JDLA § 6.2 lacks a definite quantity term. But in evaluating the JDLA, Samsung applies doctrines specific to contracts for the sale of goods. (*See, e.g.*, DMSJ 27–29 (citing authorities discussing contracts governed by the Uniform Commercial Code).) The JDLA, and the supply provision therein, is not a contract for the sale of goods. Instead, the agreement establishes a framework for future transactions: Samsung agreed to fulfill Netlist's requests for NAND and DRAM products at a competitive price.[4]

*RES Exhibit Services* provides a persuasive analogy. There, two sophisticated parties entered an agreement under which one party would provide the other services and an exhibit for industry trade shows. The agreement provided that the parties would execute subsequent project authorization forms ("PAFs") that would govern the scope of work. The original agreement did not set forth the price or scope of services, which would be set in the PAFs. 155 A.D.3d at 1515–16, 1518. The appellate court concluded that the agreement was sufficiently definite in its terms to be enforceable. The parties clearly agreed to leave the scope of work and price to be decided later; "the agreement contains no expression by the parties that they did not intend to be bound until each PAF was signed." *Id.* at 1518 (internal quotation marks omitted). Here, the parties clearly contemplated NAND and DRAM product sales to follow the JDLA. Even so, the agreement is sufficiently definite in its articulation of the framework by which the parties would engage in such transactions to be enforceable.

---

[4] Samsung briefly argues that Netlist's post-JDLA purchase orders are new offers that supersede the JDLA. (DMSJ 23; PMSJ Opp'n 24.) This summary argument is too underdeveloped for thorough consideration. *See Hibbs v. HDM Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001). In any event, Samsung's argument would not resolve Netlist's theory of breach, which is predicated on Samsung's obligation to receive and fulfill Netlist's requests, i.e., purchase orders.

11

Tellingly, Samsung focuses exclusively on § 6.2 in its discussion of sufficient definiteness. Samsung does not challenge any other provision of the JDLA for indefiniteness. Were the Court to accept Samsung's argument, the contract—and the releases, the licenses, and the parties' years-long relationship thereunder—would be rendered a nullity. This result would clearly contravene both parties' manifested intents.

The contract is sufficiently definite to be enforceable, so there is no reason to consider whether it is a valid requirements or options contract. Samsung does not dispute that the parties agreed to the JDLA. (PMSJ GDMF ¶ 22; DMSJ GDMF ¶ 13.) There is no triable issue as to whether the JDLA is an enforceable contract.

> 3. Samsung's Challenge to Netlist's Performance Was Not Adequately Discussed at the Prefiling Conference, Is Underdeveloped, and Lacks Merit

Samsung contends summary judgment should be entered in its favor because Netlist indisputably breached its obligations under the JDLA by "abandoning" the NVDIMM-P standardization project and canceling purchase orders. (DMSJ 24–25.)

Netlist avers that Samsung did not raise this theory before the night it filed its motion, when Samsung amended its interrogatory response at the eleventh hour to include this theory of breach. (DMSJ Opp'n 14–15 & 15 n.6 (indicating Samsung amended its response at 10:57 p.m. the day discovery closed).) At the hearing, counsel for Samsung represented that the parties generally discussed the breach claim, but counsel did not directly respond to the Court's queries about whether counsel presented these theories of nonperformance at the Local Rule 7-3 prefiling conference of counsel. The Court repeatedly warned that counsel must thoroughly discuss issues to be presented in motions at the prefiling conference. (*E.g.*, MJOP Order 5 n.2.) The Court even denied a prior Samsung motion for failure to comply with the prefiling conference requirement. (Order, ECF No. 116.) The rule is designed to prevent nonmoving parties from suffering the sort of unfair surprise Samsung's tactics have created here. *See Caldera v. J.M. Smucker Co.*, No. CV 12-4936-GHK (VBKx), 2013 U.S. Dist. LEXIS

183977, at *2 (C.D. Cal. June 3, 2013). The Court denies this component of Samsung's motion for failure to comply with Local Rule 7-3. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002); *e.g.*, *Singer v. Live Nation Worldwide, Inc.*, No. SACV 11-0427 DOC (MLGx), 2012 U.S. Dist. LEXIS 5196, at *3–5 (C.D. Cal. Jan. 13, 2012) (denying motion for summary judgment for failure to comply with C.D. Cal. R. 7-3).

The Court also rejects the argument on the merits. Samsung contends Netlist "never attempted to demonstrate viability of the NVDIMM-P standardization project," (PMSJ GDMF ¶ 129), but its briefs do not identify any contract provision Netlist failed to perform through this conduct. At the hearing, Samsung's counsel argued that Netlist's conduct violated §§ 2 and 5 of the JDLA, the "core purposes" of the agreement, and the implied covenant of good faith and fair dealing. These arguments are not presented in Samsung's briefs. (*See* DMSJ 24–25; PMSJ Opp'n 24–25.) The papers do not provide enough information about the purported breach for the Court to evaluate the nonperformance argument, and the Court declines to consider theories of nonperformance articulated for the first time at oral argument. *See Johnson v. Gruma Corp.*, 614 F.3d 1062, 1069 (9th Cir. 2010); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Netlist's decision to prioritize development of its proprietary technology over NVDIMM-P does not, standing alone, contravene any of its obligations under the JDLA. (*See* PMSJ GDMF ¶ 129.)

Samsung's argument that Netlist breached by canceling supply orders is not supported by the deposition testimony it cites. Netlist's witness testified that Samsung would breach the JDLA if Samsung canceled a purchase order—not that Netlist would breach the JDLA if Netlist canceled a purchase order. (Hong Dep. Tr. 164, ECF No. 157-4.) Even if the deposition testimony were consistent with Samsung's theory, the testimony presents an improper legal conclusion by a lay witness. Fed. R. Evid. 701; *see Torres v. County of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985) (discussing impropriety of testimony containing legal conclusions).

There is no genuine dispute that Netlist performed its obligations under the

1  JDLA. (PMSJ GDMF ¶¶ 129–30.)

2             4.   <u>Judicial Estoppel Does Not Apply</u>

3  Samsung argues that the doctrine of judicial estoppel precludes Netlist from

4  taking its position on the supply provision here given the position it asserted in the

5  proceeding before the Korean tax tribunal. (DMSJ 25–26; PMSJ Opp'n 25–27.)

6  "Judicial estoppel is an equitable doctrine that precludes a party from gaining an

7  advantage by asserting one position, and then later seeking an advantage by taking a

8  clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778,

9  782 (9th Cir. 2001). The Supreme Court has articulated three factors courts may

10  consider in determining whether to apply judicial estoppel:

11        First, a party's later position must be clearly inconsistent with

12        its earlier position. Second, courts regularly inquire whether

13        the party has succeeded in persuading a court to accept that

14        party's earlier position, so that judicial acceptance of an

15        inconsistent position in a later proceeding would create the

16        perception that either the first or the second court was misled.

17        Absent success in a prior proceeding, a party's later

18        inconsistent position introduces no risk of inconsistent court

19        determinations, and thus poses little threat to judicial

20        integrity. A third consideration is whether the party seeking

21        to assert an inconsistent position would derive an unfair

22        advantage or impose an unfair detriment on the opposing

23        party if not estopped.

24  *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (internal quotation marks and

25  citations omitted).

26  The first factor is dispositive here: the doctrine does not apply because Netlist's

27  position in this litigation is not "clearly inconsistent" with its prior position. Netlist

28  argued before the Korean tax authority that "the granting of cross licenses under the

[JDLA] is limited to the joint research and development." (DMSJ GDMF ¶ 65 (alteration in original).) As discussed, the JDLA contains some provisions that are specific to joint development and some that are not. Netlist's prior position on the scope of the patent licenses is immaterial to the breach theory in this litigation and to the reasons the Court will grant summary judgment as to liability.

### 5. Summary

The Court determines that Netlist has established the existence of a contract, its performance of the contract, and Samsung's breach of the supply provision of the contract. Partial summary judgment in Netlist's favor on these elements is appropriate. Damages must be proven at trial. *See McCoy Assocs. v. Nulux, Inc.*, 218 F. Supp. 2d 286, 294 (E.D.N.Y. 2002) (granting summary judgment as to liability for breach of contract claim, "regardless of the certainty of damages").

## B. Breach of NRE Fee Obligations

For the reasons discussed above, Netlist has established the JDLA is an enforceable contract and that it performed its obligations under the JDLA. The Court considers whether there are triable issues of fact as to the two theories of breach in the second claim.

Netlist bases its second claim on JDLA §§ 3.1 and 3.2, which provide that Samsung must pay Netlist nonrefundable NRE fees of $8 million less "withholding taxes . . . required by applicable law." First, Netlist contends that the NRE fees were not taxable in Korea, so withholding 16.5% of the fee violated Samsung's payment obligation under JDLA § 3.1, as qualified by § 3.2. (FAC ¶¶ 15–16, 32.) Second, Netlist asserts Samsung breached its obligation under § 3.2 to "reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes." (JDLA § 3.2; *see* FAC ¶¶ 17, 32.)

### 1. Breach of NRE Fee Payment Obligation

The parties do not genuinely dispute whether Samsung was required to withhold taxes from the NRE fees. The Korean tax authority concluded that the NRE fees were

15

not a patent royalty payment subject to tax withholding. (PMSJ GDMF ¶ 53; *see* DMSJ
GDMF ¶ 78.) Samsung submits evidence and argument that its position on the taxability
of the NRE fees was reasonable and justified, and that Netlist at least implicitly ratified
the withholding. (*E.g.*, DMSJ 29–30; PMSJ Opp'n 28–29; DMSJ GDMF ¶¶ 74, 77.)
But the reasonableness of Samsung's position is immaterial to whether it breached its
obligation; that is, the JDLA leaves no room for Samsung's reasonable
misinterpretation of Korean tax law. Samsung was not required by applicable law to
withhold; therefore, Samsung breached by withholding. (PMSJ GDMF ¶ 46; DMSJ
GDMF ¶ 73.)

The Court will enter summary judgment on the breach element in favor of Netlist
on this subclaim.

### 2. Breach of Duty to Reasonably Cooperate

There is a genuine dispute of fact as to whether Samsung fulfilled its obligation
to reasonably cooperate with Netlist in recovering the tax withholding. On one hand,
Samsung communicated on multiple occasions with Netlist and its tax consultant
concerning the tax proceedings and responded to inquiries made by a Korean tax office.
(PMSJ GDMF ¶¶ 48, 52; DMSJ GDMF ¶¶ 75–76.) On the other, Samsung declined to
take Netlist's preferred position on the withholding, effectively refusing Netlist's
consultant's request that Samsung "stick to the factual background" in the tax
proceeding. (PMSJ GDMF ¶¶ 49–51; DMSJ GDMF ¶¶ 77.) A reasonable jury could
return a verdict on the breach element in either party's favor.

This factual dispute precludes entry of summary judgment.

### 3. Damages

Samsung argues Netlist cannot show any injury it suffered from these purported
breaches. (DMSJ 31; PMSJ Opp'n 29.) The Court agrees with Samsung that Netlist's
sole evidence supporting damages consists of "[a] conclusory, self-serving affidavit[]
lacking detailed facts and any supporting evidence," which in certain circumstances
would not suffice to create a genuine issue for trial. *FTC v. Publishing Clearing House*,

104 F.3d 1168, 1171 (9th Cir. 1997). (*See* PMSJ GDMF ¶ 54; Def.'s Evid. Objs. 18–19.)

Here, however, Samsung provides no authority for the proposition that the Court may deny summary judgment to Netlist as to liability, or enter summary judgment against Netlist, for failure to provide evidence of actual damages. New York law "infer[s] at least nominal damages at the moment of breach." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993). "Even if it were shown that no actual damages have been sustained, plaintiff would seem entitled to proceed to trial at least on its contract cause of action if only to vindicate its right to nominal damages . . . ." *C.K.S. Ice Cream Co. v. Frusen Gladje Franchise, Inc.*, 172 A.D.2d 206, 208 (1991); *accord McCoy Assocs.*, 218 F. Supp. 2d at 294. The Court may not enter summary judgment against Netlist solely because there is no proof of actual injury. *See, e.g.*, *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 490–91 (S.D.N.Y. 2009) (declining to dismiss breach claim at summary judgment because claimant "may be entitled to recover nominal damages"); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 Civ. 762 (PAE), 2016 U.S. Dist. LEXIS 71493, at *55–59 (S.D.N.Y. June 1, 2016) (denying summary judgment on breach claim based on availability of nominal damages). The Court rejects Samsung's damages argument.

### 4. Summary

The Court will enter summary judgment in favor of Netlist as to liability for the first subclaim. The Court denies summary judgment as to the second subclaim.

## C. Declaratory Judgment

Netlist invoked JDLA § 13.2 to terminate the parties' contract, and it now seeks a judicial determination that the termination was effective. (FAC ¶¶ 19–24, 36–41.)

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. For a court to grant declaratory relief under the Declaratory Judgment Act, "[t]he controversy must

be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937). Where an actual controversy exists, "declaratory relief is appropriate (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Eureka Fed. Sav. & Loan Ass'n. v. Am. Cas. Co.*, 873 F.2d 229, 231 (9th Cir. 1989) (internal quotation marks omitted).

Here, a declaratory judgment would clarify the effectiveness of Netlist's termination and confirm the parties' present relationship with respect to the JDLA, relieving the contracting parties from the uncertainty over the issue.

### 1. Netlist Complied with the Termination Term

For the reasons articulated above, the JDLA is an enforceable contract. JDLA § 13.2 reads in relevant part:

> [T]he other Party shall have a right to terminate this Agreement upon written notice to a Party if: [¶] 1) such Party is in material breach of this Agreement and it is not cured within thirty (30) days period [sic] from the other Party's written demand, or as a consequence of the breach the purpose of this Agreement cannot be achieved . . . .

JDLA § 15 provides a method of providing notices to each party. On May 27, 2020, Netlist sent a letter to Samsung in the manner specified in § 15 alleging material breach and demanding Samsung to cure. (PMSJ GDMF ¶ 125.) As discussed, there is no genuine dispute that Samsung breached its obligations to supply NAND and DRAM components on Netlist's request and its obligation to pay the NRE fees without withholding taxes, and that both issues remain uncured. (*See* PMSJ GDMF ¶ 128.) Netlist sent Samsung a letter terminating the JDLA on July 15, 2020. (*Id.*) Netlist's termination comports with the JDLA's termination method.

///

18

## 2. Samsung's Breaches Were Material

Samsung summarily argues the termination was ineffective because the breaches Netlist identified in its May 27, 2020 letter were not material. (PMSJ Opp'n 30; DMSJ 32.) "Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties." *Bear, Stearns Funding, Inc. v. Interface Grp.—Nev., Inc.*, 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) (quoting *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). Although the question of materiality is generally left to the factfinder, the Court may determine materiality as a matter of law "where the evidence concerning the materiality is clear and substantially uncontradicted." *Morgan Art Found. Ltd. v. Brannan*, No. 18-CV-8231 (AT) (BCM), 2020 U.S. Dist. LEXIS 14043, at *49 (S.D.N.Y. Jan. 28, 2020) (quoting *WILJEFF, LLC v. United Realty Mgmt. Corp.*, 82 A.D.3d 1616, 1617 (2011)); *see also Bear, Stearns*, 361 F. Supp. 2d at 295 (collecting federal authorities construing New York law).

Samsung does not seriously contest materiality. Samsung rests its argument in part on its untenable interpretation of the supply provision in § 6.2. Under the unambiguous meaning of the provision, the term is an integral part of the parties' agreement, one that Netlist valued highly, as demonstrated by its negotiation and post-execution conduct. (*E.g.*, PMSJ GDMF ¶¶ 14–17, 55–59.) Samsung contends the breach of the NRE fee obligation could not be material because Netlist ultimately recovered the fees from the tax authority. (PMSJ Opp'n 30.) But "[t]he time for measuring materiality [is] when the breach occurred." *KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 545 (S.D.N.Y. 2020). At the time of the withholding, Samsung's failure to pay a significant chunk of the NRE fees was material. *See Taub v. Marchesi Di Barolo, S.p.A.*, 480 F. App'x 643, 645 (2d Cir. 2012) ("It is axiomatic that failure to pay is a material breach of a contract.") (citing *Arp Films, Inc. v. Marvel Entm't Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991)).

///

### 3. Netlist Did Not Waive Its Right to Terminate

Samsung claims Netlist waived its right to terminate the contract by delaying termination proceedings until years after the initial breaches. (PMSJ Opp'n 30–31; DMSJ 32–33.) Waiver is "the voluntary and intentional relinquishment of a contract right." Under New York law, waiver "must be based on a clear manifestation of intent to relinquish a contractual protection." *Stassa v. Stassa*, 123 A.D.3d 804, 805 (2014) (internal quotation marks omitted).

The JDLA contains a no-waiver provision. (JDLA § 16.2 ("The failure by either Party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement.").) No-waiver clauses are uniformly enforced and highly probative of an intent not to waive. *Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17-cv-01898 (AJN), 2021 U.S. Dist. LEXIS 92559, at *44 (S.D.N.Y. May 14, 2021). In the face of a no-waiver provision, there must be unequivocal evidence that a party "intended for the 'no-waiver' clause to have no effect." *Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015).

At the hearing, the Court asked Samsung to identify evidence showing that Netlist intended to waive the no-waiver provision of the JDLA. Samsung responded that Netlist had not complained about NAND and DRAM supply issues and had not acted on the purported breach for years. (*See* DMSJ GDMF ¶¶ 84–86 (outlining disputed facts concerning Netlist's delay in asserting breach).) These facts might be probative of waiver absent the provision, but they do not evince an "unmistakably manifested" intent to waive the no-waiver provision. *EchoStar Satellite L.L.C. v. ESPN, Inc.*, 79 A.D.3d 614, 617 (2010) (internal quotation marks omitted).

### 4. Summary

A declaratory judgment that Netlist terminated the JDLA would clarify the effectiveness of Netlist's termination and relieve the parties from the uncertainty over the issue. There is no genuine dispute that Netlist completed the termination in the

1  manner set forth in the JDLA, that the breaches it identified were material, and that it
2  did not waive its right to terminate. Summary judgment in Netlist's favor is appropriate
3  on this claim.

4     **D.   Consequential Damages**

5     The parties' contract disclaims liability for "any special, incidental or
6  consequential damages in connection with or arising out of this agreement," with
7  exceptions not relevant here. (JDLA § 12.5 (emphasis omitted).) Samsung contends that
8  the Court should enter summary judgment barring Netlist from recovering
9  consequential damages. (DMSJ 31–32.) Netlist responds that it may pierce the JDLA's
10 limitation on consequential damages if it shows Samsung engaged in grossly negligent
11 misconduct. (DMSJ Opp'n 22–24.)

12    Courts may determine on summary judgment that a party cannot recover
13 consequential damages. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974
14 (9th Cir. 2010). Express waivers of consequential damages are enforceable under New
15 York law. *See Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 352 (2020); *Int'l*
16 *Gateway Exch., LLC v. W. Union Fin. Servs., Inc.*, 333 F. Supp. 2d 131, 149 (S.D.N.Y.
17 2004). New York law permits a party to pierce a contractual limitation on exculpatory
18 and nominal damages clauses in the face of grossly negligent misconduct. *Sommer v.*
19 *Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992). However, the New York Court of
20 Appeals recently clarified that "in a breach of contract case, . . . th[is] public policy rule
21 does not extend to limitations on the remedies available to the non-breaching party."
22 *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 352. This decision forecloses Netlist's
23 argument; the contractual limitation on consequential damages may not be pierced here.

24    The Court will enter summary judgment precluding Netlist from recovering
25 consequential damages as a remedy for its breach claims.

26 **V.   CONCLUSION**

27    The Court denies the surplus application to seal (ECF No. 141) and grants the
28 other applications to seal (ECF Nos. 143, 146–47, 149, 169) subject to the exceptions

set forth in this Order. Within seven days, the parties shall (1) file the documents permitted to be sealed under seal pursuant to Local Rule 79-5.2.2(c) and (2) submit revised redacted versions of documents containing information the Court declines to seal pursuant to Local Rule 79-5.2.2(a).

The Court grants in part and denies in part the motions for summary judgment (ECF Nos. 145, 150) as follows:

- The Court grants summary judgment in favor of Netlist and against Samsung as to all elements but damages for Netlist's first claim for breach of the supply obligation.

- The Court grants summary judgment in favor of Netlist and against Samsung as to all elements but damages for Netlist's second claim for breach of contract only as to Netlist's theory that Samsung breached by failing to pay the full NRE fees.

- The Court grants summary judgment in favor of Netlist and against Samsung on Netlist's third claim for declaratory relief.

- The Court grants summary judgment in favor of Samsung and against Netlist on Netlist's prayer for consequential damages. Netlist cannot recover consequential damages as a remedy for its claims of breach of contract.

- The motions are denied in all other respects.

The Court provisionally seals this Order. Within seven days of the issuance of this Order, the parties shall file a joint statement as to whether any matter stated in this Order is information that should remain under seal. Thereafter, the Court will determine whether any portions of this Order should be redacted in the version filed on the public docket.

**IT IS SO ORDERED.**

Dated: October 14, 2021

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

22

# EXHIBIT 2

Trials@uspto.gov

Paper 54

571-272-7822

Date: May 8, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

SAMSUNG ELECTRONICS CO., LTD.,
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

IPR2022-00062
Patent 9,858,218 B1

Before JON M. JURGOVAN, SHEILA F. McSHANE, and
KARA L. SZPONDOWSKI, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge.*

DECISION
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00062
Patent 9,858,218 B1

# I.    INTRODUCTION

## A.  Background and Summary

Samsung Electronics Co., Ltd. ("Petitioner") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claims 1–22 ("Challenged Claims") of U.S. Patent 9,858,218 B1 (Ex. 1001, "the '218 patent").  Paper 1 ("Pet.").  Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.") to the Petition.  With our authorization (Paper 8), Petitioner filed a Preliminary Reply to the Preliminary Response (Paper 11, "Prelim. Reply") and Patent Owner filed a Preliminary Sur-Reply (Paper 12, "Prelim. Sur-Reply").  We instituted *inter partes* review under 35 U.S.C. § 314(a).  Paper 14 ("Inst. Dec.").

During the trial, Patent Owner filed a Response (Paper 31, "Resp."), Petitioner filed a Reply (Paper 35), and Patent Owner filed a Sur-Reply (Paper 37).  Petitioner and Patent Owner requested oral argument (Papers 38 and 39).  A hearing was conducted on February 15, 2023.  Paper 53 ("Tr.").

Petitioner and Patent Owner objected to evidence (Paper 32, 36) and filed Motions to Exclude (Papers 45, 46).  The parties filed Oppositions to the respective Motions to Exclude (Papers 47, 48), and further filed Replies (Papers 49, 50) to the respective Oppositions.  As discussed below, we dismiss-in-part and deny-in-part Patent Owner's Motion to Exclude, and dismiss Petitioner's Motion to Exclude.

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Having reviewed the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that the Challenged Claims are unpatentable.

IPR2022-00062
Patent 9,858,218 B1

B.      *Real Parties in Interest*

Petitioner identifies Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc. as the real parties in interest. Pet. 1. Patent Owner identifies itself as the sole real party in interest. Paper 4, 1.

C.      *Related Matters*

The parties advise that the '218 patent is related to *Samsung Electronics Co., Ltd., et al. v. Netlist, Inc.*, IPR2022-00063; *Samsung Electronics Co., Ltd., et al. v. Netlist, Inc.*, IPR2022-00064; and *Samsung Electronics Co., Ltd. v. Netlist, Inc.*, Case No. 1:21-cv-01453 (D. Del.) ("the parallel litigation"). Pet. 1; Paper 4, 3.

The parties advise that the '218 patent is related to the following legal proceedings, which are no longer pending: (1) *Netlist v. SK hynix Inc.*, Case No. 6:20-cv-000194-ADA (W.D. Tex.); (2) *Samsung Electronics Co., Ltd. v. Netlist, Inc.*, IPR2020-01042; (3) *SK hynix Inc., et al. v. Netlist, Inc.*, IPR2020-01044; (4) *Netlist, Inc. v. SK hynix Inc., et al.*, Case No. 8:17-cv-01030 (C.D. Ca.); (5) *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1089 (International Trade Commission); (6) *SK hynix Inc., et al v Netlist, Inc.*, IPR2018-00303; (7) *Netlist, Inc. v. SK hynix Inc., et al.*, Case No. 8:16-cv-01605 (C.D. Ca.); (8) *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1023 (International Trade Commission); and (9) *SK hynix Inc., et al. v. Netlist, Inc.*, IPR2017-00548. Pet. 3–4; Paper 4, 3–4.

D.      *The '218 Patent (Ex. 1001)*

The '218 patent is titled "Memory Module and Methods for Handshaking With a Memory Controller" and is generally directed to

3

IPR2022-00062
Patent 9,858,218 B1

"systems and methods for handshaking with a memory module during or upon completion of initialization." Ex. 1001, code (54), 1:19–21.

The '218 patent explains that memory subsystems, "such as memory modules are generally involved in the initialization procedure for computer systems." *Id.* at 1:25–27. For example, "the system memory controller may request that the memory subsystem perform one or more requested tasks during system initialization." *Id.* at 1:32–34. However, the '218 patent states that there is no existing method of handshaking between the system memory controller and the memory module during initialization. *Id.* at 2:59–62. As a result, the system memory controller "does not monitor the error-out signal from the memory [module]" and therefore, "perform[s] blind execution." *Id.* at 2:62–65. According to the '218 patent, this has not been a serious issue because the system memory controller "generally has complete control over the initialization procedure." *Id.* at 2:65–3:3. However, one configuration of LR-DIMM (Load Reduced Dual In-line Memory Module) has the system memory controller "handing over one or more parts of the initialization operation sequence to the memory subsystem." *Id.* at 3:3–6. In such configuration, the system memory controller may insert a waiting period of predetermined length during which it is idle while the memory controller undergoes initialization. *Id.* at 3:11–14. However, this approach has shortcomings in that the time for the memory controller to complete the task may vary and may be longer or shorter than the predetermined period of time that the system memory controller is idle. *Id.* at 3:14–37.

The '218 patent describes two methods of handshaking between a system memory controller and a memory module: notifying and polling. *Id.*

IPR2022-00062
Patent 9,858,218 B1

at 3:38–39.  In polling,  the system memory controller "reads a status register
in the memory subsystem controller to find out if the memory subsystem
controller has completed the required or requested operation."  *Id.* at 3:39–
42.  The '218 patent explains that polling is "generally inefficient because
the system memory controller does not know exactly when the memory
subsystem will have completed the required or requested operation."  *Id.* at
3:44–48.  Therefore, the notifying method, where the memory controller
sends a signal  to the system memory controller when it completes the
required or requested operation, is described by the '218 patent as
advantageous because it allows the system memory controller to execute one
or more independent commands while it waits for the notification signal
from the memory controller.  *Id.* at 3:59–67.

   The '218 patent describes embodiments establishing a handshake
mechanism between the system memory controller and the memory module
based upon notification signaling.  *Id.* at 4:1–3.  For example, Figure 3,
depicted below, "shows a host computer system including example first and
second memory modules configured to perform handshaking with a memory
controller of the host system."  *Id.* at 2:37–39.

IPR2022-00062
Patent 9,858,218 B1



Figure 3

Figure 3, above, depicts host computer system 16, including memory modules 10 and 26, memory controller 14, controller circuit 18, notification circuit 20, and output 12. *Id.* at 11:11–37. "[M]emory module 10 is configured to operate in at least two modes comprising an initialization mode during which the memory module 10 executes at least one initialization sequence, and an operational mode." *Id.* at 4:25–28.

The "at least one initialization sequence may comprise one or more training sequences." *Id.* at 5:64–66. "The operational mode is the normal mode of the memory module 10." *Id.* at 6:41–42. In operational mode, "the system memory controller 14 may cause the memory module 10 to perform standard operations such as memory read/write, pre-charge, refresh, etc., while in operational mode." *Id.* at 6:46–49. Controller circuit 18 "may receive and process address and command signals (e.g., read, write commands) from the system memory controller 14 and transmit appropriate address and commands to the memory elements in response." *Id.* at

6

IPR2022-00062
Patent 9,858,218 B1

5:40–44.  Notification circuit 20 is "configured to drive the at least one output 12 while the memory module 10 is in the initialization mode to provide at least one notification signal to the memory controller 14 indicating at least one status of the at least one initialization sequence." *Id.* at 4:32–37.

As shown in Figure 3, "the at least one first output 12 is operatively coupled to an error-out pin of the memory module 10, and a multiplexor 42 drives the transistor 36 with either of a task_in_progress signal 44 or an error signal 46 (e.g., parity error signal)." *Id.* at 11:16–20.  "[F]or example, the multiplexor 42 may be configured to drive the transistor 36 with the task_in_progress signal 44 when the memory module 10 is in the initialization mode or is executing the at least one initialization sequence, and with the error signal 46 when the memory module 10 is in the operational mode." *Id.* at 11:21–26.  The '218 patent explains that "the memory module 10 can be advantageously configured to both perform the standard (e.g., JEDEC-specified) error reporting functionality via the error-out pin during the operational mode and provide the status notification functionality during the system initialization mode." *Id.* at 11:26–31.

E.    *Illustrative Claim*

Among challenged claims 1–22, claims 1, 9, and 15 are independent. Independent claim 1, reproduced below with brackets noting Petitioner's identifiers, is illustrative of the claimed subject matter.

1.    [1.a] A memory module operable with a memory controller of a host system, comprising:

[1.b] a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections

IPR2022-00062
Patent 9,858,218 B1

including first edge connections, second edge connections, and an error edge connection in addition to the first edge connections and the second edge connections;

[1.c] dynamic random access memory elements on the printed circuit board;

[1.d] a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection; and

[1.e] wherein the memory module is operable in at least a first mode and a second mode, wherein the memory module in the first mode is configured to be trained with one or more training sequences;

[1.f] wherein the memory module in the second mode is configured to perform one or more memory read or write operations not associated with the one or more training sequences by communicating data signals via the first edge connections in response to address and command signals received via the second edge connections;

[1.g] wherein the module controller is configured to receive via the second edge connections the address and command signals associated with the one or more memory read or write operations and to control the dynamic random access memory elements in accordance with the address and command signals, and

[1.h] wherein the module controller is further configured to output via the open drain output and the error edge connection a signal indicating a parity error having occurred while the memory module is in the second mode;

[1.i] wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode.

8

IPR2022-00062
Patent 9,858,218 B1

Ex. 1001, 14:38–15:10.

F.   Evidence

Petitioner relies on the following evidence:[1]

| References | | Date | Exhibit |
|---|---|---|---|
| Hazelzet[2] | U.S. Patent Pub. No. 2008/0098277 A1 | April 24, 2008 | 1014 |
| JEDEC[3] | JEDEC COMMITTEE LETTER BALLOT, LRDIMM DDR3 Memory Initialization Chapter Proposal | November 2009[4] | 1015 |
| Buchmann[5] | U.S. Patent No. 8,139,430 B2 | Issued March 20, 2012 Filed July 1, 2008 | 1016 |
| Kim | U.S. Patent No. 8,359,521 B2 | Issued January 22, 2013 Filed January 22, 2008 | 1017 |

---

[1] The '218 patent issued from Application 15/088,115, filed April 1, 2016, which is a continuation of Application 13/942,721, filed July 16, 2013, now U.S. Patent No. 9,311,116 B1, which is a continuation of Application 12/815,339, filed June 14, 2010, now U.S. Patent No. 8,489,837 B1. Ex. 1001, codes (21, 22). The '218 patent also claims priority to Provisional Application 61/186,799, filed June 12, 2009. *Id.* at codes (60, 63).

[2] Petitioner contends Hazelzet is prior art under §§ 102(a), (b) and (e). Pet. 24.

[3] Petitioner contends JEDEC is prior art under § 102(a). Pet. 29.

[4] Petitioner contends JEDEC was distributed in November 2009. Patent Owner disputes that JEDEC was distributed. Because we decide the case on other grounds, we do not address whether JEDEC was distributed in November 2009.

[5] Petitioner contends Buchmann is prior art under § 102(e). Pet. 30.

IPR2022-00062
Patent 9,858,218 B1

In addition, Petitioner relies on the Declaration of Dr. Donald Alpert (Ex. 1003) and other evidence.  Patent Owner relies on the Declaration of Robert J. Murphy (Ex. 2027) and other evidence.  The depositions for these experts have been entered into the record.  Exs. 2023 (Alpert), 1077 (Murphy).

G.   *Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–22 are unpatentable on the following Grounds (Pet. 4):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–22 | 103(a)[6] | Hazelzet, JEDEC |
| 1–22 | 103(a) | Hazelzet, Buchmann |
| 3–6, 10–12, 17–20 | 103(a) | Hazelzet, JEDEC or Buchmann, Kim |

II.   DISCUSSION

A.  *Principles of Law*

In an *inter partes* review, a petitioner bears the burden of persuasion to prove "unpatentability by a preponderance of the evidence." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. § 316(e)); *see* 37 C.F.R. § 42.1(d) (2022).

---

[6] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103.  Although the parties dispute whether the '218 patent is entitled to claim priority to the provisional application (*see, e.g.*, footnote 1; Pet. 5–10; PO Response 12–25), there is no dispute that the '218 patent's priority claim extends to Application 12/815,339, filed June 14, 2010.  Ex. 1001, code (63).  Because the filing date of this application is before the effective date of the applicable AIA amendment, we refer to the pre-AIA version of 35 U.S.C. § 103.

IPR2022-00062
Patent 9,858,218 B1

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

     B.    *Level of Ordinary Skill in the Art*

Petitioner asserts a person of ordinary skill in the art "would have had a [B]achelor's degree in computer engineering, or a related field, and several years of additional experience working with computer memory systems. She would have been familiar with computer memory systems and basic CPU architecture documented in the literature, including standards, and generally available in commercial systems, including how computer components access a computer's memory, the role of a memory controller, the basic operation of memory modules and devices, and the techniques used to couple memory devices to the other components of the computer system." Pet. 10 (citing Ex. 1003 ¶ 56).  Patent Owner does not dispute Petitioner's proposed level of skill in the art.  *See* Resp. 5.

We find Petitioner's proposal is consistent with the level of ordinary skill in the art reflected by the '218 patent and the prior art of record, and,

IPR2022-00062
Patent 9,858,218 B1

therefore, adopt Petitioner's proposed level of ordinary skill in the art in this Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

     C.     *Claim Construction*

We construe each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent," the same standard used to construe the claim in a civil action. 37 C.F.R. § 42.100(b).

The words used in patent claims are interpreted in light of the intrinsic evidence of record, including the written description, drawings, and prosecution history. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). Absent express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning. *Id.* at 1325. There is a heavy presumption that a patent claim carries its ordinary and customary meaning. *Id.*

Petitioner proposes the following constructions:

IPR2022-00062
Patent 9,858,218 B1

| Claim Term | Proposed Construction |
|---|---|
| memory read and write operations | operations used to communicate data between the memory module and the memory controller in response to commands from the memory controller |
| training sequence | a set of operations occurring in a particular order and used for training |
| notification signal associated with the [one or more training sequences] / "information related to the [one or more training sequences]" / "open-drain signals related to the [one or more training sequences]" | unscheduled signal/information/open-drain signals provided without polling that indicate the status of the one or more training sequences |

Pet. 20–24.  Petitioner presents several arguments and support in favor of its proposed constructions.  *Id.*  Petitioner also argues that the term "mode" does not require construction.  *Id.* at 21–22.  Patent Owner agrees that "mode" does not require construction, but disagrees with Petitioner's other proposed constructions, which "deviate from the plain and ordinary meaning."  Resp. 3–5.

We find that Petitioner's proposals improperly alter the language of the respective claims to change their meaning, and also lack support in the intrinsic evidence of record.  Petitioner's proposal concerning "memory read and write operations" states that the data is communicated between the memory module and the memory controller in response to commands from the memory controller.  Pet. 20–21.  But claim 1 recites that the data signals are communicated "in response to *address and command signals*."

IPR2022-00062
Patent 9,858,218 B1

Ex. 1001, 14:60–61.  As Patent Owner argues, Petitioner's proposal seeks to change the claim language by making the data communication responsive to command signals alone, and not to both address and command signals, as claimed.  Resp. 4; Ex. 2027 ¶ 26.  We cannot construe claims to read an express limitation or element out of the claims.  *TDM America, LLC v. U.S.*, 85 Fed. Cl. 774, 778 (2009).  We decline to adopt Petitioner's proposed construction.

Petitioner's proposal for "training sequence" improperly introduces the concept of "a set of operations occurring in a *particular order*," which narrows the meaning considerably, and is not supported by the specification or file history.  *See* Exs. 1001–1002.  To the contrary, this proposal conflicts with the '218 patent, which states "in any method or process disclosed herein, the acts or operations making up the method/process may be performed *in any suitable sequence* and *are not necessarily limited to any particular disclosed sequence*."  Ex. 1001, 14:23–27.  We decline to rewrite the claims as Petitioner proposes.

Petitioner's proposal for "notification signal" introduces the concepts of "unscheduled" (mentioned nowhere in the '218 patent or file history) and "without polling."  The '218 patent identifies "polling" and "notifying" as different ways of "handshaking" between the Memory Controller Hub (MCH) or system memory controller, and the memory subsystem controller.  Ex. 1001, 2:54–58, 3:38–58.  "Notifying" is described as "advantageous" in the '218 patent, and use of the term "notification signal" in the claims implies "notifying" as described in the '218 patent.  *Id.* at 2:59–61.  However, the term "unscheduled" in Petitioner's proposal is unsupported by the intrinsic evidence so we decline to adopt Petitioner's proposal.

14

IPR2022-00062
Patent 9,858,218 B1

Neither party avers that the outcome of this case turns on Petitioner's proposed constructions, and we agree. We decline to adopt Petitioner's proposals, and instead give the claim terms their plain and ordinary meanings.

### D.    Ground 1: Obviousness Over the Combination of Hazelzet and JEDEC

Petitioner contends that claims 1–22 would have been obvious over the combination of Hazelzet and JEDEC. Pet. 44–71. Petitioner and Patent Owner dispute whether JEDEC constitutes a prior art "printed publication" under 35 U.S.C. § 311(b). Pet. 25–29; Resp. 7–12; Reply 2–8; Sur-Reply 1–9. Since we find that other grounds demonstrate unpatentability of all challenged claims, we find it unnecessary to address this issue or ground in this Final Written Decision in order to resolve the dispute between the parties.

### E.    Ground 2: Obviousness Over the Combination of Hazelzet and Buchmann

Petitioner contends that claims 1–22 of the '218 patent are unpatentable as obvious over the combination of Hazelzet and Buchmann. Pet. 42–67. We address Hazelzet and Buchmann and their combination in the following section and conclude that Petitioner has shown claims 1–22 unpatentable for the reasons that follow.

#### 1.    Hazelzet (Ex. 1014)

Hazelzet was published on April 24, 2008 and is titled "High Density High Reliability Memory Module With Power Gating and a Fault Tolerant Address and Command Bus." Ex. 1014, codes (43), (54). Petitioner asserts that Hazelzet is prior art under 35 U.S.C. §§ 102(a), (b), and (e). Pet. 24.

IPR2022-00062
Patent 9,858,218 B1

Hazelzet is generally directed to a high density, high reliability memory controller/interface. Ex. 1014 ¶ 7. Figure 2, reproduced below, is a block diagram of the enhanced server memory arrangement:



FIG. 2

Ex. 1014 ¶ 25.

Figure 2 depicts dual inline memory module ("DIMM") 20 with a "novel ECC/Parity Buffer chip 21" coupled to memory interface chip 18, which is coupled to memory controller or processor 19. *Id.* ¶ 38. Hazelzet describes that "DIMMs are printed circuit cards designed to carry a plurality of DRAMs 22 thereon and the DRAM output pins . . . are connected via the printed circuit to selected connectors 23 along the edge of both the back and front sides of the card." *Id.* ¶ 39. Figure 2 shows "the memory interface chip 18 sends and receives data from the DIMMs via the data line 15 and sends address and commands via line 16." *Id.* ¶ 38. "The memory interface chip 18 then sends and receives data, via line 15, to the memory devices, or

16

IPR2022-00062
Patent 9,858,218 B1

DRAMs 22 and sends address and command information to the register chip
21 via add/cmd line 16 and check bits for error correction purposes to the
ECC/Parity register chip 21 via line 25." *Id.*

Hazelzet further describes that the DIMM has "added error correction
code logic (ECC) incorporated therein for correcting single bit errors while
permitting continuous memory operation independent of the existence of
these errors." *Id.* ¶ 64. Hazelzet also discloses "[a] parity operating mode
. . . to permit the system to interrogate the device to determine the error
condition." *Id.* In this way, Hazelzet describes two modes: "ECC Mode
(/ECC Mode low)" and "parity mode (/ECC Mode high)." *Id.* ¶¶ 69–70; *see
also* Ex. 1014, Fig. 8. In addition, Hazelzet describes error reporting
circuitry, where "[t]wo open-drain outputs are available to permit multiple
modules to share a common signal line for reporting an error that occurred
during a valid command (/CS=low) cycle (consistent with the re-driven
signals)." *Id.* ¶ 72. "/Error (CE) indicates that a correctable error occurred
and was corrected by the ECC logic, /Error (UE) indicates that an
uncorrectable error occurred and depending on the mode selected is an
uncorrectable ECC error or a parity error." *Id.*

> 2.    *Buchmann (Ex. 1016)*

Buchmann was filed on July 1, 2008, issued on March 20, 2012, and
is titled "Power-On Initialization and Test for a Cascade Interconnect
Memory System." Ex. 1016, codes (22), (45), (54). Petitioner asserts that
Buchmann is prior art under 35 U.S.C. § 102(e). Pet. 30.

Buchmann is generally directed to "[a] memory buffer, memory
system and method for power-on initialization and test for a cascade
interconnect memory system." Ex. 1016, code (57). Buchmann describes

IPR2022-00062
Patent 9,858,218 B1

that "the memory buffer includes logic for executing a power-on and initialization training sequence initiated by the memory controller." *Id.* Buchmann discloses that it "is operable in a static bit communication (SBC) mode and a high-speed mode." *Id.* at 1:43–55.

Buchmann describes several training sequences, including training sequence TS0, which "is used to perform upstream (US) and downstream (DS) clock detection and repair (if necessary)." *Id.* at 5:51–53. During this training sequence, the memory module outputs various commands, including TS_done, which "indicates the local and all cascaded MBs are done with TS0." *Id.* at 6:1–20, Table 1. Buchmann also similarly describes other training sequences, TS2 and TS3. *Id.* at 7:15–8:45.

3. *Motivation to Combine Hazelzet and Buchmann*

Petitioner, with supporting testimony from Dr. Alpert, argues there is sufficient motivation to combine Hazelzet with Buchmann. Pet. 32–42 (citing Ex. 1003). Generally, Petitioner contends that "Hazelzet's memory modules would be modified to add the functionality of buffering the data signals similar to that in the DDR3 LRDIMM of the time and an initialization mode ("first mode/operation") into which each module could be switched and which includes training sequences whose completion is reported by the memory buffer using a status signal output over an open drain output (i.e., UE 121) of Hazelzet." Pet. 32 (citing Ex. 1003 ¶ 143).

Petitioner contends that, in the combination of Hazelzet and Buchmann, the training sequences would be like those described as TS0 and TS3 in Buchmann. Pet. 32 (citing Ex. 1016, 5:51–7:2, 8:24–9:18, Figs. 4, 6). According to Petitioner, the drain output signals would be TS0_done and TS3_ack or TS3_done. *Id.* at 32–33. Petitioner notes that Buchmann does

18

IPR2022-00062
Patent 9,858,218 B1

not disclose the memory controller communicating any data with the module
or performing operations to read or write to the memory devices during
either of the TS0 or TS3 sequences.  Pet. 33 (citing Ex. 1003 ¶ 145).

Petitioner contends that Hazelzet's ECC/Parity register would be
modified to implement the training as part of an additional mode to run, for
example, at initialization to switch among modes when appropriate, and to
use the UE 121 open drain output of Hazelzet to communicate the new
notification signals.  Pet. 33 (citing Ex. 1014 ¶ 123; Ex. 1016, 3:49–60).
According to Petitioner, "Hazelzet already uses the UE 121 open drain
output for two different signals in two different modes," and so, Petitioner
reasons, "the ECC/Parity register necessarily includes circuitry for selecting
which signal to drive on the UE 121 output depending upon the mode of the
module."  *Id.*  Petitioner contends "[i]t was well within the level of ordinary
skill to modify such circuitry such that it instead selected among three
different signals, depending upon the mode/operation."  *Id.*  Petitioner
contends a person of ordinary skill in the art "could have made that
modification without undue experimentation and with a reasonable
expectation of success."  *Id.* (citing Ex. 1003 ¶ 146).

Petitioner contends that the combination of Hazelzet and Buchmann
"would employ known open drain signaling circuitry, which necessarily
included a field effect transistor having its source coupled to ground and its
drain as the output."  *Id.* (citing Ex. 1017, Figs. 4, 5).  According to
Petitioner, a person of ordinary skill in the art "would have known that in
order to use open drain signaling to indicate training completion among
multiple modules, the open drain output would have to be configured such
that the transistor output is driven low (ground) while training is still

19

IPR2022-00062
Patent 9,858,218 B1

occurring," and "driven high upon completion." *Id.* at 33–34.  Petitioner
contends that "[t]his is because, with an open drain configuration shared by
multiple modules, any module can individually drive the output low, but it
takes the collective action of all connected modules to drive the output
high." *Id.* at 34.  Petitioner contends that a person of ordinary skill in the art
would "understand that to drive the output low (which would be a low
impedance state), the gate of the transistor must be high, causing the
transistor to conduct and connect the drain to ground." *Id.*  Conversely,
Petitioner contends, "to drive the output high (which would be a high
impedance state), the gate of the transistor must be low, turning the
transistor off." *Id.* (citing Ex. 1014 ¶ 99; Ex. 1017, 5:65–6:18, Figs. 4–5;
Ex. 1003 ¶ 147).

Petitioner argues that the prior art relied on in the Petition is
analogous to the '218 patent both because it is in the same field of endeavor
("memory module design, including error detection and correction,
initialization, training and the use of pins/paths for multiple purposes during
different operations/modes") and reasonably pertinent to the same problems
("increasing memory module capacity, performance, and/or reliability by
sharing an output pin/path to perform multiple functions during multiple
operations/modes, including initialization/training").  *Id.* at 34–35.

Petitioner argues that the combinations are "merely an arrangement of
old elements with each performing the same function it had been known to
perform and yielding no more than what one would expect from such an
arrangement." *Id.* at 35.  Petitioner contends the combinations "would have
been well within the level of ordinary skill in the art" and "would not have
resulted in any unpredictable results." *Id.*  This is a recognized reason to

IPR2022-00062
Patent 9,858,218 B1

combine under *KSR*, 550 U.S. at 417 (citing *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976)).

Petitioner also provides arguments for why a person of ordinary skill in the art would be motivated to add training for the data buffers and other components of a memory module, to add training as a separate mode, and to use the same output for the added training mode. Pet. 35–42 (citing Ex. 1003). Petitioner argues that a person of ordinary skill in the art would be motivated to add training to Hazelzet "because it was known that training improved memory module reliability." Pet. 35–36 (citing Ex. 1014 ¶¶ 1–4, 7, 42, 44, 123; Ex. 1017, 12:36–53; Ex. 1025, 15–18; Ex. 1027, 1:35–2:12; Ex. 1003 ¶ 151). In addition, Petitioner argues that LR-DIMMs and their initialization were known in the art, and provided increased performance and capacity by adding the LR-DIMM's data buffering functionality to Hazelzet's RDIMM. Pet. 36–37 (citing Ex. 1008, 22; Ex. 1003 ¶ 152).

Petitioner also notes that Buchmann discloses "a training phase that allows more flexibility and improved control data exchange during start-up" to establish "reliable communication" on the bus. *Id.* at 38 (citing Ex. 1016, 3:64–67, 14:28–35, 14:5–8). Hence, Petitioner contends that combining Buchmann's training with Hazelzet improves reliability. *Id.* Petitioner further contends that one of ordinary skill in the art would have been motivated to add the functionality of buffering the data signals and corresponding training to Hazelzet's RDIMM because it was a known, reliable technique which improved performance and enabled higher capacity. *Id.* (citing Ex. 1003 ¶¶ 154–156, 158). Petitioner contends the combination of Hazelzet and Buchmann was well within the level of skill in the art at the time and provided no more than expected at the time, a DIMM

IPR2022-00062
Patent 9,858,218 B1

with a buffer to buffer data, address and command signals, and efficient training of that buffer during initialization to ensure optimal read and write performance during normal read and write performance during normal operation. *Id.* (citing Ex. 1003 ¶ 158).

Petitioner argues that a person of ordinary skill in the art would be motivated to add training in a separate mode from normal operation "because it was known that training before normal operation was necessary to minimize errors" in read and write operations. *Id.* at 39–40 (citing Ex. 1016, 12:60–13:41; Ex. 1025, 15–18; Ex. 1022 ¶¶ 32, 52, 88–89, Fig. 4; Ex. 1056, 18, 22, 25–26, 42–44; Ex. 1057, code (57), 2:13–34, 2:60–3:3, 9:11–10:44, Fig. 5; Ex. 1003 ¶¶ 159–161). Petitioner notes that Buchmanns's invention is an "initialization training sequence" that is completed at "power-on," which would suggest to a person of ordinary skill in the art that training before normal operation is important. *Id.* at 39 (citing Ex. 1003 ¶ 159). Since Hazelzet also initializes upon power-on, Petitioner contends that Buchmann's training complements Hazelzet's initialization. *Id.* at 39 (citing Ex. 1014 ¶ 123; Ex. 1025, 15–18; Ex. 1027, 1:61–2:19, 6:24–25, 10:24–45). Petitioner contends that after updating Hazelzet's buffers to buffer both address and data signals, a person of ordinary skill in the art would have been motivated to combine the references such that training in an initialization mode occurred separate from normal operating modes/operations. *Id.* (citing Ex. 1003 ¶ 160).

Petitioner further argues that it would have been obvious to communicate training status in an initialization mode using the same open drain output already used in other modes/operations. Pet. 40 (citing Ex. 1003 ¶¶ 162–164). Petitioner contends that Hazelzet uses the same open

22

IPR2022-00062
Patent 9,858,218 B1

drain output to indicate an "uncorrectable error" in ECC mode and parity
error in parity mode. Pet. 40–41 (citing Ex. 1014, ¶¶ 44, 49, 59, 64, 69, 72,
109, Figs. 4B, 7A; Ex. 1003 ¶ 164). Petitioner contends that this disclosure
would have motivated a person of ordinary skill in the art to use the same
output in the added training mode because the parity and ECC modes would
not be using the open drain output while the training operation was running
during initialization. *Id.* at 41 (citing Ex. 1003 ¶ 165).

Petitioner further notes that multiple use of a pin was known, and
would have been considered an efficient use of the limited number of output
pins on integrated circuits. *Id.* Petitioner points to Kim as an example of
use of an open-drain output on a memory module during multiple modes.
*Id.* (citing Ex. 1017, 1:16–22, 5:49–57, 6:8–16). According to Petitioner,
Kim discloses, in addition to sharing ECC and parity on the error output pin,
that "[i]n alternate exemplary embodiments, other functions also share the
error feedback pin." *Id.* (citing Ex. 1017, 6:16–18; Ex. 1003 ¶ 166).
Petitioner contends that these disclosures would have motivated a person of
ordinary skill in the art to use Hazelzet's UE 121 open-drain output to notify
the memory controller that training was in progress or done. *Id.* (citing
Ex. 1003 ¶ 167).

Dr. Alpert testifies that a person of ordinary skill in the art would have
been motivated to arrange the modified Hazelzet to communicate signals
indicating training completion only when all memory modules have
completed that training, in order to ensure that the entire memory system had
been trained before proceeding to normal operation. *Id.* at 42. As Dr. Alpert
explains, this would permit training to be completed in an orderly and
systematic manner, limiting the complexity of the control circuitry needed to

IPR2022-00062
Patent 9,858,218 B1

implement the training, while using a known, efficient way to do so.  *Id.*
(citing Ex. 1014 ¶¶ 18, 109; Ex. 1017, Fig. 4, 5:65–6:12; Ex. 1043, 7:30–51;
Ex. 1003 ¶ 168).

Petitioner contends that a person of ordinary skill in the art would
have been further motivated to modify Hazelzet as described because
Hazelzet's memory system includes multiple memory modules in need of
training.  *Id.* (citing Ex. 1014 ¶¶ 18, 109; Ex. 1017, Fig. 4, 5:65–6:12;
Ex. 1043, 7:30–51).  Petitioner contends the combinations analyzed here
would allow any module in the system to pull the open drain pin to "low"
while still executing its training sequence, regardless of whether the other
modules in the system have completed training and were no longer pulling
that pin low, thereby delaying normal operations until the system is
completely ready.  *Id.* (citing Ex. 1003 ¶ 169).

Patent Owner contends a person of ordinary skill in the art would not
have combined Hazelzet with Buchmann to arrive at the '218 patent's claims
for several reasons.  Resp. 27–58.  Patent Owner contends that there was no
motivation to redesign Hazelzet's memory module by adding Buchmann's
memory buffer to buffer data signals.  *Id.* at 28, 31–41.  Patent Owner argues
that one of ordinary skill in the art could not combine Buchmann's training
because Hazelzet's memory modules have no buffering and thus are not
compatible with that training.  *Id.* at 31–32 (Ex. 2002, 68:19–79:24,
81:18–83:5; Ex. 2027 ¶¶ 79–84).

Patent Owner's argument considers Hazelzet *in isolation* and does not
properly consider what one of ordinary skill in the art would have
understood from the *combination* of Hazelzet and Buchmann.  "Non-
obviousness cannot be established by attacking references individually

24

IPR2022-00062
Patent 9,858,218 B1

where the rejection is based upon the teachings of a combination of references." *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)).  Hazelzet teaches a memory module with multiple modes that buffers address and command signals.  Ex. 1014 ¶¶ 16, 35.  Buchmann teaches a LR-DIMM memory buffer for buffering *data* as well as address and command signals.  Ex. 1016, 4:14–19, 29:25–47, Figs. 1, 2.  Buchmann's memory buffer uses training to improve its reliability.  Ex. 1016, 3:64–67, 14:28–35, 14:5–8.  Considered together, Hazelzet and Buchmann teach to add data buffering and training to Hazelzet's memory module.

Patent Owner argues that Petitioner's grounds require redesign of Hazelzet's memory modules to add Buchmann's memory buffers to buffer data signals, i.e., to change Hazelzet's RDIMM to an LR-DIMM. Resp. 32–34; Sur-Reply 17–20.  Patent Owner contends that Petitioner's argument for changing Hazelzet for "increased performance and capacity" is conclusory.  Resp. 32.  Patent Owner further contends the motivation to combine comes from a reference that is not part of the proposed grounds and is not prior art to the '218 patent (Ex. 1036).  *Id.* at 33 (citing *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1336 (Fed. Cir. 2020)).  Patent Owner further contends the industry debated tradeoffs between LR-DIMMs and RDIMMs, and found RDIMMs less expensive with higher performance compared with LR-DIMMs.  Pet. 34 (citing Ex. 2017, 3; Ex. 2027 ¶¶ 88–92).

Patent Owner's arguments do not undermine Petitioner's showing of a motivation to combine Hazelzet and Buchmann.  Petitioner has shown sufficiently that UDIMM, RDIMM, FBDIMM, and LR-DIMM modules

25

IPR2022-00062
Patent 9,858,218 B1

were known alternatives with known tradeoffs at the time of the '218 patent.
Reply 16–20 (citing Ex. 1077, 61:5–10; 98:11–20); Sur-Reply 17–21.
Under appropriate circumstances, such as the need for increased
performance and memory capacity, it is clear from the record that one of
ordinary skill in the art would have elected to use LR-DIMMs over
RDIMMs.  Pet. 37 (citing Ex. 1003 ¶¶ 155–156; Ex. 1028 ¶ 31);
Reply 21–22.  As Petitioner contends, load reduction in LR-DIMMs permits
high-speed controllers to drive larger quantities of data and provides for a
higher capacity memory module.  Reply 21–22 (citing Ex. 2017, 1, 3;
Ex. 2006, 4–5).  Although Patent Owner debates whether an LR-DIMM has
"increased performance" over an RDIMM, Patent Owner does not dispute
that an LR-DIMM has "increased capacity" relative to an RDIMM.  Patent
Owner contends that Petitioner's reasons of "increased performance and
capacity" for upgrading Hazelzet's RDIMM to the LRDIMM of Buchmann
are conclusory.  Resp. 32–33; Pet. 37.  However, Hazelzet explicitly
mentions its objectives as a "high density and enhanced reliability memory
solution at low cost."  *See* Ex. 1014 ¶ 7.  Patent Owner does not explain why
Hazelzet's enhanced reliability does not serve to increase performance, or
why Hazelzet's higher density does not serve to increase capacity.

Thus, Petitioner's proposed motivation to combine is based on the
teachings of the references and other evidence.  And, as noted, Petitioner
does not rely solely on JEDEC (Exhibit 1036) for the motivation to combine
Hazelzet and Buchmann.  Accordingly, Patent Owner's arguments do not
undermine Petitioner's motivation to combine.

Patent Owner argues that Hazelzet suggests an alternative to adding
more complex data line buffers to its memory architecture.  Resp. 35 (citing

IPR2022-00062
Patent 9,858,218 B1

Ex. 1014 ¶ 14; Ex. 2027 ¶¶ 93–110, 119–123); *see also* Sur-Reply 21–22.
Patent Owner argues that a person of ordinary skill in the art would have
understood that implementing such a feature would not necessarily have
been desired nor the right choice in designing a memory system. Resp. 35
(citing Ex. 2027 ¶¶ 98–105). For instance, Patent Owner contends that
memory modules that buffered data signals had several disadvantages, such
as increased complexity, power consumption, and increased costs. *Id.*
(citing Ex. 1027, 2:12–19). Patent Owner further contends that training
sequences may require bi-directional data and corresponding circuitry which
would increase device complexity and cost, and may worsen signal
transmission characteristics and therefore reliability. *Id.* (citing Ex. 2027
¶ 99).

Patent Owner's argument that adding data line buffers to a memory
architecture may not be the right choice in designing a memory system in
some cases does not negate Petitioner's contention that, in other cases, it
would be the most advantageous option considering such factors as
performance, complexity, power consumption, and cost. As noted,
Petitioner's combination basically uses Hazelzet's RDIMM as a foundation
and adds Buchmann's LR-DIMM data buffering and training to create a
modified LR-DIMM memory module. Petitioner submitted persuasive
evidence that LR-DIMMs are desirable for higher speed and capacity.
Pet. 35, 37 (citing Ex. 1036, 5; Ex. 1003 ¶¶ 155–156, 158); Reply 21–23
(citing Ex. 2017, 1, 3; Ex. 2006, 4, 5).

With regard to bi-directional data exchange, Patent Owner contends
that it *would* be required by Petitioner's combination, but the evidence is
much less certain, stating "this training sequence *may* require bi-directional

27

IPR2022-00062
Patent 9,858,218 B1

data exchange" and "*may* require a disadvantageous addition of circuitry" which "*may* worsen signal transmission characteristics."  Resp. 35, 42 (citing Ex. 1027, 2:12–19); Sur-Reply 21–22.  This falls short of stating that bi-directional data exchange or addition of circuitry is *required* in Petitioner's proposed combination, or that such added circuitry *would* worsen signal transmission.  And Patent Owner does not contend that RDIMM is *always* more advantageous than LR-DIMM.

Patent Owner further argues that "Hazelzet teaches that its solution strikes a balance between performance, capacity, reliability, and cost for low or midrange systems, which a person of ordinary skill in the art would have understood likely precludes memory modules that buffered data signals." Resp. 35–36 (citing Ex. 1014 ¶¶ 1–6; Ex. 2027 ¶¶ 106–110).  Patent Owner contends that a person of ordinary skill in the art would have understood that Hazelzet's memory system accomplished those goals without requiring additional, more complex hardware, and counsels against doing so.  *Id.* at 36 (citing Ex. 2027 ¶ 108).  We do not discern any disclosure in the cited parts of Hazelzet that precludes buffering of data signals, or the addition of components such as a data buffer.  Consequently, we do not agree with Patent Owner's arguments.

Patent Owner further argues that Hazelzet teaches away from more complex memory modules that buffered data signals by "eliminating the need to produce or procure two types of buffer devices or to redesign existing memory modules." *Id.* at 36–37 (citing Ex. 1014 ¶ 14; Ex. 2027 ¶ 109).  Patent Owner contends that a person of ordinary skill in the art would be led in a direction divergent from adding more costly and complex memory components that buffer data signals, contrary to Hazelzet's intended

IPR2022-00062
Patent 9,858,218 B1

purpose to use "reduced-function memory assemblies" for the "low or midrange markets." *Id.* at 37 (citing *In re Gurley*, 27 F.2d 551, 553 (Fed. Cir. 1994)). Patent Owner argues that Petitioner's conclusory motivation is driven only by increased performance and capacity, and fails to consider Hazelzet's disclosure as a whole, which balances trade-offs between reliability, performance, capacity, and cost. *Id.*

We agree with Petitioner that Hazelzet does not "criticize, discredit, or otherwise discourage" memory modules with data buffers. Reply 22; *see Galderma Laboratories, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013) (a prior art reference does not teach away if it does not criticize, discredit, or otherwise discourage investigation into the invention claimed). Moreover, Hazelzet states that its memory module is "capable of meeting the *desired* density, performance and reliability requirements." Ex. 1014 ¶ 7 (emphasis added). Hazelzet thus provides the designer freedom to select density, performance, and reliability according to the designer's requirements, which may encompass increased performance and capacity, and may involve the addition of components.

Patent Owner further argues that the Petition failed to demonstrate how the proposed combination could have been done. Resp. 37–38. Patent Owner argues that Petitioner makes a conclusory contention that "such an upgraded LRDIMM would have worked even in Hazelzet's RDIMM platforms (with appropriate BIOS changes)." *Id.* at 37–38. Patent Owner contends that the document that Petitioner cites as supportive of its contention states that "the controller must have the capability to do address mirroring." *Id.* at 38. Patent Owner contends that Hazelzet does not have a controller with the capability to do address mirroring. *Id.* (citing Ex. 2027

29

IPR2022-00062
Patent 9,858,218 B1

¶ 101).  Patent Owner further contends that Petitioner does not address the problems associated with LR-DIMMs in the contemporaneous art (such as complication of memory configuration, mismatch of signals between host and memory interface, and reduced timing margins), or address how a person of ordinary skill in the art would implement LR-DIMMs in Hazelzet. *Id.* (citing Ex. 2007, 1:37–61; Ex. 2008, 2:12–30; Ex. 2009 ¶ 3; Ex. 2010, 4:8-61; Ex. 2027 ¶¶ 102–106).  Patent Owner contends each of these problems is associated with the resulting performance and reliability of LR-DIMMs, and associated read and write functionality in normal operation.  *Id.* According to Patent Owner, modifying Hazelzet to implement an LR-DIMM would introduce many problems when performing the read and write operations required by the claims.  *Id.* (citing Ex. 2027 ¶¶ 104–105).

Although Patent Owner indicates several alleged problems with LR-DIMMs, LR-DIMMs were known alternatives for RDIMMs like Hazelzet. Reply 22; *see also* Ex. 2007, Fig. 2; Ex. 1077, 95:9–96:25; Ex. 2023, 294:5–296:4.  Petitioner also notes that "address mirroring" was merely an optional technique for LR-DIMMs that was already standardized for UDIMMs.  Reply 22 (citing Ex. 1077, 181:8–17, 188:8–11).  Patent Owner does not explain why "address mirroring" would be necessary in Petitioner's combination, or why the alleged problems with the LR-DIMMs of Petitioner's combination could not have been overcome by a person of ordinary skill in the art.

Patent Owner also contends that Petitioner's expert previously admitted that his analysis was "not concerned with the physical embodiments and how . . . those structures might be physically modified. . . . I haven't considered what—you know, exactly how those changes

30

IPR2022-00062
Patent 9,858,218 B1

would be made." Resp. 39 (citing Ex. 2002, 68:19–69:20; Ex. 2027 ¶ 105).
Patent Owner's argument is premised on "physical" or "bodily"
incorporation of the teachings of one reference into the other, which is not
the standard by which obviousness is determined. "[I]t is not necessary that
the inventions of the references be physically combinable to render obvious
the invention under review." *In re Sneed*, 710 F.2d 1544, 1550 Fed. Cir.
1983 (citing *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1013
(Fed. Cir. 1983); *In re Andersen*, 391 F.2d 953, 958 (CCPA 1968)). We find
no error in Petitioner's expert's approach for it is the concepts taught by the
Hazelzet and Buchmann that are being combined in the obviousness
analysis, not necessarily any physical embodiments.

Patent Owner argues that "the conclusory testimony of Petitioners'
expert does not provide an articulated motivation to change Hazelzet's
memory modules to add . . . Buchmann's memory buffers, or demonstrate
that such combination could even be done." Resp. 39 (citing Ex. 2027
¶ 106). Patent Owner contends that conclusory statements do not amount to
substantial evidence. *Id.* (citing *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d
1352, 1358 (Fed. Cir. 2019)).

We do not agree that Petitioner's expert's testimony was conclusory
or failed to explain how the combination would be done. Petitioner's expert
references the '218 patent, Hazelzet, Buchmann, and other evidence as
supporting his testimony and establishing a reasonable expectation of
success. Ex. 1003 ¶¶ 143–169. For example, the Petition specifically
identifies that a problem addressed by the '218 patent, Hazelzet, and
Buchmann is increasing memory module capacity, performance, and/or
reliability by sharing an output pin/path to perform multiple functions during

31

IPR2022-00062
Patent 9,858,218 B1

multiple operations/modes, including initialization/training.   Pet. 35 (citing
Ex. 1001, code (57), 5:66–6:14, 8:4–48; Ex. 1014, code (57), ¶¶ 7, 69–70,
123; Ex. 1016, 1:7–9, 3:49–60, 4:51–5:50, 12:60–13:41, 14:1–63, 20:20–
21:19, 33:45–67; Ex. 1022 ¶¶ 4, 5, 32–33, 52; Ex. 1025, 15–18; Ex. 1027,
1:61–2:19, 6:24–25, 10:24–45; Ex. 1017, 1:16–22, 5:49–57, 6:8–18,
11:20–34, 12:36–53; Ex. 1003 ¶ 148).   The motivation to combine may be
found in the nature of problem to be solved, leading one to look to
references relating to possible solutions to that problem.  *Ruiz v.*
*A.B. Chance Co.*, 357 F.3d 1270, 1276–77 (Fed. Cir. 2004).

Patent Owner further argues that Buchmann provides no motivation to
combine because "Petitioner points to nothing in Buchmann that would have
motivated a person of ordinary skill in the art to modify Hazelzet's memory
buffer to also buffer the data signals."  Resp. 40.  Patent Owner argues that
both references recognize that, in designing a memory system, various
constraints including power, performance, and costs need to be considered.
*Id.*  Patent Owner contends that Buchmann would have recognized that
adding the functionality of buffering data signals would require various
factors, such as decreased speeds and higher cost.  *Id.* at 41.  Patent Owner
contends that both references considered tradeoffs, but reached two very
different solutions for different purposes.  *Id.*

As noted previously, Hazelzet teaches a memory module "capable of
meeting *desired* density, performance and reliability requirements."
Ex. 1014 ¶ 7.  Similarly, Buchmann teaches that "placing more technology-
specific functionality local to the memory subsystem, such benefits as
improved performance, increased design flexibility/extendibility, etc., may
be obtained, often while making use of unused circuits within the

IPR2022-00062
Patent 9,858,218 B1

subsystem." Ex. 1016, 32:30–34.  Hence, Hazelzet's and Buchmann's purposes and solutions are aligned with respect to capacity (density, extendibility) and performance, contrary to Patent Owner's argument.

Patent Owner argues that there is no motivation to add a separate training mode in Hazelzet, let alone the specific training of Buchmann. Resp. 41–53; Sur-Reply 21–24.  Patent Owner argues that adding training to Hazelzet would have added unnecessary complexity and cost.  Resp. 41–43. However, Patent Owner's expert admitted that it was "very well known to one of ordinary skill in the art that there was an initialization mode, and there was a normal mode," for both RDIMMs (like Hazelzet) and LR-DIMMs (with data buffers).  Reply 23 (citing Ex. 1077, 110:9–20).  Patent Owner's expert further admitted that persons of ordinary skill in the art knew about the need to train memory modules, including LR-DIMMs, in an initialization mode, especially as the speed of the memory devices increases. Reply 23–24 (citing Ex. 1077, 155:7–22 ("training is required to…set the timing optimally so that part can achieve its highest performance and have its best reliability"); Ex. 2027 ¶¶ 95–96.  We agree with Petitioner that high-speed operations require training, and that cost and complexity are lesser concerns when high-speed performance is required.  *See* Reply 24.

Patent Owner further argues that Hazelzet provides no motivation to combine because it is silent regarding training.  Resp. 44–46.  Petitioner notes that Hazelzet does not exclude training during initialization, and teaches that its initialization will depend "on the available interface busses, the desired initialization speed, available space, cost/complexity objectives, subsystem interconnect structures, the use of alternate processors . . .etc." Reply 24 (citing Ex. 1014 ¶ 123).  We agree with Petitioner that Hazelzet is

33

IPR2022-00062
Patent 9,858,218 B1

not limited to any specific initialization, and Buchmann discloses training during initialization, with undisputed benefits for the data buffer. Reply 24–25 (citing Ex. 1016, code (57)).

Patent Owner further argues that Hazelzet and Buchmann teach different solutions to different problems. *Id.* at 48–53. Patent Owner argues training per Buchmann and error correction code (ECC) are not the same because training seeks to correct errors prior to transmission whereas ECC corrects errors after transmission. *Id.* at 48. Petitioner agrees that ECC is not a substitute for training, and that training would be required for reliable high-speed operations using data buffers, as discussed above, but, in any event, Patent Owner's argument does not negate Petitioner's motivation to combine. Reply 25.

Patent Owner argues that the Petition relies on hindsight. Resp. 53–58. Patent Owner argues that Petitioner relied on adding training to Hazelzet to "improve reliability" but indicates there would be no reason to implement a memory buffer just to add training to Hazelzet. *Id.* at 53. Petitioner contends that Patent Owner's hindsight argument repeatedly ignores Petitioner's motivation for adding a data buffer to Hazelzet. Reply 16–23, 25. We agree with Petitioner that Patent Owner's arguments do not adequately address Petitioner's reasons to combine. *See* Reply 16–23. Nor does Petitioner change its argument relative to a previous IPR since it was not involved in that IPR. Reply 26; Resp. 55–57. Patent Owner further argues that Petitioner's expert engages in hindsight by looking at the training sequences to see if any satisfy the claim limitations. Resp. 58. We agree with Petitioner that Patent Owner's assertion takes Petitioner's expert's testimony out of context, and that Dr. Alpert first made the

34

IPR2022-00062
Patent 9,858,218 B1

combination from the point of view of a person of ordinary skill in the art, and then considered whether the combination satisfied the claim language. Reply 26 (citing Ex. 2023, 221:22–222:8, 227:21–228:11). In any case, any judgment on obviousness is in a sense "necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (C.C.P.A. 1971).

Patent Owner contends that all grounds fail because there is no teaching, suggestion or motivation to use Hazelzet's UE line to communicate training signals. Resp. 59–70. Petitioner contends that the Petition explained the motivation for using Hazelzet's open-drain line for notifications signals in Grounds 1–3. Reply 26–27 (citing Pet. 40–42). We agree with Petitioner.

Patent Owner contends that Hazelzet describes using a bus to perform initialization distinct from the UE line. Sur-Reply 24. Patent Owner contends that the bus is needed for reporting or responding to operational subsystem information. *Id.* (citing Ex. 1014 ¶¶ 124–125; Ex. 2027 ¶¶ 166–171). Petitioner's combination does not exclude use of a bus—it merely uses the UE line to report training completion. That other information may be exchanged between the controller and memory module does not negate Petitioner's combination.

Patent Owner further argues that Buchmann does not implement the claimed notification signal with an open drain (*id.* at 25), which is an attack on Buchmann alone without considering its combination with Hazelzet. *See*

35

IPR2022-00062
Patent 9,858,218 B1

*Merck, supra*. Patent Owner's argument that Hazelzet has other unused pins available during initialization (*id.* at 26) does not negate that Petitioner's motivation stems from using a pin that has a dual purpose, suggesting it would also be useful for a separate training mode. And we do not agree with Patent Owner's argument that Petitioner fails to support its contention that use of open-drain signaling was a known efficient way to indicate that all modules had completed training. Petitioner shows that Hazelzet has multiple modules and that normal operations would be delayed until all modules completed training and were no longer pulling the UE pin low. Pet. 42 (citing Ex. 1003 ¶ 169). And Dr. Alpert relies on evidence in Hazelzet describing use of the open drain UE pin by multiple modules. Ex. 1003 ¶ 169 (citing Ex. 1014 ¶¶ 18, 109). Thus, it is not true his testimony lacked support.

Specifically, Hazelzet uses the same open drain output UE 121 to indicate "uncorrectable error" in ECC mode and parity error in parity mode. Pet. 40–41 (citing Ex. 1014 ¶¶ 44, 49, 59, 64, 69, Figs. 4B, 7A). One would have been motivated to use the same output for the training mode/operation separate from the ECC and parity modes. *Id.* at 40–41 (citing Ex. 1003 ¶ 165). And multiple use of a pin was known. *Id.* at 41 (citing Ex. 1003 ¶ 166; Ex. 1017, 1:16–22, 5:49–57, 6:8–18; Ex. 1022 ¶¶ 4, 5, 32–33, 52; Ex. 1003 ¶ 166). Petitioner contends that these disclosures would have motivated a person of ordinary skill in the art to use Hazelzet's UE 121 open-drain output to notify the memory controller that the training was in progress or done. *Id.* (citing Ex. 1003 ¶ 167). And Dr. Alpert explains that a person of ordinary skill in the art "would have been motivated to arrange the modified Hazelzet to communicate signals indicating training

36

IPR2022-00062
Patent 9,858,218 B1

completion only when all memory modules have completed that training, in order to ensure that the entire memory system had been trained before proceeding to normal operation." *Id.* at 42 (citing Ex. 1003 ¶ 168). Petitioner contends that this "would permit training to be completed in an orderly and systematic manner, limiting the complexity of the control circuitry needed to implement the training, while using a known, efficient way to do so." *Id.* (citing Ex. 1014 ¶¶ 18, 109; Ex. 1017, 5:65–6:12, Fig.4; Ex. 1043, 7:30–51; Ex. 1003 ¶ 168).

Patent Owner contends that Hazelzet "teaches away" from using its open-drain UE line during initialization. Resp. 61–64. Patent Owner, however, has not identified any teaching in Hazelzet that "criticizes, discredits, or otherwise discourages" using the UE line during initialization. *See Galderma Laboratories, supra.* Patent Owner's expert admitted that an open-drain output was a simple, well-known technique for implementing a logical OR function as a way to indicate whether all memory modules had completed their training using an open-drain line not otherwise used during initialization. Reply 27 (citing Ex. 1077, 178:21–179:25; Ex. 1003 ¶¶ 166–169; Pet. 40–42). Patent Owner argues that Hazelzet discloses only error reporting on the open-drain UE line, but ignores its combination with Buchmann which teaches notifying training status. *Id.* Hazelzet's UE line provides notifications in two different modes, thus motivating a person of ordinary skill in the art to use it for the additional function of notifying training completion in an initialization mode when combined with Buchmann. Reply 28 (citing Ex. 1003 ¶¶ 164–167). We agree with Petitioner that one of ordinary skill in the art would have understood the advantages of using an open-drain line like Hazelzet's UE line efficiently for

IPR2022-00062
Patent 9,858,218 B1

the specific task of notifying training completion by all of multiple modules. *Id.* (citing Ex. 1003 ¶¶ 168–169).

Patent Owner argues that Hazelzet discloses using a bus for some initialization tasks. Resp. 62–64. Petitioner contends Hazelzet does not require using the bus, explaining that "[i]nitialization of the memory subsystem may be completed via one or more methods, based on the available interface busses, the desired initialization speed, available space, cost/complexity objectives, subsystem interconnect structures." Reply 28 (citing Ex. 1014 ¶ 123). This statement implies flexibility in how initialization is carried out. We agree with Petitioner that since the UE line was available for training during initialization, it would have been obvious to use the UE line to signal completion of training by a module. *Id.*

Patent Owner further argues that Buchmann does not disclose an open drain for training signals. Resp. 64–68. This is again an attack on the reference individually without considering it in combination with Hazelzet as proposed by Petitioner. *See Galderma Laboratories, supra.* Petitioner combined Hazelzet with Buchmann such that Buchmann's training completion is communicated through Hazelzet's open-drain UE line, providing obvious advantages. Reply 29 (citing Pet. 32–34, 40–42).

Patent Owner argues that Buchmann's UE line is not open-drain and is not used for training, and that instead a 6-bit bus carries training. Resp. 64–66. Petitioner explains, however, that Buchmann's UE line is not between the memory modules and the memory controller, but is inside SBC receiver circuity, which would have motivated a person of ordinary skill in the art to use Hazelzet's open-drain UE line between the memory controller

IPR2022-00062
Patent 9,858,218 B1

and multiple modules to indicate in a simple and efficient way that all modules completed training. Ex. 1003 ¶¶ 162–169.

Petitioner contends that Patent Owner crops Petitioner's expert's testimony to create confusion about Dr. Alpert's testimony. Reply 29; Resp. 67–68. Petitioner contends that Dr. Alpert's testimony is consistent that "the memory controller in Hazelzet would be modified to initiate training commands, training sequences like Buchmann does, and that the success or failure of those training sequences would be indicated by a status on the UE signal line that comes back from the module to the memory controller in Hazelzet." Reply 29 (citing Ex. 2003 at 121:16–22).

Petitioner further argues that in the final written decision for IPR2018-00303, Paper 42 (Ex. 1034), the Board determined similar limitations in another patent of Patent Owner obvious over the combination of Hazelzet and Buchmann. Reply 30 (citing Ex. 1034, 15, 22). As we address the merits of this case, we do not reach Petitioner's argument that Patent Owner is collaterally estopped in this proceeding by the final written decision in IPR2018-00303.

Patent Owner argues that a person of ordinary skill in the art would not have implemented a notification signal associated with a training sequence via an open drain output because there are at least two other "straight forward" implementations that the references would have instructed a person of ordinary skill in the art to do. Resp. 68–70 (citing Ex. 2027 ¶ 179). According to Patent Owner, one implementation is to use the memory controller, and not a component on the memory module, to conduct the training. Resp. 69. Since the memory controller conducts the training, no notification signal is needed to indicate to it when training is

IPR2022-00062
Patent 9,858,218 B1

completed.  *Id.*  In the other implementation, Patent Owner contends that Hazelzet teaches to use a separate, distinct bus, and not the UE line.  Resp. 70 (citing Ex. 2027 ¶ 181).

That there may be other ways to combine Hazelzet and Buchmann does not negate Petitioner's showing of a motivation to combine in the particular way that Petitioner indicated a person of ordinary skill in the art would have pursued.  On this record, we are persuaded that Petitioner has provided sufficient reasoning to combine Hazelzet with Buchmann.  Pet. 32–42.  More specifically, Petitioner has provided sufficient evidence of motivation to add Buchmann's buffering of data signals to Hazelzet, similar to a DDR3 LRDIMM, because it was a known, reliable technique to improve performance and increase capacity of Hazelzet's memory module.  *Id.* at 32 (citing Ex. 1003 ¶ 143; ), 37 (citing Ex. 1028 ¶ 31; Ex. 1036, 5; Ex. 1003 ¶¶ 155–156), 38 (citing Ex. 1003 ¶¶ 154–156, 158).  Petitioner has also provided the motivation to add Buchmann's training to Hazelzet in order to improve reliability.  *Id.* at 35–36 (citing Ex. 1014 ¶¶ 1–4, 7, 42, 44, 123; Ex. 1017, 12:36–53; Ex. 1025, 15–18; Ex. 1027, 1:35–2:12; Ex. 1003 ¶¶ 151–152, 154).  Petitioner further provides evidence that adding training in an initialization mode before normal operation was necessary to minimize errors and ensure correct read and write operations.  *Id.* at 39 (citing Ex. 1014 ¶ 123; Ex. 1022, ¶¶ 32, 52, 88–89, Fig. 4; Ex. 1025, 15–18;; Ex. 1027, 1:61–2:19, 6:24–25, 10:24–45; Ex. 1056, 18, 22, 25–26, 42–44; Ex. 1057, code (57), 2:13–34, 2:60–3:3, 9:11–10:44, Fig. 5; Ex. 1003 ¶¶ 159–160).  Petitioner further sets forth motivation to communicate training status in an initialization mode using the same open drain output used in other modes/operations.  *Id.* at 40–42 (Ex. 1014, Figs. 4B, 7A, ¶¶ 18, 44, 49, 59,

IPR2022-00062
Patent 9,858,218 B1

64, 69, 72, 109; Ex. 1022 ¶¶ 4–5, 32–33, 52; Ex. 1043, 7:30–51; Ex. 1003
¶¶ 162–169).

In its Sur-Reply, Patent Owner argues that Hazelzet and Buchmann
are not analogous art. Sur-Reply 14–16. This is largely new argument,
which is improper in a sur-reply. *See* 37 C.F.R. § 42.23(b); Consolidated
Trial Practice Guide "TPG"[7] 73–75. In any case, we do not agree with
Patent Owner that Petitioner overstates the field of endeavor as memory
module design. Hazelzet and Buchmann repeatedly mention "design" in the
context of a memory module and its components. Ex. 1014 ¶¶ 39, 65,
67–68, 83, 90, 105; Ex. 1016, 2:30–51. Patent Owner insists that the
problem addressed in Hazelzet is not increasing memory module capacity,
performance, and reliability, but the reference is titled "High Density High
Reliability Memory Module . . ." that is "capable of meeting desired density,
performance and reliability requirements" at "low cost." Ex. 1014, code
(54), ¶ 7. But, Buchmann teaches that "[b]y placing more technology-
specific functionality local to the memory subsystem, such benefits as
improved performance, increased design flexibility/extendibility, etc., may
be obtained, often while making use of unused circuits within the
subsystem." Ex. 1016, 32:30–34 (*see also* 32:7–30). These overlapping or
identical problems and solutions would have drawn the person of ordinary
skill in the art to consider Hazelzet and Buchmann together.

In the Sur-Reply, Patent Owner contends that the combinations in the
asserted grounds are not a mere arrangement of old elements performing
known functions yielding expected results. Sur-Reply 16. Patent Owner

[7] The Consolidated Trial Practice Guide "TPG" is available at
www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2022-00062
Patent 9,858,218 B1

contends that adding data buffers to Hazelzet's module, adding a new training mode, and using a UE line on Hazelzet's redesigned module to report notifications of the new training mode would require substantial reconstruction and redesign of the elements without expectation of success. *Id.* Although data buffers and training may be "new" in the sense that Hazelzet does not have them, they are not new in the art, as Buchmann shows. *See* Ex. 1016, code (57). And understanding that Hazelzet uses a dual-purpose open drain output to signal different parameters in different modes, adding another training mode and a notification signal for that open drain output would have been straightforward for a person of ordinary skill in the art. *See* Ex. 1014 ¶ 59, Fig. 4B.

Patent Owner argues that there is no motivation to combine data buffers with Hazelzet. Sur-Reply 17. Patent Owner argues that Petitioner goes outside the bounds of Hazelzet and Buchmann by relying on Kim and Exhibits 1036 and 1037 and other evidence for ground 2 (Kim is expressly relied upon as evidence in ground 3 of the Petition (Pet. 4)). As discussed below, there is no need to reach Kim or Exhibits 1036 and 1037 to find the claims unpatentable over the combination of Hazelzet and Buchmann alone.

Patent Owner further argues that Buchmann provides no motivation to add training to a system like Hazelzet's which lacks a data buffer. Sur-Reply 20–24. Patent Owner contends that merely adding training to Hazelzet would not teach, suggest, or motivate a person of ordinary skill in the art to add training in a way that would implement the novel notification signal required by all claims. *Id.* at 20. Further, Patent Owner contends that if one added training, one of ordinary skill in the art would have used Hazelzet's existing architecture with Hazelzet's memory controller. *Id.*

IPR2022-00062
Patent 9,858,218 B1

Patent Owner's arguments fail to take into account Buchmann's teachings that "[a]dditional functions that may reside local to the memory subsystem include write and/or read buffers, . . . error detection and/or correction circuitry on one or more busses, . . . , operational and/or status registers, initialization circuitry, self-test circuitry (testing logic and/or memory in the subsystem), performance monitoring and/or control, . . . and other functions that may have previously resided in the processor, memory controller or elsewhere in the memory system." Ex. 1016, 32:7–22. Buchmann further states "[b]y placing more technology-specific functionality local to the memory subsystem, such benefits as improved performance, increased design flexibility/extendibility, etc., may be obtained, often while making use of unused circuits within the subsystem." *Id.* at 32:30–34. In other words, Buchmann identifies the design trend of moving functionality from the system processor or memory controller to the memory module. *See KSR*, 550 U.S. at 418 ("Often, it will be necessary for a court to look to . . . the effects of demands known to the design community . . . to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue").

Patent Owner argues that "Petitioner did not rebut [Patent Owner's] evidence that teaches away from adding complex and costly training to Hazelzet." Sur-Reply 21. But the only "teaching away" argument in the Response relates to adding a notification signal to Hazelzet's UE line. *See* Resp. 60–64. We do not consider new arguments in a Sur-Reply. *See* 37 C.F.R. § 42.23(b); TPG[8] 73–74.

---

[8] http://www.uspto.gov/sites/default/files/documents/tpgnov.pdf.

IPR2022-00062
Patent 9,858,218 B1

In sum, we find that one of ordinary skill in the art would have been motivated to combine Hazelzet and Buchmann for the reasons Petitioner has stated, notwithstanding Patent Owner's arguments to the contrary. We now consider whether each of the limitations of claim 1 are met by the combination of Hazelzet and Buchmann.

    4.    *Analysis of Independent Claim 1*

    a)    *Limitation 1.a: "A memory module operable with a memory controller of a host system"*

Petitioner asserts that Hazelzet discloses the preamble. Pet. 44. Specifically, Petitioner contends that Hazelzet "discloses dual inline memory modules ('DIMMS') configured to operate with the 'memory controller' of the host system." *Id.* (citing Ex. 1014 ¶¶ 36–39, Figs. 2, 3A–3D; Ex. 1003 ¶ 172). For example, Hazelzet's Figure 2 depicts a DIMM "coupled to the memory interface chip 18 which is in turn coupled to the memory controller or processor 19." Ex. 1014 ¶ 38.

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches the preamble.[9]

    b)    *Limitation 1.b: "a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections, second edge connections, and an*

---

[9] Neither party argues whether the preamble limits claim 1. We find that the evidence supports that the prior art teaches the preamble, so we do not address whether the preamble of claim 1 is limiting.

IPR2022-00062
Patent 9,858,218 B1

> *error edge connection in addition to the first edge*
> *connections and the second edge connections"*

Petitioner asserts that Hazelzet discloses this limitation. Pet. 44–48.
For example, Petitioner relies in part on Figures 3A–3D, which depict
alternative views of the DIMMS, which "are printed circuit cards designed
to carry a plurality of DRAMs 22 thereon and the DRAM output pins . . . are
connected via the printed circuit to selected connectors 23 along the edge of
both the back and front sides of the card." Pet. 44–46 (citing Ex. 1014 ¶ 39;
Ex. 1003 ¶¶ 175–176. Petitioner also relies on Figures 9 and 11 and their
associated descriptions to disclose the "edge connections that fit into a
corresponding slot of the host system so as to be in electrical communication
with the memory controller." Pet. 46–47 (citing Ex. 1014 ¶¶ 39, 97, Figs. 9,
11; Ex. 1003 ¶ 177). In addition, Petitioner relies on Figures 7A–7C to
teach a first set of edge connections for communicating data signals between
the module and the memory controller (data edge connections including pins
11, 12, 17, 18, 22, 23, 31, 32, 37, 38) and a second set of edge connections
for communicating address and control signals from the memory controller
(address edge connections including pins 67, 70, 72–75, 82, 205–207,
210–213, 220, 277 and command edge connections including pins 86, 89,
91, 93). *Id.* at 47 (citing Ex. 1014 ¶¶ 15, 35, 38, 41, Figs. 7A–7C; Ex. 1003
¶ 179). Petitioner also contends that Hazelzet discloses an error edge
connection (uncorrectable error pin UE (142) in Figure 7A) coupled to the
open drain output of the module controller. *Id.* at 47–48 (citing Ex. 1014,
¶¶ 72, 109, Figs. 4B, 7A; Ex. 1003 ¶ 164).

IPR2022-00062
Patent 9,858,218 B1

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> c)    Limitation 1.c: *"dynamic random access memory elements on the printed circuit board"*

Petitioner asserts that Hazelzet discloses this limitation. Pet. 48. For example, Hazelzet describes that "[t]he DIMM of the present invention is comprised of a printed circuit board having a front side and a back side and a plurality of double data rate (DDR) DRAMs or synchronous dynamic random access memories (SDRAMs) affixed to both the front surface and the back surface." Pet. 48 (citing Ex. 1014 ¶ 15, Figs. 2, 3A–3D; Ex. 1003 ¶ 183).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> d)    Limitation 1.d: *"a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection"*

Petitioner asserts that Hazelzet discloses this limitation. Pet. 48. Specifically, Petitioner contends that Hazelzet discloses an "ECC/Parity register ('module controller')," that is on the "'printed circuit board' and coupled to the DRAMs," and "having an output for uncorrectable errors shown in FIG. 4B as '/ERROR (UE) 121' (i.e., UE 121), which is an 'open drain output.'" *Id.* (citing Ex. 1014 ¶¶ 39, 42, 44, 59, 72, Figs. 3A–3D, 4A, 4B) (emphases omitted). Petitioner further contends that "[t]he output UE 121 is 'coupled to the error edge connection' of the module." *Id.* (citing

IPR2022-00062
Patent 9,858,218 B1

Ex. 1014 ¶¶ 59, 72, Figs. 4B, 7A (pin 142); Ex. 1003 ¶¶ 187–190) (emphasis omitted).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> e)    Limitation 1.e: *"wherein the memory module is operable in at least a first mode and a second mode, wherein the memory module in the first mode is configured to be trained with one or more training sequences"*

Petitioner asserts that Hazelzet, in combination with Buchmann, discloses this limitation. Pet. 48–49. Specifically, Petitioner asserts Hazelzet discloses that its memory module (DIMM) "is configurable to operate in (1) a 'parity mode,' which is the claimed 'second mode,' and (2) an 'ECC mode.'" *Id.* at 48 (citing Ex. 1014 ¶¶ 64, 69–72, Fig. 8) (emphasis omitted). To disclose the "first mode," Petitioner relies on Buchmann. *Id.* at 48–49. In Buchmann, Petitioner relies on training sequences like those described as TS0 or TS3 to train the data buffers. *Id.* at 30–31 (citing Ex. 1016, 5:51–72, 8:24–9:18, Figs. 4, 6), 48–49 (citing Ex. 1003 ¶ 192).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet and Buchmann teach this limitation.

> f)    Limitation 1.f: *"wherein the memory module in the second mode is configured to perform one or more memory read or write operations not associated with the one or more training sequences by communicating data signals via the first edge connections in response to*

IPR2022-00062
Patent 9,858,218 B1

> *address and command signals received via the second*
> *edge connections"*

Petitioner asserts that Hazelzet, in combination with Buchmann, discloses this limitation. Pet. 49–52. Specifically, Petitioner asserts that Hazelzet, in describing Figure 2, discloses "the memory interface chip 18 sends and receives data from the DIMMs via the data line 15 and sends address and commands via line 16." *Id.* at 49 (citing Ex. 1014 ¶ 38, Fig. 2). Hazelzet further states "[t]he memory interface chip 18 then sends and receives data, via line 15, to the memory devices, or DRAMs 22 and sends address and command information to the register chip 21 via add/cmd line 16 and check bits for error correction purposes to the ECC/Parity register chip 21 via line 25." Ex. 1014 ¶ 38.

Dr. Alpert provides testimony as to the disclosure in Hazelzet's Figure 2: "[Figure 2] shows line 15 coupling the memory controller and the DRAMs, and line 16 coupling the memory controller and the register 21." Ex. 1003 ¶ 195. Dr. Alpert further testifies that a person of ordinary skill in the art "would also understand from Figure 2 that lines 15 and 16 are coupled to edge connectors for data and address/control, respectively, since those lines coupled the DIMM to the memory controller." *Id.* (citing Ex. 1014 ¶¶ 15, 35, 38, 41, Figs. 2, 7A–7B). Dr. Alpert further testifies that a person of ordinary skill in the art "would understand that such operations—communicating data with DRAMs while communicating address and command information with the register—to constitute '*memory read or write operations*' because they follow the standard configuration for such operations with a JEDEC . . . compliant device, [Ex. 1014 ¶ 44],

IPR2022-00062
Patent 9,858,218 B1

including sending address and control to the register and data to the DRAMs." *Id.* ¶ 196 (citing Ex. 1024, 1, 14, 16).

Petitioner asserts that Hazelzet's "parity mode" is an "'operating mode' . . . in which 'the memory interface chip or controller would generate a single parity bit in conjunction with providing the full address and command field to the module.'" Pet. 50–51 (citing Ex. 1014 ¶¶ 64, 70, 75; Ex. 1003 ¶¶ 198–199) (emphasis omitted). Dr. Alpert testifies that a person of ordinary skill in the art "would understand the phrase 'operating mode' to refer to a mode in which the memory operations are employed to store data in or read data from the DRAMs of the module." Ex. 1003 ¶ 198. Dr. Alpert further testifies that a person of ordinary skill in the art "would understand [the phrase] 'the full address and command field' in this context to refer to the signals sent to a memory module during a read or write operation." *Id.* ¶ 199 (citing Ex. 1024, 1, 14, 16). Petitioner also relies on Figure 8 of Hazelzet to support its contentions that Hazelzet's "address and control signals received by the module over the address/control edge connections are '*configured to perform one or more memory read or write operations*.'" Pet. 51 (citing Ex. 1014, Fig. 8; Ex. 1003 ¶¶ 200–201).

Petitioner further contends that even if Hazelzet "does not sufficiently disclose memory read and write operations in the parity mode, it would have been obvious to include that in" Hazelzet's system because "[t]he use of such operations in an operational mode employing parity checking was known in the prior art." Pet. 51 (citing Ex. 1017, 6:19–34). Petitioner argues that a person of ordinary skill in the art "would have therefore been motivated to modify Hazelzet's 'parity mode' into the claimed 'second mode' involving a read and write operations over the recited edge

49

IPR2022-00062
Patent 9,858,218 B1

connections because to do so would have permitted memory operations using existing and convenient connections disclosed in Hazelzet and because it would have been common sense to do so." *Id.* at 52 (citing Ex. 1024, 14, 16) (emphases omitted); *see also id.* (citing Ex. 1014 ¶ 75; Ex. 1003 ¶ 206).

Petitioner contends that the combination of Hazelzet with Buchmann include "training sequences in a training mode ('first mode') separate from any mode that includes memory read and write operations in response to memory controller commands." Pet. 52 (emphasis omitted). In addition, Petitioner argues that none of the portions of Hazelzet and Buchmann "relied upon for the combinations analyzed disclose training operations occurring during the memory read and write operations in response to memory controller commands, [Ex. 1003 ¶ 210], so their silence additionally satisfies this limitation." *Id.*

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet and Buchmann teach this limitation.

> g)    Limitation 1.g: "wherein the module controller is configured to receive via the second edge connections the address and command signals associated with the one or more memory read or write operations and to control the dynamic random access memory elements in accordance with the address and command signals, and"

Petitioner asserts that Hazelzet discloses this limitation. Pet. 53. Specifically, Petitioner reiterates that, as set forth for limitations 1.b and 1.f, Hazelzet's "module can be placed into a parity mode, which is a mode in which the module is provided, over the edge connections identified for that purpose, address and control signals for performing 'one or more memory

IPR2022-00062
Patent 9,858,218 B1

read or write operations.'" Pet. 53 (emphasis omitted) (citing Ex. 1014 ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7C; Ex. 1024, 13–14, 16; Ex. 1003 ¶ 212). Petitioner further contends that Hazelzet "discloses that the printed circuit board has a first set of edge connections for communicating data signals between the DRAM and the system memory controller . . . while the memory module is in the 'parity mode' and in accordance with the received address and control signals." Pet. 53 (citing Ex. 1014 ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7C, 8). Petitioner also reiterates that, as set forth for limitation 1.f, "data communication between the memory module and the memory controller is 'in accordance with the address and command signals.'" Id. (emphasis omitted) (citing Ex. 1014 ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7C, 8; Ex. 1024, 13; Ex. 1003 ¶¶ 195–204, 213).

Patent Owner does not specifically respond to these arguments. See Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> h)    Limitation 1.h: "wherein the module controller is further configured to output via the open drain output and the error edge connection a signal indicating a parity error having occurred while the memory module is in the second mode"

Petitioner asserts that Hazelzet discloses this limitation. Pet. 53–54. Specifically, Petitioner reiterates that, as set forth for limitations 1.b and 1.d, "the error edge connection (pin 142) is coupled to the open drain output (UE 121) of the ECC/Parity register ('module controller')." Pet. 54 (citing Ex. 1014 ¶¶ 59, 72, Figs. 4B, 7A (pin 142); Ex. 1003 ¶ 215). Petitioner contends that "[w]hen the memory module is in the parity mode ('second mode'), the 'parity generator/checker circuit 231' generates and sends the

51

IPR2022-00062
Patent 9,858,218 B1

'parity error signal (PERR)' to the 'error logic circuit' 100 . . . and outputs it to the memory controller through the output line UE 121 . . . which is an open-drain output . . . coupled to the memory controller using pin number 142." *Id.* (emphasis omitted) (citing Ex. 1014 ¶¶ 38, 59, 70, 72, 76, Figs. 4, 5, 7A (pin 142); Ex. 1003 ¶¶ 219–221).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> i)   *Limitation 1.i:  "wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode"*

Petitioner asserts that Hazelzet and Buchmann disclose this limitation. Pet. 54–56. Specifically, Petitioner states that Hazelzet's memory module "would be modified to be configurable to enter a training mode and output . . . Buchmann training status signals ('*notification signals*') to the system memory controller via open drain output UE 121." Pet. 54. In Buchmann, Petitioner relies on the signals TS0_done, TS3_ack, or TS3_done. *Id.* at 31 (citing Ex. 1016, Figs. 4, 6, 5:51–72, 8:24–9:18).

Petitioner contends that "Hazelzet's memory system involves sharing the open drain output so that the memory controller can receive notification signals from multiple modules using the open drain output." Pet. 55 (citing Ex. 1014 ¶¶ 18, 72, 109; Ex. 1003 ¶ 225). Petitioner further contends that a person of ordinary skill in the art "would understand that, in this combination, the added training status signals would be at a low logic level . . . over a Hazelzet open drain output (UE 121) until the related operations

IPR2022-00062
Patent 9,858,218 B1

are completed for all modules of the system and the gate signals to the transistors of all the open drain circuits in all the modules are low, at which time the signals would be at a high impedance state, indicating completion." *Id.* (citing Ex. 1017, 5:65–6:12, Fig. 4; Ex. 1001, 9:47–10:50). Petitioner contends "[t]he high and low gate signals to the transistors represent 'driv[ing] a notification signal . . . to the error edge connection via the open drain output while the memory module is in the first mode,' respectively or vice versa." *Id.* at 55–56 (citing Ex. 1003 ¶ 226) (emphases omitted).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the current record, we determine that Petitioner has shown that Hazelzet in combination with Buchmann teaches this limitation.

### j)    *Conclusion for Claim 1*

Petitioner has shown by a preponderance of the that one of ordinary skill in the art would have had reasons to combine Hazelzet and Buchmann as proposed in the Petition, with a reasonable expectation of success in arriving at the memory module recited in claim 1. Petitioner has further shown by a preponderance of the evidence that the combination of Hazelzet and Buchmann teaches or at least suggests all limitations of claim 1. Consequently, claim 1 of the '218 patent is unpatentable as obvious over the combination of Hazelzet and Buchmann.

### 5.    *Analysis of Independent Claim 9*

Claim 9 is an independent method claim and recites similar limitations to claim 1. *See* Ex. 1001, 15:38–64. Petitioner contends claim 9 is

IPR2022-00062
Patent 9,858,218 B1

unpatentable, relying on similar disclosure in Hazelzet and Buchmann as with independent claim 1, as follows. Pet. 62–63.

> a)  Limitation 9.a: "A method performed by a memory module operating with a memory controller of the host system, . . . the method comprising:"

Petitioner contends that this preamble is satisfied by the operation of the combined system analyzed in connection with claim limitation 1.a. Pet. 62. Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.[10]

> b)  Limitation 9.b: "the memory module including dynamic random access memory elements on a printed circuit board,"

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.c. Pet. 62. Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> c)  Limitation 9.c: "the printed circuit board having edge connections that fit into a corresponding slot of a host system, the edge connections including first edge connections via which the dynamic random access memory devices communicate data with the memory controller, second edge connections via which the memory module receives address and command signals from the memory controller, and an error edge connection in addition to the first edge connections and the second edge connections,"

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.b (identifying PCB and edge connections) and

---

[10] Since we agree with Petitioner that the preamble is taught or at least suggested by the combination of Hazelzet and Buchmann, we do not decide whether the preamble is limiting.

IPR2022-00062
Patent 9,858,218 B1

limitation 1.f (explaining coupled of edge connections to DRAMs and module controller). Pet. 62. Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> d)      Limitation 9.d: "receiving from the memory controller address and command signals associated with one or more memory read or write operations;"

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.g. Pet. 62. Specifically, Petitioner contends that Hazelzet discloses memory operations that entail the module receiving address and control signals from a system memory controller via the respective address and control edge connections. *Id.* (citing Ex. 1003 ¶ 288). Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> e)      Limitation 9.e: "controlling the dynamic random access memory elements in accordance with the address and command signals;"

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.g. Pet. 62–63. Specifically, Petitioner contends that Hazelzet discloses memory operations that entail the module receiving address and control signals from a system memory controller via the respective address and control edge connections. *Id.* (citing Ex. 1003 ¶ 290). Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> f)      Limitation 9.f: "outputting to the memory controller via an open-drain output coupled to the error

IPR2022-00062
Patent 9,858,218 B1

> *edge connection a signal indicating a parity error having*
> *occurred in the memory module; and"*

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitation 1.h. Pet. 63. Specifically, Petitioner contends that
Hazelzet discloses the module outputting, in the "second mode," a parity
error signal via an open drain output (UE 121) for memory read and write
operations accessing the module. *Id.* (citing Ex. 1003 ¶ 292). Patent Owner
does not dispute Petitioner's contention. We agree with Petitioner's
contention.

> g)   *Limitation 9.g: "training with one or more*
> *training sequences while the first edge connections are*
> *not active, and"*

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitation 1.e (explaining training that occurs) and dependent
claim 7 (explaining that "first edge connections are not active" during that
training). Pet. 63 (citing Ex. 1003 ¶¶ 211–222, 294, *see also* 271–272,
274–277). Patent Owner does not dispute Petitioner's contention. We agree
with Petitioner's contention.

> h)   *Limitation 9.h: "driving a notification signal*
> *associated with the one or more training sequences to the*
> *memory controller via the open drain output and the*
> *error edge connection."*

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitation 1.g. Pet. 63. Petitioner contends that the
combination of Hazelzet and Buchmann includes a memory module that
performs training sequence operations and output to the system memory
controller training notification signals (TS0_done, TS3_ack, TS3_done) via
an open drain output (UE 121). *Id.* (citing Ex. 1003 ¶ 296). Patent Owner

IPR2022-00062
Patent 9,858,218 B1

does not dispute Petitioner's contention.  We agree with Petitioner's
contention.

> i)    *Conclusion for Claim 9*

Petitioner has shown by a preponderance of the that one of ordinary
skill in the art would have had reasons to combine Hazelzet and Buchmann
as proposed in the Petition, with a reasonable expectation of success in
arriving at the method recited in claim 9.  Petitioner has further shown by a
preponderance of the evidence that the combination of Hazelzet and
Buchmann teaches or at least suggests all limitations of claim 9.
Consequently, claim 9 of the '218 patent is unpatentable as obvious over the
combination of Hazelzet and Buchmann.

> 6.    *Analysis of Independent Claim 15*

Claim 15 is an independent method claim and recites similar
limitations to claim 1.  *See* Ex. 1001, 16:16–54.  Petitioner contends claim
15 is unpatentable, relying on similar disclosure in Hazelzet and Buchmann
as with independent claim 1, as follows.  Pet. 64–67.

> a)    *Limitation 15.a: "A memory module operable with
> a memory controller of a host system, comprising:"*

Petitioner contends that the preamble is satisfied for the reasons set
forth for claim limitation 1.a.  Pet 64.  Patent Owner does not dispute
Petitioner's contention.  *See* Resp.  We agree with Petitioner's contention.[11]

> b)    *Limitation 15.b: "a printed circuit board having
> edge connections that fit into a corresponding slot of the
> host system so as to be in electrical communication with
> the memory controller, the edge connections including*

---

[11] Since we agree with Petitioner that the preamble is taught or at least
suggested by the combination of Hazelzet and Buchmann, we do not decide
whether the preamble is limiting.

IPR2022-00062
Patent 9,858,218 B1

> *first edge connections via which the memory module*
> *receives or outputs data signals, second edge*
> *connections via which the memory module receives*
> *address and command signals, and an error edge*
> *connection in addition to the first edge connections and*
> *the second edge connections;"*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitations 1.b (identifying PCB and edge connections) and limitation 1.f (explaining coupling of edge connections to DRAMs and module controller). Pet 65. Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

> *c)      Limitation 15.c: "dynamic random access memory*
> *elements on the printed circuit board and configurable to*
> *communicate data signals with the memory controller via*
> *the first edge connections; and"*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitations 1.c (identifying DRAMs on PCB) and limitation 1.f (explaining coupling of edge connections to DRAMs). Pet 65. Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

> *d)      Limitation 15.d: "a module controller on the*
> *printed circuit board and coupled to the dynamic random*
> *access memory elements, the module controller having*
> *an open drain output coupled to the error edge*
> *connection;"*

Petitioner contends that this limitation is satisfied for the reasons set forth in claim limitation 1.d. Pet. 65. Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

IPR2022-00062
Patent 9,858,218 B1

> e) *Limitation 15.e: "wherein the memory module is configurable to perform at least a first operation and a second operation;"*

Petitioner contends that this limitation is satisfied for the reasons set forth in claim limitation 1.e.i. Pet. 65. Petitioner contends the claimed "first operation" corresponding to the "second mode" in claim 1 and the claimed "second operation" corresponds to the "first mode" of claim 1. *Id.* Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

> f) *Limitation 15.f: "[15.f.i] wherein the module controller in the first operation is configured to receive via the second edge connections address and command signals associated with one or more memory read or write operations and [15.f.ii] to control the dynamic random access memory elements in accordance with the address and command signals,"*

Petitioner contends that limitation 15.f.i is satisfied for the same reasons set forth for claim limitation 1.g. Pet. 65. Specifically, Petitioner contends that Hazelzet discloses memory operations that entail the module receiving address and control signals from a system memory controller via the respective address and control edge connections. *Id.* (citing Ex. 1003 ¶ 320).

Petitioner contends that limitation 15.f.ii is satisfied for the reasons set forth for claim limitation 1.g. Pet. 66. Specifically, Petitioner contends that Hazelzet discloses memory operations that entail the module receiving address and control signals from a system memory controller via the respective address and control edge connections, and in response communicating data between the system memory controller and the module DRAMs via the data edge connections under the control of the module

IPR2022-00062
Patent 9,858,218 B1

controller.  *Id.* (citing Ex. 1003 ¶ 322).  Patent Owner does not dispute this
limitation.  *See* Resp.  We agree with Petitioner's contentions.

> g)    *Limitation 15.g: "wherein the module controller in
> the first operation is further configured to output to the
> memory controller a signal indicating a parity error
> having occurred in the memory module; and"*

Petitioner contends that this limitation is satisfied for the reasons set
forth in claim limitation 1.h.  Pet. 66.  Petitioner contends that "Hazelzet
discloses the module outputting, in the "second mode," corresponding to the
"first operation" in this claim, a parity error signal via an open drain output
(UE 121) in connection with memory read and write operations accessing
the module."  *Id.* (citing Ex. 1003 ¶ 324).  Patent Owner does not dispute
this limitation.  *See* Resp.  We agree with Petitioner's contention.

> h)    *Limitation 15.h: "wherein the memory module in
> the second operation is configured to be trained with one
> or more training sequences while the first edge
> connections are not active, and"*

Petitioner contends that this limitation is satisfied for the same reasons
stated for claim limitation 1.e (explaining training that occurs) and claim 7
(explaining that "first edge connections are not active" during that training).
Pet. 66 (citing Ex. 1003 ¶ 326, *see also* ¶¶ 271–272, 274–277 (concerning
claim 7)).  Patent Owner does not dispute this limitation.  *See* Resp.  We
agree with Petitioner's contention.

> i)    *Limitation 15.i: "wherein the module controller in
> the second operation is configured to drive a notification
> signal associated with the one or more training*

IPR2022-00062
Patent 9,858,218 B1

> *sequences to the error edge connection via the open*
> *drain output of the module controller."*

Petitioner contends that this limitation is satisfied for the same reasons
set forth for claim limitation 1.g. Pet. 66. Petitioner notes that the
combination of Hazelzet and Buchmann includes a module that performs
training sequence operations and outputs to the system memory controller
training notification signals (e.g., TS0_done, TS3_ack, TS3_done, TS3_ack)
via an open drain output (UE 121) of the module controller. *Id.* at 66–67
(citing Ex. 1003 ¶ 328). Patent Owner does not dispute this limitation. *See*
Resp. We agree with Petitioner's contention.

### j)     Conclusion for Claim 15

Petitioner has shown by a preponderance of the that one of ordinary
skill in the art would have had reasons to combine Hazelzet and Buchmann
as proposed in the Petition, with a reasonable expectation of success in
arriving at the memory module recited in claim 15. Petitioner has further
shown by a preponderance of the evidence that the combination of Hazelzet
and Buchmann teaches or at least suggests all limitations of claim 15.
Consequently, claim 15 of the '218 patent is unpatentable as obvious over
the combination of Hazelzet and Buchmann.

### 7.     Claims 2 and 16

Claim 2 depends from claim 1 and recites "wherein the module
controller comprises an integrated circuit." Ex. 1001, 15:11–12. Claim 16
depends from claim 15 and recites the same limitation. *Id.* at 16:55–56.

Petitioner contends that Hazelzet's ECC/Parity register ("module
controller") "comprises in integrated circuit." Pet. 56. Petitioner contends
that Hazelzet explains that the module support devices, including "buffers,"

IPR2022-00062
Patent 9,858,218 B1

"registers," and "PLL's" may be comprised of "multiple separate chips" or may be "combined onto a single package or even integrated onto a single device." *Id.* (citing Ex. 1014 ¶¶ 39, 42 115, Figs. 3A–3D; Ex. 1003 ¶¶ 228, 230, 330). Patent Owner does not dispute Petitioner's contentions. We agree with Petitioner that Hazelzet teaches the limitations of claims 2 and 16 of the '218 patent.

        8.    *Claims 3 and 17*

Claim 3 depends from claim 1 and recites "wherein the module controller includes a notification circuit comprising one or more transistors each having an open drain coupled to the open drain output." Ex. 1001, 15:14–17. Claim 17 depends from claim 15 and recites a similar limitation. *Id.* at 16:57–60.

Petitioner contends that, as explained for claim limitation 1.d, Hazelzet discloses that the ECC/Parity register has an open drain output. Pet. 56. Petitioner contends that Hazelzet's ECC/Parity register has an "error correction code circuit ECC segment 21b," which is a "notification circuit" which outputs signals notifying the system memory controller of correctable, uncorrectable, and parity errors. *Id.* (citing Ex. 1014 ¶ 44). Petitioner contends that the "error correction code circuit ECC segment 21b" (within the ECC/Parity register) includes circuitry for determining whether the errors occurred, and provides an "open-drain" output for a notification signal such as UE 121. *Id.* (citing Ex. 1014 ¶¶ 59, 72, Fig. 4B; Ex. 1003 ¶ 232). Petitioner contends that a person of ordinary skill in the art would have understood that an open drain output includes a field effect transistor having gate, source, and drain, and that an "open drain" output is an output of "one or more transistors each having an open drain coupled to the open

IPR2022-00062
Patent 9,858,218 B1

drain output" while the source of that transistor is coupled to the ground.  *Id.* at 57 (citing Ex. 1017 5:65–6:18, Figs. 4–5; Ex. 1020, 1 (Title), 4:28–37; Ex. 1003 ¶¶ 137–142, 233–235).

Patent Owner does not dispute Petitioner's contentions.  *See* Resp.

We agree with Petitioner that the combination of Hazelzet and Buchmann teaches these limitations.  Hazelzet teaches that the ECC/Parity register includes an error correction code circuit that notifies the memory controller of errors, that has "[t]wo open-drain outputs are available to permit multiple modules to share a common signal line for reporting an error."  Ex. 1014 ¶¶ 59, 72, 109, Fig. 4B.  This is sufficient to teach the limitations of claims 3 and 17 of the '218 patent.

9.    *Claims 4 and 18*

Claim 4 depends from claim 3 and recites "wherein the notification circuit is configured to drive the notification signal by driving a gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground."  Ex. 1001, 15:18–22.  Claim 18 depends from claim 17 and recites a similar limitation. *Id.* at 16:61–65.

Petitioner contends (as explained in § V.D of the Petition) that in the combination of Hazelzet and Buchmann the open drain output is configured such that the transistor output is driven low (ground) while training is still occurring, and driven high upon completion.  Pet. 57.  According to Petitioner, to drive the output low (ground or "provide a low impedance path"), the gate of the transistor must be high, causing the transistor to conduct and connect the drain to ground.  *Id.*  To drive the output high (which would be a high impedance state), the gate of the transistor must be

63

IPR2022-00062
Patent 9,858,218 B1

low, turning the transistor off. *Id.* (citing Ex. 1003 ¶¶ 252–253).  Petitioner contends that, in the combination of Hazelzet and Buchmann, the ECC/Parity register is configured (for example, by placing it in the training mode) "to drive the notification signal by driving a gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground," and thereby outputting "notification signals." *Id.* (citing Ex. 1003 ¶ 254).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

We credit Dr. Alpert's testimony concerning what one of ordinary skill in the art would have understood of the structure and operation of an open drain transistor as taught by Hazelzet.  *See* Ex. 1003 ¶¶ 252–254. Although Hazelzet does not specifically mention the gate of an open drain transistor being driven high, it does mention the output being driven low which would require the gate to be driven high in light of Dr. Alpert's testimony of what a person of ordinary skill in the art would have understood about the structure and operation of an open drain transistor.  We agree with Petitioner that the combination of Hazelzet and Buchmann teaches, or at least suggests, the limitations of claims 4 and 18 of the '218 patent.

        10.    *Claims 5, 11, and 19*

    Claim 5 depends from claim 4 and recites "wherein the notification circuit is configured to drive the parity error signal by driving the gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground." Ex. 1001, 15:23–27.  Claim 11 depends from claim 10 and recites a similar limitation.

IPR2022-00062
Patent 9,858,218 B1

*Id.* at 16:4–7.  Claim 19 depends from claim 18, and also is similar.  *Id.* at 16:66–17:3.

Petitioner contends that Hazelzet's "ECC/Parity register has 'open-drain output[s]' capable of using 'parity error signals' (PERR) to output signal UE 121 to the host indicating a parity error."  Pet. 58 (citing Ex. 1014 ¶¶ 59, 70, 72, 76).  When the memory module is in the parity mode ("second mode", the "parity generator/checker circuit 231 (within SEC/DED ECC circuit 90) generates and sends the "parity error signal (PERR)" to the "error logic circuit" 100.  *Id.* (citing Ex. 1014 ¶¶ 59, 70, 72, 76, Figs. 4B–5; Ex. 1003 ¶ 258).  Hazelzet states that in the parity mode, the parity error "will be reported two clock pulses later via the Uncorrectable Error (UE) line (<u>driven low</u> for two clock pulses)."  *Id.* (citing Ex. 1014 ¶¶ 18, 70; Ex. 1003 ¶ 259) (emphasis added).

Petitioner further contends that, as explained for claims 3 and 4, "Hazelzet discloses that its open-drain output is driven 'low' (i.e., to ground) when the driver is enabled (i.e., the gate receives a high voltage), and further explains that the open-drain 'output [is] permitted to return to an un-driven state (high impedance)' when the 'driver [is] disabled.'"  *Id.* (citing Ex. 1014 ¶ 99; Ex. 1003 ¶ 260).

Petitioner thus contends that Hazlezet's "error correction code circuit ECC segment 21b" ("notification circuit") driving the open-drain output UE 121 is configured "to drive the parity error signal by driving the gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground."  *Id.* at 58–59 (citing Ex. 1017, 5:65–6:18, Figs. 4–5; Ex. 1003 ¶¶ 137–142, 261–262, 301, 336).

IPR2022-00062
Patent 9,858,218 B1

Patent Owner does not dispute Petitioner's contentions that claims 5, 11, and 19 are taught or suggested by the combination of Hazelzet and Buchmann.  *See* Resp.

Petitioner shows sufficiently that the limitations of claims 5, 11, and 19 are taught or at least suggested by the combination of Hazelzet and Buchmann.  Hazelzet teaches that its ECC/Parity buffer includes an error correction code circuit segment 21b that outputs a parity error signal (*id.* ¶ 59) that is driven low to indicate a parity error.  Ex. 1014 ¶¶ 59, 70, 72, 76, Figs. 4A–4B.  Although Hazelzet does not specifically mention the gate of an open-drain transistor being driven high to provide a low impedance path from drain to ground, Dr. Alpert testifies that a person of ordinary skill in the art would have understood an open-drain transistor to be structured and to operate in this way.  Ex. 1003 ¶¶ 258–260.  We agree with Petitioner that the limitation of claims 5, 11, and 19 are taught or at least suggested by the combination of Hazelzet and Buchmann.

11.    *Claims 6, 12, and 20*

Claim 6 depends from claim 4 and recites "wherein the notification circuit is configured to drive the notification signal using one or more OR logic elements."  Ex. 1001, 15:28–30.  Claim 12 depends from claim 10, and recites a similar limitation.  *Id.* at 16:8–10.  Claim 20 depends from claim 18, and recites the same limitation.  *Id.* at 17:4–6.

Petitioner contends that Hazelzet's "notification circuit" includes "Error Logic 100" which receives "US [sic] 110" signal and the "PERR 111" signal, and outputs one of these signals to the same "/ERROR (UE)" pin 121 depending on the mode of the memory module.  Pet. 59 (citing Ex. 1014 ¶¶ 44, 59, 69–72, Fig. 4B; Ex. 1003 ¶¶ 146, 265–266).  Petitioner

IPR2022-00062
Patent 9,858,218 B1

contends that because the Error Logic 100 receives "U[E] 110" signal and the "PERR 111" signal and the training mode notification signals, a person of ordinary skill in the art would have understood that the Error Logic 100 would necessarily include "one or more OR logic elements," such as a three-input OR gate, to determine which signal should be used to drive the transistor. *Id.* at 59. Petitioner contends the circuit thus would be "configured to drive the notification signal using one or more OR logic elements." *Id.* at 59–60 (citing Ex. 1017, 5:65–6:18, Figs. 4–5 (depicting in Fig. 5 OR logic gate used for such purpose); Ex. 1003 ¶¶ 267–268, 303, 338).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

Although Hazelzet does not specifically mention "one or more OR logic elements," we agree with Petitioner that one of ordinary skill in the art would understand that an OR logic element is implied by Hazelzet's teaching that "[w]hen *either* error line (CE) 109 *or* uncorrectable error line (UE) 110 is low, . . . [t]he error lines 120, 121 will be active . . . in ECC mode or . . . in parity mode. Ex. 1014 ¶ 59, Fig. 4B. We agree with Petitioner that Hazelzet's "either/or" signifies use of an OR logic element. Accordingly, we agree with Petitioner that this limitation of claims 6, 12, and 20 is taught by the combination of Hazelzet and Buchmann.

### 12.   *Claim 7*

Claim 7 depends from claim 1 and recites "wherein the first edge connections are not active when the memory module is in the first mode and configured to be trained with the one or more training sequences." Ex. 1001, 15:31–34.

IPR2022-00062
Patent 9,858,218 B1

Petitioner contends that, in the combination of Hazelzet and Buchmann, "in which only the TS0 training operations are carried out in the training mode ("first mode"), the address/control and data pins (data pins are the "first edge connections") of the module edge connections would not be active during that training because TS0 training involves training of the "clock" itself, and no address/control or data signals are transmitted between the host and the memory module during such training." Pet. 60 (citing Ex. 1016, 5:51–7:2; Ex. 1003 ¶ 274).

Petitioner further contends that "it would have been obvious not to send any data or address/control signals while the clock is being trained because a Skilled Artisan would have been motivated to keep the pin(s) for those signals inactive to conserve power and/or avoid unreliable operating during periods that the clock may be unstable. Pet. 61 (citing Ex. 1003 ¶ 275).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

We agree with Petitioner that it would not make sense to use the first edge connections to send any data or address/control signals while the clock is being trained. Hence, a person of ordinary skill in the art would have understood that the first edge connection must be inactive while the clock is being trained. Ex. 1003 ¶ 275.

Accordingly, we agree with Petitioner that the combination of Hazelzet and Buchmann teaches or at least suggests the limitation of claim 7 of the '218 patent.

### 13.   *Claims 8, 14, and 22*

Claim 8 depends from claim 1 and recites "wherein the module controller is configured to drive the notification signal to indicate a status of

IPR2022-00062
Patent 9,858,218 B1

the one or more training sequences." Ex. 1001, 15:35–37. Claim 14 depends from claim 9 and recites a similar limitation. *Id.* at 16:14–15. Claim 22 depends from claim 15 and recites the same limitation. *Id.* at 17:10–12.

Petitioner contends, as explained in §V.D of the Petition, that Hazelzet would be modified to be configurable to enter a training mode and output Buchmann training status signals ("notification signals") to the system memory controller via open drain output UE 121. Pet. 61. According to Petitioner, the status signals (TS0_done, TS3_ack, TS3_done) "indicate a status of the one or more training sequences" because each provides status about the related sequences, such as whether it has been completed or whether all memory buffers have returned an acknowledgement. *Id.* Petitioner contends that the combination of Hazelzet and Buchmann teaches "wherein the module controller is configured to drive the notification signal to indicate a status of the one or more training sequences." *Id.* at 61–62 (citing Ex. 1003 ¶¶ 279, 308, 342).

Patent Owner does not dispute Petitioner's contentions that the combination of Hazelzet and Buchmann teaches the limitations of claims 8, 14, and 22 of the '218 patent.

Petitioner has shown sufficiently that the combination of Hazelzet and Buchmann teaches the limitations of claims 8, 14, and 22.

### 14. *Claim 10*

Claim 10 depends from claim 9 and recites "wherein driving the notification signal comprises driving a gate of each of one or more transistors to a logic high level to provide a low impedance path from the

IPR2022-00062
Patent 9,858,218 B1

open drain output to ground, the one or more transistors each having an open drain coupled to the open drain output." Ex. 1001, 15:65–16:3.

Petitioner contends that the combination of Hazelzet and Buchmann teaches or at least suggests the limitation of claim 10.  Pet. 63–64 (citing Ex. 1003 ¶ 298).  Patent Owner does not dispute Petitioner's contention.  For the reasons stated for claims 3 and 4 (Sections II.E.8 and II.E.9), we agree with Petitioner that the combination of Hazelzet and Buchmann teaches or at least suggests the limitation of claim 10.

### 15.    Claims 13 and 21

Claim 13 depends from claim 9 and recites "wherein the memory module is configured to be trained with the one or more training sequences in response to a request by the memory controller."  Ex. 1001, 16:11–13. Claim 21 depends from claim 15 and recites a similar limitation.  *Id.* at 17:10–12.

Petitioner contends that, in the combination of Hazelzet and Buchmann, "it would have been obvious to train the memory module with one or more training sequences that initiates a response to a request by the memory controller, given that Buchmann explains that '[t]he memory system includes a memory controller that includes logic for initiating … initialization training sequence for the memory system.'"  Pet. 64 (citing Ex. 1016, 1:56–59).  Petitioner notes that Buchmann further explains that "the memory buffer [in the memory module] includes logic for executing a power-on and initialization training sequence initiated by the memory controller."  *Id.* (citing Ex. 1016, 2:39–42, 6:51–7:2, 8:24–29; Ex. 1003 ¶¶ 305, 340).

Patent Owner does not dispute Petitioner's contentions.  *See* Resp.

IPR2022-00062
Patent 9,858,218 B1

We agree with Petitioner that the combination of Hazelzet and Buchmann teaches the limitations of claims 13 and 21 of the '218 patent. Ex. 1016, 1:56–59, 2:39–42.

### 16. Conclusion for Ground 2

Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had reason to combine Hazelzet and Buchmann with a reasonable expectation of success in arriving at claims 1–22 of the '218 patent. Petitioner has further shown that the combination of Hazelzet and Buchmann teaches or at least suggests the limitations of claims 1–22. Accordingly, Petitioner has shown by a preponderance of the evidence that claims 1–22 would have been obvious over the combination of Hazelzet and Buchmann.

### F. Ground 3: Obviousness Over the Combination of Hazelzet, Buchmann, and Kim

Petitioner, alternatively, contends claims 3–6, 10–12, and 17–20 would have been obvious over the combination of Hazelzet, JEDEC or Buchmann, and Kim. Pet. 67–71. Given the parties' dispute regarding whether JEDEC is a prior art printed publication, we limit our analysis to the combination of Hazelzet, Buchmann, and Kim. For the reasons that follow, we are persuaded that the evidence, including Dr. Alpert's testimony, sufficiently supports Petitioner's arguments and, therefore, establishes by a preponderance of the evidence the unpatentability of claims 3–6, 10–12, and 17–20.

### 1. Kim (Ex. 1017)

Kim was filed on January 22, 2008, issued on January 22, 2013, and is titled "Providing a Memory Device Having a Shared Error Feedback Pin."

IPR2022-00062
Patent 9,858,218 B1

Ex. 1017, codes (22), (45), (54). Kim is generally directed to a memory
device having a shared error feedback pin. Ex. 1017, 1:6–8. Figure 4,
reproduced below, is "a block diagram of a memory module [400] having an
error feedback pin that is shared among multiple device[s]." *Id.* 3:13–16.



FIG. 4

Figure 4 depicts "the error output line from the memory devices are
dotted together via open drain drivers to a single error line that is output
from the memory module 400." *Id.* at 6:1–3.

IPR2022-00062
Patent 9,858,218 B1

Figure 5 is reproduced below.



FIG. 5

Figure 5 depicts "a block diagram of a memory device 500 that shares an error feedback pin between data CRC and address parity." *Id.* at 6:13–15.

2. *Analysis*

Petitioner contends that Kim teaches an "'open drain output' with an output pin coupled to the drain of a transistor, which includes a gate, a source, and a drain." Pet. 67 (citing Ex. 1017, Fig. 4). Petitioner also contends that Kim discloses "using a logic element (an OR gate) such that multiple error signals could drive the gate of the open-drain transistor." *Id.* at 68 (citing Ex. 1017, 6:13–18, Fig. 5). Petitioner proposes combining Kim's "open drain transistor configuration" with Hazelzet's error logic circuit 100 "such that signals indicating parity mode error, ECC mode error and training status would be provided to a logic gate, such as an OR gate, as in Kim, which would select among them based on the mode of the module, as in Hazelzet." Pet. 68–69 (underlining omitted). Petitioner contends the

IPR2022-00062
Patent 9,858,218 B1

combined circuit "would . . . include the transistor configurations and signaling recited in claims 3–5, 10, and 17–19" and "the OR logic elements as recited in claims 6, 12 and 20." Pet. 70 (citing Ex. 1003 ¶¶ 234, 270).

Petitioner contends that a person of ordinary skill in the art would be motivated to combine Kim with Hazelzet and Buchmann because (1) Kim is assigned to the same company as Hazelzet and contains some of the same disclosures, as well as some additional disclosures; (2) using the output-pin scheme of Kim in the system of Hazelzet would have been "the use of known techniques for their known purposes to achieve predictable results, i.e., using an open-drain output to provide error or status information from multiple components"; (3) "it represented a well-known (and therefore reliable) and simple technique to provide error and/or status information from a number of components and in different modes"; and (4) it would "simplify[] the design of the system and sav[e] pins on the various integrated circuits connected to the bus." *Id.* at 70–71.

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the record, we determine that Petitioner has shown that one of ordinary skill in the art would have had reason to combine Hazelzet, Buchmann, and Kim with a reasonable expectation of success, and that the combination teaches the limitations in claims 3–6, 10–12, 17–20. As Dr. Alpert establishes, Kim's disclosure overlaps substantially with Hazelzet, and discloses additional details regarding use of an open-drain output on a memory module to notify a memory controller of errors during parity and ECC modes, as well as initialization operations to train a memory module and output training status on a shared error feedback pin. Ex. 1003 ¶¶ 166, 168–169. We previously

IPR2022-00062
Patent 9,858,218 B1

addressed the reasons for combining Hazelzet and Buchmann. *See* Section II.E.3. Dr. Alpert further shows that the limitations of claims 3–6, 10–12, and 17–20 are disclosed by the combination of Hazelzet, Buchmann, and Kim. Ex. 1003 ¶¶ 171–270, 281–303, 309–328, 331–338. Thus, we determine that Petitioner has established by a preponderance of the evidence that claims 3–6, 10–12, 17–20 of the '218 patent are unpatentable as obvious over the combination of Hazelzet, Buchmann, and Kim.

G.   *Motions to Exclude*

1.   *Patent Owner's Motion to Exclude*

Patent Owner seeks to exclude Exhibits 1015, 1024–1025, 1036–1037, 1039, 1048–1049, 1051, 1056, 1071–1076, and 1080–1081. Paper 45, 9–14.

We did not rely on Exhibits 1015, 1037, 1039, 1048, 1049, 1051, 1071–1076 or 1080–1081 in rendering this Final Written Decision. Consequently, Patent Owner's Motion to Exclude is moot as to these Exhibits.

Patent Owner contends that Exhibits 1024–1025, 1036–1037, and 1056 should be excluded because they are not authenticated. FRE 901(a). Petitioner contends that some of these Exhibits are authenticated by the declaration of Julie Carlson (Ex. 1050) who was responsible for "maintenance and publication of JEDEC documents and standards" and a declaration from "Sung Joo Park, who participated in JEDEC at the relevant time and has personal knowledge of the documents he authenticates." Ex. 1055 ¶ 5." Paper 48, 6. Petitioner contends these declarations authenticate Exhibits 1036 and 1037. We agree. Petitioner contends that Exhibits 1024–1025 and 1056 "are similar JEDEC documents and contain

75

IPR2022-00062
Patent 9,858,218 B1

the same indicia of authenticity under FRE 901(b)(4) and 902(7), including similar cover pages, tables of contents, fonts, logos, technical contents, and revision logs." *Id.* We agree and determine that sufficient evidence has been provided to authenticate these Exhibits.

Patent Owner further contends we should exclude Exhibits 1024–1025, 1036–1037, and 1056 because they are inadmissible hearsay under FRE 801 and 802. Paper 45, 12–14. Petitioner contends that the declaration of Julie Carlson establishes that Exhibits 1036–1037 are business records of JEDEC under FRE 803(6) as of the dates shown on the documents. Paper 48, 13. We agree that Exhibits 1036–1037 fall under the business records exception to the hearsay rule.

Comparison of Exhibits 1036 and 1037 to Exhibits 1024, 1025, and 1056 leads us to conclude that these Exhibits also are authenticated business records (standards or committee letter ballots) of JEDEC. They have similar cover pages, tables of contents, fonts, logos, technical contents, and revision logs. Patent Owner has introduced no evidence to suggest that these Exhibits are not what they appear to be.

Consequently, Patent Owner's Motion to Exclude is *dismissed-in-part* as moot as to Exhibits 1015, 1037, 1039, 1048, 1049, 1051, 1071–1076, and 1080–1081, and is *denied-in-part* as to Exhibits 1024–1025, 1036–1037, and 1056.

> 2.   *Petitioner's Motion to Exclude*

Petitioner seeks to exclude Exhibit 2017 and paragraphs 20–21 of Exhibit 2026. Paper 46, 1. We *dismiss* Petitioner's Motion to Exclude as moot because the resolution of these issues is not required to reach our Final Written Decision.

IPR2022-00062
Patent 9,858,218 B1

## III.    CONCLUSION

For the foregoing reasons, we determine that Petitioner establishes by a preponderance of the evidence that claims 1–22 of the '218 patent are unpatentable.

## IV.    ORDER

Accordingly, it is:

ORDERED that claims 1–22 of the '218 patent have been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *dismissed-in-part* as moot as to Exhibits 1015, 1037, 1039, 1048, 1049, 1051, 1071–1076, and 1080–1081, and is *denied-in-part* as to Exhibits 1024–1025, 1036–1037, and 1056;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed; and

IPR2022-00062
Patent 9,858,218 B1

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2.[12]

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1–22 | 103[13] | Hazelzet, JEDEC | | |
| 1–22 | 103 | Hazelzet, Buchmann | 1–22 | |
| 3–6, 10–12, 17–20 | 103 | Hazelzet, Buchmann, Kim | 3–6, 10–12, 17–20 | |
| **Overall Outcome** | | | 1–22 | |

---

[12] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).
[13] We do not reach this ground for the reasons discussed in Section II.D.

IPR2022-00062
Patent 9,858,218 B1

FOR PETITIONER:

Eliot D. Williams
Neil P. Sirota
Theodore W. Chandler
Ferenc Pazmandi
Stephanie C. Kato
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
neil.sirota@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
stephanie.kato@bakerbotts.com


FOR PATENT OWNER:

Sarah Spires
Rex Hwang
SKIERMONT DERBY LLP
sspires@skiermontderby.com
rhwang@skiermontderby.com

# EXHIBIT 3

Trials@uspto.gov
571-272-7822

Paper 54
Date: May 9, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SAMSUNG ELECTRONICS CO., LTD.,
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

———————

IPR2022-00064
Patent 10,474,595 B2

———————

Before JON M. JURGOVAN, SHEILA F. McSHANE, and
KARA L. SZPONDOWSKI, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge.*

DECISION
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00064
Patent 10,474,595 B2

# I.     INTRODUCTION

## *A. Background and Summary*

Samsung Electronics Co., Ltd. ("Petitioner") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claims 1–24 ("Challenged Claims") of U.S. Patent 10,474,595 B2 (Ex. 1001, "the '595 patent").  Paper 1 ("Pet."). Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.") to the Petition.  With our authorization (Paper 8), Petitioner filed a Preliminary Reply to the Preliminary Response (Paper 11, "Prelim. Reply") and Patent Owner filed a Preliminary Sur-Reply (Paper 12, "Prelim. Sur-Reply").  We instituted *inter partes* review under 35 U.S.C. § 314(a). Paper 14 ("Inst. Dec.").

During the trial, Patent Owner filed a Response (Paper 31, "Resp."), Petitioner filed a Reply (Paper 35), and Patent Owner filed a Sur-Reply (Paper 37).  Petitioner and Patent Owner requested oral argument (Papers 38 and 39).  A hearing was conducted on February 15, 2023.  The hearing transcript is entered in the record.  Paper 53 ("Tr.").

Petitioner and Patent Owner objected to evidence (Paper 32, 36) and filed Motions to Exclude (Papers 45, 46).  The parties filed Oppositions to the respective Motions to Exclude (Papers 47, 48), and further filed Replies (Papers 49, 50) to the respective Oppositions.  As discussed below, we dismiss-in-part and deny-in-part Patent Owner's Motion to Exclude, and dismiss Petitioner's Motion to Exclude.

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Having reviewed the complete trial record, we determine that Petitioner has

IPR2022-00064
Patent 10,474,595 B2

shown, by a preponderance of the evidence, that the Challenged Claims are
unpatentable.

    B.    *Real Parties in Interest*

Petitioner identifies Samsung Electronics Co., Ltd. and Samsung
Semiconductor, Inc. as the real parties in interest. Pet. 1. Patent Owner
identifies itself as the sole real party in interest. Paper 3, 3.

    C.    *Related Matters*

The parties advise that the '595 patent is related to *Samsung
Electronics Co., Ltd., et al. v. Netlist, Inc.*, IPR2022-00062; *Samsung
Electronics Co., Ltd., et al. v. Netlist, Inc.*, IPR2022-00063; and *Samsung
Electronics Co., Ltd. v. Netlist, Inc.*, Case No. 1:21-cv-01453 (D. Del.) ("the
parallel litigation"). Pet. 1; Paper 3, 3.

The parties advise that the '595 patent is related to the following legal
proceedings, which are no longer pending: (1) *SK hynix Inc., et al. v.
Netlist, Inc.*, IPR2020-01042; (2) *Netlist v. SK hynix Inc.,* Case No. 6:20-cv-
000194-ADA (W.D. Tex.); (3) *Samsung Electronics Co., Ltd. v. Netlist, Inc.*,
IPR2020-01044; (4) *SK hynix Inc., et al. v. Netlist, Inc.*, IPR2020-01044;
(5) *Netlist, Inc. v. SK hynix Inc., et al.*, Case No. 8:17-cv-01030 (C.D. Ca.);
(6) *In the Matter of Certain Memory Modules and Components Thereof, and
Products Containing Same*, Inv. No. 337-TA-1089 (International Trade
Commission); (7) *SK hynix Inc., et al v Netlist, Inc.*, IPR2018-00303;
(8) *Netlist, Inc. v. SK hynix Inc., et al.*, Case No. 8:16-cv-01605 (C.D. Ca.);
(9) *In the Matter of Certain Memory Modules and Components Thereof, and
Products Containing Same*, Inv. No. 337-TA-1023 (International Trade
Commission); and (9) *SK hynix Inc., et al. v. Netlist, Inc.*, IPR2017-00548.
Pet. 1–2; Paper 3, 3–4.

3

IPR2022-00064
Patent 10,474,595 B2

  D. The '595 Patent (Ex. 1001)

  The '595 patent is titled "Memory Module Having an Open-Drain Output Pin for Parity Error in a First Mode and for Training Sequences in a Second Mode" and is generally directed to "systems and methods for handshaking with a memory module during or upon completion of initialization." Ex. 1001, code (54), 1:24–26.

  The '595 patent explains that "[m]emory subsystems such as memory modules are generally involved in the initialization procedure for computer systems." *Id.* at 1:30–32. For example, "the system memory controller may request that the memory subsystem perform one or more requested tasks during system initialization." *Id.* at 1:37–39. However, the '595 patent states that there is no existing method of handshaking between the system memory controller and the memory module during initialization. *Id.* at 2:64–67. As a result, the system memory controller "does not monitor the error-out signal from the memory [module]" and therefore, "perform[s] blind execution." *Id.* at 3:1–3. According to the '595 patent, this has not been a serious issue because the system memory controller "generally has complete control over the initialization procedure." *Id.* at 3:3–8. However, certain configurations have the system memory controller "handing over one or more parts of the initialization operation sequence to the memory subsystem." *Id.* at 3:8–11. In these types of configurations, the system memory controller may insert a waiting period of predetermined length during which it is idle while the memory controller undergoes initialization. *Id.* at 3:16–19. However, this approach has shortcomings in that the time for the memory controller to complete the task may vary and may be longer or

4

IPR2022-00064
Patent 10,474,595 B2

shorter than the predetermined period of time that the system memory controller is idle. *Id.* at 3:19–41.

The '595 patent describes two methods of handshaking between a system memory controller and a memory module: notifying and polling. *Id.* at 3:42–43. In polling, the system memory controller "reads a status register in the memory subsystem controller to find out if the memory subsystem controller has completed the required or requested operation." *Id.* at 3:43–46. The '595 patent explains that polling is "generally inefficient because the system memory controller does not know exactly when the memory subsystem will have completed the required or requested operation." *Id.* at 3:48–52. Therefore, the notifying method, where the memory controller sends a signal to the system memory controller when it completes the required or requested operation, is described by the '595 patent as advantageous because it allows the system memory controller to execute one or more independent commands while it waits for the notification signal from the memory controller. *Id.* at 3:63–4:1.

The '595 patent describes embodiments establishing a handshake mechanism between the system memory controller and the memory module based upon notification signaling. *Id.* at 4:5–7. For example, Figure 3, depicted below, "shows a host computer system including example first and second memory modules configured to perform handshaking with a memory controller of the host system." *Id.* at 2:42–44.

IPR2022-00064
Patent 10,474,595 B2



Figure 3

Figure 3, above, depicts host computer system 16, including memory modules 10 and 26, memory controller 14, controller circuit 18, notification circuit 20, and output 12. *Id.* at 11:15–40. "[M]emory module 10 is configured to operate in at least two modes comprising an initialization mode during which the memory module 10 executes at least one initialization sequence, and an operational mode." *Id.* at 4:29–33.

The "at least one initialization sequence may comprise one or more training sequences." *Id.* at 6:2–4. "The operational mode is the normal mode of the memory module 10." *Id.* at 6:45–46. In operational mode, "the system memory controller 14 may cause the memory module 10 to perform standard operations such as memory read/write, pre-charge, refresh, etc., while in operational mode." *Id.* at 6:50–53. Controller circuit 18 "may receive and process address and command signals (e.g., read, write commands) from the system memory controller 14 and transmit appropriate address and commands to the memory elements in response." *Id.* at

6

IPR2022-00064
Patent 10,474,595 B2

5:45–49.  Notification circuit 20 is "configured to drive the at least one output 12[,] while the memory module 10 is in the initialization mode to provide at least one notification signal to the memory controller 14 indicating at least one status of the at least one initialization sequence." *Id.* at 4:36–42.

As shown in Figure 3, "the at least one first output 12 is operatively coupled to an error-out pin of the memory module 10, and a multiplexor 42 drives the transistor 36 with either of a task_in_progress signal 44 or an error signal 46 (e.g., parity error signal)." *Id.* at 11:19–23.  "[F]or example, the multiplexor 42 may be configured to drive the transistor 36 with the task_in_progress signal 44 when the memory module 10 is in the initialization mode or is executing the at least one initialization sequence, and with the error signal 46 when the memory module 10 is in the operational mode." *Id.* at 11:24–29.  The '595 patent explains that "the memory module 10 can be advantageously configured to both perform the standard (e.g., JEDEC-specified) error reporting functionality via the error-out pin during the operational mode and provide the status notification functionality during the system initialization mode." *Id.* at 11:29–34.

E.    *Illustrative Claim*

Among challenged claims 1–24, claims 1, 10, 17, and 21 are independent.  Independent claim 1, reproduced below with brackets noting Petitioner's identifiers, is illustrative of the claimed subject matter.

1.    [1.a] A memory module operable with a memory controller of a host system, comprising:

[1.b] a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge

7

IPR2022-00064
Patent 10,474,595 B2

connections including first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and control signals, and an error edge connection in addition to the first edge connections and the second edge connections;

[1.c] dynamic random access memory elements on the printed circuit board;

[1.d] a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection; and

[1.e.i] wherein the memory module is configurable to operate in any of at least a first mode and a second mode;

[1.e.ii] wherein the memory module in the first mode is configurable to perform one or more normal memory read or write operations by communicating data signals via the first edge connections in response to address and control signals received via the second edge connections,

[1.e.iii] wherein the memory module in the second mode is not accessed by the memory controller for normal memory read or write operations, and

[1.e.iv] wherein the memory module in the second mode is configurable to perform operations related to one or more training sequences;

[1.f.i] wherein the module controller is configurable to receive via the second edge connections the address and control signals associated with the one or more normal memory read or write operations,

[1.f.ii] wherein the dynamic random access memory elements are configurable to communicate data signals with the memory controller via the first edge connections in accordance with the address and control signals, and

[1.f.iii] wherein the module controller is further configurable to output via the open drain output and the error

edge connection a signal indicating a parity error having occurred while the memory module is in the first mode;

[1.g] wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state.

Ex. 1001, 14:39–15:21.

F.    *Evidence*

Petitioner relies on the following evidence:[1]

| References | | Date | Exhibit |
|---|---|---|---|
| Hazelzet[2] | U.S. Patent Pub. No. 2008/0098277 A1 | April 24, 2008 | 1014 |
| JEDEC[3] | JEDEC COMMITTEE LETTER BALLOT, LRDIMM DDR3 | November 2009[4] | 1015 |

---

[1] The '595 patent issued from Application 15/088,115, filed April 1, 2016, now U.S. Patent No. 9,585,218, which is a continuation of Application No. 13/942,721, filed July 16, 2013, now U.S. Patent No. 9,311,116 B1, which is a continuation of Application No. 12/815,339, filed June 14, 2010, now U.S. Patent No. 8,489,837 B1. Ex. 1001, codes (21, 22). The '595 patent also claims priority to Provisional Application No. 61/186,799, filed June 12, 2009. *Id.* at codes (60, 63).
[2] Petitioner contends Hazelzet is prior art under 35 U.S.C. §§ 102(a), (b) and (e). Pet. 24.
[3] Petitioner contends JEDEC is prior art under 35 U.S.C. § 102(a). Pet. 27.
[4] Petitioner contends JEDEC was distributed in November 2009. Patent Owner disputes that JEDEC was distributed. Resp. 8–12. Because we decide the case on other grounds, we do not address whether JEDEC was distributed in November 2009.

IPR2022-00064
Patent 10,474,595 B2

| References | | Date | Exhibit |
|---|---|---|---|
| | Memory Initialization Chapter Proposal | | |
| Buchmann[5] | U.S. Patent No. 8,139,430 B2 | Issued March 20, 2012 Filed July 1, 2008 | 1016 |
| Kim | U.S. Patent No. 8,359,521 B2 | Issued January 22, 2013 Filed January 22, 2008 | 1017 |

In addition, Petitioner relies on the Declaration of Dr. Donald Alpert (Ex. 1003) and other evidence.  Patent Owner relies on the Declaration of Robert J. Murphy (Ex. 2027) and other evidence.  The depositions for these experts have been entered into the record.  Exs. 2023 (Alpert), 1077 (Murphy).

G.    *Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–24 are unpatentable on the following Grounds (Pet. 4):

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–24 | 103(a)[6] | Hazelzet, JEDEC |
| 1–24 | 103(a) | Hazelzet, Buchmann |
| 3–7, 12–14, 20, 22, 23 | 103(a) | Hazelzet, JEDEC or Buchmann, Kim |

---

[5] Petitioner contends Buchmann is prior art under § 102(e).  Pet. 28.

[6] The Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103.  Although the parties dispute whether the '595 patent is entitled to claim priority to the provisional application (*see, e.g.*, footnote 1; Pet. 5–10; PO Response 12–25), there is no dispute that the '595 patent's priority claim extends to Application No. 12/815,339, filed June 14, 2010.  Ex. 1001, code (63).  Because the filing date of this application is before the effective date of the applicable AIA amendment, we refer to the pre-AIA version of 35 U.S.C. § 103.

IPR2022-00064
Patent 10,474,595 B2

## II.  DISCUSSION

### A.  Principles of Law

In an *inter partes* review, a petitioner bears the burden of persuasion to prove "unpatentability by a preponderance of the evidence." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. § 316(e)); *see* 37 C.F.R. § 42.1(d) (2022).

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) any objective evidence of nonobviousness, i.e., secondary considerations.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### B.    Level of Ordinary Skill in the Art

Petitioner asserts a person of ordinary skill in the art "would have had a [B]achelor's degree in computer engineering, or a related field, and several years of additional experience working with computer memory systems. She would have been familiar with computer memory systems and basic CPU architecture documented in the literature, including standards, and generally available in commercial systems, including how computer components access a computer's memory, the role of a memory controller,

11

IPR2022-00064
Patent 10,474,595 B2

the basic operation of memory modules and devices, and the techniques used to couple memory devices to the other components of the computer system." Pet. 10 (citing Ex. 1003 ¶ 55). Patent Owner does not dispute Petitioner's proposed level of skill in the art. *See* Resp. 6.

We find Petitioner's proposal is consistent with the level of ordinary skill in the art reflected by the '595 patent and the prior art of record, and, therefore, adopt Petitioner's proposed level of ordinary skill in the art in this Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

C.    *Claim Construction*

We construe each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent," the same standard used to construe the claim in a civil action. 37 C.F.R. § 42.100(b).

The words used in patent claims are interpreted in light of the intrinsic evidence of record, including the written description, drawings, and prosecution history. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). Absent "express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning." *Id.* at 1325. There is a heavy presumption that a patent claim carries its ordinary and customary meaning. *Id.*

Petitioner proposes the following constructions:

IPR2022-00064
Patent 10,474,595 B2

| Claim Term | Proposed Construction |
|---|---|
| memory read or write operations | operations used to communicate data between the memory module and the memory controller in response to commands from the memory controller |
| normal memory read or write operations | memory read and write operations |
| mode | plain and ordinary meaning |
| training sequence | a set of operations occurring in a particular order and used for training |
| notification signal associated with the [one or more training sequences] / information related to the [one or more training sequences] / open-drain signals related to the [one or more training sequences] | unscheduled signal/information/open-drain signals provided without polling that indicate the status of the one or more training sequences |

Pet. 18–24. Petitioner presents several arguments and support in favor of its proposed constructions. *Id.* Petitioner also contends that "normal memory read and write operations" are the same as "memory read and write operations." Pet. 19–21. Petitioner further argues that the term "mode" does not require construction. *Id.* at 21–22.

Patent Owner agrees that "mode" does not require construction, but disagrees with Petitioner's other proposed constructions, which "deviate from [the] plain and ordinary meaning." Resp. 3–6.

We find that several of Petitioner's proposals improperly alter the language of the respective claims to change their meaning, and also lack support in the intrinsic evidence of record. Petitioner's proposal concerning

13

IPR2022-00064
Patent 10,474,595 B2

"memory read or write operations" states that the data is communicated between the memory module and the memory controller in response to commands from the memory controller. Pet. 18–19. But claim 1 recites that the data signals are communicated "in response to *address and command signals*." Ex. 1001, 14:58–62 (emphasis added). We "cannot construe claims to read an express limitation or element out of the claims." *TDM America, LLC v. U.S.*, 85 Fed. Cl. 774, 787 (2009). We decline to adopt Petitioner's proposed construction. For the same reason, we decline to adopt Petitioner's proposed construction of "normal memory read or write operations" to mean the same as "memory read or write operations."

Since Petitioner and Patent Owner do not dispute the meaning of the term "mode," we apply the plain and ordinary meaning that would be given to the term by a person of ordinary skill in the art. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy).

Petitioner's proposal for "training sequence" improperly introduces the concept of "a set of operations occurring in a *particular order*," which narrows the meaning considerably, and is not supported by the specification or file history. *See* Exs. 1001–1002. To the contrary, this proposal conflicts with the '595 patent, which states "in any method or process disclosed herein, the acts or operations making up the method/process may be performed *in any suitable sequence* and *are not necessarily limited to any particular disclosed sequence*." Ex. 1001, 14:24–28 (emphasis added). We decline to rewrite the claims as Petitioner proposes.

IPR2022-00064
Patent 10,474,595 B2

Petitioner's proposal for "notification signal" introduces the requirements of "unscheduled" (mentioned nowhere in the '595 patent or file history) and "without polling."   The '595 patent identifies "polling" and "notifying" as different ways of "handshaking" between the Memory Controller Hub (MCH) or system memory controller, and the memory subsystem controller.  Ex. 1001, 3:42–43.  "Notifying" is described as "advantageous" in the '595 patent, and use of the term "notification signal" in the claims implies "notifying" as described in the '595 patent.  *Id.* at 3:63–65.  However, the term "unscheduled" in Petitioner's proposal is unsupported by the intrinsic evidence so we decline to adopt Petitioner's proposal.

Neither party avers that the outcome of this case turns on Petitioner's proposed constructions, and we agree.  We decline to adopt Petitioner's proposals, and instead give the claim terms their plain and ordinary meanings.

D.     *Ground 1: Obviousness Over the Combination of Hazelzet and JEDEC*

Petitioner contends that claims 1–24 would have been obvious over the combination of Hazelzet and JEDEC.  Pet. 30–68.  Petitioner and Patent Owner dispute whether JEDEC constitutes a prior art "printed publication" under 35 U.S.C. § 311(b).  Pet. 25–28; Resp. 8–13; Reply 2–9; Sur-Reply 2–9.  Since we find that other grounds demonstrate unpatentability of all Challenged Claims, we find it unnecessary to address this issue or ground in this Final Written Decision in order to resolve the dispute between the parties.

IPR2022-00064
Patent 10,474,595 B2

> E.      *Ground 2: Obviousness Over the Combination of Hazelzet and Buchmann*

Petitioner contends that claims 1–24 of the '595 patent are unpatentable as obvious over the combination of Hazelzet and Buchmann. Pet. 30–68.  We address Hazelzet and Buchmann and their combination in the following section and conclude that Petitioner has shown claims 1–24 unpatentable for the reasons that follow.

> 1.      *Hazelzet (Ex. 1014)*

Hazelzet was published on April 24, 2008 and is titled "High Density High Reliability Memory Module With Power Gating and a Fault Tolerant Address and Command Bus."  Ex. 1014, codes (43), (54).  Petitioner asserts that Hazelzet is prior art under 35 U.S.C. §§ 102(a), (b), and (e).  Pet. 24.

Hazelzet is generally directed to a high density, high reliability memory controller/interface.  Ex. 1014 ¶ 7.  Figure 2, reproduced below, is a block diagram of the enhanced server memory arrangement:

IPR2022-00064
Patent 10,474,595 B2



FIG. 2

Figure 2 depicts dual inline memory module ("DIMM") 20 with a "novel ECC/Parity Buffer chip 21" coupled to memory interface chip 18, which is coupled to memory controller or processor 19. *Id.* ¶ 38. Hazelzet describes that "DIMMs are printed circuit cards designed to carry a plurality of DRAMs 22 thereon and the DRAM output pins . . . are connected via the printed circuit to selected connectors 23 along the edge of both the back and front sides of the card." *Id.* ¶ 39. Figure 2 shows "the memory interface chip 18 sends and receives data from the DIMMs via the data line 15 and sends address and commands via line 16." *Id.* ¶ 38. "The memory interface chip 18 then sends and receives data, via line 15, to the memory devices, or DRAMs 22 and sends address and command information to the register chip 21 via add/cmd line 16 and check bits for error correction purposes to the ECC/Parity register chip 21 via line 25." *Id.*

IPR2022-00064
Patent 10,474,595 B2

Hazelzet further describes that the DIMM has "added error correction code logic (ECC) incorporated therein for correcting single bit errors while permitting continuous memory operation independent of the existence of these errors." *Id.* ¶ 64. Hazelzet also discloses "[a] parity operating mode . . . to permit the system to interrogate the device to determine the error condition." *Id.* In this way, Hazelzet describes two modes: "ECC Mode (/ECC Mode low)" and "parity mode (/ECC Mode high)." *Id.* ¶¶ 69–70; *see also* Ex. 1014, Fig. 8. In addition, Hazelzet describes error reporting circuitry, where "[t]wo open-drain outputs are available to permit multiple modules to share a common signal line for reporting an error that occurred during a valid command (/CS=low) cycle (consistent with the re-driven signals)." *Id.* ¶ 72. "/Error (CE) indicates that a correctable error occurred and was corrected by the ECC logic, /Error (UE) indicates that an uncorrectable error occurred and depending on the mode selected is an uncorrectable ECC error or a parity error." *Id.*

 2. *Buchmann (Ex. 1016)*

Buchmann was filed on July 1, 2008, issued on March 20, 2012, and is titled "Power-On Initialization and Test for a Cascade Interconnect Memory System." Ex. 1016, codes (22), (45), (54). Petitioner asserts that Buchmann is prior art under 35 U.S.C. § 102(e). Pet. 28.

Buchmann is generally directed to "[a] memory buffer, memory system and method for power-on initialization and test for a cascade interconnect memory system." Ex. 1016, code (57). Buchmann describes that "the memory buffer includes logic for executing a power-on and initialization training sequence initiated by the memory controller." *Id.*

18

IPR2022-00064
Patent 10,474,595 B2

Buchmann discloses that it "is operable in a static bit communication (SBC) mode and a high-speed mode." *Id.* at 1:43–44.

Buchmann describes several training sequences, including training sequence TS0, which "is used to perform upstream (US) and downstream (DS) clock detection and repair (if necessary)." *Id.* at 5:51–53. During this training sequence, the memory module outputs various commands, including TS_done, which "indicates the local and all cascaded MBs are done with TS0." *Id.* at 6:1–20, Table 1. Buchmann also similarly describes other training sequences, TS2 and TS3. *Id.* at 7:15–8:45.

### 3.   *Motivation to Combine Hazelzet and Buchmann*

Petitioner, with supporting testimony from Dr. Alpert, argues there is sufficient motivation to combine Hazelzet with Buchmann. Pet. 32–40 (citing Ex. 1003).

Petitioner argues that the prior art relied on in the Petition is analogous to the '595 patent both because it is in the same field of endeavor ("memory module design, including error detection and correction, initialization, training and the use of pins/paths for multiple purposes during different operations/modes") and reasonably pertinent to the same problems ("increasing memory module capacity, performance, and/or reliability by sharing an output pin/path to perform multiple functions during multiple operations/modes, including initialization/training"). *Id.* at 32–33.

In the Hazelzet-Buchmann combination, Petitioner relies on Hazelzet to teach memory modules modified to buffer data signals similar to the DDR3 LRDIMM standard, and an initialization mode into which each module could be switched and which includes training sequences whose completion is reported by the memory buffer using a status signal output

19

IPR2022-00064
Patent 10,474,595 B2

over Hazelzet's open drain output (UE 121). Pet. 30 (citing Ex. 1003 ¶ 164).
Petitioner relies on Buchmann's TS0 and TS3 training sequences and
contends that the open drain output signals signaling training status would be
TS0_done and TS3_ack or TS3_done. *Id.* at 30–31 (citing Ex. 1016,
5:51–7:2, 8:24–9:18, Figs. 4, 6). Petitioner explains that Hazelzet's
ECC/Parity register would be modified to implement Buchmann's training
as part of an additional mode to run, for example, at initialization, to switch
among modes when appropriate, and to use the UE 121 open drain output of
Hazelzet to communicate the new notification signals. *Id.* at 31 (citing
Ex. 1014 ¶ 123; Ex. 1016, 3:49–60). Petitioner contends that Hazelzet
already uses the UE 121 open drain output for two different signals in two
different modes, and that the ECC/Parity register necessarily includes
circuitry for selecting which signal to drive on the UE 121 output depending
on the mode of the module. *Id.* Petitioner contends it was well within the
level of ordinary skill to modify such circuitry such that it instead selected
among three different signals, depending on mode, and contends that
"a Skilled Artisan could have made that modification without undue
experimentation and with a reasonable expectation of success." *Id.* (citing
Ex. 1003 ¶ 167).

Petitioner argues that the combinations are "merely an arrangement of
old elements with each performing the same function it had been known to
perform and yielding no more than what one would expect from such an
arrangement." *Id.* at 33. Petitioner contends the combinations "would have
been well within the level of ordinary skill in the art" and "would not have
resulted in any unpredictable results." *Id.* This is a recognized reason to

IPR2022-00064
Patent 10,474,595 B2

combine under *KSR*, 550 U.S. at 417 (citing *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976)).

Petitioner also provides arguments for why a person of ordinary skill in the art would be motivated to add training for the data buffers and other components of a memory module, to add training as a separate mode, and to use the same output for the added training mode. Pet. 33–40 (citing Ex. 1003). Petitioner argues that a person of ordinary skill in the art would be motivated to add training to Hazelzet "because it was known that training improved memory module reliability." *Id.* at 33–34 (citing Ex. 1014 ¶¶ 1–4, 7, 42, 44, 123; Ex. 1017, 12:36–53; Ex. 1025, 15–18; Ex. 1027, 1:35–2:12; Ex. 1003 ¶ 172). In addition, Petitioner argues that LR-DIMMs and their initialization were known in the art, and provided increased performance and capacity by adding the LR-DIMM's data buffering functionality to Hazelzet's RDIMM. Pet. 34–35 (citing Ex. 1008, 22; Ex. 1003 ¶ 173).

Petitioner also notes that Buchmann discloses a "training phase that allows more flexibility and improved control data exchange during start-up" to establish "reliable communication" on the bus. *Id.* at 36 (citing Ex. 1016, 3:64–67, 14:5–8, 14:28–35). Hence, Petitioner contends that combining Buchmann's training with Hazelzet improves reliability. *Id.* Petitioner further contends that one of ordinary skill in the art would have been motivated to add the functionality of buffering the data signals and corresponding training to Hazelzet's RDIMM because it was a known, reliable technique which improved performance and enabled higher capacity. *Id.* (citing Ex. 1003 ¶¶ 175–177, 179). Petitioner contends the combination of Hazelzet and Buchmann was well within the level of skill in the art at the time and provided no more than expected at the time, a DIMM

21

IPR2022-00064
Patent 10,474,595 B2

with a buffer to buffer data, address and command signals, and efficient training of that buffer during initialization to ensure optimal read and write performance during normal read and write performance during normal operation. *Id.* (citing Ex. 1003 ¶ 179).

Petitioner argues that a person of ordinary skill in the art would be motivated to add training in a separate mode from normal operation "because it was known that training before normal operation was necessary to minimize errors" in read and write operations. *Id.* at 37–38 (citing Ex. 1016, 12:60–13:41; Ex. 1025, 15–18; Ex. 1022 ¶¶ 32, 52, 88–89, Fig. 4; Ex. 1056, 18, 22, 25–26, 42–44; Ex. 1057, code (57), 2:13–34, 2:60–3:3, 9:11–10:44, Fig. 5; Ex. 1003 ¶¶ 180–182). Petitioner notes that Buchmanns's invention is an "initialization training sequence" that is completed at "power-on," which would suggest to a person of ordinary skill in the art "that training before normal operation is important." *Id.* at 37 (citing Ex. 1003 ¶ 180). Since Hazelzet also initializes upon power-on, Petitioner contends that Buchmann's training complements Hazelzet's initialization. *Id.* at 37 (citing Ex. 1014 ¶ 123; Ex. 1025, 15–18; Ex. 1027, 1:61–2:19, 6:24–25, 10:24–45). Petitioner contends that after updating Hazelzet's buffers to buffer both address and data signals, a person of ordinary skill in the art would have been motivated to combine the references such that training in an initialization mode occurred separate from normal operating modes/operations. *Id.* (citing Ex. 1003 ¶ 181).

Petitioner further argues that it would have been obvious to communicate training status in an initialization mode using the same open drain output already used in other modes/operations. Pet. 38 (citing Ex. 1003 ¶¶ 183–185). Petitioner contends that Hazelzet uses the same open

22

IPR2022-00064
Patent 10,474,595 B2

drain output to indicate an "uncorrectable error" in ECC mode and parity error in parity mode. Pet. 38–39 (citing Ex. 1014 ¶¶ 44, 49, 59, 64, 69, 72, 109, Figs. 4B, 7A; Ex. 1003 ¶ 164). Petitioner contends that this disclosure would have motivated a person of ordinary skill in the art to use the same output in the added training mode because the parity and ECC modes would not be using the open drain output while the training operation was running during initialization. *Id.* at 39 (citing Ex. 1003 ¶¶ 185–186).

Petitioner further notes that a person of ordinary skill would have been motivated because multiple use of a pin was known and would have been considered an efficient use of the limited number of output pins on integrated circuits. *Id.* Petitioner points to Kim as an example of use of an open-drain output on a memory module during multiple modes. *Id.* (citing Ex. 1017, 1:16–22, 5:49–57, 6:8–16). According to Petitioner, Kim discloses, in addition to sharing ECC and parity on the error output pin, that "[i]n alternate exemplary embodiments, other functions also share the error feedback pin." *Id.* (citing Ex. 1017, 6:16–18; Ex. 1003 ¶ 187). Petitioner contends that these disclosures would have motivated a person of ordinary skill in the art to use Hazelzet's UE 121 open-drain output to notify the memory controller that training was in progress or done. *Id.* (citing Ex. 1003 ¶ 188).

Dr. Alpert testifies that a person of ordinary skill in the art would have been motivated to arrange the modified Hazelzet "to communicate signals indicating training completion only when all memory modules have completed that training, in order to ensure that the entire memory system had been trained before proceeding to normal operation." *Id.* at 39–40. As Dr. Alpert explains, "[t]his would permit training to be completed in an

23

IPR2022-00064
Patent 10,474,595 B2

orderly and systematic manner, limiting the complexity of the control circuitry needed to implement the training, while using a known, efficient way to do so." *Id.* (citing Ex. 1043, 7:30–51; Ex. 1017, 5:65–6:12, Fig. 4; Ex. 1014 ¶¶ 18, 109; Ex. 1003 ¶ 189).

Petitioner contends that a person of ordinary skill in the art would have been further motivated to modify Hazelzet as described because Hazelzet's "memory system includes multiple memory modules in need of training." *Id.* (citing Ex. 1014 ¶¶ 18, 109; Ex. 1017, 5:65–6:12, Fig. 4; Ex. 1043, 7:30–51). Petitioner contends the combinations analyzed would "allow any module in the system to pull the open drain pin to 'low' . . . while still executing its training sequence, regardless of whether [the] other modules in the system have completed training and were no longer pulling that pin low, thereby delaying normal operations until the system is completely ready." *Id.* (citing Ex. 1003 ¶¶ 158–163, 190).

Patent Owner argues that Grounds 1–3 fail because a person of ordinary skill in the art would not have combined Hazelzet with Buchmann to arrive at the '595 patent claims. Resp. 28–70. Specifically, Patent Owner argues that each Ground requires redesigning Hazelzet's memory modules to buffer data signals, but that neither Hazelzet or Buchmann provide the motivation for a person of ordinary skill in the art to do so. Resp. 6, 32 (citing Ex. 2027 ¶ 87). Patent Owner argues that Hazelzet's memory modules are incompatible with Buchmann's training until after Hazelzet has been updated with a buffer for both address and data. *Id.* at 32–33 (citing Ex. 2002, 68:19–79:24, 81:18–83:5; Ex. 2019, 49; Ex. 2023, 210:15–18; Ex. 2027 ¶¶ 88–93; Pet. 37). However, Petitioner noted that Buchmann explicitly teaches a memory buffer which buffers both address and data.

IPR2022-00064
Patent 10,474,595 B2

Pet. 36–37 (citing Ex. 1014 ¶ 123; Ex. 1016, Fig. 1; Ex. 1025, 15–18; Ex. 1027, 1:61–2:19, 6:24–25, 10:24–45). Patent Owner's argument considers Hazelzet *in isolation* and does not properly consider what one of ordinary skill in the art would have understood from the *combination* of Hazelzet and Buchmann. "Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references." *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)).

Patent Owner argues that Petitioner's grounds require redesign of Hazelzet's memory modules to add Buchmann's memory buffers to buffer data signals, i.e., to change Hazelzet's RDIMM to an LR-DIMM. Resp. 33–35; Sur-Reply 18–20. Patent Owner contends that Petitioner's argument for changing Hazelzet for "increased performance and capacity" is conclusory. Resp. 33. Patent Owner further contends that Petitioner is reaching outside of the ground for motivation, asking to Board to reconstitute its grounds to add the LR-DIMM Design Specification (Ex. 1036), which is improper. *Id.* at 33–34 (citing *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1336 (Fed. Cir. 2020)). Patent Owner further contends the industry debated tradeoffs between LR-DIMMs and RDIMMs, and found RDIMMs less expensive with higher performance compared with LR-DIMMs. Resp. 34–35 (citing Ex. 2027 ¶¶ 94–101).

Patent Owner's arguments do not undermine Petitioner's showing of a motivation to combine Hazelzet and Buchmann. Petitioner has shown sufficiently that UDIMM, RDIMM, FBDIMM, and LR-DIMM modules were known alternatives with known tradeoffs at the time of the '595 patent. Reply 16–20 (citing Ex. 1077, 61:5–10; 98:11–16); Sur-Reply 18–20.

25

IPR2022-00064
Patent 10,474,595 B2

Under appropriate circumstances, such as the need for increased performance and memory capacity, it is clear from the record that one of ordinary skill in the art would have elected to use LR-DIMMs over RDIMMs. Pet. 35 (citing Ex. 1003 ¶¶ 175–177; Ex. 1028 ¶ 31); Reply 20–22. As Petitioner contends, load reduction in LR-DIMMs permits high-speed controllers to drive larger quantities of data and provides for a higher capacity memory module. Reply 21–22 (citing Ex. 2006, 4–5; Ex. 2017 1, 3). Although Patent Owner debates whether an LR-DIMM has "increased performance" over an RDIMM, Patent Owner does not dispute that an LR-DIMM has "increased capacity" relative to an RDIMM. Patent Owner contends that Petitioner's reasons of "increased performance and capacity" for upgrading Hazelzet's RDIMM to the LRDIMM of Buchmann are conclusory. Resp. 33–34; Pet. 33, 35–36. However, Hazelzet explicitly mentions its objectives as a "high density and enhanced reliability memory solution at low cost." *See* Ex. 1014 ¶ 7. Patent Owner does not explain why Hazelzet's enhanced reliability does not serve to increase performance, or why Hazelzet's higher density does not serve to increase capacity.

Thus, Petitioner's proposed motivation to combine is based on the teachings of the references and other evidence. Petitioner does not rely solely on Exhibit 1036 and the remaining evidence is sufficient to establish the motivation to combine Hazelzet and Buchmann. Accordingly, Patent Owner's arguments do not undermine Petitioner's motivation to combine.

Patent Owner argues that Hazelzet suggests an alternative to adding more complex data line buffers to its memory architecture. Resp. 35 (citing Ex. 1014 ¶ 14; Ex. 2027 ¶¶ 102–119, 128–132); *see also* Sur-Reply 21–22. Patent Owner argues that a person of ordinary skill in the art "would have

IPR2022-00064
Patent 10,474,595 B2

understood that implementing such a feature would not necessarily have been desired nor the right choice in designing a memory system." Resp. 36 (citing Ex. 2027 ¶¶ 107–114).  For instance, Patent Owner contends that "memory modules that buffered data signals had several disadvantages, such as increased complexity, power consumption, and increased costs." *Id.* (citing Ex. 1027, 2:12–19).  Patent Owner further contends that training sequences may require bi-directional data and corresponding circuitry which would increase device complexity and cost, and may worsen signal transmission characteristics and therefore reliability.  *Id.* (citing Ex. 2027 ¶ 108).

Patent Owner's argument that adding data line buffers to a memory architecture may not be the right choice in designing a memory system in some cases does not negate Petitioner's contention that, in other cases, it would be the most advantageous option considering such factors as performance, complexity, power consumption, and cost.  As noted, Petitioner's combination basically uses Hazelzet's RDIMM as a foundation and adds Buchmann's LR-DIMM data buffering and training to create a modified LR-DIMM memory module.  Petitioner submitted persuasive evidence that LR-DIMMs are desirable for higher speed and capacity. Pet. 35–36 (citing Ex. 1036, 5; Ex. 1003 ¶¶ 175–179); Reply 21–23 (citing Ex. 2006, 4, 5).

Patent Owner contends that bi-directional data exchange would be *required* by Petitioner's combination, but Dr. Alpert testifies that bi-directional data exchange is a "possibility," not a requirement.  Ex. 2023, 245:17–246:10.  Furthermore, Patent Owner does not indicate what disadvantage would necessarily result from using bi-directional data

IPR2022-00064
Patent 10,474,595 B2

exchange.  Resp. 36, 42.  The evidence states only that bi-directional exchange "*may* require a disadvantageous addition of circuitry" which "*may* also worsen signal transmission characteristics."  Resp. 36, 42–43 (citing Ex. 1027, 2:12–19) (emphasis added); Sur-Reply 22.  This falls short of stating that bi-directional data exchange or addition of circuitry is *required* in Petitioner's proposed combination, or that such added circuitry *would* worsen signal transmission.  And Patent Owner does not contend that RDIMM is *always* more advantageous than LR-DIMM.

Patent Owner further argues that "Hazelzet teaches that its solution strikes a balance between performance, capacity, reliability, and cost for low or midrange systems, which [a person of ordinary skill in the art] would have understood likely precludes memory modules that buffered data signals."  Resp. 36 (citing Ex. 1014 ¶¶ 1–6; Ex. 2027 ¶¶ 115–119).  Patent Owner contends that a person of ordinary skill in the art would have understood that Hazelzet's memory system accomplished those goals without requiring additional, more complex hardware, and counsels against doing so.  *Id.* at 36–37 (citing Ex. 2027 ¶ 117).  We do not discern any disclosure in the cited parts of Hazelzet that precludes buffering of data signals, or the addition of components such as a data buffer.  Consequently, we do not agree with Patent Owner's arguments.

Patent Owner further argues that Hazelzet teaches away from more complex memory modules that buffered data signals by "eliminating the need to produce or procure two types of buffer devices or to re-design existing memory modules."  *Id.* at 37–38 (citing Ex. 1014 ¶ 14; Ex. 2027 ¶ 118) (emphasis omitted).  Patent Owner contends that a person of ordinary skill in the art would be led in a direction divergent from adding more costly

28

IPR2022-00064
Patent 10,474,595 B2

and complex memory components that buffer data signals, contrary to
Hazelzet's intended purpose to use "reduced-function memory assemblies"
for the "low or midrange server markets." *Id.* at 37 (citing *In re Gurley*,
27 F.3d 551, 553 (Fed. Cir. 1994)). Patent Owner argues that Petitioner's
conclusory motivation is driven only by increased performance and capacity,
and fails to consider Hazelzet's disclosure as a whole, which balances trade-
offs between reliability, performance, capacity, and cost. *Id.* at 37–38.

We agree with Petitioner that Hazelzet does not "'criticize, discredit,
or otherwise discourage' memory modules with data buffers." Reply 22; *see
Galderma Laboratories, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir.
2013) (a prior art reference does not teach away if it "does not criticize,
discredit, or otherwise discourage investigation into the invention claimed").
To the contrary, Petitioner shows that adding data buffering lowers the load
and enhances performance. Reply 22 (citing Pet. 34–35; Ex. 1003
¶¶ 175–177, 179; Ex. 1077, 84:14–86:21).

Patent Owner further argues that the Petition failed to demonstrate
how the proposed combination could have been done. Resp. 38–39. Patent
Owner argues that Petitioner makes a conclusory contention that "[s]uch an
upgraded LRDIMM would have worked even in Hazelzet's RDIMM
platforms (with appropriate BIOS changes)." *Id.* at 38. Patent Owner
contends that the document that Petitioner cites as supportive of its
contention states that "the controller must have the capability to do address
mirroring." *Id.* at 38. Patent Owner contends that "Hazelzet does not have a
controller with the capability to do address mirroring." *Id.* (citing Ex. 2027
¶ 110). Patent Owner further contends that Petitioner does not address the
problems associated with LR-DIMMs in the contemporaneous art (such as

29

IPR2022-00064
Patent 10,474,595 B2

complication of memory configuration, mismatch of signals between host and memory interface, and reduced timing margins), or address how a person of ordinary skill in the art would implement LR-DIMMs in Hazelzet. *Id.* at 38–39 (citing Ex. 2007, 1:37–61; Ex. 2008, 2:12–30; Ex. 2009 ¶ 3; Ex. 2010, 4:8–61; Ex. 2027 ¶¶ 111–115). Patent Owner contends each of these problems is associated with the resulting performance and reliability of LR-DIMMs, and associated read and write functionality in normal operation. *Id.* According to Patent Owner, "modifying Hazelzet to implement an LR-DIMM would introduce many problems when performing the read and write operations required by the claims." *Id.* (citing Ex. 2027 ¶¶ 113–114).

Although Patent Owner indicates several alleged problems with LR-DIMMs, LR-DIMMs were known alternatives for RDIMMs like Hazelzet. Reply 22–23; *see also* Ex. 2007, Fig. 2; Ex. 1077, 95:9–96:25; Ex. 2023, 294:5–296:4. Petitioner also notes that "address mirroring" was merely an optional technique for LR-DIMMs that was already standardized for UDIMMs. Reply 22–23 (citing Ex. 1077, 181:8–17, 188:8–11). Patent Owner does not explain why "address mirroring" would be necessary in Petitioner's combination, or why the alleged problems with the LR-DIMMs of Petitioner's combination could not have been overcome by a person of ordinary skill in the art.

Patent Owner also contends that Petitioner's expert previously admitted that his analysis was "not concerned with the physical embodiments and how . . . those structures might be physically modified. . . . I haven't considered what—you know, exactly how those changes would be made." Resp. 39 (citing Ex. 2002, 68:19–69:20; Ex. 2027 ¶ 114). Patent Owner's argument is premised on "physical" or "bodily"

30

IPR2022-00064
Patent 10,474,595 B2

incorporation of the teachings of one reference into the other, which is not
the standard by which obviousness is determined. "[I]t is not necessary that
the inventions of the references be physically combinable to render obvious
the invention under review." *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir.
1983) (citing *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1013
(Fed. Cir. 1983); *In re Andersen*, 391 F.2d 953, 958 (CCPA 1968)). We find
no error in Petitioner's expert's approach for it is the concepts taught by the
Hazelzet and Buchmann that are being combined in the obviousness
analysis, not necessarily any physical embodiments.

Patent Owner argues that "the conclusory testimony of Petitioners'
expert does not provide an articulated motivation to change Hazelzet's
memory modules to add . . . Buchmann's memory buffers, or demonstrate
that such combination could even be done." Resp. 39–40 (citing Ex. 2027
¶ 115). Patent Owner contends that "[c]onclusory statements do not amount
to substantial evidence." *Id.* at 40 (citing *TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352, 1358 (Fed. Cir. 2019)).

We do not agree that Petitioner's expert's testimony was conclusory
or failed to explain how the combination would be done. Petitioner's expert
references the '595 patent, Hazelzet, Buchmann, and other evidence as
supporting his testimony and establishing a reasonable expectation of
success. Ex. 1003 ¶¶ 167, 170. For example, the Petition specifically
identifies that a problem addressed by the '595 patent, Hazelzet, and
Buchmann is "increasing memory module capacity, performance, and/or
reliability by sharing an output pin/path to perform multiple functions during
multiple operations/modes, including initialization/training." Pet. 33 (citing
Ex. 1001, code (57), 5:66–6:14, 8:4–48; Ex. 1014, code (57), ¶¶ 7, 69–70,

31

IPR2022-00064
Patent 10,474,595 B2

123; Ex. 1016, 1:7–9, 3:49–60, 4:51–5:50, 12:60–13:41, 14:1–63, 20:20–
21:19, 33:45–67; Ex. 1022 ¶¶ 4, 5, 32–33, 52; Ex. 1025, 15–18; Ex. 1027,
1:61–2:19, 6:24–25, 10:24–45; Ex. 1017, 1:16–22, 5:49–57, 6:8–18,
11:20–34, 12:36–53; Ex. 1003 ¶ 169).  The motivation to combine may be
found in the nature of problem to be solved, leading one to look to
references relating to possible solutions to that problem.  *Ruiz v.
A.B. Chance Co.*, 357 F.3d 1270, 1276–77 (Fed. Cir. 2004).

Patent Owner further argues that Buchmann provides no motivation to
combine because "Petitioner points to nothing in Buchmann that would have
motivated [a person of ordinary skill in the art] to modify Hazelzet's
memory buffer to also buffer the data signals."  Resp. 40–41.  Patent Owner
argues that both references recognize that, "in designing a memory system,
various constraints[] including power, performance, and costs[] need to be
considered."  *Id.* at 41.  Patent Owner contends that Buchmann would have
recognized that adding the functionality of buffering data signals would
require various factors, such as decreased speeds and higher cost.  *Id.* at 41.
Patent Owner contends that both references considered tradeoffs, but
reached two very different solutions for different purposes.  *Id.*

Hazelzet teaches a memory module "capable of meeting the *desired*
density, performance and reliability requirements."  Ex. 1014 ¶ 7 (emphasis
added).  Similarly, Buchmann teaches that "placing more technology-
specific functionality local to the memory subsystem, such benefits as
improved performance, increased design flexibility/extendibility, etc., may
be obtained, often while making use of unused circuits within the
subsystem."  Ex. 1016, 32:30–34.  Hence, Hazelzet's and Buchmann's

32

IPR2022-00064
Patent 10,474,595 B2

purposes and solutions are aligned with respect to capacity (density, extendibility) and performance, contrary to Patent Owner's argument.

Patent Owner argues that there is no motivation to add a separate training mode in Hazelzet, let alone the specific training of Buchmann. Resp. 41–52; Sur-Reply 22–24. Patent Owner argues that adding training to Hazelzet would have added unnecessary complexity and cost. Resp. 42–44. However, Patent Owner's expert admitted that it was "very well known to one of ordinary skill in the art that there was an initialization mode, and there was a normal mode," for both RDIMMs (like Hazelzet) and LR-DIMMs (with data buffers). Reply 23 (citing Ex. 1077, 110:9–20). Patent Owner's expert further admitted that persons of ordinary skill in the art "knew about the need to train memory modules, including LR-DIMMs, in an initialization mode, especially as the speed of the memory devices increases." *Id.* at 23–24 (citing Ex. 1077, 155:7–22 ("training is required to . . . set the timing optimally so that part can achieve its highest performance and have its best reliability"); Ex. 2027 ¶¶ 104–105). We agree with Petitioner that high-speed operations require training, and that cost and complexity are lesser concerns when high-speed performance is required. *See* Reply 23–24.

Patent Owner further argues that Hazelzet provides no motivation to combine because it is silent regarding training. Resp. 44–47. Petitioner notes that Hazelzet does not exclude training during initialization, and teaches that its initialization will depend "on the available interface busses, the desired initialization speed, available space, cost/complexity objectives, subsystem interconnect structures, the use of alternate processors. . . etc." Reply 24 (citing Ex. 1014 ¶ 123). We agree with Petitioner that Hazelzet is

33

IPR2022-00064
Patent 10,474,595 B2

not limited to any specific initialization, and Buchmann discloses training during initialization, with undisputed benefits for the data buffer. Reply 24–25 (citing Ex. 1016, code (57)).

Patent Owner further argues that Hazelzet and Buchmann teach different solutions to different problems. Resp. 48–52. Patent Owner argues training per Buchmann and error correction code (ECC) are not the same because training seeks to correct errors prior to transmission whereas ECC corrects errors after transmission. *Id.* at 49–50. Petitioner agrees "that ECC is not a substitute for training, and that training would be required for reliable high-speed operations" using data buffers, as discussed above, but, in any event, Patent Owner's argument does not negate Petitioner's motivation to combine. Reply 25.

Patent Owner argues that the Petition relies on hindsight. Resp. 53–58. Patent Owner argues that Petitioner relied on adding training to Hazelzet to "improve reliability" but indicates there would be no reason to implement a memory buffer just to add training to Hazelzet. *Id.* at 53. Petitioner contends that Patent Owner's hindsight argument repeatedly ignores Petitioner's motivation for adding a data buffer to Hazelzet. Reply 25–26. We agree with Petitioner that Patent Owner's arguments do not adequately address Petitioner's reasons to combine. *See* Pet. 32–40. Nor does Petitioner change its argument relative to a previous IPR since it was not involved in that IPR. Reply 26; Resp. 55–57. Patent Owner further argues that Petitioner's expert engages in hindsight by looking at the training sequences to see if any satisfy the claim limitations. Resp. 57. We agree with Petitioner that Patent Owner's assertion takes Petitioner's expert's testimony out of context, and that Dr. Alpert first made the combination

34

IPR2022-00064
Patent 10,474,595 B2

from the point of view of a person of ordinary skill in the art, and then considered whether the combination satisfied the claim language. Reply 26 (citing Ex. 2023, 221:22–222:8, 227:21–228:11). In any case, any judgment on obviousness is in a sense "necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (C.C.P.A. 1971).

Patent Owner contends that all grounds fail because there is no teaching, suggestion, or motivation to use Hazelzet's UE line to communicate training signals. Resp. 58–70. Petitioner contends that the Petition explained the motivation for using Hazelzet's open-drain line for notifications signals in Grounds 1–3, and that Patent Owner's arguments to the contrary attack and mischaracterize the references individually. Reply 26–27 (citing Pet. 38–40). We agree with Petitioner. For example, Petitioner shows that multiple use of a pin was known to communicate error information during a normal mode and training information during a training mode. Pet. 38–40 (citing Ex. 1017, 1:16–22, 5:49–57, 6:8–18; Ex. 1022 ¶¶ 4–5, 32–33, 52; Ex. 1003 ¶¶ 183–190).

Patent Owner contends that Hazelzet describes using a bus to perform initialization distinct from the UE line. Sur-Reply 25. Patent Owner contends that the bus is needed for reporting or responding to operational subsystem information. *Id.* (citing Ex. 1014 ¶¶ 124–125; Ex. 2027 ¶¶ 175–180). Petitioner's combination does not exclude use of a bus—it merely uses the UE line to report training completion. That other

IPR2022-00064
Patent 10,474,595 B2

information may be exchanged between the controller and memory module does not negate Petitioner's combination.

Patent Owner further argues that Buchmann does not implement the claimed notification signal with an open drain (*id.* at 26), which is an attack on Buchmann alone without considering its combination with Hazelzet. *See Merck, supra*. Patent Owner's argument that Hazelzet has other unused pins available during initialization (*id.* at 26) does not negate that Petitioner's motivation stems from using a pin that has a dual purpose, suggesting it would also be useful for a separate training mode. And we do not agree with Patent Owner's argument that Petitioner fails to support its contention that use of open-drain signaling was a known efficient way to indicate that all modules had completed training. Petitioner shows that Hazelzet has multiple modules and that normal operations would be delayed until all modules completed training and were no longer pulling the UE pin low. Pet. 40 (citing Ex. 1003 ¶¶ 158–163, 190). And Dr. Alpert relies on evidence in Hazelzet describing use of the open drain UE pin by multiple modules. Ex. 1003 ¶ 190 (citing Ex. 1014 ¶¶ 18, 109). Thus, it is not true his testimony lacked support.

Hazelzet uses the same open drain output UE 121 to indicate "uncorrectable error" in ECC mode and parity error in parity mode. Pet. 38 (citing Ex. 1014 ¶¶ 44, 49, 59, 64, 69, 72, 109, Figs. 4B, 7A). One would have been motivated to use the same output for the training mode/operation separate from the ECC and parity modes. *Id.* at 39 (citing Ex. 1003 ¶¶ 185–186). And multiple use of a pin was known. *Id.* at 39 (citing Ex. 1017, 1:16–22, 5:49–57, 6:8–18; Ex. 1022 ¶¶ 4, 5, 32–33, 52; Ex. 1003 ¶¶ 187–188). Petitioner contends that these disclosures would have

IPR2022-00064
Patent 10,474,595 B2

motivated a person of ordinary skill in the art to use Hazelzet's UE 121 open-drain output to notify the memory controller that the training was in progress or done. *Id.* (citing Ex. 1003 ¶ 188). And Dr. Alpert explains that a person of ordinary skill in the art "would have been motivated to arrange the modified Hazelzet to communicate signals indicating training completion only when all memory modules have completed that training, in order to ensure that the entire memory system had been trained before proceeding to normal operation." *Id.* at 39–40 (citing Ex. 1003 ¶ 189). Petitioner contends that this "would permit training to be completed in an orderly and systematic manner, limiting the complexity of the control circuitry needed to implement the training, while using a known, efficient way to do so." *Id.* (citing Ex. 1043, 7:30–51; Ex. 1017, 5:65–6:12, Fig. 4; Ex. 1014 ¶¶ 18, 109; Ex. 1003 ¶ 189).

Patent Owner contends that Hazelzet "teaches away" from using its open-drain UE line during initialization. Resp. 60–63. Patent Owner, however, has not identified any teaching in Hazelzet that "criticizes, discredits, or otherwise discourages" using the UE line during initialization. *See Galderma Laboratories, supra.* Patent Owner's expert admitted that an open-drain output was a simple well-known technique for implementing a logical OR function as a way to indicate whether all memory modules had completed their training using an open-drain line not otherwise used during initialization. Reply 27 (citing Ex. 1077, 178:21–179:25; Ex. 1003 ¶¶ 187–190; Pet. 38–40). Patent Owner argues that Hazelzet discloses only error reporting on the open-drain UE line, but ignores its combination with Buchmann which teaches notifying training status. *Id.* Hazelzet's UE line provides notifications in two different modes, thus motivating a person of

37

IPR2022-00064
Patent 10,474,595 B2

ordinary skill in the art "to use it for the additional function of notifying training completion in an initialization mode when combined" with Buchmann. Reply 28 (citing Ex. 1003 ¶¶ 185–188). We agree with Petitioner that one of ordinary skill in the art "would have understood the advantages of using an open-drain line like Hazelzet's UE line efficiently for the specific task of notifying training completion by all of multiple modules." *Id.* (citing Ex. 1003 ¶¶ 189–190) (emphasis omitted).

Patent Owner argues that Hazelzet discloses using a bus for some initialization tasks. Resp. 61–63. Petitioner contends Hazelzet does not require using the bus, explaining that "[i]nitialization of the memory subsystem may be completed via one or more methods, based on the available interface busses, the desired initialization speed, available space, cost/complexity objectives, subsystem interconnect structures." Reply 28 (citing Ex. 1014 ¶ 123). This statement implies flexibility in how initialization is carried out. We agree with Petitioner that since the UE line was available for training during initialization, it would have been obvious to use the UE line to signal completion of training by a module. *Id.*

Patent Owner further argues that Buchmann does not disclose an open drain for training signals. Resp. 63–67. This is again an attack on the reference individually without considering it in combination with Hazelzet, as proposed by Petitioner. *See Galderma Laboratories, supra.* Petitioner combines Hazelzet with Buchmann such that Buchmann's training completion is communicated through Hazelzet's open-drain UE line, providing obvious advantages. Reply 29 (citing Pet. 30–32, 38–40).

Patent Owner argues that Buchmann's UE line is not open-drain and is not used for training, and that instead a 6-bit bus carries training. Resp.

38

IPR2022-00064
Patent 10,474,595 B2

64–66.  Petitioner explains, however, that Buchmann's UE line is not between the memory modules and the memory controller, but is inside SBC receiver circuity, which would have motivated a person of ordinary skill in the art to use Hazelzet's open-drain UE line between the memory controller and multiple modules to indicate in a simple and efficient way that all modules completed training.  Ex. 1003 ¶¶ 183–190.

Petitioner contends that Patent Owner crops Petitioner's expert's testimony to create confusion about Dr. Alpert's testimony.  Reply 29; Resp. 66–67.  Petitioner contends that Dr. Alpert's testimony is consistent that "the memory controller in Hazelzet would be modified to initiate training commands, training sequences like Buchmann does, and that the success or failure of those training sequences would be indicated by a status on the UE signal line that comes back from the module to the memory controller in Hazelzet."  Reply 29 (citing Ex. 2003, 121:16–22).

Petitioner further argues that in the final written decision for IPR2018-00303, Paper 42 (Ex. 1034), the Board determined similar limitations in another patent of Patent Owner obvious over the combination of Hazelzet and Buchmann.  Reply 30 (citing Ex. 1034, 15, 22).  As we address the merits of this case, and determine all challenged claims unpatentable, we do not reach Petitioner's argument that Patent Owner is collaterally estopped in this proceeding by the final written decision in IPR2018-00303.

Patent Owner argues that a person of ordinary skill in the art would not have implemented a notification signal associated with a training sequence via an open drain output because there are at least two other "straight forward" implementations that the references would have instructed a person of ordinary skill in the art to do.  Resp. 68–70 (citing

IPR2022-00064
Patent 10,474,595 B2

Ex. 2027 ¶ 188).  According to Patent Owner, one implementation is to use the memory controller, and not a component on the memory module, to conduct the training.  Resp. 68–69.  Since the memory controller conducts the training, no notification signal is needed to indicate to it when training is completed.  *Id.*  In the other implementation, Patent Owner contends that Hazelzet teaches to use a separate, distinct bus, and not the UE line. Resp. 69–70 (citing Ex. 2027 ¶ 190).

That there may be other ways to combine Hazelzet and Buchmann does not negate Petitioner's showing of a motivation to combine in the particular way that Petitioner indicated a person of ordinary skill in the art would have pursued.  On this record, we are persuaded that Petitioner has provided sufficient reasoning to combine Hazelzet with Buchmann.  More specifically, Petitioner has provided sufficient evidence of motivation to add Buchmann's buffering of data signals to Hazelzet, similar to a DDR3 LRDIMM, because it was a known, reliable technique to improve performance and increase capacity of Hazelzet's memory module. Pet. 35–36 (citing Ex. 1014, code (57), ¶ 36, Fig. 1; Ex. 1028 ¶ 31; Ex. 1036, 5; Ex. 1003 ¶¶ 175–177).  Petitioner has also provided the motivation to add Buchmann's training to Hazelzet in order to improve reliability.  *Id.* at 34 (citing Ex. 1014 ¶¶ 1–4, 7, 42, 44, 123; Ex. 1017, 12:36–53; Ex. 1025, 15–18; Ex. 1027, 1:35–2:12; Ex. 1003 ¶ 172).  Petitioner further provides evidence that adding training in an initialization mode before normal operation was necessary to minimize errors and ensure correct read and write operations.  *Id.* at 37 (citing Ex. 1014 ¶ 123; Ex. 1025, 15–18; Ex. 1022, Fig. 4, ¶¶ 32, 52, 88–89; Ex. 1027, 1:61–2:19, 6:24–25, 10:24–45; Ex. 1056, 18, 22, 25–26, 42–44; Ex. 1057, Fig. 5, code (57), 2:13–34,

IPR2022-00064
Patent 10,474,595 B2

2:60–3:3, 9:11–10:44; Ex. 1003 ¶¶ 180–181).  Petitioner further sets forth
motivation to communicate training status in an initialization mode using the
same open drain output used in other modes/operations.  *Id.* at 38–40
(Ex. 1003 ¶¶ 158–163, 183–190; Ex. 1014 ¶¶ 18, 44, 49, 59, 64, 69, 72, 109,
Figs. 4B, 7A; Ex. 1022 ¶¶ 4–5, 32–33, 52; Ex. 1043, 7:30–51).

  In its Sur-Reply, Patent Owner argues that Hazelzet and Buchmann
are not analogous art.  Sur-Reply 15–18.  This is largely new argument,
which is improper in a sur-reply.  *See* 37 C.F.R. § 42.23(b); Consolidated
Trial Practice Guide "TPG"[7] 73–75.  In any case, we do not agree with
Patent Owner that Petitioner overstates the field of endeavor as memory
module design.  Hazelzet and Buchmann repeatedly mention "design" in the
context of a memory module and its components.  Ex. 1014 ¶¶ 39, 65,
67–68, 83, 90, 105; Ex. 1016, 2:30–51.  Patent Owner insists that the
problem addressed in Hazelzet is not increasing memory module capacity,
performance, and reliability, but the reference is titled "High Density High
Reliability Memory Module . . . ." that is "capable of meeting desired
density, performance and reliability requirements" at "low cost." Ex. 1014,
code (54), ¶ 7.  And, Buchmann identifies benefits that "[b]y placing more
technology-specific functionality local to the memory subsystem, such
benefits as improved performance, increased design flexibility/extendibility,
etc., may be obtained, often while making use of unused circuits within the
subsystem." Ex. 1016, 32:30–34 (*see also* 32:7–30).  These overlapping or
identical problems and solutions would have drawn the person of ordinary
skill in the art to consider Hazelzet and Buchmann together.

---

[7] The Consolidated Trial Practice Guide "TPG" is available at
www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2022-00064
Patent 10,474,595 B2

In the Sur-Reply, Patent Owner contends that the combinations in the asserted grounds are not a "mere arrangement of old elements performing known functions yielding expected results." Sur-Reply 17. Patent Owner contends that adding data buffers to Hazelzet's module, adding a new training mode, and using a UE line on Hazelzet's redesigned module to report notifications of the new training mode would require substantial reconstruction and redesign of the elements without expectation of success. *Id.* Although data buffers and training may be "new" in the sense that Hazelzet does not have them, they are not new in the art, as Buchmann shows. *See* Ex. 1016, code (57). And understanding that Hazelzet uses a dual-purpose open drain output to signal different parameters in different modes, simply adding another training mode and a notification signal for that open drain output would have been straightforward for a person of ordinary skill in the art. *See* Ex. 1014 ¶ 59, Fig. 4B.

Patent Owner argues that there is no motivation to combine data buffers with Hazelzet. Sur-Reply 18. Patent Owner argues that Petitioner goes outside the bounds of Hazelzet and Buchmann by relying on Kim and Exhibits 1036 and 1037 and other evidence for ground 2 (Kim is expressly relied upon as evidence in ground 3 of the Petition (Pet. 4)). As discussed below, there is no need to reach Kim or Exhibits 1036 and 1037 to find the claims unpatentable over the combination of Hazelzet and Buchmann alone.

Patent Owner further argues that Buchmann provides no motivation to add training to a system like Hazelzet's which lacks a data buffer. Sur-Reply 20–24. Patent Owner contends that merely adding training to Hazelzet would not teach, suggest, or motivate a person of ordinary skill in the art "to add training in a way that would implement the novel notification

IPR2022-00064
Patent 10,474,595 B2

signal required by all claims." *Id.* at 20 (emphasis omitted).  Further, Patent
Owner contends that if one added training, one of ordinary skill in the art
would have used Hazelzet's existing architecture with Hazelzet's memory
controller. *Id.* at 20–21.

Patent Owner's arguments fail to take into account Buchmann's
teachings that "[a]dditional functions that may reside local to the memory
subsystem . . . include write and/or read buffers, . . . error detection and/or
correction circuitry on one or more busses, . . . operational and/or status
registers, initialization circuitry, self-test circuitry (testing logic and/or
memory in the subsystem), performance monitoring and/or control, . . . and
other functions that may have previously resided in the processor, memory
controller or elsewhere in the memory system." Ex. 1016, 32:7–22.
Buchmann further states "[b]y placing more technology-specific
functionality local to the memory subsystem, such benefits as improved
performance, increased design flexibility/extendibility, etc., may be
obtained, often while making use of unused circuits within the subsystem."
*Id.* at 32:30–34.  In other words, Buchmann identifies the design trend of
moving functionality from the system processor or memory controller to the
memory module.  *See KSR*, 550 U.S. at 418 ("Often, it will be necessary for
a court to look to . . . the effects of demands known to the design community
. . . to determine whether there was an apparent reason to combine the
known elements in the fashion claimed by the patent at issue").

Patent Owner argues that "Petitioner did not rebut [Patent Owner's]
evidence that teaches away from adding complex and costly training to
Hazelzet." Sur-Reply 21 (emphasis omitted).  We do not consider new
arguments in a Sur-Reply.  *See* 37 C.F.R. § 42.23(b); TPG 73–74.  In any

IPR2022-00064
Patent 10,474,595 B2

case, the only "teaching away" argument in the Response relates to adding a notification signal to Hazelzet's UE line. *See* Resp. 60–63.

In sum, we find that one of ordinary skill in the art would have been motivated to combine Hazelzet and Buchmann for the reasons Petitioner has stated, notwithstanding Patent Owner's arguments to the contrary. We now consider whether each of the limitations of claim 1 are met by the combination of Hazelzet and Buchmann.

> *1.    Analysis of Independent Claim 1*
>
> > *a)    Limitation 1.a: "A memory module operable with a memory controller of a host system, comprising"*

Petitioner contends "Hazelzet discloses dual inline memory modules ('DIMMs') configured to operate with the 'memory controller' of the host system." Pet. 41 (citing Ex. 1014 ¶¶ 36–39, Figs. 2, 3A–3D; Ex. 1003 ¶ 193).

Patent Owner does not respond to Petitioner's contention concerning the preamble. *See* Resp. Petitioner has shown that Hazelzet discloses claim 1's preamble, to the extent it is limiting.[8]

> > *b)    Limitation 1.b: "a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and control signals, and an error edge*

---

[8] Since we agree with Petitioner that the preamble is taught or at least suggested by the combination of Hazelzet and Buchmann, we do not decide whether the preamble is limiting.

IPR2022-00064
Patent 10,474,595 B2

> *connection in addition to the first edge connections and
> the second edge connections"*

Petitioner contends Hazelet's DIMM comprises a printed circuit board
which fits in the slot of the host system.  Pet. 42–44 (citing Ex. 1014 ¶¶ 15,
37, 39, 97, Figs. 2, 3A–3D, 9, 11; Ex. 1003 ¶¶ 196–198).  Petitioner further
contends "the printed circuit board has a first set of edge connections for
communicating data signals between the module and the memory controller"
(Pet. 45 (citing Ex. 1014 ¶¶ 15, 35, 38, 41, Figs. 7A–7C; Ex. 1003 ¶ 199))
and a "second set of edge connections for communicating address and
control signals from the memory controller" (Pet. 45 (citing Ex. 1014 ¶¶ 15,
35, 38, 41, Figs. 7A–7C; Ex. 1003 ¶ 200)).  Petitioner further contends
Hazelzet "has an error edge connection coupled to the open drain output of
the module controller."  Pet. 45–46 (citing Ex. 1014 ¶¶ 72, 109, Figs. 4B,
7A; Ex. 1003 ¶ 201).

Patent Owner does not specifically respond to these arguments.  *See*
Resp.  Based on our review and consideration of the record, we determine
that Petitioner has shown that Hazelzet teaches this limitation.

> c) *Limitation 1.c:  "dynamic random access memory
> elements on the printed circuit board"*

Petitioner contends Hazelzet's memory module includes DRAMs on
the printed circuit board.  Pet. 46 (citing Ex. 1014 ¶ 15, Figs. 2, 3A–3D;
Ex. 1003 ¶ 204).

Patent Owner does not specifically respond to this argument.  *See*
Resp.  Based on our review and consideration of the record, we determine
that Petitioner has shown that Hazelzet teaches this limitation.

> d) *Limitation 1.d:  "a module controller on the
> printed circuit board and coupled to the dynamic random*

IPR2022-00064
Patent 10,474,595 B2

> access memory elements, the module controller having
> an open drain output coupled to the error edge
> connection"

Petitioner contends Hazelzet's ECC/parity register discloses a module
controller, and has an uncorrectable error output 121, which is an open drain
output.  Pet. 46 (citing Ex. 1014 ¶¶ 44, 59, 72, Figs. 3A–3D, 4A–4B).
Petitioner contends Hazelzet's ECC/parity register is on the printed circuit
board and is coupled to the DRAMs.  *Id.* (citing Ex. 1014 ¶¶ 39, 42, Figs.
3A–3D; Ex. 1003 ¶ 207).  Petitioner contends Hazelzet's UE 121 is coupled
to the error edge connection of the module.  *Id.* (citing Ex. 1014 ¶¶ 59, 72,
Figs. 4B, 7A (pin 142); Ex. 1003 ¶¶ 208–211).

Patent Owner does not specifically respond to these arguments.  *See*
Resp.  Based on our review and consideration of the record, we determine
that Petitioner has adequately shown that Hazelzet teaches this limitation.

> e)  Limitation 1.e.i:  "wherein the memory module is
> configurable to operate in any of at least a first mode and
> a second mode"

Petitioner contends Hazelzet's memory module operates in the parity
mode, corresponding to the claimed "first mode" and an ECC mode.
Pet. 46–47 (citing Ex. 1014 ¶¶ 64, 69–72, Fig. 8; Ex. 1003 ¶ 213).  Petitioner
contends the claimed "second mode" corresponds to a training mode carried
out using Buchmann's training sequences.  *Id.* at 46–47*; see also* Pet. 38–39.

Patent Owner does not specifically respond to these arguments.  *See*
Resp.  Based on our review and consideration of the record, we determine
that Petitioner has shown that Hazelzet and Buchmann teaches this
limitation.

> f)  Limitation 1.e.ii:  "wherein the memory module in
> the first mode is configurable to perform one or more

46

IPR2022-00064
Patent 10,474,595 B2

> *normal memory read or write operations by*
> *communicating data signals via the first edge*
> *connections in response to address and control signals*
> *received via the second edge connections"*

Petitioner contends that Hazelzet's memory module is configurable to receive address and control signals via the edge connections.  Pet. 47 (citing Ex. 1014 ¶¶ 15, 35, 38, 41, Figs. 2, 7A–7B; Ex. 1003 ¶ 214).  Petitioner further contends Hazelzet's memory module communicates address and command information normally as a JEDEC compliant device, sending address and control to the register and data to the DRAMs.  *Id.* (citing Ex. 1014 ¶¶ 44, 75, Fig. 8; Ex. 1024, 1, 14, 16; Ex. 1003 ¶¶ 215, 219).  Petitioner contends Hazelzet discloses that these operations occur during the parity mode, which is a normal mode of operation.  *Id.* at 48–50 (citing Ex. 1014 ¶¶ 38, 64, 70, 75; Ex. 1003 ¶¶ 221–223, 225).

Patent Owner does not specifically respond to these arguments.  *See* Resp.  Based on our review and consideration of the record, we determine that Petitioner has shown that Hazelzet teaches this limitation.

> g)    *Limitation 1.e.iii:  "wherein the memory module in*
> *the second mode is not accessed by the memory*
> *controller for normal memory read or write operations"*

Petitioner contends that the combination includes Buchmann's "training sequences in a training mode ('second mode') during initialization separate from any mode that includes memory read and write operations in response to memory controller commands, thereby satisfying this limitation."  Pet. 50 (citing § V.D) (emphasis omitted).  Petitioner further argues that neither Hazelzet nor Buchmann disclose memory read and write operations occurring during training operations, so their silence additionally

IPR2022-00064
Patent 10,474,595 B2

satisfies this limitation.  *Id.* (citing Ex. 1003 ¶ 229; *Süd-Chemie, Inc. v. Multisorb Technologies, Inc.*, 554 F.3d 1001, 1004–05 (Fed. Cir. 2009)).

Patent Owner does not specifically respond to these arguments.  *See* Resp.  Based on our review and consideration of the record, we determine that Petitioner has shown that Hazelzet and Buchmann teach this limitation.

> h)    Limitation 1.e.iv:  *"wherein the memory module in the second mode is configurable to perform operations related to one or more training sequences"*

Petitioner contends that the proposed combination includes "a separate training mode ('second mode') into which the module can be placed and in which the module can implement ('configurable to perform') various training sequences (e.g., Write Leveling and Read Enable Training per JEDEC/TS0 and TS3 per Buchmann) ('operations related to one or more training sequences')".  Pet 50 (citing § V.D) (emphasis omitted).  Petitioner contends that "[e]ach of these operations includes a set of operations occurring in a particular order, used for training the memory module."  *Id.* at 51 (citing Ex. 10165:51–57, 8:24–9:18, Figs. 4, 6; Ex. 1018, Fig. 4; Ex. 1040, 14:1–15.3; Ex. 1003 ¶ 230).

Patent Owner does not specifically respond to these arguments.  *See* Resp.  Based on our review and consideration of the record, we determine that Petitioner has adequately shown that Hazelzet and Buchmann teach this limitation.

> i)    Limitation 1.f.i: *"wherein the module controller is configurable to receive via the second edge connections the address and control signals associated with the one or more normal memory read or write operations"*

Petitioner contends, as explained for claim limitations 1.b and 1.e.ii, that Hazelzet's module receives address and control signals associated with

48

IPR2022-00064
Patent 10,474,595 B2

normal memory read and write operations over edge connections.  Pet. 51
(citing Ex. 1014 ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7B; Ex. 1024, 13–14,
16; Ex. 1003 ¶ 232).

Patent Owner does not specifically respond to these arguments.  *See*
Resp.  Based on our review and consideration of the record, we determine
that Petitioner has adequately shown that Hazelzet teaches this limitation.

> j)      Limitation 1.f.ii: "wherein the dynamic random
> access memory elements are configurable to
> communicate data signals with the memory controller via
> the first edge connections in accordance with the address
> and control signals"

Petitioner contends, as explained for claim limitations 1.b and 1.e.ii,
that Hazelzet discloses a printed circuit board that has a first set of edge
connections for communicating data signals between the DRAM and the
system memory controller.  Pet. 51 (citing Ex. 1014 ¶¶ 15, 35, 38, 41,
Figs. 7A–7C).  Petitioner contends the communication of data signals occurs
while the memory module is in the "parity mode" and in accordance with the
received address and control signals.  *Id.* (citing Ex. 1014 ¶¶ 15, 35, 38, 41,
64, 70, Figs. 2, 8).  Petitioner contends, as explained for claim limitation
1.e.ii, "data communication between the memory module and the memory
controller is 'in accordance with the address and control signals.'"  *Id.*
at 51–52 (citing Ex. 1014 ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7C, 8;
Ex. 1024, 13; Ex. 1003 ¶¶ 214–223, 233) (emphasis omitted).

Patent Owner does not specifically respond to these arguments.  *See*
Resp.  Based on our review and consideration of the current record, we
determine that Petitioner has adequately shown that Hazelzet teaches this
limitation for purposes of institution.

IPR2022-00064
Patent 10,474,595 B2

> k)      Limitation 1.f.iii: "wherein the module controller
> is further configurable to output via the open drain
> output and the error edge connection a signal indicating
> a parity error having occurred while the memory module
> is in the first mode"

Petitioner contends, as explained in claim limitations 1.b and 1.d, that
"the error edge connection (pin 142) is coupled to the open drain output (UE
121) of the ECC/Parity register ('module controller')." Pet. 52 (citing
Ex. 1014 ¶¶ 59, 72, Figs. 4B, 7A (pin 142); Ex. 1003 ¶ 234) (emphasis
omitted). Petitioner contends the ECC/Parity register includes an
"SEC/DED ECC 90" with "parity generator/checker circuit 231." *Id.* (citing
Ex. 1014, ¶¶ 28, 76, Figs. 4B, 5; Ex. 1003 ¶ 235). Petitioner notes that
"[w]hen the memory module is in the parity mode ('first mode'), the 'parity
generator/checker circuit 231' generates and sends the 'parity error signal
(PERR)' to the 'error logic circuit' 100." *Id.* (citing Ex. 1014 ¶¶ 70, 76,
Figs. 4, 5; Ex. 1003 ¶ 236) (emphasis omitted). Petitioner contends the
"error logic circuit" 100 outputs the parity error signal (PERR) to the
memory controller through the output line UE 121, which is an open-drain
output coupled to the memory controller using pin 142. *Id.* (citing Ex. 1014
¶¶ 38, 59, 70, 72, Fig. 7A (pin 142); Ex. 1003 ¶¶ 237–240).

Patent Owner does not specifically respond to these arguments. *See*
Resp. Based on our review and consideration of the record, we determine
that Petitioner has shown that Hazelzet teaches this limitation.

> l)      Limitation 1.g: "wherein the module controller in
> the second mode is further configurable to provide
> information related to the one or more training
> sequences by driving the open drain output and the error
> edge connection to a first state or to a second state, one
> of the first state and the second state being a low logic

IPR2022-00064
Patent 10,474,595 B2

> *level and the other one of the first state and the second*
> *state being a high impedance state"*

Petitioner contends that in the proposed combination, the Hazelzet module would be modified to be configurable to enter a training mode and output Buchmann training status signals to the system memory controller via an open drain output UE 121. Pet. 52–53 (citing § V.D). According to Petitioner, each of the status signals analyzed (TS0_done, TS3_ack, TS3_done) represent the "'information related to the one or more training sequences' because each provides status about the related sequences, such as whether it has been completed or whether all memory buffers have returned an acknowledgement." *Id.* at 53 (emphasis omitted). Petitioner contends this combination satisfies "wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences." *Id.* (citing Ex. 1003 ¶¶ 164–167, 243) (emphasis omitted).

Petitioner further contends Hazelzet's "memory system involves sharing the open drain output so that the memory controller can receive notification signals from multiple modules using the open drain output." *Id.* (citing Ex. 1014 ¶¶ 18, 72, 109; Ex. 1003 ¶ 244). Petitioner states that a person of ordinary skill in the art would understand that, in the combination, "the added training status signals would be at a low logic level" over Hazelzet's open drain output (UE 121) "until the related operations are completed for all modules of the system and the gate signals to the transistors of all the open drain circuits in all the modules are low, at which time the signals would be in a high impedance state, indicating completion." *Id.* at 53–54 (citing Ex. 1017, 5:65–6:12, Fig. 4; Ex. 1003 ¶ 245). Petitioner

51

IPR2022-00064
Patent 10,474,595 B2

contends the high and low gate signals to the transistors represent "driving the open drain output and the error edge connection to a first state or to a second state." *Id.* at 54 (citing Ex. 1003 ¶ 245) (emphasis omitted).

Petitioner states that "open drain signals would be changed from a high impedance state to a low state as the gate of the transistor changes from a low to a high to indicate the related training operations were in progress, and changed from a low state to a high impedance state as the gate of the transistor driving the signal changes from a high to a low to indicate when the related operations complete in each memory module." *Id.* (citing Ex. 1014 ¶¶ 59, 70, 72, Fig. 4B; Ex. 1017, 5:65–6:12, Fig. 4; Ex. 1016, 3:52–54, 5:51–7:2, 8:24–9:18, 26:30–32, 27:18–21, Figs. 4, 6; Ex. 1003 ¶ 246). Petitioner contends each combination therefore satisfies "one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state." *Id.* (emphasis omitted).

Patent Owner does not specifically respond to these arguments. *See* Resp. Based on our review and consideration of the record, we determine that Petitioner has shown that Hazelzet and Buchmann teach this limitation.

*m)*    *Conclusion for Claim 1*

Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art would have had reasons to combine Hazelzet and Buchmann as proposed in the Petition, with a reasonable expectation of success in arriving at the memory module recited in claim 1. Petitioner has further shown by a preponderance of the evidence that the combination of Hazelzet and Buchmann teaches or at least suggests all limitations of

52

IPR2022-00064
Patent 10,474,595 B2

claim 1. Consequently, claim 1 of the '595 patent is unpatentable as obvious over the combination of Hazelzet and Buchmann.

### 2. Analysis of Independent Claim 10

Claim 10 is an independent method claim and recites similar limitations to claim 1. *See* Ex. 1001, 15:59–16:44. Petitioner contends claim 10 is unpatentable, relying on similar disclosure in Hazelzet and Buchmann as with independent claim 1, as follows. Pet. 61–64.

### a) Limitation 10.a: "A memory module operable with a memory controller of a host system, comprising:"

Petitioner contends that the preamble is satisfied for the reasons set forth for claim element 1.a. Pet. 61. Patent Owner does not dispute the preamble. *See* Resp. We agree with Petitioner's contention.[9]

### b) Limitation 10.b: "a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and control signals, and an error edge connection in addition to the first edge connections and the second edge connections;"

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.b. Pet. 61. Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

---

[9] *See* footnote 9.

IPR2022-00064
Patent 10,474,595 B2

> c)   Limitation 10.c: "dynamic random access memory
> elements on the printed circuit board;"

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitation 1.c. Pet. 61. Patent Owner does not dispute
Petitioner's contention. We agree with Petitioner's contention.

> d)   Limitation 10.d: "a module controller on the
> printed circuit board and coupled to the dynamic random
> access memory elements, the module controller having
> an open drain output coupled to the error edge
> connection and configurable to drive the open drain
> output from a first state to a second state and from the
> second state to the first state, one of the first state and the
> second state being a low logic level, and the other one of
> the first state and the second state being a high
> impedance state; and"

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitations 1.d and 1.g. Pet. 61–62. Petitioner notes that
limitation 10.d recites "configurable to drive the open drain output from a
first state to a second state and from the second state to the first state." *Id.* at
61–62 (citing Ex. 1003 ¶ 319) (emphasis omitted). Petitioner contends this
additional language is similar to claim 7 and is satisfied because "the open
drain signals would be low logic levels to indicate the training sequence"
MB-DRAM/TS0 or TS3 was in progress "(*i.e.*, the logic levels of the open
drain output changes from a high impedance state to a low state, because the
gate of the transistor changes from a low to a high)." *Id.* at 62. On the other
hand, Petitioner contends "the open drain signal would be at a high-
impedance (*i.e.*, the logic level of the open drain output changes from a low
state to a high impedance state, because the gate of the transistor changes
from a high to a low) when th[e] sequence completed in all memory

IPR2022-00064
Patent 10,474,595 B2

modules." *Id.* (citing Ex. 1014 ¶¶ 59, 70, 72, 76, Figs. 4B, 5; Ex. 1017, 5:65–6:18, Figs. 4, 5; Ex. 1003 ¶¶ 158–163, 168, 320).

Patent Owner does not dispute Petitioner's contention. We agree with Petitioner's contention.

> e)      Limitation 10.e: *"wherein the memory module is operable in at least a first mode in which the memory module is configurable to perform one or more memory read or write operations by communicating data signals via the first edge connections in response to address and control signals received via the second edge connections, and a second mode in which the memory module is not accessed by the memory controller for memory read or write operations, and wherein the memory module in the second mode is configurable to perform operations related to one or more training sequences without communicating data signals via the first edge connections;"*

Petitioner contends that the analysis of claim limitation 1.e and claim 9 satisfies this claim element. Pet. 62–63 (citing Ex. 1003 ¶ 323). Petitioner contends that the memory module is not accessed by the memory controller for memory read and write operations during MB-DRAM training, TS0 training or TS3 training. *Id.* at 63 (citing Ex. 1003 ¶ 323).

Patent Owner does not dispute Petitioner's contention that Hazelzet and Buchmann teach this claim limitation. We agree with Petitioner's contention.

> f)      Limitation 10.f: *"wherein the module controller in the first mode is configurable to receive via the second edge connections the address and control signals associated with the one or more memory read or write operations, wherein the dynamic random access memory elements are configurable to communicate data signals with the memory controller via the first edge connections*

55

IPR2022-00064
Patent 10,474,595 B2

> *in accordance with the address and control signals, and wherein the module controller in the first mode is further configurable to output via the open drain output and the error edge connection a signal indicating a parity error having occurred in the memory module while the memory module is in the first mode;"*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.f. Pet. 63. Patent Owner does not dispute Petitioner's contention, with which we agree.

> g)   *Limitation 10.g: "wherein the module controller in the second mode is further configurable to output to the memory controller open-drain signals related to the one or more training sequences via the open drain output and the error edge connection while the memory module is in the second mode."*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitation 1.g. Pet. 63. Patent Owner does not dispute Petitioner's contention, with which we agree.

> h)   *Conclusion for Claim 10*

Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art would have had reasons to combine Hazelzet and Buchmann as proposed in the Petition, with a reasonable expectation of success in arriving at the method recited in claim 10. Petitioner has further shown by a preponderance of the evidence that the combination of Hazelzet and Buchmann teaches or at least suggests all limitations of claim 10. Consequently, claim 10 of the '595 patent is unpatentable as obvious over the combination of Hazelzet and Buchmann.

IPR2022-00064
Patent 10,474,595 B2

### 3. *Analysis of Independent Claim 17*

Claim 17 is an independent method claim and recites similar limitations to claim 1. *See* Ex. 1001, 17:14–48. Petitioner contends claim 17 is unpatentable, relying on similar disclosure in Hazelzet and Buchmann as with independent claim 1, as follows. Pet. 64–65.

a)   *Limitation 17.a: "A method, comprising:"*

Petitioner contends that the preamble is satisfied by operation of the combined system analyzed in connection with claim 1. Pet. 64 (citing Ex. 1003 ¶ 341). Patent Owner does not dispute Petitioner's contention. *See* Resp. We agree with Petitioner's contention.[10]

b)   *Limitation 17.b: "at a memory module coupled with a memory controller of a host system, the memory module including a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and control signals, and an error edge connection in addition to the first edge connections and the second edge connections, the memory module further including dynamic random access memory elements on the printed circuit board;"*

Petitioner contends that this limitation is satisfied for the reasons set forth for claim limitations 1.a, 1.b and 1.c. Pet. 64. Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

c)   *Limitation 17.c: "receiving via the second edge connections address and control signals associated with one or more memory read or write operations; controlling the dynamic random access memory elements*

---

[10] *See* footnote 9.

IPR2022-00064
Patent 10,474,595 B2

> *to communicate data signals corresponding to the one or*
> *more memory read or write operations via the first edge*
> *connections in response to the address and control*
> *signals; outputting via an open drain output coupled to*
> *the error edge connection a signal indicating a parity*
> *error having occurred in the memory module while the*
> *memory module is being accessed by the memory*
> *controller for a memory read or write operation;"*

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitations 1.e and 1.f. Pet. 64. Petitioner contends that
Hazelzet "discloses normal memory operations that entail the module
receiving address and control signals from a system memory controller via
the respective address and control edge connections, and in response
communicating data between the system memory controller and the module
DRAMs via the data edge connections under the control of the module
controller." *Id.* (citing § VI.A.1(2); Ex. 1003 ¶¶ 214–221, 345). Petitioner
contends that, similarly, Hazelzet "discloses the module outputting, in the
'first mode,' a parity error signal via an open drain output (UE 121) in
connection with memory read and write operations accessing the module."
*Id.* (citing § VI.A.1.f; Ex. 1003 ¶¶ 231–241, 345) (emphasis omitted).
Patent Owner does not dispute this limitation. *See* Resp. We agree with
Petitioner's contention that Hazelzet and Buchmann teach or at least suggest
limitation 17.c.

> d)      Limitation 17.d: "*performing operations related to*
> *one or more training sequences while the memory*
> *module is not accessed by the memory controller for*
> *memory read or write operations; and outputting to the*
> *memory controller via the open drain output and the*
> *error edge connection open-drain signals related to the*

IPR2022-00064
Patent 10,474,595 B2

>*one or more training sequences and unrelated to any*
>*memory read or write operation."*

Petitioner contends that this limitation is satisfied for the reasons set forth in claim limitation 1.e and 1.g. Pet. 65. Petitioner contends that the combination of Hazelzet and Buchmann "include a module that performs training sequence operations unrelated to memory read or write operations in response to commands from the memory controller." *Id.* (citing Ex. 1003 ¶¶ 231–241). Petitioner contends that, "[s]imilarly, the module of the combined system outputs to the system memory controller training notification signals (*e.g.*, . . . TS0_done, TS[0]_ack, TS3_done, TS3_ack) via an open drain output (UE 121)," which notification signals are related solely to Buchmann "training sequences and not to any memory controller operations that seek to communicate data with the module or seek to read or write to the memory devices during the training mode analyzed here." *Id.* (citing §VI.A.1.g; Ex. 1003 ¶¶ 164–165, 180–181, 229, 347).

Patent Owner does not dispute this limitation. *See* Resp. We agree with Petitioner's contention.

>            e)      *Conclusion for Claim 17*

Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art would have had reasons to combine Hazelzet and Buchmann as proposed in the Petition, with a reasonable expectation of success in arriving at the memory module recited in claim 17. Petitioner has further shown by a preponderance of the evidence that the combination of Hazelzet and Buchmann teaches or at least suggests all limitations of claim 17. Consequently, claim 17 of the '595 patent is unpatentable as obvious over the combination of Hazelzet and Buchmann.

IPR2022-00064
Patent 10,474,595 B2

### 4. *Analysis of Independent Claim 21*

Claim 21 is an independent method claim and recites similar limitations to claim 1. *See* Ex. 1001, 18:4–52. Petitioner contends that claim 21 is unpatentable, relying on similar disclosure in Hazelzet and Buchmann as with independent claim 1, as follows. Pet. 65–68.

#### a) Limitation 21.a: *"A memory module operable with a memory controller of a host system, comprising:"*

Petitioner contends that the preamble is satisfied by the combination of Hazelzet and Buchmann for the reasons set forth for claim element 1.a. Pet. 65. Patent Owner does not dispute Petitioner's contention. *See* Resp. We agree with Petitioner's contention.[11]

#### b) Limitation 21.b: *"a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections, second edge connections, and an error edge connection in addition to the first edge connections and the second edge connections;"*

Petitioner contends that this limitation is satisfied by the combination of Hazelzet and Buchmann for the reasons set forth for claim limitation 1.b. Pet. 65. Patent Owner does not dispute Petitioner's contention. *See* Resp. We agree with Petitioner's contention.

#### c) Limitation 21.c: *"dynamic random access memory elements on the printed circuit board; and"*

Petitioner contends that this limitation is satisfied by the combination of Hazelzet and Buchmann for the reasons set forth for claim limitation 1.c.

---

[11] *See* footnote 9.

IPR2022-00064
Patent 10,474,595 B2

Pet. 65–66.  Patent Owner does not dispute Petitioner's contention.  *See*
Resp.  We agree with Petitioner's contention.

> d)      Limitation 21.d: "a module controller on the
> printed circuit board and coupled to the dynamic random
> access memory elements, the module controller including
> a transistor having a gate and an open drain output
> coupled to the error edge connection; wherein the
> module controller is configurable to drive the gate of the
> transistor so as to drive the open drain output to a first
> state or a second state, the first state being a low logic
> level and the second state being a high impedance state;"

Petitioner contends that this limitation is satisfied for the reasons set
forth for claim limitation 1.d and claims 3 and 4.  Pet. 66.  Specifically,
Petitioner contends that the Hazelzet and Buchmann satisfy "a module
controller on the printed circuit board and coupled to the dynamic random
access memory elements" of claim 21 for the reasons set for the claim
element 1.d.  *Id.* (citing Ex. 1003 ¶¶ 206–209) (emphasis omitted).
Petitioner contends "the module controller including a transistor having a
gate and an open drain output coupled to the error edge connection" is
satisfied for the reasons that Petitioner set forth for claim 3.  *Id.* (citing
Ex. 1003 ¶¶ 251–255) (emphasis omitted).

Specifically, Petitioner contends that Hazelzet discloses that the
ECC/Parity register has "open drain output[s]" such as UE 121.  Pet. 55
(citing Ex. 1014 ¶¶ 44, 59, 72, Fig. 4B; Ex. 1003 ¶ 252) (emphasis omitted).
Petitioner contends that "a Skilled Artisan would understand an open drain
output to necessarily include, a field effect transistor having gate, source,
and drain."  *Id.* at 7, 55 (citing § V.D)  Petitioner further contends that a
"Skilled Artisan would have also understood that the disclosed 'open drain'
output is the output of 'a transistor having an open drain' while the 'source'

61

IPR2022-00064
Patent 10,474,595 B2

of that transistor is 'coupled to the ground.'" *Id.* at 55–56 (citing Ex. 1017, 5:65–6:18, Figs. 4–5; Ex. 1020, title, 4:28–37; Ex. 1003 ¶¶ 158–163, 168, 253–254) (emphasis omitted).

Petitioner further contends that the combination of Hazelzet and Buchmann satisfy claim 21's language reciting "wherein the module controller is configurable to drive the gate of the transistor so as to drive the open drain output to a first state or a second state, the first state being a low logic level [e.g., ground] and the second state being a high impedance state" for the reasons set forth for claim 4. Pet. 66 (citing §VI.A.4; Ex. 1003 ¶¶ 271, 361) (emphasis omitted).

Specifically, Petitioner contends that the combination of Hazelzet and Buchmann has an "open drain output configured such that the transistor output is driven low (ground) while training is still occurring and driven high upon completion." Pet. 56. "[T]o drive the output low (i.e., ground), the gate of the transistor must be high, causing the transistor to conduct and connect the drain to ground." *Id.* "[T]o drive the output high (which would be a high impedance state), the gate of the transistor must be low, turning the transistor off." *Id.* (citing Ex. 1003 ¶¶ 168, 272–275).

Petitioner thus contends that in the combination of Hazelzet and Buchmann, "the ECC/Parity register is configurable (for example, by placing it in the training mode) 'to drive a gate of the transistor high so as to drive open drain output and the error edge connection to ground, or to drive the gate of the transistor low so as to drive the open drain output and the error edge connection to the high impedance state," and thereby output training sequence status signals." *Id.* (citing Ex. 1003 ¶ 274) (emphasis omitted).

IPR2022-00064
Patent 10,474,595 B2

Patent Owner does not dispute Petitioner's contentions. *See* Resp. We agree with Petitioner's contentions.

> e)      Limitation 21.e: "[i] wherein the module
> controller is configurable to receive via the second edge
> connections memory commands associated with normal
> memory read or write operations and to output a set of
> address and control signals for each of the normal
> memory read or write operations; [ii] wherein the
> dynamic random access memory elements are
> configurable to communicate one or more N-bit-wide
> data signals with the memory controller via the first edge
> connections in response to the set of address and control
> signals, where N is at least 32; [iii] wherein the module
> controller is further configurable to output via the open
> drain output and the error edge connection a signal
> indicating a parity error having occurred during any of
> the memory read or write operations by driving the open
> drain output and the error edge connection to the first
> state;"

Petitioner contends that this limitation is satisfied by the combination of Hazelzet and Buchmann for the same reasons set forth for claim limitations 1.f.i–iii. Pet. 66–68.

For limitation 21.e.i, Petitioner contends that Hazelzet "discloses that the ECC/Parity register is configurable *(e.g.*, when placed in parity mode) to receive address command signals" that a person of ordinary skill in the art "would understand to be associated with normal memory read and write operations ('memory commands associated with normal memory read or write operations')." *Id.* at 66–67 (citing Ex. 1003 ¶¶ 214–221; Ex. 1014, ¶¶ 15, 35, 38, 41, 64, 70, Figs. 2, 7A–7B) (emphasis omitted). "[A]nd that, in response to such commands, the ECC/Parity register outputs associated address and control signals to the DRAMs of the module." *Id.* at 67 (citing

IPR2022-00064
Patent 10,474,595 B2

Ex. 1014 ¶¶ 42, 75).  Hazelzet therefore discloses claim element 21.e.i.  *Id.*
(citing Ex. 1003 ¶ 364).

Petitioner contends, to the extent one might argue that Hazelzet does
not sufficiently disclose claim limitation 21.e.i, "it would have been obvious
to include it in the combined system."  *Id.*  In particular, Petitioner contends
that Hazelzet "clearly discloses the ECC/Parity register receiving address
and command information associated with memory commands."  *Id.* (citing
Ex. 1014 ¶¶ 15, 38, 41–42, 64, 70, 75, Figs. 2, 7A–7B).  Petitioner contends
that a person of ordinary skill in the art "would have been motivated to
configure the register to correspondingly output associated address and
control signals to the DRAMs, and it would have been common sense to do
so, because that would be necessary to carry out the memory operations and
access the DRAMs."  *Id.* (citing Ex. 1003 ¶ 365).

Petitioner contends that Hazelzet "also discloses that the DRAMs are
configurable (*i.e.*, when connected to the address, control, data and PLL
lines of the module, as described in Hazelzet, [Ex.] 1014, [Fig.] 2), to
communicate data signals with the system memory controller over the
disclosed edge connections in response to address and control signals."  *Id.*
Petitioner contends that Hazelzet "discloses pinout information for one
embodiment of his module, which includes 64 data lines (DQ0-DQ63)" to
"communicate a 64-bit wide data signal."  *Id.* at 67–68 (citing Ex. 1014,
Figs. 7A–7C; Ex. 1003 ¶¶ 231–241).  Alternatively, Petitioner contends that
Hazelzet discloses a 72 bit wide (i.e., 9x8=72) embodiment.  *Id.* at 68 (citing
Ex. 1014 ¶ 92).  Petitioner contends that Hazelzet therefore discloses claim
limitation 21.e.ii.  *Id.* (citing Ex. 1003 ¶ 366).

IPR2022-00064
Patent 10,474,595 B2

Petitioner further contends that, to the extent Patent Owner argues that a single "dynamic random access memory element" must be able to "communicate one or more N-bit-wide data signals . . . where N is at least 32," to satisfy the limitation in claim limitation 21.e.ii, Petitioner contends that this limitation would nevertheless have been obvious. *Id.* (emphasis omitted). Petitioner contends that "modifying the memory system to use SDRAMs with high bit widths (*e.g.*, 32 bit wide) was not only known (or at least obvious), but also well within the skill of a [person of ordinary skill in the art] by the effective filing date of the [']595 Patent." *Id.* (citing Ex. 1024, i; Ex. 1029, 1; Ex. 1014 ¶ 113; Ex. 1003 ¶ 367).

Petitioner contends that the combination of Hazelzet and Buchmann discloses claim limitation 21.e.iii for the reasons set forth above for claim limitation 1.f.iii. *Id.* (citing Ex. 1003 ¶¶ 231–241, 368).

Patent Owner does not dispute Petitioner's contention that Hazelzet and Buchmann teach this claim limitation. We agree with Petitioner's contention.

> f)    *Limitation 21.f: "wherein the memory module is configurable to perform operations related to one or more training sequences while the memory module is not accessed by the memory controller for memory read or write operations; and wherein the module controller is configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection from one of the first state and the second state to the other one of the first state and the second state."*

Petitioner contends that this limitation 21.f is satisfied for the reasons set forth for claim limitations 1.e, 1.g, and 10.e. Pet. 68. Patent Owner does not dispute Petitioner's contentions, with which we agree.

65

IPR2022-00064
Patent 10,474,595 B2

g)    *Conclusion for Claim 21*

Petitioner has shown by a preponderance of the that one of ordinary skill in the art would have had reasons to combine Hazelzet and Buchmann as proposed in the Petition, with a reasonable expectation of success in arriving at the method recited in claim 21. Petitioner has further shown by a preponderance of the evidence that the combination of Hazelzet and Buchmann teaches or at least suggests all limitations of claim 21. Consequently, claim 21 of the '595 patent is unpatentable as obvious over the combination of Hazelzet and Buchmann.

5.    *Claims 2 and 11*

Claim 2 depends from claim 1 and recites "wherein the module controller comprises an integrated circuit." Ex. 1001, 15:22–23. Claim 11 depends from claim 10 and recites the same limitation. *Id.* at 16:45–46.

Petitioner contends that Hazelzet's ECC/Parity register ("module controller") "comprises in integrated circuit." Pet. 54 (citing Ex. 1014 ¶ 38) (emphasis omitted). Petitioner contends that Hazelzet "explains that the module support devices, including 'buffers,' 'registers,' and 'PLL' may be comprised of 'multiple separate chips' or may be 'combined onto a single package or even integrated onto a single device.'" *Id.* (citing Ex. 1014 ¶¶ 39, 42 115, Figs. 3A–3D; Ex. 1003 ¶¶ 249–250, 329). Patent Owner does not dispute Petitioner's contentions. We agree with Petitioner that Hazelzet teaches the limitations of claims 2 and 11 of the '595 patent.

6.    *Claim 3*

Claim 3 depends from claim 1 and recites "wherein the module controller includes a notification circuit comprising a transistor having an

IPR2022-00064
Patent 10,474,595 B2

open drain coupled to the open drain output and source coupled to the ground." Ex. 1001, 15:24–27.

Petitioner contends that, as explained for claim limitation 1.d, Hazelzet discloses that the ECC/Parity register has an open drain output. Pet. 55. Petitioner contends that Hazelzet's "ECC/Parity register has an 'error correction code circuit ECC segment 21b,' which is a 'notification circuit'" which "outputs signals notifying the system memory controller of correctable, uncorrectable, and parity errors." *Id.* (citing Ex. 1014 ¶ 44) (emphasis omitted). Petitioner contends that the "error correction code circuit ECC segment 21b" (within the ECC/Parity register) includes circuitry for determining whether the errors occurred, and provides an "open-drain" output for a notification signal such as UE 121. *Id.* (citing Ex. 1014 ¶¶ 59, 72, Fig. 4B; Ex. 1003 ¶ 252). Petitioner contends that a person of ordinary skill in the art would have understood that an open drain output includes a field effect transistor having gate, source, and drain, and that an "open drain" output is an output of "a transistor having an open drain" while the source of that transistor is "coupled to the ground." *Id.* at 55–56 (citing Ex. 1017, 5:65–6:18, Figs. 4–5; Ex. 1020, 1 (Title), 4:28–37; Ex. 1003 ¶¶ 158–163, 253–254) (emphasis omitted).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

We agree with Petitioner that the combination of Hazelzet and Buchmann teaches these limitations. Hazelzet teaches that the ECC/Parity register includes an error correction code circuit that notifies the memory controller of errors, that has "[t]wo open-drain outputs are available to permit multiple modules to share a common signal line for reporting an

IPR2022-00064
Patent 10,474,595 B2

error." Ex. 1014 ¶¶ 59, 72, 109, Fig. 4B.  This is sufficient to teach the "notification circuit" limitation of claim 3 of the '595 patent.

>        7.      *Claim 4*

Claim 4 depends from claim 3 and recites "wherein the module controller is configurable to drive a gate of the transistor high so as to drive open drain output and the error edge connection to ground, or to drive the gate of the transistor low so as to drive the open drain output and the error edge connection to the high impedance state." Ex. 1001, 15:28–33.

Petitioner contends (as explained in § V.D of the Petition) that in the combination of Hazelzet and Buchmann "the open drain output is configured such that the transistor output is driven low (ground) while training is still occurring[,] and driven high upon completion." Pet. 56.  According to Petitioner, "to drive the output low (i.e., ground), the gate of the transistor must be high, causing the transistor to conduct and connect the drain to ground." *Id.*  "[T]o drive the output high (which would be a high impedance state), the gate of the transistor must be low, turning the transistor off." *Id.* (citing Ex. 1003 ¶¶ 168, 272–275).  Petitioner contends that, in the combination of Hazelzet and Buchmann, "the ECC/Parity register is configured (for example, by placing it in the training mode) 'to drive a gate of the transistor high so as to drive open drain output and the error edge connection to ground, or to drive the gate of the transistor low so as to drive the open drain output and the error edge connection to the high impedance state,' and thereby output training sequence status signals." *Id.* (citing Ex. 1003 ¶ 274) (emphasis omitted).

Patent Owner does not dispute Petitioner's contentions.  *See* Resp.

IPR2022-00064
Patent 10,474,595 B2

We credit Dr. Alpert's testimony concerning what one of ordinary skill in the art would have understood of the structure and operation of an open drain transistor as taught by Hazelzet. *See* Ex. 1003 ¶¶ 272–275. Although Hazelzet does not specifically mention the gate of an open drain transistor being driven high, it does mention the output being driven low which would require the gate to be driven high in light of Dr. Alpert's testimony of what a person of ordinary skill in the art would have understood about the structure and operation of an open drain transistor. *Id.* Conversely, Dr. Alpert testifies to drive the output high (which would be the high impedance state), the gate of the transistor must be low, turning the gate off. Ex. 1003 ¶ 272 (citing ¶ 168). We agree with Petitioner that the combination of Hazelzet and Buchmann teaches, or at least suggests, the limitation of claim 4 of the '595 patent.

> 8.    *Claim 5*

Claim 5 depends from claim 4 and recites "wherein the module controller is configurable to output the signal indicating a parity error having occurred by driving the gate of the transistor high to provide a low impedance path between the open drain output and the ground." Ex. 1001, 15:34–38. Petitioner contends that Hazelzet's "ECC/Parity register has 'open-drain output[s]' capable of using 'parity error signals' (PERR) to output signal UE 121 to the host indicating a parity error." Pet. 56 (citing Ex. 1014 ¶¶ 59, 70, 72, 76). "[W]hen the memory module is in the parity mode ('first mode'), the 'parity generator/checker circuit 231' (within SEC/DED ECC circuit 90) generates and sends the 'parity error signal (PERR)' to the 'error logic circuit' 100." *Id.* at 56–57 (citing Ex. 1014 ¶¶ 59, 70, 72, 76, Figs. 4B, 5; Ex. 1003 ¶ 278). Hazelzet states that in the

IPR2022-00064
Patent 10,474,595 B2

parity mode, the parity error "will be reported two clock pulses later via the Uncorrectable Error (UE) line (<u>driven low</u> for two clock pulses)." *Id.* at 57 (citing Ex. 1014 ¶¶ 18, 70; Ex. 1003 ¶ 279) (emphasis original).

Petitioner further contends that, as explained for claim 4, "Hazelzet discloses that its open-drain output is driven 'low' (i.e., to ground) when the driver is enabled (i.e., the gate receives a high voltage), and further explains that the open-drain 'output [is] permitted to return to an un-driven state (high impedance)' when the 'driver [is] disabled.'" *Id.* (citing Ex. 1014 ¶ 99; Ex. 1003 ¶ 280) (emphasis omitted).

Petitioner contends that, accordingly, Hazelzet discloses its open-drain output UE 121 is configured to "output the signal indicating a parity error having occurred by driving the gate of the transistor high to provide a low impedance path between the open drain output and the ground." *Id.* (citing Ex. 1017, 5:65–6:18, Figs. 4, 5; Ex. 1003 ¶¶ 158–163, 281) (emphasis omitted). Petitioner also refers to the Petition's analysis for claim 4.

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

Petitioner shows sufficiently that the limitation of claim 5 is taught or at least suggested by the combination of Hazelzet and Buchmann. Hazelzet teaches that its ECC/Parity buffer includes an error correction code circuit segment 21b that outputs a parity error signal that is driven low to indicate a parity error. Ex. 1014 ¶¶ 59, 70, 72, 76, Figs. 4A–4B. Although Hazelzet does not specifically mention the gate of an open-drain transistor being driven high to provide a low impedance path from drain to ground, Dr. Alpert testifies that a person of ordinary skill in the art would have understood an open-drain transistor to be structured and to operate in this

IPR2022-00064
Patent 10,474,595 B2

way. Ex. 1003 ¶¶ 280–282. We agree with Petitioner that the limitation of claim 5 is taught or at least suggested by the combination of Hazelzet and Buchmann.

9.      *Claims 6, 13, and 22*

Claim 6 depends from claim 3 and recites "wherein the notification circuit further includes a multiplexor or a logic circuit having a [sic] output coupled to a gate of the transistor and configurable to drive the gate of the transistor with either a first signal related to the parity error or a second signal related to the one or more training sequences." Ex. 1001, 15:39–44. Claim 13 depends from claim 10, and recites a similar limitation. *Id.* at 16:62–67. Claim 22 depends from claim 21 and recites a similar limitation. *Id.* at 18:53–59.

Petitioner contends that Hazelzet's "notification circuit" includes "Error Logic 100" which receives "US [sic] 110" signal and the "PERR 111" signal, and outputs one of these signals to the same "/ERROR (UE)" pin 121 depending on the mode of the memory module. Pet. 57–58 (citing Ex. 1014 ¶¶ 44, 59, 69–72, Fig. 4B; Ex. 1003 ¶ 285). Petitioner contends that the circuitry would be modified to implement the additional training mode, in which the UE 121 open drain output would, when the module is in the training mode, be used to send the notification/status signals identified above. *Id.* at 58 (citing Ex. 1003 ¶¶ 162, 167, 286, 333, 372).

Dr. Alpert testifies that a person of ordinary skill in the art would have understood that "the UE 121 open drain output is driven by a transistor in an open drain configuration, and that such a transistor . . . has 'a gate' that can be driven to assert the open drain output." *Id.* at 58 (citing Ex. 1003 ¶¶ 158–163, 286) (emphasis omitted). According to Petitioner, because "the

71

IPR2022-00064
Patent 10,474,595 B2

Error Logic 100 receives 'U[E] 110' signal and the 'PERR 111' signal and the training mode notification signals, but uses only one such signal to drive the UE 121 output, depending on mode," a person of ordinary skill in the art "would also understand that Error Logic 100 would necessarily include logic circuitry to determine which signal should be used to drive the transistor." *Id.* (citing Ex. 1017, 5:65–6:18, Figs. 4, 5) (depicting in Fig. 5 an "OR" gate used for such purpose). Petitioner regards additional circuitry as a "logic circuit," which necessarily has "an output coupled to a gate of the transistor," because that is how a transistor in an open drain configuration is driven. *Id.* (citing Ex. 1003 ¶¶ 286–287) (emphasis omitted). Petitioner further contends that "the signal driving that gate is necessarily related to one of the signals input to Error Logic 100 (*e.g.*, 'PERR 111' ('first signal') or the training notification signals ('second signal'), depending on mode, so the additional logic circuitry is 'configurable to drive the gate of the transistor with either a first signal related to the parity error or a second signal related to the one or more training sequences.'" *Id.* at 58–59 (citing Ex. 1003 ¶¶ 288, 333, 372) (emphasis omitted).

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

Although Hazelzet does not specifically mention an OR logic circuit, we agree with Petitioner that one of ordinary skill in the art would understand that an OR logic circuit is implied by Hazelzet's teaching that "[w]hen *either* error line (CE) 109 *or* uncorrectable error line (UE) 110 is low . . . [t]he error lines 120, 121 will be active . . . in ECC mode or . . . in parity mode." Ex. 1014 ¶ 59, Fig. 4B. We agree with Petitioner that Hazelzet's "either/or" signifies use of a logic circuit performing an OR operation, and that extending the logic circuit to perform OR operation for

72

IPR2022-00064
Patent 10,474,595 B2

the training signals' status in training mode would have been straightforward. Accordingly, we agree with Petitioner that this limitation of claims 6, 13, and 22 is taught by the combination of Hazelzet and Buchmann.

        *10. Claims 7 and 14*

Claim 7 depends from claim 1 and recites "wherein the module controller is configurable to provide the information related to the one or more training sequences by driving a gate of the transistor with the second signal so as to drive the open drain output from the high impedance state to ground or from ground to the high impedance state." Ex. 1001, 15:45–50. Claim 14 recites a similar limitation. *Id.* at 17:1–6.

Petitioner contends that, in the combination of Hazelzet and Buchmann, "the open drain output is configured such that the transistor output is driven low (ground) while training is still occurring and driven high upon completion." Pet. 59. Petitioner also contends "to drive the output low (i.e., ground), the signal at the gate of the transistor ('the second signal' when the system is in training mode) must be high, causing the transistor to conduct and connect the drain to ground." *Id.* (emphasis omitted). Petitioner further contends "to drive the output high (which would be a high impedance state), the gate of the transistor must be low, turning the transistor off." *Id.* (citing Ex. 1003 ¶¶ 168, 292–295).

Petitioner contends, in the combination of Hazelzet and Buchmann, "the ECC/Parity register is configurable (for example, by placing it in the training mode) 'to provide the information related to the one or more training sequences by driving a gate of the transistor with the second signal

IPR2022-00064
Patent 10,474,595 B2

so as to drive the open drain output from the high impedance state to ground or from ground to the high impedance state.'" *Id.*

Patent Owner does not dispute Petitioner's contentions. *See* Resp.

We agree with Petitioner that the combination of Hazelzet and Buchmann teaches, or at least suggests, that the module controller provides information for the training sequences by driving the gate of a transistor with the second signal so as to drive the open drain output from the high impedance state to ground or from ground to the high impedance state. Ex. 1003 ¶¶ 291–296, 334–335. Accordingly, we agree with Petitioner that the combination of Hazelzet and Buchmann teaches or at least suggests the limitations of claims 7 and 14.

11.    *Claims 8, 9, 15, 16, 18, 19, and 24*

Claim 8 depends from claim 1 and recites "wherein the second edge connections include one or more pins that are not active while the memory module is in the second mode." Ex. 1001, 15:51–53. Claims 9, 15, 18, 19, and 24 depend from respective claims 1, 10, 17, and 21, and recite similar limitations. *Id.* at 15:54–58 (claim 9); 17:7–9 (claim 15); 17:49–52 (claim 18); 17:53–56 (claim 19); and 19:3–7 (claim 24).

Petitioner contends that in the combination of Hazelzet and Buchmann, "in which only the TS0 training operations are carried out in the training mode ('second mode'), the address/control and data pins (including the high order address/control pins) of the module edge connections would not be active during that training because TS0 training involves training of the "clock" itself, and no address/control or data signals are transmitted between the host and the memory module during such training." Pet. 60 (citing Ex. 1016, 5:51–7:2; Ex. 1003 ¶¶ 300, 306–307, 349, 376) (emphasis

74

IPR2022-00064
Patent 10,474,595 B2

omitted).  Petitioner contends that this teaching satisfies the limitations of each of these dependent claims.  *Id.*

Petitioner contends that, "[t]o the extent one might argue otherwise, it would have been obvious not to send any data or address/control signals while the clock is being trained because a [person of ordinary skill in the art] would have been motivated to keep the pin(s) for those signals inactive to conserve power and/or avoid unreliable operation during periods that the clock may be unstable." *Id.* at 60–61 (citing Ex. 1003 ¶¶ 301, 308).

Petitioner also contends that neither Hazelzet nor Buchmann "disclose address/control or data pins being active while the memory module is in a MB-DRAM Training or TS0 training mode during initialization/power-on." *Id.* at 61.  "Because these claims each recite a negative limitation," Petitioner further contends that "silence also satisfies these claims." *Id.* (citing Ex. 1003 ¶¶ 302, 309) (quoting *Süd-Chemie*, 554 F.3d at 1004–05).

Patent Owner does not dispute Petitioner's contentions  *See* Resp.

Petitioner has shown sufficiently that the combination of Hazelzet and Buchmann teaches the limitations of claims 8, 9, 15, 16, 18, 19, and 24. Specifically, Petitioner shows that the pins for the address and control signals in the Hazelzet-Buchmann combination would not be active during training of the memory module.  *See, e.g.*, Ex. 1003 ¶¶ 300–303.

> 12.    *Claims 12, 20, and 23*

Claim 12 depends from claim 10 and recites "[12.a] wherein the module controller includes a notification circuit having a transistor with an open drain coupled to the open drain output and a source coupled to the ground, [12.b] wherein the module controller is configurable to output to the memory controller the open-drain signals related to the one or more training

75

IPR2022-00064
Patent 10,474,595 B2

sequences by driving a gate of the transistor high so as to drive, the open drain output and the error edge connection to ground, and by driving the gate of the transistor low as to drive the open drain output and the error edge connection to the high impedance state, and [12.c] wherein the notification circuit is configurable to output the signal indicating a parity error having occurred by driving the gate of the transistor high to provide a low impedance path between the open drain output and ground." Ex. 1001, 16:47–61.

Claim 20 depends from claim 17 and recites "[20.a] wherein the memory module includes a notification circuit having a transistor with an open drain coupled to the open drain output and a source coupled to ground, [20.b] wherein outputting via an open drain output coupled to the error edge connection a signal indicating a parity error having occurred in the memory module comprises driving a gate of the transistor high to provide a low impedance path between the open drain output and ground, and [20.c] wherein outputting the open-drain signals related to the one or more training sequences and unrelated to any memory read or write operation comprises driving the gate of the transistor to drive the open drain output from a high impedance state to ground and from ground to the high impedance state." *Id.* at 17:57–18:3.

Claim 23 depends from claim 22 and recites "[23.a] wherein the transistor has a source coupled to ground, [23.b] wherein the module controller is configurable to output the signal indicating a parity error having occurred by driving the gate of the transistor high to provide a low impedance path between the open drain output and ground, and [23.c] wherein the module controller is configurable to provide the information

IPR2022-00064
Patent 10,474,595 B2

related to the one or more training sequences by driving the open drain output from a high impedance state to ground or from ground to the high impedance state." *Id.* at 18:60–19:2.

Petitioner contends that these claims are satisfied by the Hazelzet-Buchmann combination for the same reasons set forth for claims 3, 4, and 5. Pet. 63 (citing Ex. 1003 ¶¶ 331, 353, 374). In particular, Petitioner contends that the analysis for claim 3 satisfies claim limitation 12.a, the analysis for claim 4 satisfies claim limitation 12.b, and the analysis for claim 5 satisfies claim limitation 12.c. *Id.*

Similarly, Petitioner contends that the analysis in claim 3 satisfies claim limitations 20.1 and 23.a, the analysis in claim 5 satisfies claim limitations 20.b and 23.b, and the analysis in claim 4 satisfies claim limitations 20.c and 23.c. *Id.*

Petitioner further contends that in the Hazelzet-Buchmann combination, the open drain signals relating to the training signals (e.g., TS0_done, TS3_ack, TS3_done) are "unrelated to any memory read or write operation" because they are related solely to the Buchmann training sequences, "and not to any memory controller operations that seek to communicate data with the module or seek to read or write to the memory devices." *Id.* at 63–64 (citing § VI.A.1.g, Ex. 1003 ¶¶ 164, 180, 229, 347).

Patent Owner does not dispute Petitioner's contentions. *See* Resp. For the reasons stated for claims 3, 4 and 5, we agree with Petitioner that the Hazelzet-Buchmann combination teaches or at least suggests the limitations of claims 12, 20, and 23.

IPR2022-00064
Patent 10,474,595 B2

### 13.    Conclusion for Ground 2

Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had reason to combine Hazelzet and Buchmann with a reasonable expectation of success in arriving at claims 1–24 of the '595 patent.  Petitioner has further shown that the combination of Hazelzet and Buchmann teaches or at least suggests the limitations of claims 1–24.  Accordingly, Petitioner has shown by a preponderance of the evidence that claims 1–24 would have been obvious over the combination of Hazelzet and Buchmann.

### F.    Ground 3:  Obviousness Over the Combination of Hazelzet, Buchmann, and Kim

Petitioner, alternatively, contends claims 3–7, 12–14, 20, 22 and 23 would have been obvious over the combination of Hazelzet, JEDEC or Buchmann, and Kim.  Pet. 69–74.  For the reasons that follow, we are persuaded that the evidence, including Dr. Alpert's testimony, sufficiently supports Petitioner's arguments for the combination of Hazelzet, Buchmann, and Kim, and, therefore, establishes by a preponderance of the evidence the unpatentability of claims 3–7, 12–14, 20, 22, and 23.  Because we determine that the combination of Hazelzet, Buchmann, and Kim establishes unpatentability under this ground, we need not address the combination of Hazelzet, JEDEC, and Kim.  *See also* Section II.D.

### 1.    Kim (Ex. 1017)

Kim was filed on January 22, 2008, issued on January 22, 2013, and is titled "Providing a Memory Device Having a Shared Error Feedback Pin." Ex. 1017, codes (22), (45), (54).  Kim is generally directed "to a memory

IPR2022-00064
Patent 10,474,595 B2

device having a shared error feedback pin." Ex. 1017, 1:6–8. Kim's

Figure 4 is reproduced below.



FIG. 4

Kim's Figure 4 shows "a block diagram of a memory module [400]

having an error feedback pin that is shared among multiple device[s]." *Id.*

at 3:13–16. Kim's Figure 4 further depicts "the error output line from the

memory devices are dotted together via open drain drivers to a single error

line that is output from the memory module 400." *Id.* at 6:1–3.

IPR2022-00064
Patent 10,474,595 B2

Kim's Figure 5 is reproduced below.



FIG. 5

Kim's Figure 5 depicts "a block diagram of a memory device 500 that shares an error feedback pin between data CRC and address parity." *Id.* at 6:13–15.

> 2. *Analysis*

Petitioner contends that Kim teaches an "'open drain output' with an output pin coupled to the drain of a transistor, which includes a gate, a source, and a drain." Pet. 69 (citing Ex. 1017, Fig. 4). Petitioner also contends that Kim discloses "using a logic element (an OR gate) such that multiple error signals could drive the gate of the open-drain transistor." *Id.* at 70 (citing Ex. 1017, 6:13–18, Fig. 5). Petitioner proposes combining Kim's "open drain transistor configuration" with Hazelzet's error logic circuit 100 "such that signals indicating parity mode error, ECC mode error and training status would be provided to a logic gate, such as an OR gate, as in Kim, which would select among them based on the mode of the module,

IPR2022-00064
Patent 10,474,595 B2

as in Hazelzet." Pet. 71 (emphasis omitted). Petitioner contends the combined circuit would include the transistor configurations and signaling recited in claims 3–5 (Ex. 1003 ¶¶ 265, 276, 283), the multiplexor configuration recited in claims 6, 13 and 22 (Ex. 1003 ¶¶ 161, 180, 196), the open drain training sequence signals of claims 7 and 14 (Ex. 1003 ¶¶ 163, 181), and the transistor signaling of claims 12, 20, and 23 (Ex. 1003 ¶¶ 180, 187, 197). Pet. 73.

Petitioner contends that a person of ordinary skill in the art would be motivated to combine Kim with Hazelzet and Buchmann because (1) Kim is assigned to the same company as Hazelzet and contains some of the same disclosures, as well as some additional disclosures; (2) using the output-pin scheme of Kim in the system of Hazelzet would have been "the use of known techniques for their known purposes to achieve predictable results, i.e., using an open-drain output to provide error or status information from multiple components"; (3) "it represented a well-known (and therefore reliable) and simple technique to provide error and/or status information from a number of components and in different modes"; and (4) it would "simplify[] the design of the system and sav[e] pins on the various integrated circuits connected to the bus." *Id.* at 73–74 (citing § V.E; Ex. 1017, 1:16–22, 5:49–57, 5:65–6:18, Figs. 4, 5; Ex. 1003 ¶¶ 251, 257, 267–270, 330–335, 353, 372, 374; Ex. 1014 ¶¶ 72, 122).

Beyond the arguments previously addressed, Patent Owner does not specifically address these assertions. *See* Resp. Based on our review and consideration of the record, we determine that Petitioner has shown that one of ordinary skill in the art would have had reason to combine Hazelzet, Buchmann, and Kim, and that the combination teaches the limitations in

IPR2022-00064
Patent 10,474,595 B2

claims 3–7, 12–14, 20, 22, and 23.  As Dr. Alpert establishes, Kim's
disclosure overlaps substantially with Hazelzet, and discloses additional
details regarding use of an open-drain output on a memory module to notify
a memory controller of errors during parity and ECC modes, as well as
initialization operations to train a memory module and output training status
on a shared error feedback pin.  Ex. 1003 ¶¶ 166–169.  Thus, we determine
that Petitioner has established by a preponderance of the evidence that
claims 3–7, 12–14, 20, 22, and 23 of the '595 patent are unpatentable as
obvious over the combination of Hazelzet, Buchmann, and Kim.

     G.    *Motions to Exclude*

       1.    *Patent Owner's Motions to Exclude*

Patent Owner seeks to exclude Exhibits 1015, 1024–1025,
1036–1037, 1039, 1048–1049, 1051, 1056, 1071–1076, and 1080–1081.
Paper 45, 9–14.

We did not rely on Exhibits 1015, 1037, 1039, 1048, 1049, 1051,
1071–1076 or 1080–1081 in rendering this Final Written Decision.
Consequently, Patent Owner's Motion to Exclude is moot as to these
Exhibits.

Patent Owner contends that Exhibits 1024–1025, 1036–1037, and
1056 should be excluded because they are not authenticated.  FRE 901(a).
Petitioner contends that some of these Exhibits are authenticated by the
declaration of Julie Carlson (Ex. 1050) who was responsible for
"maintenance and publication of JEDEC documents and standards" and a
declaration from "Sung Joo Park, who participated in JEDEC at the relevant
time and has personal knowledge of the documents he authenticates."
Ex. 1055 ¶ 5.  Paper 48, 6.  Petitioner contends these declarations

IPR2022-00064
Patent 10,474,595 B2

authenticate Exhibits 1036 and 1037.  We agree.  Petitioner contends that
Exhibits 1024–1025 and 1056 "are similar JEDEC documents and contain
the same indicia of authenticity under FRE 901(b)(4) and 902(7), including
similar cover pages, tables of contents, fonts, logos, technical contents, and
revision logs." *Id.*  We agree and determine that sufficient evidence has
been provided to authenticate these Exhibits.

Patent Owner further contends we should exclude Exhibits
1024–1025, 1036–1037, and 1056 because they are inadmissible hearsay
under FRE 801 and 802.  Paper 45, 12–14.  Petitioner contends that the
declaration of Julie Carlson establishes that Exhibits 1036–1037 are business
records of JEDEC under FRE 803(6) as of the dates shown on the
documents.  Paper 48, 13.  We agree that Exhibits 1036–1037 fall under the
business records exception to the hearsay rule.

Comparison of Exhibits 1036 and 1037 to Exhibits 1024, 1025, and
1056 leads us to conclude that these Exhibits also are authenticated business
records (standards or committee letter ballots) of JEDEC.  They have similar
cover pages, tables of contents, fonts, logos, technical contents, and revision
logs.  Patent Owner has introduced no evidence to suggest that these
Exhibits are not what they appear to be.

Consequently, Patent Owner's Motion to Exclude is *dismissed-in-part*
as moot as to Exhibits 1015, 1037, 1039, 1048, 1049, 1051, 1071–1076, and
1080–1081, and is *denied-in-part* as to Exhibits 1024–1025, 1036–1037, and
1056.

## 2.    *Petitioner's Motions to Exclude*

Petitioner seeks to exclude Exhibit 2017 and paragraphs 20–21 of
Exhibit 2026.  Paper 46, 1.  We *dismiss* Petitioner's Motion to Exclude as

IPR2022-00064
Patent 10,474,595 B2

moot because we did not rely on Exhibits 2017 or 2026 to reach our Final
Written Decision.

## III.   CONCLUSION

For the foregoing reasons, we determine that Petitioner establishes by
a preponderance of the evidence that claims 1–24 of the '595 patent are
unpatentable.

## IV.   ORDER

Accordingly, it is:

ORDERED that claims 1–24 of the '595 patent have been shown to be
unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is
*dismissed-in-part* as moot as to Exhibits 1015, 1037, 1039, 1048, 1049,
1051, 1071–1076, and 1080–1081, and is *denied-in-part* as to Exhibits
1024–1025, 1036–1037, and 1056;

FURTHER ORDERED that Petitioner's Motion to Exclude is
dismissed; and

IPR2022-00064
Patent 10,474,595 B2

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2.[12]

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1–24 | 103[13] | Hazelzet, JEDEC | | |
| 1–24 | 103 | Hazelzet, Buchmann | 1–24 | |
| 3–7, 12–14, 20, 22, 23 | 103 | Hazelzet, Buchmann, Kim | 3–7, 12–14, 20, 22, 23 | |
| **Overall Outcome** | | | 1–24 | |

[12] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[13] We do not reach this ground for the reasons discussed in Section II.D.

IPR2022-00064
Patent 10,474,595 B2

FOR PETITIONER:

Eliot D. Williams
Neil P. Sirota
Theodore W. Chandler
Stephanie C. Kato
Ferenc Pazmandi
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
neil.sirota@bakerbotts.com
ted.chandler@bakerbotts.com
stephanie.kato@bakerbotts.com
ferenc.pazmandi@bakerbotts.com


FOR PATENT OWNER:

Sarah Spires
Rex Hwang
SKIERMONT DERBY LLP
sspires@skiermontderby.com
rhwang@skiermontderby.com

# EXHIBIT 4

Trials@uspto.gov                                           Paper 53
571-272-7822                                       Date: May 3, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SAMSUNG ELECTRONICS CO., LTD.,
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

———————————

IPR2022-00063
Patent 10,217,523 B1

———————————

Before JON M. JURGOVAN, SHEILA F. McSHANE, and
KARA L. SZPONDOWSKI, *Administrative Patent Judges*.

SZPONDOWSKI, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00063
Patent 10,217,523 B1

# I.   INTRODUCTION

We instituted an *inter partes* review of claims 1–34 of U.S. Patent No. 10,217,523 B1 (Ex. 1001, "the '523 patent"), in response to a Petition (Paper 1, "Pet.") filed by Samsung Electronics Co., Ltd. ("Petitioner"). Paper 13 ("Dec.").  During the trial, Netlist, Inc. ("Patent Owner") filed a Response to the Petition (Paper 28, "PO Resp."), Petitioner filed a Reply (Paper 31, "Reply"), and Patent Owner filed a Sur-reply (Paper 34, "Sur-reply").  In addition, both parties filed Motions to Exclude Evidence (Papers 43 ("PO Mot. Excl."), 44 ("Pet. Mot. Excl.")), Oppositions to the motions (Papers 45 ("PO Opp. Excl."), 46 ("Pet. Opp. Excl.")), and Replies to the Oppositions (Papers 48 ("Pet. Reply Excl.), 50 ("PO Opp. Excl.")).

An oral hearing was held on February 1, 2023, and a copy of the transcript was entered into the record.  Paper 52 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6.  This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial.  Based on the complete record, Petitioner has not shown, by a preponderance of the evidence, that claims 1–34 of the '523 patent are unpatentable.

# II.   BACKGROUND

## A.   Real Parties in Interest

Petitioner identifies Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc. as real parties in interest.   Pet. 1.  Patent Owner identifies itself as the sole real party in interest.  Paper 3, 3.

## B.   Related Matters

Petitioner indicates *Samsung Electronics Co., Ltd. et al. v. Netlist, Inc.,* No. 1:21-cv-01453 (D. Del. filed Oct. 15, 2021) involves the '523

IPR2022-00063
Patent 10,217,523 B1

patent.  Pet. 1.  Petitioner and Patent Owner also identify many other related
matters.  Pet. 1–3; Paper 3, 3–5; Paper 5.

The Board previously instituted trial in IPR2020-01421 on the same
claims of the '523 patent and on the same grounds presented here, but with
different petitioners.  *See* Ex. 1043.  That IPR was terminated after
institution because settlement was reached.  Ex. 1044.

C.  *The '523 Patent (Ex. 1001)*

The '523 patent is titled "Multi-Mode Memory Module with Data
Handlers" and issued on February 26, 2019, from an application filed on
March 29, 2014.  Ex. 1001, codes (22), (45), (54).

The '523 patent is directed to a self-testing memory module for
testing a plurality of memory devices mounted thereon.  Ex. 1001, 5:4–27.
Figure 2, reproduced below, is a block diagram illustrating component
blocks of memory module 10 and memory controller 14.  *Id.* at 5:28–34,
8:41–62, 9:22–42, Fig. 2.



FIG. 2

IPR2022-00063
Patent 10,217,523 B1

Figure 2, above, shows memory module 10 includes control module 22 that generates address and control signals for testing memory devices 20 and data module 28 that includes a plurality of distributed data handlers 30. Ex. 1001, 5:12–16.  Data handlers 30 of data module 28 generate test patterns to write to memory devices 20 and compare test patterns read from memory devices 20 to the written patterns to identify faults.  *Id.* at 5:28–34.

Figure 3, reproduced below, provides additional detail regarding the control module, data handlers and their components and interconnections. Ex. 1001, Fig. 3.



Figure 3, above, shows additional control module 22, data module 28, plurality of memory devices 18, and certain components thereof.  Ex. 1001, 9: 32–36, Fig. 3.  Control module 22 includes memory device controller 32 with memory controller 34 and test controller 36.  *Id.* at 9:38–40, Fig. 3. Data module 28 includes data handlers 30, switch 44, and data handler logic

4

IPR2022-00063
Patent 10,217,523 B1

element 46, which includes data generation element 54 and verification element 56. *Id*. at 10:7–21, 10:38–40.

"In one embodiment, the memory device controller 34 receives signals 38 (e.g., address and control signals) from the system memory controller 14 and signals 42 (e.g., address and controls signals) from the test controller 36." *Id.* at 9:45–49. "The control module 22 of certain embodiments is configured to selectively input to the address and control ports of the plurality memory devices 18 either the address control signals 38 from the system memory controller 14 or the address and control signals 42 from the control module 22 (e.g., from the test controller 36)." *Id.* at 9:49–55. "For example, the memory device controller 34 may send either the signals 38 from the system memory controller 14 or, alternatively, the signals 42 from the test controller 36, to the register 40 depending on whether the memory module 10 is in normal (non-test) mode or in a test mode, respectively." *Id.* at 9:55–60. "The test controller 36 controls the generation of the address and control signal sequences to be used during the self-testing operation of the memory module 10 and also communicates with the data module 28." *Id.* at 9:63–66.

"The data module 28 . . . may be in communication with one or more of the memory devices 20, the control module 22, and the memory controller." *Id.* at 10:7–10. "Each of the data handlers 30 of certain embodiments comprises a switch 44," which "may include a data multiplexer/demultiplexer." *Id.* at 10:13–15. "In certain embodiments, the switch 44 is configured to selectively input to the corresponding plurality of data ports either data signals 48 from the system memory controller 14 or data signals 50 from the data handler logic elements 46." *Id.* at 10:17–21.

IPR2022-00063
Patent 10,217,523 B1

"The switch 44 of certain embodiments may further be configured to receive data signals 52 (e.g., during a read operation) from the plurality of memory devices 18 and to propagate the data signals 52 to the data handler logic element 46 and/or the memory controller 14." *Id.* at 10:21–25. "In some embodiments, for example, the switch 44 selectively inputs the data signals 48 to be written to the plurality of memory devices 18 from the system memory controller 14 when the memory module 10 is a normal (non-test mode) mode and, alternatively, inputs the data signals 50 from the data handler logic element 46 during a test mode." *Id.* at 10:26–31.

### D.   Illustrative Claims

Petitioner challenges claims 1–34 of the '523 patent.  Pet. 5–6. Claims 1 and 19 are independent.  Ex. 1001, 16:55–17:30, 19:4–45.  Claim 1, reproduced below with brackets noting Petitioner's identifiers, is illustrative of the subject matter of the challenged claims:

> 1. [a] A memory module accessible in a computer system by a system memory controller via a system memory bus, comprising:
>
>> [b] memory devices mounted on a circuit board, the memory devices having address and control ports and data ports;
>>
>> [c] a data module mounted on the circuit board and coupled between the data ports of the memory devices and the system memory bus, the data module including data handler logic elements;
>>
>> [d] a control module mounted on the circuit board and coupled to the data module, the address and control ports of the memory devices, and the system memory bus; and
>>
>> [e] wherein the memory module is operable in any of a plurality of modes including a first mode and a second mode;
>>
>> [f] [i] wherein the control module in the first mode is configured to receive system address and control signals from the system memory controller and to output first memory

IPR2022-00063
Patent 10,217,523 B1

address and control signals to the memory devices according to the system address and control signals, and [ii] the data module in the first mode is configured to propagate one or more first data signals between the memory devices and the system memory controller, [iii] the one or more first data signals being transmitted or received by at least a portion of the memory devices in response to the first memory address and control signals; and

[g] [i] wherein the control module in the second mode is configured to output second memory address and control signals to the address and control ports of the memory devices, and [ii] the data module in the second mode is configured to isolate the memory devices from being accessed by the system memory controller and to transmit one or more second data signals including data patterns provided by the data handler logic elements to the data ports of the memory devices according to one or more commands output from the control module, and [iii] wherein at least a portion of the memory devices are configured to receive the one or more second data signals according to the second memory address and control signals from the control module.

Ex. 1001, 16:55–17:30.

## E.  *Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–34 of the '523 patent are unpatentable based on the following grounds:

IPR2022-00063
Patent 10,217,523 B1

| Claims Challenged | 35 U.S.C. §[1] | Reference(s) |
|---|---|---|
| 1–34 | 103(a) | Ellsberry,[2] Jeddeloh[3] |
| 1–34 | 103(a) | Ellsberry, Jeddeloh, Averbuj[4] |
| 14, 17–34 | 103(a) | Ellsberry, Jeddeloh, Lee[5] |
| 14, 17–34 | 103(a) | Ellsberry, Jeddeloh, Averbuj, Lee |

Pet. 5–6.

In addition, Petitioner relies on the Declarations of Dr. Vivek Subramanian (Exs. 1003, 1061). Patent Owner relies on the Declarations of Dr. Michael Brogioli (Exs. 2001, 2004). Deposition transcripts have been entered into the record for Dr. Subramanian (Exs. 2005, 2016) and Dr. Brogioli (Ex. 1064).

## III. ANALYSIS

### A. *Legal Standards*

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103, and was effective on March 16, 2013. Because the '523 patent has a filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of 35 U.S.C. § 103.
[2] US Pub. No. 2006/0277355 A1, published December 7, 2006. Ex. 1005.
[3] US 7,310,752 B2, issued December 18, 2007, claiming priority to Application No. 10/660,844, filed on Sept 12, 2003. Ex. 1006.
[4] US Pub. No. 2005/0257109 A1, published November 17, 2005. Ex. 1007.
[5] US Pub. No. 2006/0095817 A1, published May 4, 2006. Ex. 1008.

IPR2022-00063
Patent 10,217,523 B1

invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.[6]  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *KSR*, 550 U.S. at 418.  An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016); *see KSR*, 550 U.S. at 418.  Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *KSR*, 550 U.S. at 418; *In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (a finding of a motivation to combine "must be supported by a 'reasoned explanation'").

B.  *Level of Ordinary Skill in the Art*

Petitioner contends a person of ordinary skill in the art at the time of the invention would have a "Bachelor's degree in electrical engineering,

---

[6] The parties did not present evidence relating to objective indicia of nonobviousness.

IPR2022-00063
Patent 10,217,523 B1

computer engineering, or in a related field and at least one year of work experience relating to memory systems, and would be familiar with the design of memory devices, memory modules, and BIST." Pet. 6. Petitioner contends that this level of ordinary skill in the art was adopted by the Board in IPR2014-00970, which challenged U.S. Patent No. 8,001,434 ("'434 patent"). *Id.* The '523 patent is a continuation of the '434 patent. Ex. 1001, code (63).

In our Institution Decision, we preliminarily adopted Petitioner's unopposed[7] proposed level of ordinary skill in the art. Paper 13, 14. In the Response, Patent Owner does not challenge Petitioner's characterization of the level of ordinary skill in the art, and Dr. Brogioli testifies that "I accept this proposed level of ordinary skill in the art." PO Resp. 6; *see* Ex. 2004 ¶ 22. Nothing in the full record persuades us that our preliminary finding as to the level of ordinary skill in the art was incorrect. Accordingly, we maintain our adoption of Petitioner's proposed level of ordinary skill in the art, as consistent with the level of ordinary skill in the art reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

C. *Claim Construction*

We construe each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent," the same standard used to construe the claim in a civil action. 37 C.F.R. § 42.100(b) (2020). Under this standard, the words of a claim generally are given their

---

[7] Patent Owner did not challenge the proposed level of ordinary skill in the art in the Preliminary Response. Paper 7, 5.

IPR2022-00063
Patent 10,217,523 B1

"ordinary and customary meaning," which is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

For the terms "configured to" and "operate independently," Petitioner offers the Board's previous construction in IPR2014-00970, and further states that the Board declined to construe these terms in IPR2020-01421. Pet. 13. For the term "rank," Petitioner offers a construction, and also contends that the Board declined to construe this term in IPR2020-01421. *Id.* However, for each of the foregoing three terms, Petitioner also contends that "[e]ither way, the prior art invalidates the 523 Patent." *Id.* Petitioner contends that the term "mode" should be given its plain and ordinary meaning, and also offers the construction adopted by the district court in the Western District of Texas, and further contends that the Board declined to construe this term in IPR2020-01421. *Id.* at 14. For the terms "data handler," "data handler logic element[s]," and "data module," Petitioner provides the constructions adopted by the district court in the Western District of Texas. *Id.* at 14–15.

Although in Response, Patent Owner states "[t]o the extent Petitioner or its expert have proffered or applied constructions inconsistent with the plain and ordinary meaning of these terms, Patent Owner explicitly disagrees with those constructions," in the Sur-reply, Patent Owner states that "the Board needn't construe any disputed terms because . . . they do not bear on the issues in dispute." PO Resp. 4; Sur-reply 1.

We agree with Patent Owner that it is not necessary to provide an express interpretation of any terms for purposes of this Decision. *See*

IPR2022-00063
Patent 10,217,523 B1

*Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The
Board is required to construe 'only those terms . . . that are in controversy,
and only to the extent necessary to resolve the controversy.'" (quoting *Vivid
Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

   D.  *Ground 1: Obviousness Based on Ellsberry and Jeddeloh*

     Petitioner contends claims 1–34 would have been obvious over the
combination of Ellsberry and Jeddeloh.  Pet. 26–104.  After reviewing the
entire record developed at trial, we determine that Petitioner has not shown,
by a preponderance of the evidence, that claims 1–34 are unpatentable over
Ellsberry and Jeddeloh.

    1.  *Ellsberry (Ex. 1005)*

     Ellsberry relates to "a device, system, and method for expanding the
memory capacity of a memory module."  Ex. 1005, code (57).  "A control
unit and memory bank switch are mounted on a memory module to
selectively control write and/or read operations to/from memory devices
communicatively coupled to the memory bank switch."  *Id.*  "By selectively
routing data to and from the memory devices, a plurality of memory devices
may appear as a single memory device to the operating system."  *Id.*

     Figure 2 of Ellsberry, reproduced below, "illustrates a block diagram
of a capacity-expanding memory system 200 according to one embodiment."
*Id.* ¶ 28.  System 200 has DIMM (dual inline memory module) interface 202
that couples to a memory socket and communication bus over which data,
memory addresses, commands, and control information are transmitted.  *Id.*
The capacity-expanding feature of the invention is accomplished by a
combination of control unit 204 and one or more memory bank switches
206, 208.  *Id.*

IPR2022-00063
Patent 10,217,523 B1



Fig. 2

Figure 2 of Ellsberry, above, illustrates system 200 with control ASIC 204 that receives addresses and commands from DIMM interface 202 and generates corresponding control signals on bus 210 and addresses and command information on bus 220 to selectively connect memory banks 212–228 to DIMM interface 202 via switch ASICs 206, 208. *Id*. ¶¶ 28–29.

Specifically, control unit 204 receives memory addresses and commands from DIMM interface 202 and controls switches 206 and 208 via control bus 210 to indicate how data from DIMM interface 202 should be received from and/or stored in memory banks 212–228. *Id*. ¶¶ 29–30, Fig. 2. Control unit 204 also generates address and command information on address bus 220 to access memory banks 212–228. *Id*. Switches 206 and 208 receive data from, or provide data to, DIMM interface 202 via data buses 230 and 232. *Id*.

IPR2022-00063
Patent 10,217,523 B1

Control unit 404 and switches 206 and 208 are further illustrated in Figures 3 and 4. Figure 3, reproduced below, "illustrates a block diagram of an address and command processing system 300" which "may be implemented as part of the control unit 204." *Id.* ¶ 39.



Fig. 3

Figure 3, above, depicts that "[m]emory addresses and command information are received from the DIMM interface 202, buffered in a register 302 and sent to all memory banks . . . over address bus 220." *Id.* In addition, "[t]he memory address and command information is also decoded 304 and memory configuration information 306 is determined." *Id.* "A bank switch state machine 308 then determines which memory bank should be activated or accessed." *Id.* "The state machine 308 sends control

14

IPR2022-00063
Patent 10,217,523 B1

information to the memory bank switches 206 & 208 via the control bus 210
to indicate which memory banks should be activated/deactivated or
accessed." *Id*.

Figure 4, reproduced below, "illustrates a block diagram of a data
processing system 400," which "may be implemented as part of the memory
bank switch 206." *Id.* ¶ 45.



Fig. 4

Figure 4, above, depicts that "[d]ata is transmitted from the DIMM
interface 202 via the data bus 230 to bidirectional signal drivers 402 & 404
that transmit and receive data over separate data busses 234 and 236 to the
different sets of memory banks." *Id.* "A read/write logic unit 406
determines whether data is being read from or written to the memory devices

15

IPR2022-00063
Patent 10,217,523 B1

(e.g., 212).” *Id.* “Memory configuration information 408 is obtained from the control unit.” *Id.*

2. *Jeddeloh (Ex. 1006)*

Jeddeloh relates to “[a] memory module [that] includes several memory devices coupled to a memory hub [that] includes several link interfaces coupled to . . . a self-test module.” Ex. 1006, code (57).

Jeddeloh’s  Figure 2, reproduced below, shows an embodiment of a memory hub 200.



FIG.2

Figure 2, above, depicts memory hub 200 coupled to memory devices 240a-d.  Link interfaces 210a-d and 212a-d are coupled to switch 260, and switch 260 is further coupled to memory interfaces 270a-d, which are, in turn, coupled to memory devices 240a-d.  Each of the memory interfaces

IPR2022-00063
Patent 10,217,523 B1

270a-d includes a memory controller 280a-d, a write buffer 282a-d, and a
cache memory unit 284a-d. Self-test module 290 is coupled to the switch
260 through a test bus 292.

Jeddeloh's Figure 3, reproduced below, illustrates a self-test module
308:



FIG.3

Figure 3 above, shows self-test module 308, including BIST (built-in
self test) engine 310 and memory sequencer 304 that generate and distribute
address and command/control signals during testing, and pattern generator
314, compare circuit 340, and results memory 346 that generate, distribute,
and compare test patterns, and store fault information. *Id.* at 9:57–67,
10:30–51. Jeddeloh states that Figure 3 "is a functional block diagram
representative of a suitable self-test module," and "[t]he functional blocks
shown . . . are conventional, and can be implemented using well known

17

IPR2022-00063
Patent 10,217,523 B1

techniques and circuitry." *Id.* at 9:45–50.  Jeddeloh also discloses use of a
SMBus to communicate with off-module components, for instance, a test
apparatus can use it to "set memory testing parameters and receive test
results." *Id.* at 8:26–53, 10:47–51.

> 3.  *Analysis of Independent Claim 1*

Petitioner asserts that Ellsberry alone or Ellsberry combined with
Jeddeloh teaches all the limitations in claim 1, and that one of ordinary skill
in the art would have been motivated to combine Ellsberry and Jeddeloh.
Pet. 26–61.  Petitioner relies on Ellsberry to teach limitations 1[a], 1[b], 1[d],
1[f][i], 1[f][ii], 1[f][iii], and on the combination of Ellsberry and Jeddeloh to
teach limitations 1[c], 1[e], and 1[g][i], 1[g][ii], and 1[g][iii].  *Id.* at 37–61.
Petitioner contends it would have been obvious to modify Ellsberry with
Jeddeloh's teachings to include self-test functionality, and to distribute
Jeddeloh's test circuit functionality among Ellsberry's Control ASIC and
Switch ASICs.  *Id.* at 25–37.

> a)  *Petitioner's Proposed Combination*

Petitioner contends that Ellsberry discloses a memory module
(limitation 1[a]) that separates circuitry into handling address and control
signals and handling data signals, as shown in Petitioner's annotated Figure
2 below.  Pet. 26–27, 38 (citing Ex. 1005, Fig. 2).

IPR2022-00063
Patent 10,217,523 B1



Fig. 2

Petitioner's annotated Figure 2 of Ellsberry above shows address/control signals are handled by Control ASIC 204 (grey) and data signals are handled by a plurality of distributed Switch ASICs 206 thru 208 (purple). *Id*. at 26–27. According to Petitioner, Control ASIC 204 is coupled to Switch ASICs (purple) via bus 210 (pink), and ASIC 204 is also coupled to the address and control ports of the memory devices (DRAMs) (yellow) via bus 220 (blue). *Id.* at 44. Petitioner asserts that Control ASIC 204 receives system address and control signals over DIMM interface 202 (orange), and outputs address and command signals to the memory devices (yellow) on bus 220 (blue). *Id.* at 48–49. Petitioner further contends that the Switch ASICs (purple) pass data between the memory devices and the memory bus/memory controller (green). *Id.* at 40.

Petitioner contends that Ellsberry's memory devices (DRAMs) teach the claimed "memory devices" (limitation 1[b]), Ellsberry's Switch ASICs

IPR2022-00063
Patent 10,217,523 B1

teach the claimed "data module" (limitation 1[c]), and Ellsberry's Control
ASIC teaches the claimed "control module" (limitation 1[d]). *Id.* at 38–46.

Petitioner relies on Jeddeloh to teach a test mode with self-test
functionality. *Id.* at 26. Jeddeloh discloses a "functional block diagram" of
a self-test module, as shown in Petitioner's annotated Figure 3 below. *Id.* at
29 (citing Ex. 1006, Fig. 3).



Petitioner's annotated Figure 3 of Jeddeloh above shows BIST engine
310, clock generator 324, and memory sequencer 304 (in grey) that generate
and distribute address and command/control signals during testing, and
pattern generator 314, compare circuit 340, and results memory 346 (in
purple) that generate, distribute, and compare test patterns, and store fault
information. *Id.*

Petitioner contends that Ellsberry teaches operation in a first (normal)
mode (limitations 1[e], 1[f][i], 1[f][ii], 1[f][iii]). *Id.* at 46–56. In the first
mode, Petitioner contends that Ellsberry's Control ASIC "*receive[s] system
address and control signals from the system memory controller*" over

20

IPR2022-00063
Patent 10,217,523 B1

DIMM interface 202 and outputs address and command signals ("*first memory address and control signals*") to the memory devices on bus 220 (limitations 1[f][i], 1[f][iii]).  *Id.* at 48–51, 55.  Petitioner contends that Ellsberry's Switch ASICs "*propagate*" 8-bit sections of "*first data signals*" between "*the memory devices*" (DRAM) and DIMM interface 202 (connected to the "*system memory controller*") via buses (limitations 1[f][ii], 1[f][iii]).  *Id.* at 52–56.

Petitioner contends that, as combined with Jeddeloh, Ellsberry operates in a test (second) mode (limitations 1[e], 1[g][i], 1[g][ii], 1[g][iii])).  *Id.* at 48, 56–62.  According to Petitioner, the proposed combination is "straightforward":  Ellsberry's "memory modules would be modified to include a test mode implementing self-test functionality, such as disclosed in" Jeddeloh.  *Id.* at 26.  In the proposed combination, Jeddeloh's self-test module is divided between circuitry for handling address/control signals and circuitry for handling data signals.  *Id.* at 28.  Specifically, "[s]elf-test address/control signal circuitry would be implemented in Ellsberry's Control ASIC to send commands to self-test data signal circuitry implemented in Ellsberry's distributed Switch ASICs and address and control information to the memory devices in order to carry out the testing functionality described in" Jeddeloh.  *Id.* (emphasis omitted).

Petitioner contends that the functionality of Jeddeloh's BIST engine 310, clock generator 324, and memory sequencer 304 would be incorporated into Ellsberry's Control ASIC 204, and the functionality of Jeddeloh's pattern generator 314, compare circuit 340, and results memory 346 would be incorporated into Ellsberry's distributed Switch ASICs.  *Id.* at 29–30.  So, for example, in the proposed combination, the recited "data handler logic

21

IPR2022-00063
Patent 10,217,523 B1

elements" in limitation 1[c] would also include "logic elements implementing the functionality of [Jeddeloh's] pattern generator and compare circuitry." *Id.* at 43.

The proposed combination is shown in Petitioner's annotated compilation of Figures 2, 3, and 4 of Ellsberry and Figure 3 of Jeddeloh, reproduced below. *Id.* at 30 (citing Ex. 1006, 9:46–51, Fig. 3).



Petitioner's annotated compilation of Figures 2, 3, and 4 of Ellsberry and Figure 3 of Jeddeloh, above, shows the following:  (1) added "Self-Test" functionality to the control blocks in Ellsberry's Figure 3 (Control ASIC)

IPR2022-00063
Patent 10,217,523 B1

and Figure 4 (Switch ASIC); (2) within the new "Self-Test" functionality of
the Switch ASIC, Petitioner places the purple annotated sections of
Jeddeloh's Figure 3 (i.e., pattern generator 314, compare circuit 340, and
results memory 346); and (3) within the new "Self-Test" functionality of the
Control ASIC, Petitioner places the grey annotated sections of Jeddeloh's
Figure 3 (i.e., BIST engine 310, clock generator 324, and memory sequencer
304).  *See* Pet. 29–30.

Petitioner asserts that to enter test mode and carry out the self-test
functionality in the proposed combination, the memory module would
receive mode commands (e.g., over a maintenance bus), as taught by
Jeddeloh.  *Id.* at 30 (citing Ex. 1006, 8:26–53, 10:3–6).  Petitioner contends
that the modified Control ASIC would "*output second memory address and
control signals to the address and control ports of the memory devices*"
(limitation 1[g][i]), "similar to how [Ellsberry's] Control ASIC outputs
address/control signals during normal operation."  *Id.* at 56 (citing Ex. 1003
¶¶ 243–250; Ex. 1006, Fig. 3, 9:51–10:2, 10:24–29).  That is, "[t]o carry out
that self-test functionality, the self-test circuitry in the modified Control
ASIC would send address/control signals to the memory devices (*e.g.*, over
Bus 220 of Ellsberry Figure 2)."  *Id.* at 30–31.  Petitioner contends that in
test mode, the address/control signals are generated from Jeddeloh's
memory sequencer 304 in the modified Control ASIC and output to the ports
of the memory devices 204 (limitations 1[g][i], 1[g][iii]).  *Id.* at 61.

Petitioner further contends that "the self-test circuitry in the modified
Control ASIC would send . . . command signals to the Switch ASICs (*e.g.*,
over Bus 210 of Ellsberry Figure 2)" (limitation 1[g][ii]).  *Id.* at 30–31
(citing Ex. 1005 ¶ 56, Fig. 13; Ex. 1006, 10:30–51; Ex. 1003 ¶ 143)

23

IPR2022-00063
Patent 10,217,523 B1

(emphasis omitted).  Petitioner contends that the command signals are generated from Jeddeloh's BIST engine in the modified Control ASIC, and therefore teach "*one or more commands output from the control module*." (limitation 1[g][ii]).  *Id.* at 60.

Petitioner contends that in the proposed combination, "there are two sources of data for the memory devices: (i) the system memory controller (during normal mode) and (ii) the pattern generator/compare circuit functionality in each Switch ASIC (during test mode)."  *Id.* at 57.  For limitation [g][ii], Petitioner asserts that "[d]uring test mode, the pattern generator functionality of the modified Switch ASICs '*transmit[s] one or more second data signals including data patterns provided by the data handler logic elements to the data ports of the memory devices*,' similar to how [Ellsberry's] Switch ASICs transmit data during normal operation."  *Id.* at 60 (citing Ex. 1003 ¶¶ 273–274; Ex. 1006, Fig. 3, code (54), 10:3–23). According to Petitioner, "[e]ach source communicates data along a different path in the Switch ASICs, so that '*the system memory controller*' is '*isolate[d]*' from the '*memory devices*' during test mode ('*second mode*') according to commands from the Control ASIC ('*control module*')."  *Id.* at 57 (citing Ex. 1003 ¶ 255).

Petitioner asserts that "in normal mode [e.g., limitations 1[f][ii], 1[f][iii]], data from the system memory controller will travel over DIMM interface 202 and data buses 230-232, through the Switch ASICs, and over a port bus (e.g., 234 or 236)."  *Id.* at 57.  According to Petitioner, "within each Switch ASIC, the data travels from the data bus to one of two output ports, such as Port A, according to commands from the Control ASIC."  *Id.* Petitioner's annotated Fig. 2, reproduced below, depicts such a path:

IPR2022-00063
Patent 10,217,523 B1



Fig. 2

*Id.* at 58 (citing Ex. 1003 ¶ 256).  Petitioner's annotated Figure 2, above, shows a diagonal green arrow from data bus 232, through Switch ASIC 208, and up to Port A of Bank 0.  The same annotation is shown for data bus 230, through Switch ASIC 206, and up to Port A of Bank 0.

Petitioner contends that in the proposed combination, "[i]n test mode, [e.g., limitations 1[g]ii], 1[g][iii]], each Switch ASIC will output data from its pattern generator to the applicable output port, with the Control ASIC signaling the Switch ASIC ('*according to one or more commands output from the control module'*) whether to output test data or normal data just as the Control ASIC sends command signals during normal operations."  *Id.* at 58 (citing Ex. 1003 ¶ 257; Ex. 1005, Figs. 2–3, ¶¶ 30–31).  Petitioner provides annotated Figure 2, reproduced below, depicting that path.

25

IPR2022-00063
Patent 10,217,523 B1



*Id.* at 59 (citing Ex. 1003 ¶ 257).  Petitioner's annotated Figure 2, above, shows Figure 2 on the right, and enlarged Switch ASIC 208 on the left, with "Pattern Generator" added inside Switch ASIC 208, and an orange arrow from "Pattern Generator" to Port A of Bank 0.

Petitioner asserts that "in the Combined System data travels over two different data paths in the two different modes.  Because each path merges into the same port on the Switch ASIC, only one path can be used at a time, using for instance a MUX/DEMUX as was well-known, otherwise there could be data collisions."  *Id.* (citing Ex. 1003 ¶ 258).  In the Reply brief, Petitioner further asserts that "the proposed combination would use a MUX to isolate the *address/control* signals . . . just like the data signals."  Reply 10 (citing Ex. 1061 ¶¶ 701, 741, 754).

Petitioner asserts for limitation 1[g][iii] that the modified Control ASIC generates address/control signals with memory sequencer 304 that are output to the ports of the memory devices 240, and command signals with

IPR2022-00063
Patent 10,217,523 B1

BIST engine 310, to Switch ASICs, which generate "*second data signals*" via pattern generator 314. *Id.* at 61 (citing Ex. 1006, Fig. 3, 9:51–60, 9:66–10:2, 10:24–28, cl. 7; Ex. 1003 ¶¶ 279–280. Therefore, according to Petitioner, "the Control ASIC would gain the functionality of generating its own address/command signals when in a self-test mode, and the Switch ASICs would gain the functionality of generating their own data signals when in self-test mode." Reply 24; *see also* Pet. 58–61.

### (1) Petitioner's Rationale for the Combination

Petitioner asserts that:

> [A] Skilled Artisan would have considered the Combined System to be an arrangement of old elements each performing its known functions (Ellsberry's module acting as computer memory and Jeddeloh[]'s self-test functionality performing self-test on that module) and yielding what one would expect from the arrangement (a memory module with self-test). Ellsberry and Jeddeloh[] each employ known signaling and testing techniques found in many prior art systems. EX1006, 9:46-51. Combining them would therefore have been well within a Skilled Artisan's abilities, would not have resulted in any unpredictable results and could have been readily accomplished without undue experimentation and with a reasonable expectation of success. EX1003, ¶¶146-147.

Pet. 32 (emphasis omitted). Petitioner additionally provides purported rationale why a person of ordinary skill in the art would be motivated to (1) add the testing mode to Ellsberry and (2) divide the self-test functionality of Jeddeloh's Figure 3 between Ellsberry's Control ASIC and distributed Switch ASICs, set forth below. *Id.* at 32–37.

27

IPR2022-00063
Patent 10,217,523 B1

### (a) Motivation to Add Testing to Ellsberry

Petitioner contends there are several reasons why a person of ordinary skill in the art would be motivated to add a testing mode to Ellsberry. *Id.* at 32–34; Ex. 1003 ¶¶ 149–53.

First, Petitioner contends, quoting U.S. Patent No. 7,181,659, a non-asserted reference, that "[a]s chips become faster in frequency, there is a greater need for hardware to include self-test logic." *Id.* at 32 (citing Ex. 1018, 1:14–18). Moreover, Petitioner contends that Ellsberry discloses that its modules are JEDEC compliant and JEDEC standards at the time required self-testing. *Id.* (citing Ex. 1005 ¶ 50, claims 10, 19; Ex. 1016, 1–2, 25–28, 55–66; Ex. 1017, 2–11).

Second, Petitioner contends that because Ellsberry's Control ASIC configures the memory devices on the module "rather than [being] directly programmed by the host system," a person of ordinary skill would have been motivated to have a built-in testing capability in the Control ASIC itself. *Id.* at 33 (citing Ex. 1005 ¶ 44; Ex. 1003 ¶ 150).

Third, Petitioner contends that Jeddeloh emphasizes the need for testing circuitry in memory modules because of the increasing significance of signal timing. *Id.* (citing Ex. 1006, 2:41–51, 3:47–52).

Fourth, Petitioner contends that because Ellsberry describes that its Control ASIC configures the memory devices, one of ordinary skill would be motivated to add testing and, further, because Ellsberry has a "Mode" pin, to operate in other modes, a skilled artisan would have been motivated to

28

IPR2022-00063
Patent 10,217,523 B1

provide functionality to switch between additional modes. *Id.* at 33–34 (citing Ex. 1005 ¶ 33; Ex. 1003 ¶ 152).

Fifth, Petitioner also contends a person of ordinary skill in the art "would have been motivated to add testing in a mode separate from normal operating mode because the purpose of testing was to confirm the module would operate appropriately in normal mode." *Id.* at 34 (citing Ex. 1006, 2:43–50, 3:47–53; Ex. 1016, 1–2, 25–28 55–66; Ex. 1017, 2–11. Ex. 1003 ¶ 153).

Sixth, Petitioner would add testing mode because "normal operation where the host sends read/write commands to the Control ASIC would interfere with such testing." *Id.*

### (b) *Motivation to Distribute Jeddeloh's Components into Ellsberry*

Petitioner contends there are several reasons why a person of ordinary skill in the art would be motivated to divide the self-test functionality of Jeddeloh's Figure 3 between Ellsberry's Control ASIC and Switch ASICs. Pet. 34–37.

First, Petitioner contends that such distribution is consistent with Ellsberry's architecture, and how Ellsberry handles address/control signal mapping in the Control ASICs and data signal routing in the Switch ASICs. Pet. 35. According to Petitioner, a person of ordinary skill in the art would have been motivated to divide the added functionality from Jeddeloh in a similar manner in order to simplify the design and minimize changes to Ellsberry. *Id.* (citing Ex. 1003 ¶¶ 155–156).

Second, Petitioner contends such a distribution of self-test functionality is consistent with how each of Ellsberry's Switch ASICs

IPR2022-00063
Patent 10,217,523 B1

already included logic elements and connections for implementing data transactions in 8-bit portions.  *Id.* at 35–36.  According to Petitioner, a person of ordinary skill in the art "would have understood that additional logic functionality related to communicating data to and from data devices, such as that of [Jeddeloh], could be readily and efficiently included in the Switch ASICs, and configured to receive command signals from the added [Jeddeloh] testing-related functionality in the modified Control ASIC and report results thereto, without undue experimentation."  *Id.* at 36 (citing Ex. 1003 ¶ 158).

Third, Petitioner contends that a person of ordinary skill in the art would have been motivated to make such a design because other references teach placement of such self-test functionality in distributed data buffers similar to Ellsberry's Switch ASICs.  *Id.* (citing Ex. 1019[8] ¶¶ 77, 97, Figs. 5, 18; Ex. 1020,[9] 15:57–65, 18:63–19:23, 35:10–37:1, Figs. 5, 18, 36; Ex. 1007 ¶¶ 49–50, 53, 55–57, Figs. 1, 6–7; Ex. 1025, 30).

Fourth, Petitioner contends that an additional reference, Lepejian,[10] teaches that, in order to reduce busing area, pattern generators should be distributed to each of the Switch ASICs.  *Id.* (citing Ex. 1021, 3:45–53; Ex. 1003 ¶ 162).

Fifth, Petitioner contends that a person of ordinary skill in the art "would have been motivated to place self-test pattern generator functionality, such as [Jeddeloh's], in [Ellsberry's] Switch ASICs in order to place it close to its associated memory devices, thereby simplifying the

---

[8] Tsern, US Patent Pub. 2007/0070669 A1 (published Mar. 29, 2007).
[9] Shaeffer et al., US 7,562,271 B2 (issued July 14, 2009).
[10] Lepejian et al., US 6,011,748 (issued Jan. 4, 2000).

IPR2022-00063
Patent 10,217,523 B1

wiring plan on the circuit board, reducing capacitance/propagation delay of the data lines, and reducing the inductance/crosstalk of the data lines," *Id.* at 36–37 (citing Ex. 1002, 6–7; Ex. 1023, 2:27–3:6, Ex. 1024, 23–25, 207; Ex. 1009, 52, 54; Ex. 1003 ¶ 163) (internal citations omitted).

Finally, quoting another reference, Zimmerman,[11] Petitioner argues it was known that "functionality shown embodied in a single integrated circuit or functional block may be implemented using multiple cooperating circuits or blocks, or vice versa." *Id.* at 37 (citing Ex. 1026, 7:43–46; Ex. 1027, 7:7–14; Ex. 1003 ¶ 165).

### b)   Patent Owner's Arguments

Patent Owner contends that Petitioner has failed to show that a person of ordinary skill in the art would be motivated to combine Ellsberry and Jeddeloh in the manner required to achieve the claims of the '523 patent. PO Resp. 35–70.  Specifically, Patent Owner argues that Petitioner "provides no motivation to combine elements of Ellsberry and its *distributed* architecture with and Jeddeloh and its *centralized* architecture in the way the '523 [p]atent claims require," and thus, "Petitioner's arguments are based only on hindsight." *Id.* at 37 (citing Ex. 2004 ¶ 122); *see also id.* at 39–43. Patent Owner contends that Petitioner's expert, Dr. Subramanian, admitted that he was "unaware of any prior memory module with a similar architecture to Ellsberry *ever* having incorporated self-test functionality as the '523 [p]atent does, despite its general architecture being known in the art *for years*." *Id.* at 36 (citing Ex. 2005, 47:20–48:8, 48:14–17, 52:1–7, 148:14–19; Ex. 2004 ¶¶ 118, 120–121); *see also id.* at 54–55.

_____

[11] Zimmerman, US 7,177,211 B2 (issued Feb. 13, 2007).

IPR2022-00063
Patent 10,217,523 B1

Patent Owner also argues that Petitioner's combination "goes directly against the explicit teachings of Jeddeloh" because it distributes "pieces of Jeddeloh's centralized self-test logic differently . . . across disparate circuits and placing them in direct communication with the memory devices" and without Jeddeloh's memory interface components. *Id.* at 46. Patent Owner further argues that Petitioner's combination requires a MUX/DEMUX circuit in each of Ellsberry's switch ASICs, which is not consistent with the teachings in Ellsberry or Jeddeloh, and further would introduce memory timing issues that Jeddeloh tries to avoid. *Id.* at 47–48.

In addition, Patent Owner argues that Petitioner's arguments regarding motivation to add testing to Ellsberry are deficient for various reasons. *Id.* at 49–53. Patent Owner also argues that Petitioner's contentions regarding motivation to distribute pieces of Jeddeloh's self-test module to separate parts of Ellsberry are likewise deficient. *Id.* at 54–59.

Patent Owner further argues that Petitioner has not established that a person of ordinary skill in the art would have had a reasonable expectation of success in achieving the claimed invention from the combination because, according to Patent Owner, the combined system would not result in a functional device and would have required multiple further modifications and engineering. *Id.* at 59–60. Patent Owner also argues that "Petitioner has identified a relatively low level of experience as being ordinary in the field," and the challenges encountered by the combination "would have been beyond such a [person of ordinary skill in the art's] ability to reasonably resolve them." *Id.* at 60 (citing Ex. 2004 ¶¶ 83–84); *see also id.* at 61–70.

32

IPR2022-00063
Patent 10,217,523 B1

    c)  *Analysis*

    For the reasons set forth below, we agree with Patent Owner that Petitioner has not explained persuasively why one of ordinary skill in the art, absent hindsight and use of the '523 patent as a roadmap, would have been motivated to combine Ellsberry and Jeddeloh in the manner proposed. *See In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) (citing *In re Gorman*, 933 F.2d 982, 987 (Fed. Cir. 1991)) ("It is impermissible to use the claimed invention as an instruction manual or 'template' to piece together the teachings of the prior art so that the claimed invention is rendered obvious."). Specifically, we determine that Petitioner has not provided sufficient rationale establishing why a person of ordinary skill in the art would have been motivated to divide the self-test functionality of Jeddeloh's Figure 3 between the Control ASIC and Switch ASICs of Ellsberry and with a reasonable expectation of success in doing so.[12] *See KSR*, 550 U.S. at 418 (establishing that an invention would have been obvious requires "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements *in the way* the claimed new invention does") (emphasis added).

    Petitioner's proposed combination requires (1) adding a test mode with self-test functionality to Ellsberry; (2) modifying Jeddeloh's self-test

---

[12] Because we determine that Petitioner has not provided sufficient reasoning why a person of ordinary skill in the art would have been motivated to divide the self-test functionality of Jeddeloh's Figure 3 between the Control ASIC and Switch ASICs of Ellsberry with a reasonable expectation of success, we need not reach whether Petitioner has sufficiently established motivation to add testing to Ellsberry with a reasonable expectation of success.

IPR2022-00063
Patent 10,217,523 B1

module, i.e., dividing the self-test functionality and related circuitry shown in Jeddeloh's Figure 3; (3) incorporating the divided self-test functionality and related circuitry in Ellsberry's Control ASIC and Switch ASICs; and (4) adding MUX/DEMUX to each of Ellsberry's Switch ASICs, and further using a MUX to isolate the address/control signals. Pet. 25–37; Reply 10. As a result of incorporating the divided self-test functionality and related circuitry in Ellsberry's Control ASIC and Switch ASICs, Petitioner further asserts that the Control ASIC would generate its own address/control/command signals when in a self-test mode, and the Switch ASICs would generate their own data signals when in self-test mode. Reply 24; Pet. 56–61. That is, according to Petitioner, while in self-test mode, the added memory sequencer functionality in the Control ASIC would generate address and control signals, the added BIST functionality in the Control ASIC would generate command signals, and the added pattern generator/compare circuit functionality in the Switch ASIC would generate data signals. Pet. 56–61. Petitioner's changes therefore require multiple levels of modifications in order to purportedly teach the claimed second mode (limitation 1[e]), and the functionality of the claimed second mode (limitations 1[c], 1[g][1], 1[g][ii], and 1[g][iii]).

A number of facts are undisputed. There is no dispute that Ellsberry's distributed architecture was well known. PO Resp. 36; Ex. 2004 ¶¶ 56–57, 127; Reply 18. There is no dispute that Ellsberry does not teach testing. PO Resp. 36; Ex. 2004 ¶ 63; Pet. 32 (describing asserted motivations to add a testing mode to Ellsberry); Ex. 2005, 64:23–25. There is no dispute that Jeddeloh employs a centralized architecture that is different from Ellsberry's distributed architecture. PO Resp. 39; Reply 14. There is no dispute that

IPR2022-00063
Patent 10,217,523 B1

neither reference teaches distributing self-test functionality as in the claimed invention.  PO Resp. 36, 38; Pet. 34 (describing dividing the self-test functionality of Jeddeloh); Reply 36 ("the Petition is not asserting anticipation, so it is irrelevant whether any single reference discloses the combination of elements at issue").  Moreover, both Dr. Subramanian and Dr. Brogioli testified that they were not aware of any memory module with a similar architecture to Ellsberry ever having incorporated self-test functionality as configured in the claimed invention, despite Ellsberry's distributed architecture being well known in the art.  Ex. 2004 ¶¶ 18, 126–127, 143; Ex. 2005, 47:20–48:8, 48:14–17, 52:1–7, 148:14–19.

Although Petitioner contends that the combination of Ellsberry and Jeddeloh is merely an arrangement of old elements, each performing the same function (Pet. 31–32), Petitioner has not identified persuasive evidence that supports these contentions.  Petitioner identifies Ellsberry's memory module and Jeddeloh's self-test functionality, but Petitioner has not identified any "old element" where self-test functionality is divided in the manner in which Petitioner proposes to divide Jeddeloh's functionality.  In other words, this is not a situation where each element is purportedly taught, in some manner, by one of the references, and the elements are merely rearranged and combined.  *KSR*, 550 U.S. at 418 (in an obviousness analysis, one must "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue."); *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1366–1367 (Fed. Cir. 2008) (a combination of prior art is "more likely to be obvious where it 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from

IPR2022-00063
Patent 10,217,523 B1

such an arrangement."). Here, the proposed combination involves modifying *both* references in order to reach the claimed invention, and in particular, to purportedly teach the specific requirements of limitations 1[c], 1[e], 1[g][i], 1[g][ii], and 1[g][iii].

Petitioner's first, second, fifth, and sixth reasons to distribute Jeddeloh's functionality into Ellsberry all rely on Ellsberry's distributed architecture as a basis for providing motivation to divide the added functionality and circuitry from Jeddeloh, i.e., in manner consistent with Ellsberry's architecture. We first address these rationales. Both parties identify the different architectures of Ellsberry and Jeddeloh as a basis for their arguments, but Petitioner contends that these differences provide motivation to combine the references, whereas Patent Owner contends the opposite – that these differences do not support a motivation to combine.[13]

Petitioner relies on Ellsberry's distributed architecture as the rationale to divide Jeddeloh's self-test module circuitry, but Ellsberry itself does not teach a testing mode. *See* Reply 36 (Ellsberry's "distributed architecture *itself* provides a motivation for a [person of ordinary skill in the art] to distribute the BIST functionality from" Jeddeloh). Although the motivation

---

[13] In the Reply, Petitioner refers to Ellsberry as an LRDIMM architecture and Jeddeloh as an FBDIMM architecture. *See generally* Reply. Patent Owner contends this is a new argument, and that neither Ellsberry nor Jeddeloh mention LRDIMM or FBDIMM, and that the LRDIMM and FBDIMM module types postdate both references. Sur-reply 10. We agree that neither Ellsberry nor Jeddeloh mention LRDIMM or FBDIMM. *See id*. Regardless of how the architectures of Ellsberry and Jeddeloh are labelled, we agree with Patent Owner that the question is whether Ellsberry would be combined with Jeddeloh, not whether LRDIMM would be combined with FBDIMM. *Id.* at 11. We, therefore, focus our analysis on the disclosures in Ellsberry and Jeddeloh.

IPR2022-00063
Patent 10,217,523 B1

to combine may come from the references themselves, *WMS Gaming, Inc. v. International Game Tech.,* 184 F.3d 1339, 1355 (Fed. Cir. 1999), there still must be evidence that "the skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed." *In re Rouffet,* 149 F.3d 1350, 1357 (Fed. Cir. 1998); *see also In re Werner Kotzab,* 217 F.3d 1365, 1371, (Fed. Cir. 2000) ("[A] rejection cannot be predicated on the mere identification ... of individual components of claimed limitations. Rather, particular findings must be made as to the reason the skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed."). To that end, we agree with Patent Owner that Petitioner's proposed rationale for the combination appears circular, and based on hindsight. *See* Sur-reply 17; *Monarch Knitting Mach. Corp. v. Sulzer Morat Gmbh,* 139 F.3d 877, 880 (Fed. Cir. 1998) ("[d]efining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness").

That is, we are not persuaded that simply because Ellsberry has a distributed architecture, that, with no knowledge of the claimed invention, one of ordinary skill in the art would select Jeddeloh's self-test module, divide that self-test module functionality, implement it into Ellsberry's Control ASIC and Switch ASICs, and then make the extensive further modifications required to Ellsberry that are necessary to achieve the claimed invention. As the various modifications required to teach the claims (particularly, limitations 1[c], 1[e], 1[g][i], 1[g][ii], and 1[g][ii]), become more complex and untethered to the design of Ellsberry and Jeddeloh, the

IPR2022-00063
Patent 10,217,523 B1

influence of impermissible hindsight bias emerges, as further discussed
below.

  Petitioner's contentions that the proposed combination is
"straightforward because it would not require any new data or control paths
and thus would not create any new timing issues" because it would take
advantage of the existing data and control paths of Ellsberry's module, are
not persuasive because they oversimplify the changes required, as discussed
further below.  *See* Reply 14–15, 19–20 ("implementing self-test
functionality in either [a centralized or distributed] architecture would have
been straightforward, because a [person of ordinary skill in the art] could
simply use the ***existing*** buffers for data and address/command on the
memory module to add self-test functionality without any ***new*** data or
control paths"); Ex. 1061 ¶¶ 664–666.  For similar reasons, we do not find
persuasive Petitioner's arguments that "the proposed combination is much
more straightforward than alternative implementations proposed by the
['523 patent] (but not explained in any detail) that would require ***new***
structures and/or signal paths."  Reply 15 (citing Ex. 1061 ¶ 688).  Nor are
we persuaded that the necessary modifications to both references would
"simplify the design and minimize the changes to Ellsberry, and thereby
likely avoid design problems and produce a more reliable system," as
Dr. Subramanian testifies.  *See* Ex. 1003 ¶¶ 155, 158 (emphasis omitted).

  Modifying Jeddeloh's self-test module to divide the functionality and
circuitry creates the need to continue modifying the various components of
Ellsberry in order to achieve the claimed invention.  For example, the
modification requires that Ellsberry's Control ASIC must generate
address/control/command signals in a new self-test mode (limitations 1[e],

IPR2022-00063
Patent 10,217,523 B1

1[g][i], 1[g][ii], 1[g][iii]), and similarly, Ellsberry's Switch ASICs must generate data signals in a new self-test mode (limitations 1[c], 1[e], 1[g][ii], 1[g][iii].  Reply 24; Pet. 56–61.  Furthermore, Ellsberry's Switch ASICs require a MUX/DEMUX in order to handle the different data paths in normal and new self-test mode (limitation 1[e], 1[g][ii]).  *See* Pet. 59.  Thus, in order to meet each of these claim limitations that require a new testing mode to be added to Ellsberry, Petitioner simply continues to modify the references in a way that conveniently results in the same configuration as the claimed invention.  That is, the claims require that the testing data and address/control logic is separated between the data module and the control module.  Although the wiring and signaling rerouting itself may not be complex, the combination of functionality and circuitry that requires modification to achieve the correct timing and synchronization results from the knowledge of the particular claim limitations, not any motivation to combine asserted by Petitioner.  *See* Ex. 2004 ¶¶ 82–83.

Petitioner cites to supporting testimony from Dr. Subramanian on the combination, but Dr. Subramanian's testimony is unavailing because it essentially repeats what is stated in the Petition, and states that Ellsberry and Jeddeloh "employ known signaling and testing techniques found in many prior art systems," and combining Ellsberry and Jeddeloh "would therefore have been well within a Skilled Artisans's abilities, would not have resulted in any unpredictable results and could have been readily accomplished without undue experimentation and with a reasonable expectation of success."  Pet. 32 (citing Ex. 1003 ¶¶ 146–147).  We find this testimony to be conclusory, at a minimum, particularly in light of the relatively low level

IPR2022-00063
Patent 10,217,523 B1

of skill in the art advanced by Petitioner.  Further, as discussed below,
Dr. Subramanian's testimony is misguided.

We find more persuasive Patent Owner's contentions that "[p]ortions
of Jeddeloh's self-test module cannot be disassembled and distributed across
Ellsberry's memory module as proposed by Petitioner without creating new
pathways or changing how existing components work, which creates timing
issues and issues synchronizing the various signals sent to and received from
the memory devices."  PO Resp. 62–63 (citing Ex. 2004 ¶ 83).  For example,
Dr. Brogioli explains that "two new circuits have been created using
components disclosed in Jeddeloh and deployed to a distributed, and
markedly different architecture than Jeddeloh.  Not only are new pathways
required within Ellsberry's architecture that are not contemplated by
Jeddeloh, but these pathways in some instances require being bidirectional."
Ex. 2004 ¶ 83.  We find this testimony credible, given the nature and extent
of the modifications proposed by Petitioner.

This is exemplified in Petitioner's modifications to Ellsberry's
Control ASIC in order to teach limitations 1[e], 1[g][i], 1[gii], and 1[g[iii].
Dr. Subramanian testifies that Jeddeloh's "self-test functionality would be
implemented in Ellsberry such that the address and command signals are
generated in Ellsberry's control unit instead of receiving those address and
command signals from the system bus."  Ex. 1061 ¶ 665; *see also id.* ¶ 678
(modification involves "adding an address/command generator to Ellsberry's
Control ASIC").

Patent Owner argues that the Control ASIC in Petitioner's combined
system "would be unable to properly access the memory devices in a
'second' mode," i.e., a testing mode.  PO Resp. 66 (citing Ex. 2004 ¶ 97).

40

IPR2022-00063
Patent 10,217,523 B1

Patent Owner argues that any address and control signals originating from the modified Control ASIC's Control Block[14] during test mode will bypass register 302, a necessary component of the Control ASIC that helps control the timing of the signals received from the system.  PO Resp. 66; Ex. 2004 ¶¶ 96–97.  Dr. Brogioli testifies that "register 302 buffers address and command information received from the DIMM interface," so if testing mode is used, "signals would not pass through register 302 and hence the timing would change, and thus the functioning."  Ex. 2004 ¶ 96 (citing Ex. 1005 ¶ 39).  According to Dr. Brogioli, "without register 302, the carefully synchronized data and address/control signals would no longer be synchronized."  *Id.*

For convenience, Petitioner's modified Fig. 3 of Ellsberry is reproduced below:

---

[14] Patent Owner contends that without Jeddeloh's memory controller, which is not part of the proposed combination, the proposed combination is unable to generate address signals during test mode in accordance with limitation [1.g.i].  PO Resp. 28–30.  Petitioner contends that Jeddeloh's memory sequencer 304 generates address signals for testing because it "receives read and write commands" and then "generates properly timed signals for *controlling* the operation of the memory device."  Reply 5 (citing Ex. 1006, 9:58–59); *see also id.* at 3–6.  Petitioner contends that Jeddeloh omitted address and control signal lines from Figure 3 "to avoid unnecessarily obscuring the present invention."  *Id.* at 6 (citing Ex. 1006, 9:51–54, 9:61–64; Ex. 1061 ¶ 736).  We find that the cited disclosure from Jeddeloh better supports Petitioner's position.

IPR2022-00063
Patent 10,217,523 B1



Fig. 3

Reply 40.  Petitioner's modified Figure 3, depicted above, shows Ellsberry's Figure 3 with the proposed added functionality from Jeddeloh (BIST engine 310, clock generator 324, and memory sequencer 304) in gray in the Control Block.  A directional right arrow is depicted on the top left, labelled "system address/cmd" going into register 302, with two single directional right arrows coming out of register 302 and to the right into bank A and bank B address cmd 220 and a single directional down arrow into the Control Block that are labelled with red circles.  In the Control Block are four blocks:  the added functionality from Jeddeloh in gray, address/cmd decode 304, config decode 306, and bank switch state machine 308.  There is a directional right arrow coming out of the Control Block to bank switch control 210.

Patent Owner contends "the single-directional arrow from register 302

IPR2022-00063
Patent 10,217,523 B1

to the control block and to bus 220 faces the wrong direction" and "the link would have to be bidirectional before the [combined system] would be able to generate any useful test signals." PO Resp. 67 (citing Ex. 2004 ¶¶ 97–98). Dr. Brogioli testifies that a person of ordinary skill in the art "would need to account for the change in signal timing resulting from the test address/control signals skipped register 302 in order to synchronize the data and address/control signals." Ex. 2004 ¶ 98. According to Dr. Brogioli, a person of ordinary skill in the art "would then be met with the problem that if you make the unidirectional arrows shown above bidirectional, that would introduce issues over who is controlling the line (the system or control block), and how." *Id.* Dr. Brogioli further testifies that a person of ordinary skill in the art would "not be familiar with how to manage a bidirectional interconnect in this context, and how to effectively control the end points that are intended to transmit data over the bidirectional interconnect, in a shared manner, at the speeds that Ellsberry contemplates." *Id*.

Petitioner responds that Patent Owner's arguments "misinterpret the normal operation" of Ellsberry. Reply 39 (citing Ex. 1061 ¶¶ 724–731). According to Petitioner, "the connection to the 'Control Block' . . . is **already** bidirectional, such that signals output on bus 220 come from the 'Control Block' in the Control ASIC, not directly from register 302, which is how the Control ASIC can output different signals than it receives." *Id.* at 39–40 (citing Ex. 1061 ¶¶ 726, 729). Petitioner contends that "in order for the Control Block to output signals on bus 220 in normal mode, that connection must already be bidirectional," and "[t]he same is true in the proposed combination," as shown in Petitioner's annotated Figure 3, above.

43

IPR2022-00063
Patent 10,217,523 B1

*Id.* at 40 (citing Ex. 1061 ¶ 729).

Dr. Subramanian testifies that "[i]n normal mode, the role of register 302 is to provide address and command signals from the system bus that are *input* to the Control Block, which decodes that information and, in response, outputs the signals to control the memory bank switches (using 210) and memory devices (using 220)." Ex. 1061 ¶ 726 (citing Ex. 1005, Figs. 3, 8B, 9, ¶¶ 12, 32, 44). Dr. Subramanian, therefore, contends that "[t]he signals from the Control ASIC come from the 'Control Block,' not directly from register 302, and thus register 302 does not affect the timing of the *output* from the 'Control Block,' since the timing is set by the Control Block, not by the register 302." *Id.* Dr. Subramanian testifies that a person of ordinary skill in the art would have understood "that the arrows in Figure 3 are not indicating universal unidirectional communication from the register 302 into the Control Block and to bus 220 as Dr. Brogioli argues, but also include signals coming out from the Control Block going to bus 220, meaning the connection to the Control Block is already bidirectional." *Id.* at ¶ 729. Dr. Subramanian further testifies that a person of ordinary skill in the art would have understood "how to route signals to implement self-test functionality inside an ASIC or similar integrated circuit, as evidenced by the prior art." Ex. 1061 ¶ 730 (citing Ex. 1006, Figs. 1–3; Ex. 1016 at 3, 25–28; Ex. 1058 at 3, 26–29).

We find that the disclosure in Ellsberry better supports Patent Owner's arguments. *See* Sur-reply 22–26. Central to the dispute is whether Ellsberry's Figure 3 discloses bidirectional communication, i.e., whether there are already signals coming *from* the Control Block *to* bus 220. Patent Owner and Dr. Brogioli rely on paragraph 39 of Ellsberry, which describes

IPR2022-00063
Patent 10,217,523 B1

Figure 3.  Sur-reply 22–26; Ex. 2004 ¶ 96.  Paragraph 39 of Ellsberry states:

> The command processing system 300 controls physical bank
> selection and bank switching direction.  *Memory addresses and
> command information are received from the DIMM interface
> 202, buffered in a register 302 and sent to all memory banks
> (e.g., Bank 0, Bank 1, Bank 2 and Bank 3) over address bus
> 220.  The memory address and command information is also
> decoded 304 and memory configuration information 306 (e.g.,
> DRAM type. etc.) is determined.*  The memory configuration
> information may be determined from preset information.  A
> bank switch state machine 308 then determines which memory
> bank should be activated or accessed.  In one embodiment of
> the invention, this state machine 308 is a logical translation
> table that maps a primary space address to a secondary space
> address based on the memory configuration present.  For
> example, the state machine 308 may be the address mapping
> table illustrated in FIGS. 7A-F, which was previously
> described*.  The state machine 308 sends control information to
> the memory bank switches 206 & 208 via the control bus 210 to
> indicate which memory banks should be activated/deactivated
> or accessed.*

Ex. 1005 ¶ 39 (emphasis added).  In other words, Ellsberry teaches that
memory address and command information is received from DIMM
interface 202, buffered in register 302, and sent to memory banks over
address bus 220.  It further teaches that the memory address and command
information is also decoded (i.e., address/cmd decode block 304 in the
control block) to determine memory configuration information (i.e., config
decode block 306), and that state machine 308 determines which memory
bank switch should be activated or accessed and sends control information to
the memory bank switches 206 and 208 over control bus 210.  This
disclosure in Ellsberry does not disclose that any information is sent *from*
the Control Block and *to* bus 220; rather, it only indicates that information is

IPR2022-00063
Patent 10,217,523 B1

provided *to* the Control Block and then *to* bus 210. The citations from Ellsberry that Dr. Subramanian relies upon do not state otherwise. For example, paragraph 32 of Ellsberry states that "[a]lthough address information may be sent to all memory banks over address bus 220, the memory bank switch 206 and/or control unit 204 determine which memory devices or banks are accessed." Petitioner does not persuasively rebut Patent Owner's arguments or Dr. Brogioli's testimony as to the disclosure in paragraph 39. We, accordingly, afford more weight to Dr. Brogioli's testimony on this point, as well as his testimony describing the extent of the modifications required of the proposed combination. *See, e.g.*, Ex. 2004 ¶¶ 83, 98.

As discussed above, Petitioner contends that the proposed combination involves using the same data control mechanisms and pathways (e.g., Reply 24–27, 37), and Dr. Subramanian testifies that adding the self-test functionality to Ellsberry "does not require any new timing or routing at the module level." Ex. 1061 ¶¶ 678, 682; *see* Reply 25. However, Dr. Subramanian admits that the proposed combination requires that Ellsberry's Switch ASICs and Control ASIC must be redesigned to add the relevant functionality from Jeddeloh. *See* Ex. 2016, 153:18–154:17, 158:13–23, 160:17–162:7. This is consistent with Dr. Brogioli's testimony that "two new circuits have been created using components disclosed in Jeddeloh and deployed to a distributed, markedly different architecture than Jeddeloh." Ex. 2004 ¶ 83.

In addition to the modifications to the Control ASIC, Dr. Subramanian testifies that modifications are required to the Switch ASIC, "such that the write data signals are generated in Ellsberry's memory bank switches instead

IPR2022-00063
Patent 10,217,523 B1

of receiving write data from the system bus, and the memory bank switches then handle the data transfers the same way, and with the same timing, as before." Ex. 1061 ¶ 665 (emphasis omitted); *see id.* ¶ 678 ("a data generator as taught by Jeddeloh is added to each memory bank switch in Ellsberry to provide data signals in a self-test mode instead of providing the data signals from the system memory bus when in a normal mode"). Dr. Subramanian further testifies that Ellsberry had "already solved the timing and synchronization issues between its control unit and the distributed memory bank switches by following the timing requirements of the relevant JEDEC standards." Ex. 1061 ¶ 684 (citing Ex. 1005 ¶¶ 46, 50). As discussed, the modification to Ellsberry also requires adding a MUX to isolate the data signals in the Switch ASIC and the address/control signals in the Control ASIC. Pet. 59, Reply 10. According to Dr. Subramanian, "the prior art confirms that a [person of ordinary skill in the art] would have known how to use a multiplexer or demultiplexer . . . without any timing and signal issues." Ex. 1061 ¶ 701; *see id.* ¶¶ 741, 754, Ex. 1003 ¶ 258.

In our view, Petitioner minimizes the extent of the redesign required to make the proposed combination, and due to that, we find Dr. Brogioli's testimony to be more credible. *See, e.g.*, Ex. 2004 ¶¶ 81–86. For example, we find persuasive Dr. Brogioli's testimony that "[w]hen attempting to adapt circuitry and functions meant for one type of architecture for use in a different architecture, a [person of ordinary skill in the art] would have understood that technical problems would arise, such as issues coordinating signals between functional units that were intended to remain united, and issues managing shared buses or data lines, for example." Ex. 2004 ¶ 82. We also find credible Dr. Brogioli's testimony that a person of ordinary skill

IPR2022-00063
Patent 10,217,523 B1

in the art "would have been met with substantial challenges coordinating data and address signaling circuitry of Jeddeloh once you split up and distributed it into Ellsberry's specific architecture." *Id.* at ¶ 83. Dr. Brogioli testifies "[n]ot only are new pathways required within Ellsberry's architecture that are not contemplated by Jeddeloh, but these pathways in some instances require being bidirectional," as was shown above in connection with the modifications to the Control ASIC. *Id.* We afford weight to Dr. Brogioli's testimony that "Jeddeloh's self-test module cannot be disassembled and distributed across Ellsberry's memory module as proposed by Petitioner without creating new pathways or changing how existing components work" in view of the extent of the modifications required. *Id.*

Dr. Subramanian's testimony that Ellsberry "already solved the timing and synchronization issues between its control unit and the distributed memory bank switches by following the timing requirements of the relevant JEDEC standards," merely supports that Ellsberry, standing alone and without the proposed modifications, is JEDEC compatible, not that Ellsberry "solved the timing and synchronization issues between its control unit and the distributed memory bank switches" in the proposed combination with the proposed modifications to Ellsberry, including the addition of self-test functionality from Jeddeloh. *See* Ex. 1061 ¶ 684.

The record supports that the proposed modifications were informed by the requirements of the claims. The fact that a person of ordinary skill in the art "could" make these changes does not inform us that a person of ordinary skill in the art "would" make these changes. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("obviousness concerns whether a

IPR2022-00063
Patent 10,217,523 B1

skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention"); *see ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.,* 694 F.3d 1312, 1327 (Fed. Cir. 2012) ("[T]he expert's testimony on obviousness was essentially a conclusory statement that a person of ordinary skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions. This is not sufficient and is fraught with hindsight bias.").  As discussed by Patent Owner, Dr. Subramanian conceded that there were multiple ways a person of ordinary skill in the art could add self-testing to Ellsberry.  *See* PO Resp. 57 (citing Ex. 2004 ¶¶ 46, 47, 128, 129, 146; Ex. 2005, 121–125).  For example, a person of ordinary skill in the art could have incorporated all of Jeddeloh's self-test logic into Ellsberry's Control ASIC or duplicated Jeddeloh's self-test logic into Ellsberry's Switch ASICs.  *See* Ex. 2004 ¶ 129; Ex. 2005, 121–125, 184–185.  Dr. Brogioli credibly testifies that these alternative designs would have been more similar to what was seen in the prior art.  Ex. 2004 ¶¶ 46, 47, 128, 129, 146.  Accordingly, the record supports that Petitioner's specific modifications were driven by hindsight view of the roadmap provided by the claim limitations, e.g., the testing data and address/control logic is separated between the data module and the control module (limitations 1[e], 1[g][i], 1[g][ii], 1[g][ii]).

Petitioner also asserts that a person of ordinary skill in the art would have understood that Jeddeloh has a central hub 140 which functions like an AMB in an FBDIMM to buffer both data and address/command signals for the memory devices.  Reply 20.  Petitioner further asserts that Jeddeloh

49

IPR2022-00063
Patent 10,217,523 B1

teaches implementing the BIST self-test functionality in the central hub,
"i.e., an AMB that buffers data and address/command signals." *Id.* at 21
(citing Ex. 1061 ¶ 672; Ex. 1006, 5:47–49, 8:26–29, 9:44–60).  Petitioner
asserts that the '523 patent "admits that self-test functionality could be
implemented in an AMB." *Id.* (citing Ex. 1001, 4:41–44).  Dr. Subramanian
testifies that the '523 patent "express[es] concerns about concentration of
self-test circuitry in a combined address/control and data buffer, as
[Jeddeloh] does, and these known concerns with prior art implementations
would have further motivated" a person of ordinary skill in the art to divide
Jeddeloh's circuitry functionality between Ellsberry's Control ASIC and
Switch ASICs to avoid "these very issues."  Ex. 1003 ¶ 156 (citing Ex. 1001,
4:41–56); *see* Reply 21.

We agree with Patent Owner (Sur-reply 12–13) that whether self-test
can be implemented in an AMB or a centralized architecture such as
Jeddeloh does not inform whether the combination of Ellsberry and Jeddeloh
is obvious.  *See Innogenetics N.V. v. Abbott Laboratories*, 512 F.3d 1363,
1373 (Fed. Cir. 2008) ("knowledge of a problem and motivation to solve it
are entirely different from motivation to combine particular references to
reach the particular claimed method").  Instead, motivation must be
demonstrated to combine the particular references, i.e., Ellsberry and
Jeddeloh.  *See id.* at 1373–1374; *see also W.L. Gore & Assoc., Inc. v.
Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983) ("To imbue one of
ordinary skill in the art with knowledge of the invention in suit, when no
prior art reference or references of record convey or suggest that knowledge,

IPR2022-00063
Patent 10,217,523 B1

is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher.")

For the third rationale for distributing Jeddeloh's functionality into Ellsberry, Petitioner relies upon several references—Tsern, Schaffer, and Averbuj—to support its contentions that a person of ordinary skill in the art "would have been motivated to make such a design because other references teach [a person of ordinary skill in the art] to place such self-test functionality in distributed data buffers similar to [Ellsberry's] Switch ASICs." Pet. 36 (citing Ex. 1019 ¶¶ 77, 97, Figs. 5, 18; Ex. 1020, 15:57–65, 18:63–19:23, 35:10–37:1, Figs. 5, 18, 36; Ex. 1007 ¶¶ 49–50, 53, 55–57, Figs. 1, 6–7; Ex. 1025, 30).  In the Reply, Petitioner expands on this, arguing that a person of ordinary skill in the art "would be motivated to distribute the self-test functionalities in a way that matches how those functionalities are distributed in the memory module."  Reply 36–37 (citing Ex. 1061 ¶ 786 (citing Ex. 1016 at 3, 25; Ex. 1058 at 3, 26; Ex. 1017 at 2–12; Ex. 1018 at 2:38–67; Ex. 1019, Figs. 1, 8)).

Dr. Subramanian testifies that the prior art teaches the use of the same interfaces and signal traces that are used during normal operation.  Ex. 1061 ¶ 783.  For example, he testifies that Jeddeloh "teaches to put all the self-test functionality blocks in the central hub (self-test module 290) and use the existing data/address/command interfaces (270) and connections from the central hub to the memory devices (240) which are also used during normal operation."  *Id.* (citing Ex. 1006, Fig. 2).  Dr. Subramanian further testifies that "Tsern also teaches to follow the existing structure of its module where each of the distributed buffers (100a-d) has existing address/command lines (103) and data lines (102) to the memory devices (101), and put a separate

IPR2022-00063
Patent 10,217,523 B1

self-test module (1883) in each of those buffers." *Id.* (citing Ex. 1019, Figs. 1, 18).  To that end, Dr. Subramanian testifies that "if the memory module as a central hub . . . which uses address/command and data signals to interface with the memory devices, then the corresponding self-test functionalities of generating test address/command and data signals would also be implemented in that central hub."  Ex. 1061 ¶ 786 (citing Ex. 1016 at 3, 26; Ex. 1017 at 2-12; Ex. 1018 at 2:38–67; Ex. 1058 at 3, 26).  Dr. Subramanian further testifies that "if the memory module has distributed buffers," like in Tsern, "where each buffer handles both address/command and data signals, the corresponding self-test functionalities of generating test address/command and data signals are distributed the same way, replicating the self-test functionalities in each buffer."  *Id.* (citing Ex. 1019, Figs. 1, 18). Dr. Subramanian compares Tsern's distributed data buffers to Ellsberry's Switch ASICs.  Ex. 1003 ¶ 159; *see also* Pet. 36.

We do not see how these references support Petitioner's proposed combination, or provide a motivation to a person of ordinary skill in the art to divide Jeddeloh's circuitry and functionality and incorporate it into Ellsberry's Switch ASIC and Control ASIC.  Rather, Petitioner's arguments here are similar to its arguments relying on Ellsberry's distributed architecture as motivation to divide Jeddeloh's circuitry and functionality, as discussed above.

Although each of Tsern, Schaffer, and Averbuj disclose a distributed buffer, akin to the Switch ASICs in Ellsberry, none of the references cited by Petitioner teaches separating testing data and address logic, as in the proposed combination.  *See* Sur-reply 14.  As Dr. Brogioli testifies, each of these references "kept data and address/control generation elements

IPR2022-00063
Patent 10,217,523 B1

consolidated on the PCBs of their respective memory modules, unlike how
the '523 Patent teaches." Ex. 2004 ¶ 149; *see* PO Resp. 58, Sur-reply 17.
This testimony is supported by the disclosure in these references.  For
example, Tsern discloses a single redundancy and repair unit 1883 in buffer
100a that sends address/control signals over path 1005 and data signals over
path 1006.  PO Resp. 58; *see* Ex. 1019, Figs. 5, 18.  Dr. Subramanian even
testified that each of the repeating components in Tsern's buffers (i.e., data
slice) includes all of the same circuitry and functionality.  Ex. 2005, 159:11–
160:22; see Ex. 1019, Fig. 5.  Schaffer provides a similar disclosure to
Tsern.  *See* Ex. 1020, Figs. 5, 18, 36.  Averbuj discloses both address
generation unit 42 and data generation unit 44 in memory interfaces 41.
Ex. 1007, ¶¶ 48–51, Fig. 6.  Moreover, Dr. Subramanian testified during his
deposition that "none of these references teach breaking up the self-test
functional blocks the way the '523 Patent does."  Ex. 2004 ¶ 148; Ex. 2004,
181:19–182:4, 182:9–19, 183:10–15.

Although these references may support placing self-test functionality
into distributed data buffers, i.e., Ellsberry's Switch ASICs, they do not fully
support the combination proposed by Petitioner, that is, dividing the data
logic in one location (i.e., Ellsberry's Switch ASIC) and the address/control
in a different location (i.e., Ellsberry's Control ASIC) in the context of a
self-test environment.  In other words, all Petitioner has established is that
the self-test functionality in the cited references was in the same location,
e.g., a central hub or repeated in distributed buffers, but not that it was split,
as in the proposed combination, and as is required by the claims.  We find
that the disclosure in these references does not support the proposed
combination; rather, it further reinforces that the proposed combination is

IPR2022-00063
Patent 10,217,523 B1

driven by hindsight.  We agree with Patent Owner that "Petitioner cites no example anywhere attempting disaggregated data and address handling for testing, much less doing so into distributed memory architecture like Ellsberry."  PO Resp. 38 (citing Ex. 2004 ¶¶ 123–125, 143).

For the fourth rationale for distributing Jeddeloh's functionality into Ellsberry, Petitioner relies upon the Lepejian reference, asserting that it "teaches [a person of ordinary skill in the art] that, in order to reduce busing area, pattern generators should be distributed to each of the Switch ASICs." Pet. 36 (citing Ex. 1021, 3:45–53; Ex. 1003 ¶ 162).  However, similar to Petitioner's reliance on the other references discussed above, this merely establishes that Lepejian discloses redundantly distributing functionality across Switch ASICs, but does not provide motivation for the proposed combination, i.e., distributing the self-test functionality across the Switch ASIC and Control ASIC.  *See* PO Resp. 58–59.

In view of the number and extent of modifications necessary to achieve the proposed combination of Ellsberry and Jeddeloh, this indicates that the series of proposed modifications are the result of hindsight.  *See Metalcraft of Mayville, Inc. v. The Toro Co*., 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("[W]e cannot allow hindsight bias to be the thread that stitches together prior art patches into something that is the claimed invention."); *InTouch Techs., Inc. v. VGO Commc'ns, Inc*., 751 F.3d 1327, 1351 (Fed. Cir. 2014) (criticizing use of the challenged patent as a "roadmap" for putting what the expert referred to as "pieces of a 'jigsaw puzzle'" together). We, therefore, find that the evidence does not show that a person or ordinary skill in the art would have been motivated to make the alleged modifications to Jeddeloh and Ellsberry without the benefit and knowledge of the '523

patent. See *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (internal quotations omitted) (an obviousness analysis must "avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit."). Specifically, we determine that Petitioner has not provided sufficient reasoning establishing why a person of ordinary skill in the art would have been motivated to divide the self-test functionality of Jeddeloh's Figure 3 between the Control ASIC and Switch ASICs of Ellsberry and that the skilled artisan would have had a reasonable expectation of success in doing so.

Accordingly, for the foregoing reasons, we determine that Petitioner has not established that claims 1–34 are unpatentable over Ellsberry and Jeddeloh.

### E. *Grounds 2–4; Obviousness Over Ellsberry, Jeddeloh, and Averbuj/Lee/Averbuj and Lee*

Petitioner relies on the same motivation to combine Ellsberry and Jeddeloh in the remaining grounds. *See* Pet. 104–113. Therefore, for the same reasons as set forth above for Ground 1, we determine that Petitioner has not established that claims 1–34 are unpatentable.

## IV. MOTIONS TO EXCLUDE

### A. *Petitioner's Motion to Exclude*

Petitioner contends that in its Sur-reply, Patent Owner improperly relies upon testimony from Petitioner's expert reading from certain documents in order to "backdoor" certain exhibits into evidence. Pet. Mot. Excl. 4. Petitioner identifies these as Exhibits 2010, 2011, 2012, and 2014, but states that Patent Owner did not submit these exhibits with its Sur-reply.

IPR2022-00063
Patent 10,217,523 B1

*Id.* This testimony is purportedly related to when the labels "LRDIMM" and "FBDIMM" were first introduced.  *Id.* at 3–4.  Petitioner, therefore "requests that the Board exclude any attempt by Patent Owner to use any testimony related to Exhibits 2010, 2011, 2012, or 2014 concerning when the labels 'LRDIMM' and 'FBDIMM' were first introduced."  *Id.* at 5.

Patent Owner argues that the deposition excerpts at Exhibit 2016, 57:17–58:15 and 79:8–80:1 show permissible questioning regarding information within Dr. Subramanian's personal knowledge.  PO Opp. Mot. Excl. 1–4.  In addition, Patent Owner contends that Petitioner's motion to exclude is improper in that it (1) seeks to exclude evidence that is not cited or relied upon; (2) cites to no authority for the Board to strike testimony based on speculation as to what might occur in the future; and (3) is overbroad in that it is unclear what is encompassed by the request.  *Id.* at 5.

In Reply, Petitioner argues that the cited testimony shows that Dr. Subramanian lacked personal knowledge, and, is therefore inadmissible. Pet. Mot. Excl. Reply 2–4.

Although Petitioner cites to testimony as part of its arguments, Petitioner does not clearly identify what testimony it seeks to exclude. Petitioner cites to Exhibit 2016 at 48:20–49:11, 49:17–50:6, 50:25–51:15, 52:3–7, 57:17–58:15, 71:21–72:16, 74:2–4, 76:1–24, 77:1–78:2, 79:8–80:1. *See* Pet. Mot. Excl. 3–5; Pet. Mot. Exclude Reply 2–3.  In the Reply, Petitioner also cites to Exhibit 2016, 80:2–81:1.  Pet. Mot. Excl. Reply 4.

We do not rely on any of the foregoing testimony in this Decision. *See supra*, Section III.D.3, including fn. 9.  Therefore, Petitioner's Motion to Exclude is dismissed as moot.

IPR2022-00063
Patent 10,217,523 B1

### B. *Patent Owner's Motion to Exclude*

Patent Owner seeks exclusion, in whole or in part, of Exhibits 1012, 1014–1017, 1022, 1024, 1028, 1029, and 1031, as well as any related testimony that is relied upon by Petitioner.  PO Mot. Excl. 1.  Patent Owner contends that Petitioner (1) has not properly authenticated these exhibits and (2) that they are inadmissible hearsay.  PO Mot. Excl. 5–8; PO Mot. Excl. Reply 1–4.  In response, Petitioner contends that (1) for various reasons, each of the exhibits have been properly authenticated, and (2) the exhibits are not inadmissible hearsay because they are merely used to "show the state of the art and the knowledge of one of ordinary skill in the art."  Pet. Opp. Mot. Excl. 1–14.

We do not rely on any of these exhibits in rendering our Decision. *See supra* Section III.D.3.   Therefore, Patent Owner's Motion to Exclude is dismissed as moot.

## V.  CONCLUSION

For the foregoing reasons, we are not persuaded that Petitioner has established by a preponderance of the evidence that claims 1–34 of the '523 patent are unpatentable.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–34 | 103(a) | Ellsberry, Jeddeloh | | 1–34 |
| 1–34 | 103(a) | Ellsberry, Jeddeloh, Averbuj | | 1–34 |
| 14, 17–34 | 103(a) | Ellsberry, Jeddeloh, Lee | | 14, 17–34 |
| 14, 17–34 | 103(a) | Ellsberry, Jeddeloh, Averbuj, | | 14, 17–34 |

57

IPR2022-00063
Patent 10,217,523 B1

| | | Lee | | |
|---|---|---|---|---|
| **Overall Outcome** | | | | 1–34 |

## VI. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–34 of the '523 patent have not been shown to be unpatentable under 35 U.S.C. § 103(a); and

FURTHER ORDERED that Petitioner's Motion to Exclude (Paper 44) is *dismissed as moot*; and

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 43) is *dismissed as moot*; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-00063
Patent 10,217,523 B1

FOR PETITIONER:

Eliot D. Williams
Neil P. Sirota
Theodore W. Chandler
Ferenc Pazmandi
Stephanie C. Kato
BAKER BOTTS L.L.P
eliot.williams@bakerbotts.com
neil.sirota@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
stephanie.kato@bakerbotts.com


FOR PATENT OWNER:

Sarah Spires
Rex Hwang
SKIERMONT DERBY LLP
sspires@skiermontderby.com
rhwang@skiermontderby.com

EXHIBIT 5

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

OCT 17 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NETLIST INC., a Delaware corporation, | No.    22-55209 |
| Plaintiff-Appellee, | D.C. No. 8:20-cv-00993-MCS-ADS |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, | MEMORANDUM* |
| Defendant-Appellant. | |

| | |
|---|---|
| NETLIST INC., a Delaware corporation, | No.    22-55247 |
| Plaintiff-Appellant, | D.C. No. 8:20-cv-00993-MCS-ADS |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, | |
| Defendant-Appellee. | |

Appeal from the United States District Court
for the Central District of California
Mark C. Scarsi, District Judge, Presiding

Argued and Submitted June 8, 2023
Pasadena, California

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Before:  M. SMITH and DESAI, Circuit Judges, and AMON,[**] District Judge.
Partial Dissent by Judge DESAI.

This appeal arises from a contract dispute between Samsung Electronics Co.,

Ltd. and Netlist Inc.  Samsung appeals the district court's (1) grant of partial

summary judgment in favor of Netlist on Netlist's breach of contract claims, (2)

award of nominal damages, (3) grant of a declaratory judgment that Netlist properly

terminated the contract, and (4) preclusion of Samsung's affirmative defenses at

trial.  Netlist cross appeals the district court's preclusion of certain fees pursuant to

the contract's consequential-damages bar.  We assume the parties' familiarity with

the briefing and record.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we

affirm in part and reverse and remand in part.

1.    The district court erred in granting Netlist summary judgment on its

claim that Samsung violated § 6.2 of the Joint Development and License Agreement

("JDLA"), because the provision is ambiguous as to whether Samsung's supply

obligation is limited to the now-failed joint development project (the "JDP") or

applies more broadly to the parties' overall business relationship.  *See L.F. v. Lake*

*Wash. Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020) (grant of summary

judgment reviewed de novo).  Section 6.2 requires Samsung to "supply NAND and

---

[**]    The Honorable Carol Bagley Amon, United States District Judge for
the Eastern District of New York, sitting by designation.

DRAM products to Netlist on Netlist's request at a competitive price." The substantive law of New York governs this dispute. To assess contract ambiguity, we consider "the intention of the parties . . . [as] gathered from the four corners of the instrument." *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007). And in determining the parties' intent as to a particular provision, New York courts read "the entirety of the agreement in the context of the parties' relationship and circumstances," rather than isolating distinct provisions of the agreement. *In re Riconda*, 688 N.E.2d 248, 252 (N.Y. 1997).

Standing alone, the plain language of § 6.2 favors Netlist's interpretation: that Samsung must fulfill all NAND and DRAM orders by Netlist for whatever purpose. *See Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." (citation omitted)). Read as an integrated whole, however, the contract's apparent purpose as derived from its title, structure, and related provisions make § 6.2 "reasonably susceptible of more than one interpretation." *See Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233 (N.Y. 1986).

*First*, the JDLA has two stated purposes: (1) developing a new NVDIMM-P product (*i.e.*, the JDP), and (2) patent cross-licensing. The title and preamble of the agreement exclusively reference these two topics, and each substantive section

3

corresponds entirely to one of the two goals. In this context, it is reasonable to interpret § 6.2 as tethered to one of those projects rather than as a separate, freestanding obligation. *See Hooper Assocs., Ltd. v. AGS Comps., Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989) ("Words in a contract are to be construed to achieve the apparent purpose of the parties.").

*Second*, the title and structure of § 6 support a finding of ambiguity. Section 6, "Supply of Components," requires both parties to supply certain products to the other upon request. Section 6.1 requires Netlist to "provide Samsung any NVDIMM-P controller," while § 6.2 requires Samsung to "supply NAND and DRAM products." Netlist's view is that because § 6.1 explicitly links Netlist's supply obligation to the JDP, while § 6.2 does not, that omission must be viewed as intentional. That is one plausible reading. It would also be reasonable to read §§ 6.1 and 6.2 as complementary mirror provisions that describe the parties' obligations to provide components of the NVDIMM-P product. *See N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) ("The *expressio unius* canon applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." (internal quotation marks and alteration omitted)).

*Third*, if Netlist's interpretation of § 6.2 is correct, then the provision would be a significant outlier in the overall agreement. As noted, all other substantive provisions of the JDLA concern either the JDP or cross-licensing and describe the

parties' rights and obligations related to those elements in detail. But if § 6.2 is properly understood as an unbounded supply obligation, it would represent a separate, third element of the JDLA. In addition, it would be unusual for this purportedly important, discrete obligation to be referenced only once in a single sentence in the entire agreement. Accordingly, we conclude that § 6.2 could reasonably be understood as restricted to the NVDIMM-P project.[1] *See Hooper*, 548 N.E.2d at 905 ("Although the words might seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view." (internal quotation marks and citation omitted)).

Because we conclude that § 6.2 is ambiguous as a matter of law, we remand to the district court to consider in the first instance whether the extrinsic evidence "creates a genuine issue of material fact" as to the provision's meaning. *See MacIntyre v. Carroll Coll.*, 48 F.4th 950, 956 (9th Cir. 2022) ("[T]he remaining issues are not purely legal and require us to determine whether the evidence creates a genuine issue of material fact. The district court is thus better suited to consider these issues in the first instance.").

    2.    The district court erred in granting Netlist judgment on its claim that

---

[1] To the extent Samsung contends that the district court independently erred by awarding nominal damages following the jury's finding that Netlist had not suffered actual damages from the breach of § 6.2, we disagree. *See Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993).

Samsung breached § 3 of the JDLA by erroneously withholding $1.32 million of its $8 million payment to Netlist and paying that sum to the Korean tax authority. Section 3 requires Samsung to pay Netlist $8 million in non-recurring engineering fees, less any withholding taxes required by Korean law.  The Korean tax authority ultimately concluded that the fees were not subject to withholding.  The district court determined that "the reasonableness of Samsung's position [on whether the taxes were properly withheld] is immaterial to whether it breached its obligation."  We disagree.  Section 3.2 provides that if Samsung deducts withholding taxes, it must "reasonably cooperate with Netlist in any lawful efforts to claim a credit or *refund* or exemption with respect to any such withholding taxes."   Because § 3.2 contemplates that Samsung may reasonably but erroneously withhold taxes, we do not interpret § 3.1 as providing for strict liability upon an erroneous withholding. *See Beal Sav. Bank*, 865 N.E.2d at 1213–14.  A contrary holding that Samsung breached § 3 by reasonably misinterpreting Korean tax law would also produce absurd results and be inconsistent with the parties' reasonable expectations. *See Uribe v. Merchs. Bank of N.Y.*, 693 N.E.2d 740, 743 (N.Y. 1998) (construing contract in accordance with the "reasonable expectation and purpose of the ordinary businessperson" (alteration and citation omitted)).  Accordingly, we reverse the district court's entry of judgment in Netlist's favor on the § 3 breach of contract

claim and remand with instructions to enter judgment for Samsung.[2]

3.     The district court erred in granting a declaratory judgment that Netlist properly terminated the JDLA because disputed fact issues precluded summary judgment on the materiality of Samsung's alleged breach of § 6.2.  "Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'"  *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (citation omitted).  New York courts consider several factors in assessing materiality, including, among others: the extent to which the injured party will be deprived of the benefit which he reasonably expected, the likelihood that the party failing to perform or to offer to perform will cure his failure, the quantitative character of the default, and the breaching party's good faith or willfulness.  *See Hadden v. Consol. Edison Co. of N.Y., Inc.*, 312 N.E.2d 445, 449 (N.Y. 1974); Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981).  The record reflects that several of these factors hinge upon disputed facts.  For example, the parties dispute whether—assuming that the district court correctly construed § 6.2—the exchange of Samsung's mandatory supply obligation in return for Netlist's patent

---

[2] On cross appeal, Netlist challenges the district court's conclusion that the JDLA's provision concerning consequential damages barred recovery of the fees Netlist paid to its tax consultant, PricewaterhouseCoopers, for assistance in obtaining a refund of the erroneously withheld taxes.  Because we hold that Samsung did not breach § 3 of the JDLA, and therefore that Netlist is not owed damages resulting from the purported breach, we need not address whether the district court properly barred recovery of the fees.

licenses was "the centerpiece" of the agreement.

We reject Samsung's contention that Netlist's declaratory-judgment claim fails for the independent reason that Netlist waived its right to terminate the contract by delaying termination proceedings until 2020. The district court properly determined that given the JDLA's no-waiver provision, Netlist's failure to act upon notice of the breach does not constitute a clear manifestation of intent to waive its termination rights. *See Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988) (requiring "clear manifestation of intent by [one party] to relinquish [contractual] protection"). We reverse the district court's entry of a declaratory judgment and remand for further proceedings.

4.     The district court correctly precluded Samsung from asserting at trial affirmative defenses of waiver, estoppel, and acquiescence. Samsung pleaded all three defenses in its answer, but did not raise them in response to Netlist's motion for partial summary judgment or in its own motion for summary judgment. Samsung therefore abandoned the defenses. Where a movant puts liability at issue on summary judgment, a defendant opposing summary judgment may not decline to raise an affirmative defense that, if successful, would defeat the movant's claim, and then seek to assert that defense at trial. *See* Fed. R. Civ. P. 56(a).[3]

---

[3] The district court also properly precluded Samsung from raising an election of remedies affirmative defense. Samsung failed to plead the defense in its answer, *see In re Adbox, Inc.*, 488 F.3d 836, 841 (9th Cir. 2007); Fed. R. Civ. P. 8(c)(1), and the

**AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

The parties shall bear their own costs.

---

court did not abuse its discretion in finding that Samsung had not shown "good cause" to amend its answer at the close of discovery, *see Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992).

FILED

OCT 17 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Netlist Inc. v. Samsung Electronics Co., Ltd.*, No. 22-55209

DESAI, Circuit Judge, dissenting in part:

I respectfully dissent from Section 1 of the memorandum disposition. The majority's means-to-an-end analysis of § 6.2 is a departure from longstanding rules of contract interpretation, particularly when interpreting a contract negotiated at an arm's length between two sophisticated parties. Worse, my colleagues' perfunctory conclusion that § 6.2 is ambiguous makes doing business harder. It forces contracting parties to anticipate and expressly disclaim every conceivable limiting construction to avoid an alleged ambiguity. I would not impose that burden.

Section 6.2 is clear and unambiguous: Samsung agreed to "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price." That provision means what it says. The majority concedes, as it must, that "the plain language of § 6.2 favors Netlist's interpretation." Mem. Disp. at 3. Yet my colleagues bend over backwards to invent an ambiguity based on the agreement's "apparent purpose as derived from its title, structure, and related provisions." Mem. Disp. at 3.[1] Their arguments are unpersuasive.

---

[1] The majority's decision relies on Samsung's made-for-litigation theory that § 6.2 is ambiguous. But Samsung never even argued the agreement was ambiguous until after it decided to stop fulfilling its supply obligations. In fact, Samsung raised its ambiguity argument for the first time only after the district court denied its motion for judgment on the pleadings.

For starters, my colleagues overreach by concluding without any basis that §
6.2 is "a significant outlier in the overall agreement." Mem. Disp. at 4. The
majority's own notions about the fairness of Samsung's supply obligation go far
beyond interpreting the "four corners of the contract," *Ellington v. EMI Music, Inc.*,
21 N.E.3d 1000, 1003 (N.Y. 2014), and instead infer, "under the guise of judicial
construction, . . . additional requirements to relieve a party from asserted
disadvantage flowing from the terms actually used." *Collard v. Inc. Vill. of Flower
Hill*, 421 N.E.2d 818, 823 (N.Y. 1981). Those inferences violate New York's
"established contract law, which focuses on the parties' chosen language, by
injecting considerations untethered to the words that the parties included in their
agreement." *Donohue v. Cuomo*, 184 N.E.3d 860, 870 (N.Y. 2022). When "a contract
'was negotiated between sophisticated, counseled business people negotiating at
arm's length,' courts should be especially 'reluctant to interpret an agreement as
impliedly stating something which the parties have neglected to specifically
include.'" *2138747 Ontario, Inc. v. Samsung C & T Corp.*, 103 N.E.3d 774, 780
(N.Y. 2018) (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d
876, 879 (N.Y. 2004)). Yet that is what the majority did here.

Although the majority's decision purports to rely on the plain text of § 6.2, it
goes further than the plain text; it takes a simple clause—"Samsung will supply
NAND and DRAM products to Netlist"—and inserts the words "in connection with

2

the JDP." But if the parties meant to limit Samsung's supply obligation to NAND and DRAM used *only in connection with the JDP*, they would have said so. *See Ellington*, 21 N.E.3d at 1004 ("If the parties intended to bind future affiliates they would have included language expressing that intent."); *Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 365 (N.Y. 2009) (holding that the plain language of a contract's sunset clause applied to the entire agreement when "the parties could have drafted an agreement that restricted the scope of the sunset clause" but declined to do so). Indeed, the majority acknowledges that the parties did exactly that in Netlist's supply obligation in § 6.1. Other parts of the agreement similarly include limiting language where the parties saw fit to include it. *See, e.g.*, § 4.1 (discussing ownership of inventions "arising out of the JDP"); § 1 (defining a term used in the agreement to describe technology created "in the course and within the scope of the JDP"). We must give meaning to the omission of similar language in § 6.2. *E.g.*, *Quadrant Structured Prods. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) (explaining that the *expressio unius* maxim precludes courts from reading language into a contract provision that a "sophisticated drafter" omitted). Respectfully, my colleagues overstep by rewriting § 6.2 to add language Samsung failed to include.

The majority's analysis next turns to the title and structure of § 6 to justify its conclusion that § 6.2 is ambiguous. But the title and structure confirm just the

opposite. Section 6's title ("Supply of Components") is general, and both Samsung and Netlist develop and manufacture components generally, not just for the JDP. All but one of the provisions in § 6 discuss the parties' rights and obligations related to the supply of components generally. Section 6.3 preserves both parties' rights to make "semiconductor components" and sell them to third parties. Section 6.4 provides that neither party must buy "any products" from the other. And Section 6.2 requires Samsung to supply "NAND and DRAM products" to Netlist at competitive prices. In the *only* provision tied to a JDP-specific product (§ 6.1), the parties expressly said so. It runs afoul of basic principles of contract interpretation to imply a similar limitation into any other provision in § 6.

Finding no support in the terms of the agreement, the majority's decision settles on the recitals as the basis for its finding that § 6.2 is ambiguous. Mem. Disp. at 3. But nothing in the recitals makes § 6.2 ambiguous. The recitals state that two main goals of the agreement were developing a new NVDIMM-P product through the JDP and cross-licensing patents. In their quest to find an ambiguity where none exists, my colleagues again read too much into the plain text. Parties often have many reasons for executing contracts, and they need not list every form of consideration in the recitals. In any event, the supply obligation as written in § 6.2 furthers these goals or, at a minimum, there is nothing inconsistent about the agreement's general purposes and the clear supply obligation in § 6.2. Nor can the

4

recitals alter the plain language of a substantive term. *See Jones Apparel Grp., Inc. v. Polo Ralph Lauren Corp.*, 791 N.Y.S.2d 409, 410 (App. Div. 2005) ("Since the contract is unambiguous on its face, there is no need to refer to its recitals, which are not part of the operative agreement.").

In short, every purportedly "reasonable" justification the majority's decision constructs to conclude that § 6.2 is ambiguous requires inserting words in § 6.2, implying policy considerations, and looking beyond the four corners of the agreement. That is not this court's role. A contract "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).

I respectfully dissent from the portion of the majority's decision holding that § 6.2 is ambiguous. I would affirm the district court's summary judgment on Netlist's breach of contract claim over § 6.2.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC.<br><br>       Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD, et al.<br><br>      Defendants. | Civil Case No. 2:22cv00293-JRG<br>(Lead Case)<br><br>**JURY TRIAL DEMANDED** |
| NETLIST, INC.<br><br>       Plaintiff,<br><br>v.<br><br>MICRON TECHNOLOGY TEXAS, LLC, et al.<br><br>      Defendants. | Civil Case No. 2:22cv-00294-JRG<br>(Member Case)<br><br>**JURY TRIAL DEMANDED** |

**SAMSUNG'S MOTION TO STAY PENDING RESOLUTION
OF THE C.D. CAL. CASE REVERSED AND REMANDED
BY THE NINTH CIRCUIT REGARDING SAMSUNG'S LICENSE**

## <u>TABLE OF CONTENTS</u>

TABLE OF ABBREVIATIONS ................................................................................. iv

TABLE OF EXHIBITS ........................................................................................... v

I.      INTRODUCTION ................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................... 2

        A.      Samsung and Netlist Entered into the JDLA in 2015 ............................ 2

        B.      The C.D. Cal. Held that Netlist Terminated the JDLA in 2020............. 3

        C.      After the C.D. Cal. Summary Judgment Order, This Court Held That Samsung
                Was Licensed Until July 15, 2020 ........................................ 3

        D.      The Ninth Circuit Reversed and Remanded the C.D. Cal.'s Erroneous Decision .. 5

III.    LEGAL STANDARD ........................................................................... 6

IV.     ARGUMENT ...................................................................................... 7

        A.      A Stay Will Simplify, and Likely Eliminate, the Case ......................... 7

        B.      Netlist Is Unlikely To Prove That Samsung Breached the JDLA, or That Any
                Breach Was Material ........................................................ 9

        C.      Fifth Circuit Law Compels This Court To Stay This Case ..................... 10

        D.      Netlist Would Not Be Unduly Prejudiced by a Stay ........................... 12

        E.      The Stage of the Case Weighs in Favor of a Stay ............................ 13

V.      CONCLUSION .................................................................................. 14

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Astec Am., Inc. v. Power-One, Inc.*,
No. 6:07-CV-464, 2008 WL 11441994 (E.D. Tex. July 15, 2008) .........................................8

*Customedia Techs. v. Dish Network Corp.*,
No. 2:16-CV-129,2017 .........................................................................................................6

*Cywee Grp. Ltd. v. Samsung Elecs. Co.*,
No. 2:17-CV-140, 2019 WL 11023976 (E.D. Tex. Feb. 14, 2019).....................................14

*EchoStar Techs. Corp. v. TiVo, Inc.*,
No. 5:05-CV-81, 2006 WL 2501494 (E.D. Tex. July 14, 2006) ...........................................6

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
No. 2:15-CV-00011, 2016 WL 1162162 (E.D. Tex. Mar. 23, 2016) .....................................6

*Glass Equip. Dev., Inc. v. Besten, Inc.*,
174 F.3d 1337 (Fed. Cir. 1999).........................................................................................11

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)...............................................................................................................9

*Lochner Techs., LLC v. Lenovo Inc.*,
No. 2:10-CV-430-JRG, 2013 WL 12172638 (E.D. Tex. July 24, 2013)............................6, 8

*Michael v. Ghee*,
325 F. Supp. 2d 829 (N.D. Ohio 2004)..................................................................................9

*NFC Tech. LLC v. HTC Am., Inc.*,
No. 2:13-CV-1058, 2015 WL 1069111 (E.D. Tex. Mar. 11, 2015) .....................................13

*Nichia Corp. v. Mary Elle Fashions, Inc.*,
No. 2:16-CV-615-JRG, 2016 WL 9558954 (E.D. Tex. Dec. 22, 2016) ..................................8

*Nken v. Holder*,
556 U.S. 418 (2009)...............................................................................................................9

*Norman IP Holdings, LLC v. TP-Link Techs., Co.*,
No. 6:13-CV-384, 2014 WL 5035718 (E.D. Tex. Oct. 8, 2014) ...........................................14

*Stafford v. Rite Aid Corp.*,
No. 3:17-CV-01340-AJB-JLB, 2020 WL 4366014 (S.D. Cal. July 30, 2020)........................8

*Trinity Indus., Inc. v. 188 L.L.C.*,
   No. 3:02-CV-405-H, 2002 WL 1315743 (E.D. Tex. 2002)......................................................8

*VirtualAgility Inc. v. Salesforce.com, Inc.*,
   759 F.3d 1307 (Fed. Cir. 2014)......................................................................................12, 13

*West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*,
   751 F.2d 721 (5th Cir. 1985) ....................................................................................... *passim*

*Wolf Designs, Inc. v. Donald McEvoy Ltd. Inc.*,
   341 F. Supp. 2d 639 (N.D. Tex. 2004) ................................................................................6

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| C.D. Cal. | U.S. District Court for the Central District of California |
| C.D. Cal. Case | *Netlist Inc. v. Samsung Elecs. Co.*, No. 8:20-CV-00993 (C.D. Cal.) |
| JDLA | Joint Development and License Agreement |
| Netlist/Samsung EDTX1 | *Netlist Inc. v. Elecs. Co.*, No. 2:21-CV-463 (E.D. Tex.) |
| Ninth Circuit Appeal | *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55247 (9th Cir.) |

iv

**TABLE OF EXHIBITS**

| Ex. | Description |
|---|---|
| 1 | *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55247, Dkt. 77-1 (9th Cir. Oct. 17, 2023) |
| 2 | Joint Development and License Agreement (JDLA) |
| 3 | *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55247, Dkt. 11 (9th Cir. June 6, 2022) |
| 4 | *Netlist Inc. v. Samsung Elecs. Co.*, No. 8:20-CV-00993, Dkt. 276 (C.D. Cal. Dec. 3, 2021) |

## I.      INTRODUCTION

The time has now come that this case be stayed in light of an order issued by the Ninth

Circuit last week that reversed and remanded the order of the Central District of California that

erroneously and summarily found that Netlist's license to Samsung had been terminated.  *See* Ex.

1 (Ninth Circuit's October 17, 2023 decision).  The Court is well aware of this issue relating to

the parties' Joint Development and License Agreement.  Indeed, Samsung previously sought a

stay pending the resolution of the Ninth Circuit Appeal regarding the license issues in both this

case and in *Netlist/Samsung EDTX1*, arguing that it would be wholly inefficient and a waste of

party and judicial resources to move forward in those actions in light of the pending Ninth

Circuit Appeal related to an issue that was an absolute bar to the patent assertion claims.  The

Court denied Samsung's repeated requests.  The situation is now indisputably different.  The

Ninth Circuit order has issued and its mandate is abundantly clear.  And this Court has

previously held Samsung's memory products were fully licensed through July 15, 2020, the date

that Netlist purportedly terminated the license as found by the now-reversed C.D. Cal ruling.

Under the circumstances and at this point in the litigation it would be a clear abuse of discretion

for this Court to move forward with this case—it must stay this action under controlling Fifth

Circuit law.

Netlist's refusal to allow its breach of contract and license termination claims to proceed

in its chosen forum (the C.D. Cal.) before proceeding with its infringement claims here is no

surprise given Netlist's erratic, forum shopping conduct throughout the parties' dispute.  Having

achieved a legally precarious decision in the C.D. Cal. terminating the parties' license

agreement, it rushed its Texas litigations against Samsung hoping to obtain a judgment on its

infringement claims before the inevitable reversal of the C.D. Cal. decision.  The day has come,

however, for Netlist to face the consequences of its own actions.  The Ninth Circuit has reversed

████████████████████████████████████████

the C.D. Cal.'s judgment that Netlist properly terminated the parties' JDLA.  Thus, Samsung is licensed to Netlist's asserted patents unless Netlist prevails in the remanded C.D. Cal. case— where it has the burden to prove a material breach of the JDLA.  This entire case is now moot.

Netlist continues to litigate the validity of Samsung's license in the C.D. Cal. Case, which pre-dates this case by two years.  Accordingly, the central question in this case—one that resolves the entire dispute—is already being litigated in front of another court.  Thus, the Court, at a minimum, should stay this case pending resolution of the proceedings in the C.D. Cal.

## II.      FACTUAL BACKGROUND

The Court is well familiar with the history of Samsung and Netlist's JDLA, the C.D. Cal. Case regarding Netlist's erroneous termination of the JDLA in 2020, and Samsung's Ninth Circuit Appeal.  *See, e.g.*, Dkt. 121 (denying Samsung's motion to stay pending the Ninth Circuit Appeal).  The facts changed materially last week—the Ninth Circuit reversed the C.D. Cal.'s erroneous decision erroneous judgment that the JDLA was terminated and remanded the case for further proceedings.  Ex. 1 at 5, 8.  As a result, ***Samsung's license to the asserted patents is in full force and effect***.  A summary of the pertinent facts is provided below.

### A.      Samsung and Netlist Entered into the JDLA in 2015

In 2015, Samsung and Netlist entered into the JDLA, Ex. 2, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████

**B.     The C.D. Cal. Held that Netlist Terminated the JDLA in 2020**

Five years after entering into the agreement, Netlist purported to terminate the JDLA on July 15, 2020, and filed an action in C.D. Cal. (1) alleging that Samsung had breached two provisions of the JDLA, and (2) seeking a declaration that the license had been terminated.  *See* Dkt. 121 at 2-3.  In 2021, the district court granted summary judgment in favor of Netlist, finding that Samsung violated § 6.2 of the JDLA (relating to supply of certain NAND and DRAM products to Netlist) and § 3 (a tax provision). Ex. 1 at 2-7.  As a result, the court granted Netlist a declaratory judgment that Netlist terminated Samsung's license on July 15, 2020.  The case then proceeded to a jury trial on only the element of damages for the breach of § 6.2 of the JDLA, and a jury found that Netlist did not prove that it suffered any damages as a result of Samsung's purported breach of § 6.2.  Ex. 4.  Separately, the C.D. Cal. Court ruled from the bench that Netlist likewise suffered no recoverable damages as a result of Samsung's purported breach of § 3.  Samsung appealed.  *See Netlist, Inc. v. Samsung Elecs. Co., Inc.*, No. 22-55247 (9th Cir.).

**C.     After the C.D. Cal. Summary Judgment Order, This Court Held That Samsung Was Licensed Until July 15, 2020**

After the C.D. Cal. summary judgment order, Samsung filed a declaratory judgment action in Delaware on October 15, 2021, and Netlist filed a patent infringement case (*Netlist/Samsung EDTX1*) on December 20, 2021, followed by this case on August 1, 2022, Dkt. 1.  In each of these patent litigations, Samsung has asserted that it is licensed to Netlist's patent portfolio under the JDLA.

In *Netlist/Samsung EDTX1*, the Court held on summary judgment that Samsung was licensed to all accused products sold before July 15, 2020. *See Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-CV-00463-JRG, Dkt. 196. In Samsung's summary judgment motion, Samsung explained that, although it believes that ***all*** accused products continue to be licensed today, issue preclusion, arising from the C.D. Cal.'s judgment that Netlist had terminated the JDLA on July 15, 2020, prevented Samsung from making that argument before this Court. *Id.* at 21 n.9; *see also id.*, Dkt. 290 at 1 n.1; *id.*, Dkt. 255 at 1, 5; *id.*, Dkt 345 at 1 & n.1. On April 5, 2023, the Court entered partial summary judgment that all accused products sold before July 15, 2020, were licensed under the JDLA, recognizing that the JDLA presented a bar to relief here for covered sales during the JDLA's active term. *Id.*, Dkt. No. 432 at 2. In *Netlist/Samsung EDTX1*, the Court rejected Netlist's argument to the contrary, and held that Samsung's license was in force through July 15, 2020, but found a question of fact regarding whether the accused HBM products (which are not at issue in this case) were "Foundry Products," and therefore unlicensed under the terms of the JDLA. *Id.* at 2; *id.*, March 28, 2023 Tr. at 56:4-24, 58:3-60:1. At the *Netlist/Samsung EDTX1* trial, Samsung presented evidence that the accused HBM products are not "Foundry Products," and Netlist failed to rebut this evidence. *Id.*, Trial Tr. at 814:15-820:22. The Court, therefore, granted Samsung's motion for judgment as a matter of law that the accused HBM products are not "Foundry Products," thus confirming that all of Samsung's accused products were fully licensed through July 15, 2020. *Id*. at 1266:4-1267:1.

Accordingly, the Court found that Samsung had a license to Netlist's patents, but relied on the C.D. Cal.'s judgment that the license terminated on July 15, 2020. As summarized below, that judgment has now been reversed, and remanded for further proceedings. *See, e.g.*, Ex. 1 at 8.

### D.     The Ninth Circuit Reversed and Remanded the C.D. Cal.'s Erroneous Decision

On October 17, 2023, the Ninth Circuit issued an order holding that the district court erred in granting summary judgment to Netlist on its breach of contract and license termination claims, reversing the determination that Samsung breached the JDLA, and that those breaches were material.  Ex. 1 at 1-8.  More specifically, the Ninth Circuit held as follows:

1.     "The district court erred in granting Netlist summary judgment on its claim that Samsung violated § 6.2 [the supply provision] of the Joint Development and License Agreement ('JDLA'), because the provision is ambiguous as to whether Samsung's supply obligation is limited to the now-failed joint development project (the 'JDP') or applies more broadly to the parties' overall business relationship."  Ex. 1 at 2.  The Ninth Circuit remanded this claim to allow the "district court to consider in the first instance whether the extrinsic evidence 'creates a genuine issue of material fact' as to the provision's meaning."  *Id.* at 5.

2.     "The district court erred in granting Netlist judgment on its claim that Samsung breached § 3 of the JDLA by erroneously withholding $1.32 million of its $8 million payment to Netlist and paying that sum to the Korean tax authority."  *Id.* at 5-6.  The Ninth Circuit thus "reverse[d] the district court's entry of judgment in Netlist's favor on the § 3 breach of contract claim and remand[ed] with instructions to enter judgment for Samsung."  *Id.* at 6-7.

3.     "The district court erred in granting a declaratory judgment that Netlist properly terminated the JDLA because disputed fact issues precluded summary judgment on the materiality of Samsung's alleged breach of § 6.2."  *Id.* at 7.  The Ninth Circuit remanded the declaratory judgment claim "for further proceedings."  *Id.* at 8.

The remand to C.D. Cal. will address Netlist's continued assertion that Samsung breached § 6.2 of the JDLA and that, as a result, Netlist properly terminated Samsung's license

on July 15, 2020.  Absent a final resolution of whether Netlist validly terminated Samsung's

license, Samsung remains licensed to the Netlist patents asserted here.

## III.    LEGAL STANDARD

The Court "has the inherent power to control its own docket, including the power to stay

proceedings before it." *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-

00011, 2016 WL 1162162, at *1 (E.D. Tex. Mar. 23, 2016).  Exercising this authority is

especially appropriate where issues presented in one action will be resolved in an earlier-filed

action pending in another court.  *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d

721, 728-29 (5th Cir. 1985) (finding it was an abuse of discretion for a Texas district court to

issue a preliminary injunction on an issue overlapping with a contract dispute pending in an

earlier filed New York action); *Wolf Designs, Inc. v. Donald McEvoy Ltd. Inc.*, 341 F. Supp. 2d

639, 642-46 (N.D. Tex. 2004) (entering stay, noting "a stay pending the outcome of litigation in

another court between the same parties, involving the same or controlling issues, is an

appropriate means of avoiding unnecessary waste of judicial resources").

In determining how to manage its docket, the district court "must weigh competing

interests and maintain an even balance." *Customedia Techs. v. Dish Network Corp.*, No. 2:16-

CV-129,2017 WL 3836123. at *1 (E.D. Tex. Aug. 9, 2017) (citing *Landis v. N. Am. Co.*, 299

U.S. 248, 254-55 (1936)); *EchoStar Techs. Corp. v. TiVo, Inc.*, No. 5:05-CV-81, 2006 WL

2501494, at *1 (E.D. Tex. July 14, 2006) ("Essentially, courts determine whether the benefits of

a stay outweigh the inherent costs based on these factors.").  For example, in deciding whether to

stay litigation for a pending appeal in a parallel action, this Court has considered factors such as

"whether a stay will simplify issues in question and trial of the case," "whether a stay will unduly

prejudice or present a clear tactical advantage to the nonmoving party," and "whether discovery

is complete and whether a trial date has been set." *Lochner Techs., LLC v. Lenovo Inc.*, No.

2:10-CV-430-JRG, 2013 WL 12172638, at *1 (E.D. Tex. July 24, 2013).

## IV.    ARGUMENT

The Court should stay this case so that the C.D. Cal. can address whether Samsung continues to be licensed to Netlist's asserted patents, thereby mooting this entire case.  Here, a stay will simplify the issues in question because Samsung maintains that it is fully licensed to Netlist's patents unless Netlist prevails in the remanded C.D. Cal. Case, where it has the burden to prove a material breach of the JDLA; a stay will not unduly prejudice Netlist because it has licensed its patents to others (including Samsung) such that money damages are sufficient; and the stage of this case (e.g., no depositions have occurred yet) weighs in favor of a stay.  Indeed, continuing the present case before the first-filed C.D. Cal. Case resolves Netlist's breach of contract claims would be an abuse of discretion.  *West Gulf*, 751 F.2d at 728-29.

### A.    A Stay Will Simplify, and Likely Eliminate, the Case

A stay will simplify the issues in this case, given the extensive overlap.  Allowing this case to move forward while the parallel C.D. Cal. Case is not fully resolved would require this Court to address the same issues as those pending in California.

Specifically, Samsung's license is an overlapping issue—Samsung has pled a license defense in this case.  *See, e.g.*, Dkt. 145 at 24-27 (Seventh Additional Defense: Express License).  As such, the C.D. Cal.'s resolution of Netlist's claim that the JDLA has been terminated will either eliminate the entire case, or eliminate an affirmative defense (after the date of alleged termination, and pending any appeals).  Indeed, the Court already held in *Netlist/Samsung EDTX1* that Samsung's memory products are licensed up to alleged termination on July 15, 2020.  *Netlist Inc. v. Elecs. Co.*, No. 2:21-CV-463, Dkt. 432 at 2 (E.D. Tex. Apr. 5, 2023).  Thus, the remaining question as to Samsung's license defense is whether products are licensed after the alleged termination.  The JDLA provides that a party may terminate the agreement ████████████

██████████████████████████

███████████████████████████

████████████████████████████████

████████████████████████████████

████████         The C.D. Cal. Case is a case for "Breach of Contract," and seeks declaratory relief as to whether or not Netlist's alleged termination was effective.  *See, e.g.*, *Netlist Inc. v. Samsung Elecs. Co.*, No. 8:20-CV-00993, Dkt. 1 (C.D. Cal. May 28, 2020).  Thus, the issues in the C.D. Cal. Case are exactly the same as those that this Court would have to address in deciding whether Samsung remains licensed, absent a stay.

Needless to say, if the C.D. Cal. agrees with Samsung, then the license would render Netlist's infringement suit moot.  Because the C.D. Cal. Case could resolve this case in its entirety, this Court should stay this action until C.D. Cal. resolves Netlist's allegation that the JDLA was terminated.  In the unlikely event that Netlist prevails, issue preclusion would apply to bar Samsung's license defense for sales after July 15, 2020, again (pending any appeal).  Either way, the most efficient approach is to stay this case.  Indeed, this and other courts have stayed proceedings in similar contexts.  *Lochner*, 2013 WL 12172638, at *1-2 (staying pending an appeal in a parallel action); *Nichia Corp. v. Mary Elle Fashions, Inc.*, No. 2:16-CV-615-JRG, 2016 WL 9558954, at *2 (E.D. Tex. Dec. 22, 2016) (staying pending an appeal involving the same patent); *Astec Am., Inc. v. Power-One, Inc.*, No. 6:07-CV-464, 2008 WL 11441994, at *3 (E.D. Tex. July 15, 2008) (staying pending an appeal involving the same patents); *Trinity Indus., Inc. v. 188 L.L.C.*, No. 3:02-CV-405-H, 2002 WL 1315743, at *3 (E.D. Tex. 2002) (staying pending an appeal dealing with the same contract, noting "[i]t would be inefficient to proceed with this case only to find that the Illinois case was later remanded and that the parties were litigating the same issues in two separate cases"); *see also Stafford v. Rite Aid Corp.*, No. 3:17-

███████████████████████████████████

CV-01340-AJB-JLB, 2020 WL 4366014, at *5 (S.D. Cal. July 30, 2020); *Michael v. Ghee*, 325

F. Supp. 2d 829 (N.D. Ohio 2004).

> **B.     Netlist Is Unlikely To Prove That Samsung Breached the JDLA, or That Any Breach Was Material**

Although the Court need not resolve the likelihood that Netlist will prevail on its claims

in the C.D. Cal. at this stage,[1] Netlist is unlikely to prevail there, meaning that Samsung's license

will continue to remain in effect.  To prevail in the C.D. Cal. Case, Netlist must establish that:

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ meaning

it goes to the root of the agreement.  Netlist is unlikely to prevail on either of these issues, let

alone both.

***First***, as explained in Samsung's Ninth Circuit brief, the extrinsic evidence demonstrates

that Samsung's supply obligation (Ex. 2, § 6.2) was tied to the NVDIMM-P joint-development

---

[1] In its opposition to Samsung's motion to sever, transfer, and stay, Netlist argued that Samsung was required to show a "strong showing that it is likely to succeed on the merits."  Dkt. 21 at 11 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).  However, *Nken* is inapposite because it relates to a stay of enforcement of an order pending the appeal of the legality of that order, ***not*** a stay of one case when a decision in another may profoundly affect the case's outcome, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936), as is the case for the C.D. Cal. Case. Holding otherwise would greatly complicate the stay decision and make this Court analyze the same issues before the C.D. Cal., and preview what it thinks the C.D. Cal. (and a jury there) will do.  Far from saving judicial resources, that would duplicate effort and intrude on the first filed court's authority.  *Cf. West Gulf*, 751 F.2d at 730-31 ("[The first filed action's] Judge Sand was in the better position to know what was needed, if anything, to preserve the status quo, as well as the likelihood of the parties to prevail that underlies issuance or not of a preliminary injunction.").  That is not the point of *Landis*, which authorizes this Court to stay this case when a decision in another case may profoundly affect the outcome here, so long as it does not cause undue prejudice.  As explained below, a stay here has the potential to save the Court, jury, and parties substantial work, while causing Netlist no undue prejudice.

████████████████████████████████████████

project ("JDP").  *See* Ex. 3 at 30-35.  For example, the Ninth Circuit explained several ways in

which, "[r]ead as an integrated whole," the contract supports an interpretation that the supply

obligation was tied to the NVDIMM-P project, including: (1) the stated purposes of the contract

(developing NVDIMM-P product and patent cross-licensing); (2) the title and structure of § 6,

which requires "Supply of Components" for both parties, and ties Netlist's obligations to any

NVDIMM-P controller; and (3) the overall agreement, in which "all other substantive provisions

. . . concern either the JDP or cross-licensing."  Ex. 1 at 3-5.  ████████████████████

████████████████████████████████████████████████

██████████████████

     ***Second***, even if there were a breach, Netlist cannot prove that any such alleged breach

was material—which is required for Netlist to terminate the JDLA.  *See, e.g.*, Ex. 1 at 7-8 (listing

out disputed facts relevant to materiality); Ex. 2, § 13.2.  "Under New York law, for a breach of a

contract to be material, it must 'go to the root of the agreement between the parties.'"  Ex. 1 at 7

(quoting *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)).  The

Ninth Circuit held that factors impacting whether any alleged breach was material hinge on

disputed facts, including whether § 6.2's supply provision (assuming the district court correctly

construed it) was the "centerpiece" of the agreement.  *Id.* at 7-8.  Netlist will not be able to prove

that the supply provision was the "centerpiece" of the agreement.  Indeed, the C.D. Cal. jury's

finding that Netlist suffered no damages from the alleged breach illustrates that the supply

provision was not material.  *See, e.g.*, Ex. 4 (Jury Verdict); Ex. 3 at 47-48 (arguing that a

harmless breach is not material as a matter of law); *id.* at 47-56.

     **C.      Fifth Circuit Law Compels This Court To Stay This Case**

     Not only is a stay advisable in this case, Fifth Circuit law forecloses the business-as-usual

approach to this case that Netlist advances.  In *West Gulf*, the Fifth Circuit held it was an abuse

of discretion for a Texas district court to resolve issues that overlapped with the same contract-related issues presented in an earlier-filed New York case.  751 F.2d at 728-32.

In that case, the first-filed New York action involved petitions to enforce and vacate the decision of panel that interpreted a provision in a union contract.  *Id*. at 723, 728.  The Texas action involved a declaratory and injunctive relief request regarding issues surrounding that same provision.  *Id*. at 728.  Despite the overlap, the Texas court issued a preliminary injunction.  *Id*. at 731.  Under the principals of comity, the Fifth Circuit held that the Texas court "should have stayed, dismissed, or transferred West Gulf's action."  *Id*. at 730.  In so doing, the Fifth Circuit held that the district court abused its discretion "in permitting the Texas action to proceed and in issuing the injunction."  *Id.* n.2.  As the Fifth Circuit explained, "[t]he central point" of the comity analysis "is that it was up to [the New York court] to determine whether an injunction was necessary" and "[i]nevitably the district court's injunction intruded on [the New York court's] authority."  *Id.* at 730-31.

Here, it is beyond dispute that the C.D. Cal. Case relates to whether Samsung breached the JDLA and whether any such breach was material such that Netlist could properly terminate it and deprive Samsung of its license to the asserted patents in this case.  This issue—whether Samsung has continued to hold a license covering the accused products after July 15, 2020—is at the heart of this case, as Samsung's license is a complete defense to Netlist's infringement claims.  *See Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1341-42 (Fed. Cir. 1999).  The C.D. Cal. Case undisputedly pre-dates this action because Netlist filed the C.D. Cal. action on May 28, 2020, two years before initiating this case.  *Netlist Inc. v. Samsung Elecs. Co.*, No. 8:20-CV-00993, Dkt. 1 (C.D. Cal. May 28, 2020).

Due to the significant overlap between this case and the first-filed C.D. Cal. Case, under

Fifth Circuit law, the C.D. Cal. court must address the core issue of Samsung's license defense. The C.D. Cal. judgment finding Netlist terminated the JDLA has been reversed, leaving Samsung licensed, yet Netlist continues to assert that the Samsung is not licensed because the JDLA was terminated.  However, it is up to the C.D. Cal. court to determine whether the JDLA (and Samsung's license) is still in force.  *See West Gulf*, 751 F.2d at 730-31.  A determination of this Court on the validity of the license after July 15, 2020, here risks trampling on the C.D. Cal. court's authority.  Thus, under Fifth Circuit law, this Court must stay the case pending resolution of the C.D. Cal. Case.

**D.      Netlist Would Not Be Unduly Prejudiced by a Stay**

A stay would not unduly prejudice Netlist or present a clear tactical advantage to Samsung.  "[W]hether the patentee will be unduly prejudiced by a stay in the district court proceedings . . . focuses on the patentee's need for an expeditious resolution of its claim." *VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1318 (Fed. Cir. 2014).

Here, Netlist decided to split its claims between two different courts, and cannot claim prejudice from the natural and required result of its decision.  Netlist chose to litigate its contract claims in C.D. Cal. separate from its patent infringement claims in E.D. Tex. (which it filed two years after filing its complaint in the C.D. Cal.).  It is not unduly prejudicial to first allow the resolution of Netlist's contract claims in its chosen forum—which will determine whether Samsung holds a license and therefore has a complete defense to patent infringement—before resolving whether liability attaches in the absence of a license in this Court.  Indeed, Netlist waited until the C.D. Cal. found , in 2021, that Netlist's had terminated Samsung's license ***before*** initiating any patent infringement actions against Samsung in the first place because even Netlist understood that resolution of the JDLA was a predicate to pursuing infringement claims

Money damages are plainly sufficient because Netlist has licensed its patents to others,

including to Samsung.  If Netlist prevails in the C.D. Cal. Case, this case could be re-started (assuming any of its claims survive IPRs) and Netlist could proceed with its claims seeking damages.  Monetary relief will sufficiently compensate Netlist for any purported damages in the (unlikely) event of liability, and a "stay will not diminish the monetary damages to which [Netlist] will be entitled if it succeeds in its infringement suit—it only delays realization of those damages . . . ."  *Virtua/Agility*, 759 F.3d at 1318.  A delay of the vindication of patent rights alone is insufficient to defeat a motion to stay.  *See, e.g.*, *NFC Tech. LLC v. HTC Am., Inc.*, No. 2:13-CV-1058, 2015 WL 1069111, at *2-3 (E.D. Tex. Mar. 11, 2015) (granting stay where "that monetary relief will be sufficient to compensate [the plaintiff] for any injury to its patent rights").

In contrast, Samsung will suffer undue prejudice without a stay by incurring the burden of continuing to defend against infringement allegations to patents to which it ***currently holds a license***.  Without a stay, this case will advance toward trial, and the parties and the Court will continue to invest significant time and resources in preparing the case, including scheduling dozens of depositions in multiple continents.  Moreover, absent a stay, Samsung will have no choice (in order to avoid waiver) but to litigate the same issue that is being litigated in the C.D. Cal.—Samsung's license after July 15, 2020—requiring inefficient and duplicative efforts by the parties, the Court, and the jury, as well as the risk of conflicting rulings.

### E.      The Stage of the Case Weighs in Favor of a Stay

Finally, the stage of the case weighs in favor of a stay (to the extent the Court considers this factor, despite the mandate to stay under *West Gulf*).  Although the parties have exchanged written discovery, no depositions have taken place, and many remain to be scheduled.  In fact, despite Samsung's serving deposition notices over a month ago, Netlist has not provided dates for any of its witnesses.  Further, Netlist has served 24 individual deposition notices on Samsung and has accepted only 3 of the deposition dates offered by Samsung.  Netlist's conduct is not

consistent with that of a party who wishes to complete discovery within the limits provided by the Court.

In any event, at this point, "[t]he most burdensome parts of the case . . . all lie in the future." *Cywee Grp. Ltd. v. Samsung Elecs. Co.*, No. 2:17-CV-140, 2019 WL 11023976, at *1 (E.D. Tex. Feb. 14, 2019). Several months of work remain for the parties and the Court, including ***imminent depositions in multiple continents***, expert reports, and pre-trial motions, which favors granting Samsung's request for a stay. *See, e.g., Norman IP Holdings, LLC v. TP-Link Techs., Co.*, No. 6:13-CV-384, 2014 WL 5035718, at *3 (E.D. Tex. Oct. 8, 2014) ("Courts often find the stage of litigation weighs in favor of a stay if there remains a significant amount of work ahead for the parties and the court, even when the parties and/or the court have already devoted substantial resources to the litigation." (citations omitted)). Under the circumstances, the best course of action is to stay this case before the parties (and the Court) engage in further burdensome discovery and pre-trial efforts.

## V.      CONCLUSION

Accordingly, the Court should stay this case pending resolution of the remanded the C.D. Cal. Case, which will decide whether Samsung is still licensed to Netlist's patents.

Date: October 23, 2023                           Respectfully submitted,

                                                 */s/ Michael J. McKeon*

                                                 Ruffin B. Cordell
                                                 TX Bar No. 04820550
                                                 cordell@fr.com
                                                 Michael J. McKeon
                                                 D.C. Bar No. 459780
                                                 mckeon@fr.com
                                                 Lauren A. Degnan
                                                 D.C. Bar No. 452421
                                                 degnan@fr.com

Brian Livedalen
DC Bar No. 1002699
livedalen@fr.com
Daniel A. Tishman
DC Bar No. 1013923
tishman@fr.com
Christopher Dryer
D.C. Bar No. 1022460
dryer@fr.com
Matthew P. Mosteller
CA Bar No. 324808
mosteller@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 783-5070
Facsimile:  (202) 783-2331

Francis J. Albert
CA Bar No. 247741
albert@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Ste. 400
San Diego, CA  92130
Telephone: (858) 678-5070
Facsimile:  (858) 678-5099

Katherine H. Reardon
NY Bar No. 5196910
kreardon@fr.com
Jonathan B. Bright
GA Bar No. 256953
FISH & RICHARDSON P.C.
1180 Peachtree St., NE, 21st Floor
Atlanta, GA 30309
Telephone: (404) 892-5005
Facsimile:  (404) 892-5002

Kathryn Quisenberry
TX Bar No. 24105639
quisenberry@fr.com
FISH & RICHARDSON P.C.
909 Fannin Street Suite 2100
Houston, TX 77010
Telephone: (713) 654-5300

Thomas H. Reger II
reger@fr.com
Texas Bar No. 24032992
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
Facsimile:  (214) 747-2091

James Huguenin-Love
MN Bar No. 0398706
huguenin-love@fr.com
FISH & RICHARDSON P.C.
60 South 6th Street, Suite 3200
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile:  (612) 288-9696

Karolina Jesien
NY Bar No. 4626180
jesien@fr.com
FISH & RICHARDSON P.C.
7 Times Square, 20th Floor
New York, NY 10036
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

Melissa Richards Smith
melissa@gillamsmith.com
GILLAM & SMITH, LLP
303 South Washington Ave.
Marshall, Texas 75670
Telephone:  (903) 934-8450
Facsimile:   (903) 934-9257

J. Travis Underwood
Texas Bar No. 24102587
travis@gillamsmithlaw.com
GILLAM & SMITH, LLP
102 North College Avenue, Suite 800
Tyler, Texas 75702
Telephone: (903) 934-8450
Facsimile:  (903) 934-9257

Brian R. Nester
DC Bar No. 460225

bnester@cov.com
COVINGTON & BURLING LLP
One CityCenter 850 Tenth Street, N
Washington, DC 20001-4956
Telephone: (202)-662-6000

Alice J. Ahn
CA Bar No. 271399/DC Bar No. 1004350
aahn@cov.com
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone:  (415) 591-7091
Facsimile:   (415) 955-6571

*Attorneys for Defendants Samsung Electronics
Co., Ltd.; Samsung Electronics America, Inc.; and
Samsung Semiconductor, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5 on October 23, 2023. As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A) and by electronic mail.

*/s/ Michael J. McKeon*

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rules CV-7(h) and (i), counsel for the parties met and conferred on October 18, 2023, October 20, 2023, and October 23, 2023. On October 23, 2023, Sam Baxter participated for Plaintiff; Ruffin Cordell participated for Defendants. The parties discussed their positions on this motion. At the time of the call, Netlist did not agree to stay the case, and indicated that the motion is opposed.

*/s/ Michael J. McKeon*

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I certify that the following document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

*/s/ Michael J. McKeon*

EXHIBIT 7

| | |
|---|---|
| **From:** | Ahn, Alice |
| **To:** | Sheasby, Jason; #Netlist-Samsung-D.Del; Zhong, Annita; Lindsay, Jonathan; Emily DiBenedetto; Karen Keller; Tezyan, Michael; Nathan R. Hoeschen; Werner, Tom; Zhao, Yanan; Kahn, David |
| **Cc:** | Samsung-Netlist-COV; Jack; Rodger |
| **Subject:** | Samsung Elecs. Co., Ltd. v. Netlist Inc., 1:23-cv-01122-RGA (D. Del.) |
| **Date:** | Tuesday, October 31, 2023 3:58:23 PM |
| **Attachments:** | image001.png |

Counsel,

Samsung would not oppose staying Netlist's deadline for responding to Samsung's complaint in *Samsung Elecs. Co., Ltd. v. Netlist, Inc.,* 1:23-cv-01122-RGA (D. Del.) pending resolution of *Netlist, Inc. v. Samsung Elecs. Co., Ltd.,* No. 8:20-cv-00993-MCS (C.D. Cal.). Please let us know Netlist's position on this issue.

**Alice Ahn**

Covington & Burling LLP
Salesforce Tower, 415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T +1 415 591 7091 | aahn@cov.com
www.cov.com

EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **NETLIST, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **SAMSUNG ELECTRONICS CO., LTD.,** | ) | |
| **SAMSUNG ELECTRONICS AMERICA,** | ) | |
| **INC., SAMSUNG SEMICONDUCTOR,** | ) | Civil Action No.2:21-cv-463 |
| **INC.** | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

1.      Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, for its Complaint against defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Semiconductor, Inc. ("SSI") (collectively, "Samsung" or "Defendants"), states as follows, with knowledge as to its own acts, and on information and belief as to the acts of others:

2.      This action involves three of Netlist's patents: U.S. Patent Nos. 10,860,506 (the "'506 Patent," Ex. 1), 10,949,339 (the "'339 Patent," Ex. 2), and 11,016,918 (the "'918 Patent," Ex. 3) (collectively, the "Patents-in-Suit").

I.     **THE PARTIES**

3.      Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Drive, Suite 100, Irvine, CA 92617.

4.      On information and belief, SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi, 16677, Republic of Korea.  On information and belief, SEC is the worldwide parent corporation for SEA and SSI, and is responsible for the infringing activities identified in this complaint.  On information and belief, SEC's Device Solutions division is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, SEC is also involved in the design, manufacture, and provision of products sold by SEA.

5.      On information and belief, SEA is a corporation organized and existing under the laws of the State of New York.  On information and belief, SEA, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  Defendant SEA maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  SEA may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  SEA is a wholly owned subsidiary of SEC.

6.      On information and belief, SSI is a corporation organized and existing under the laws of the State of California.  On information and belief, SSI, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined

below. Defendant SSI maintains facilities at 6625 Excellence Way, Plano, Texas 75023. Defendant SSI may be served with process through its registered agent National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136. On information and belief, SSI is a wholly owned subsidiary of SEA.

7.     On information and belief, Defendants have used, sold or offered to sell products and services, including the Accused Instrumentalities, in this judicial district.

## II.     <u>JURISDICTION AND VENUE</u>

8.     Subject matter jurisdiction is based on 28 U.S.C. § 1338, in that this action arises under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*).

9.     Each Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

10.     Personal jurisdiction exists generally over the Defendants because each Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Eastern District of Texas. Personal jurisdiction also exists over each Defendant because each, directly or through subsidiaries, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products within the State of Texas and the Eastern District of Texas that infringe one or more claims of the Patents-in-Suit. Further, on information and belief, Defendants have placed or contributed to placing infringing products into the stream of commerce knowing or understanding that such products would be sold and used in the United States, including in this District.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b). For example, SEC maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district. As another example, SEA maintains a regular and established place of

business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district. Venue is also proper for SSI because it maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.

12. Defendants have not contested proper venue in this District. *See, e.g.*, Answer at ¶ 10, *Arbor Global Strategies LLC v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-333, Dkt. 43 (E.D. Tex. Apr. 27, 2020); Answer at ¶ 29, *Acorn Semi, LLC v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-347, Dkt. 14 (E.D. Tex. Feb. 12, 2020).

## III.   FACTUAL ALLEGATIONS

### Background

13. Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies. Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets. Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time. These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.

14. Netlist has a long history of being the first to market with disruptive new products such as the first load-reduced dual in-line memory module ("LR-DIMM"), HyperCloud®, based on Netlist's distributed buffer architecture later adopted by the industry for DDR4 LRDIMM. Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM. These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via quad-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

15.     Generally speaking, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs).  The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system.  A memory module is typically installed into a memory slot on a computer motherboard.

16.     Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.  The structure, function, and operation of memory modules is defined, specified, and standardized by the JEDEC Solid State Technology Association ("JEDEC"), the standard-setting body for the microelectronics industry.  Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR5, DDR4, DDR3) and the type of module (*e.g.*, RDIMM, LRDIMM).

## The Asserted Netlist Patents

### The '506 Patent

17.     The '506 Patent is entitled "Memory Module With Timing-Controlled Data Buffering."  Netlist owns the '506 Patent by assignment from the listed inventors Hyun Lee and Jayesh R. Bhakta.  The '506 Patent was filed as Application No. 16/391,151 on April 22, 2019, issued as a patent on December 8, 2020, and claims priority to, among others, a utility application filed on July 27, 2013 (No. 13/952,599) and a provisional application filed on July 27, 2012 (No. 61/676,883).

18.     Samsung had knowledge of the '506 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket.

19.     As described in the '506 Patent, in conventional memory modules, the "distribution of control signals and a control clock signal in the memory module is subject to strict constraints"

- 5 -

to ensure that memory devices on the memory module can be properly accessed. Ex. 1 at 2:16-17. For example, in some conventional memory modules, "control wires are routed so there is an equal length to each memory component, in order to eliminate variation of the timing of the control signals and the control clock signal between different memory devices in the memory modules." *Id.* at 2:20-24. But as noted in the '506 Patent, "[t]he balancing of the length of the wires to each memory devices compromises system performance, limits the number of memory devices, and complicates their connections." *Id.* at 2:24-27. In yet other conventional memory systems, the memory controller includes mechanisms for compensating for unbalanced wire lengths on the memory module. *Id.* at 2:30-32. However, with increasing memory operating speed and memory density "such leveling mechanisms are also insufficient to ensure proper timing of the control and/or data signals received and/or transmitted by the memory modules." *Id.* at 2:32-36.

20. The '506 Patent discloses a memory module operable in a memory system with a memory controller that includes memory devices, a module control circuit, and a plurality of buffer circuits coupled between respective sets of data signal lines in a data bus and respective sets of the memory devices. As summarized in the Abstract, "[e]ach respective buffer circuit is configured to receive the module control signals and the module clock signal, and to buffer a respective set of data signals in response to the module control signals and the module clock signal. Each respective buffer circuit includes a delay circuit configured to delay the respective set of data signals by an amount determined based on at least one of the module control signals." *Id.*, Abstract.

21. The buffer circuits (118, highlighted below) are associated with respective groups of memory devices and are distributed across the memory module at positions corresponding to the respective groups of memory devices as illustrated in the exemplary configuration of Figure 2A.



FIG. 2A

'506 Patent, Figure 2A. However, because the buffer circuits—or "isolation devices"—are distributed across the memory module, at high speeds of operation, the same set of module control signals may reach different buffer circuits at different times across one cycle of the system clock. *Id.* at 9:51-62 ("Because the isolation devices 118 are distributed across the memory module 110, during high speed operations, it may take more than one clock cycle time of the system clock MCK for the module control signals to travel along the module control signals lines 230 from the module control device 116 to the farthest positioned isolation devices 118, such as isolation device ID-1 and isolation device ID-(n−1) in the exemplary configuration shown in FIG. 2."). The '506 Patent discloses an embodiment wherein "each isolation devices includes signal alignment circuits that determine, during a write operation, a time interval between a time when one or more module control signals are received from the module control circuit 116 and a time when a write strobe or write data signal is received from the MCH 101. This time interval is used during a subsequent read operation to time the transmission of read data to the MCH 101, such that the read data follows a read command by a read latency value associated with the system 100." *Id.* at 10:11-21.

**The '339 Patent**

22.     The '339 Patent is entitled "Memory Module With Controlled Byte-Wise Buffers." Netlist owns the '339 Patent by assignment from the listed inventors Hyun Lee and Jayesh R. Bhakta.  The '339 Patent was filed as Application No. 15/470,856 on March 27, 2017, issued as a patent on March 16, 2021, and claims priority to U.S. Patent Application No. 12/504,131 filed on July 16, 2009, U.S. Patent Application No. 12/761,179 filed on April 15, 2010 and U.S. Application No. 13/970,606 filed on August 20, 2013.

23.     Samsung had knowledge of the '339 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket.

24.     As described in the '339 Patent, in optimizing performance of memory subsystems (e.g. memory modules) "consideration is always given to memory density, power dissipation (or thermal dissipation, speed, and cost."  Ex. 2 at 2:5-7.   The '339 Patent further explains that "[g]enerally, these attributes are not orthogonal to each other, meaning that optimizing one attribute may detrimentally affect another attribute. For example, increasing memory density typically causes higher power dissipation, slower operational speed, and higher costs." *Id.* at 2:7-12.  The '339 Patent is generally directed to a memory module optimized to reduce the load experienced by a system memory controller via the use of configurable data transmission circuits.

25.     The '339 Patent discloses a memory module configured to communicate with a memory controller that includes DDR DRAM devices arranged in multiple ranks each of the same width as the memory module, and a module controller configured to receive and register input control signals for a read or write operation from the memory controller and to output registered address and control signals.  As summarized in the Abstract, "[t]he registered address and control signals selects one of the multiple ranks to perform the read or write operation. The module controller further outputs a set of module control signals in response to the input address and

control signals. The memory module further comprises a plurality of byte-wise buffers controlled by the set of module control signals to actively drive respective byte-wise sections of each data signal associated with the read or write operation between the memory controller and the selected rank." *Id.*, Abstract.

26. Figure 3A illustrates an example of a memory subsystem consistent with embodiments disclosed in the '339 patent.



**FIG. 3A**

'339 Patent, Figure 3A. As shown above, Figure 3A depicts a memory subsystem 400 including memory modules 402 comprising memory devices 412, data transmission circuits 416 (highlighted above), and module control circuits 430. The data transmission circuits 416 operate to reduce the load experienced by the memory controller 420 to improve performance of a read or write operation. *Id.* at 17:14-44 ("Referring again to FIG. 3A, when the memory controller 420 executes read or write operations, each specific operation is targeted to a specific one of the ranks A, B, C, and D of a specific memory module 402. The data transmission circuit 416 on the specifically

targeted one of the memory modules 402 functions as a bidirectional repeater/multiplexor, such that it drives the data signal when connecting from the system memory controller 420 to the memory devices 412. The other data transmission circuits 416 on the remaining memory modules 402 are disabled for the specific operation. . . . Thus, the memory controller 420, when there are four four-rank memory modules, sees four load-reducing switching circuit loads, instead of sixteen memory device loads. The reduced load on the memory controller 420 enhances the performance and reduces the power requirements of the memory system . . . ."). In certain embodiments, "the data transmission circuit 416 comprises or functions as a byte-wise buffer. In certain such embodiments, each of the one or more data transmission circuits 416 has the same bit width as does the associated memory devices 412 per rank to which the data transmission circuit 416 is operatively coupled." *Id.* at 13:31-36.

**The '918 Patent**

27. The '918 Patent is entitled "Flash-DRAM Hybrid Memory Module." Netlist owns the '918 Patent by assignment from the listed inventors Chi-She Chen, Jeffrey C. Solomon , Scott H. Milton, and Jayesh Bhakta. The '918 Patent was filed as Application No. 17/138,766 on December 30, 2020, issued as a patent on May 25, 2021, and claims priority to, among others, U.S. Application No. 13,559,476 filed on July 26, 2012, U.S. Application No. 12/240,916 filed on September 29, 2008, and U.S. Application No. 12/131,873 filed on June 2, 2008 as well as to two provisional applications, filed on June 1, 2007 (No. 60/941,586) and July 28, 2011 (No. 61/512,871).

28. Samsung had knowledge of the '918 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket via notice of U.S. Patent Application No. 12/240,916 and U.S. Patent Application No. 12/131,873 on August 2, 2021.

29.     As summarized in the Abstract, the '918 Patent discloses a memory module that includes a printed circuit board with an interface that couples it to a host system for provision of power, data, address and control signals, and additionally features "[f]irst, second, and third buck converters [that] receive a pre-regulated input voltage and produce first, second and third regulated voltages. A converter circuit reduces the pre-regulated input voltage to provide a fourth regulated voltage. Synchronous dynamic random access memory (SDRAM) devices are coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, and a voltage monitor circuit monitors an input voltage and produces a signal in response to the input voltage having a voltage amplitude that is greater than a threshold voltage." Ex. 3, Abstract.

30.     The '918 Patent discloses, *inter alia*, a power module that provides power to various components of the memory system as depicted in Figure 16, shown below.



FIG. 16

31.     The '918 Patent explains that "[t]he power module 1100 provides a plurality of voltages to the memory system 1010 comprising non-volatile and volatile memory subsystems

1030, 1040. The plurality of voltages comprises at least a first voltage 1102 and a second voltage 1104. The power module 1100 comprises an input 1106 providing a third voltage 1108 to the power module 1100 and a voltage conversion element 1120 configured to provide the second voltage 1104 to the memory system 1010. The power module 1100 further comprises a first power element 1130 configured to selectively provide a fourth voltage 1110 to the conversion element 1120. In certain embodiments, the first power element 1130 comprises a pulse-width modulation power controller." *Id.* at 28:3-15. "The conversion element 1120 can comprise one or more buck converters and/or one or more buck-boost converters." *Id.* at 29:18-19.

32.     Relatedly, on December 10, 2021, the United States Patent and Trademark Office issued a Notice of Allowance for the pending claims of Application No. 17/138,019, a continuation of the '918 Patent. *See* Ex. 4 (allowed claims of App. No. 17/138,019). Netlist intends to assert the allowed claims of App. No. 17/138,019 upon issuance against Samsung.

33.     The inventions of the '918 Patent and App. No. 17/138,019 provide for the effective operation of DDR5 memory modules, by enabling, among other benefits, greater power efficiency than previous generations of DDR technology. The DDR5 standard is characterized by the use of an on-module power management system. Samsung itself notes "[t]he on-DIMM PMIC further boosts power management efficiency and power supply stability." Ex. 12 at 5.

### Samsung's Infringing Activities

34.     Samsung is a global technology company that manufactures semiconductor memory products such as DRAM, NAND Flash and MCP (Multi-Chip Package). Samsung develops, manufactures, sells and imports into the United States memory components and memory modules designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.

35.    Samsung was a licensee of Netlist until July 15, 2020.  *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 20-cv-993, Dkt. 186 at 20-21 (C.D. Cal. Oct. 14, 2021).  Immediately after Samsung's license was deemed terminated, Samsung filed an improper declaratory judgment action in the District of Delaware concerning unrelated patents directed at different aspects of memory module technology than the patents in the present suit.  *See Samsung Elecs. Co., Ltd. et al v. Netlist, Inc.*, No. 21-cv-1453, Dkt. 1 (D. Del. Oct. 15, 2021).  Netlist has moved to dismiss each count of Samsung's declaratory judgment complaint in Delaware.

36.    On information and belief, Samsung makes, uses, sells, offers to sell, and/or imports within this District and elsewhere in the United States, without authority, infringing DDR4 LRDIMMs, DDR5 LRDIMMs, DDR5 RDIMMs, DDR5 SODIMMs, DDR5 UDIMMs, and other products that have materially the same structures and designs in relevant parts (the "Accused Instrumentalities").

37.    The accused DDR4 LRDIMMs include, without limitation, any Samsung DDR4 LRDIMM products made, sold, used and/or imported into the United States by Samsung.  By way of non-limiting example, the accused DDR4 LRDIMMs products include, Samsung products having the following part numbers:  M386A4K40BB0-CRC, M386A8K40BM1-CRC, M386A8K40BM2-CTD, M386A8K40BMB-CRC, M386A8K40CM2-CRC, M386A8K40CM2-CTD, M386A8K40CM2-CVF, M386A8K40DM2-CTD, M386A8K40DM2-CVF, M386A8K40DM2-CWE, M386AAG40AM3-CWE, M386AAG40MM2-CVF, M386AAG40MMB-CVF, M386AAK40B40-CUC, M386AAK40B40-CWD, M386ABG40M50-CYF, M386ABG40M51-CAE, M386ABG40M5B-CYF.  Further examples of Samsung's DDR4 LRDIMM products can be found via Samsung's module-selector web page. *See Module: Memory Modules For Extensive Use*, Samsung, *available at* https://www.samsung.com/semiconductor/dram/module.

38.     As further example, the Accused Instrumentalities include, without limitation, any Samsung DDR5 LRDIMM and DDR5 RDIMM products made, sold, used and/or imported into the United States by Samsung that are JEDEC-standard compliant memory modules.  By way of non-limiting example, the accused DDR5 LRDIMM and DDR5 RDIMM products include products marketed and publicized in an October 12, 2021 Samsung Press release, as shown below.



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).



*Id.* at 3 (depiction of a Samsung DDR5 RDIMM).

## IV.     FIRST CLAIM FOR RELIEF – '506 PATENT

39.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

40.     On information and belief, Samsung directly infringed and is currently infringing at least one claim of the '506 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts.  For example, and as shown below, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts infringe at least claim 1 of the '506 Patent.[1]

41.     For example, to the extent the preamble is limiting, each of the accused DDR4 LRDIMMs comprise a memory module operable in a computer system to communicate with a memory controller of the computer system via a memory bus including control and address (C/A) signal lines and a data bus.  As an example, Samsung's website markets and contains datasheets for the accused DDR4 LRDIMMs.



## LRDIMM

**Load Reduced DIMM**

- Include a register for enhancing clock,
  command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

42.     Ex. 6 at 2 (depiction of a Samsung DDR4 LRDIMM).  Each LRDIMM includes "a register for enhancing clock, command and control signals" as well as data buffers for "[e]nhanced

---

[1] The theories set forth herein are based on Netlist's present understanding of the Samsung Accused Instrumentalities. Netlist reserves the right to supplement or amend these contentions as permitted by the Local Rules and any Orders of the Court as discovery progresses.  Further, Netlist's contentions contain images and examples illustrating Netlist's infringement theories. As such, the images and examples are not intended, and should not be read, as narrowing or limiting the scope of these contentions.

data signal." *Id.* It communicates with a server's memory controller via control and address signal

lines in a memory bus as well as a data bus. For example:

| Pin Name | Description | Pin Name | Description |
|---|---|---|---|
| A0–A17[1] | Register address input | SCL | I2C serial bus clock for SPD/TS and register |
| BA0, BA1 | Register bank select input | SDA | I2C serial bus data line for SPD/TS and register |
| BG0, BG1 | Register bank group select input | SA0–SA2 | I2C slave address select for SPD/TS and register |
| RAS_n[2] | Register row address strobe input | PAR | Register parity input |
| CAS_n[3] | Register column address strobe input | VDD | SDRAM core power supply |
| WE_n[4] | Register write enable input | VPP | SDRAM activating power supply |
| CS0_n, CS1_n, CS2_n, CS3_n | DIMM Rank Select Lines Input | VREFCA | SDRAM command/address reference supply |
| CKE0, CKE1 | Register clock enable lines input | VSS | Power supply return (ground) |
| ODT0, ODT1 | Register on-die termination control lines input | VDDSPD | Serial SPD/TS positive power supply |
| ACT_n | Register input for activate input | ALERT_n | Register ALERT_n output |
| DQ0–DQ63 | DIMM memory data bus | RESET_n | Set Register and SDRAMs to a Known State |
| CB0–CB7 | DIMM ECC check bits | EVENT_n | SPD signals a thermal event has occurred |
| DQS0_t– DQS17_t | Data Buffer data strobes (positive line of differential pair) | VTT | SDRAM I/O termination supply |
| DQS0_c– DQS17_c | Data Buffer data strobes (negative line of differential pair) | RFU | Reserved for future use |
| CK0_t, CK1_t | Register clock input (positive line of differential pair) | | |
| CK0_c, CK1_c | Register clocks input (negative line of differential pair) | | |

NOTE :
1. Address A17 is only valid for 16 Gb x4 based SDRAMs.
2. RAS_n is a multiplexed function with A16.
3. CAS_n is a multiplexed function with A15.
4. WE_n is a multiplexed function with A14.

Ex. 7 (M386AAK40B40 Datasheet) at 6.





*Id.* at 10 (red lines in original).

43.     The accused DDR4 LRDIMMs further each comprise a module board having edge connections to be coupled to respective signal lines in the memory bus, as illustrated in the examples below.



Ex. 6 at 2 (depiction of a Samsung DDR4 LRDIMM); *see also* Ex. 7 (M386AAK40B40 Datasheet) at 42.

44.     The accused DDR4 LRDIMMs further each comprise a module control device on the module board configurable to receive input C/A signals corresponding to a memory read operation via the C/A signal lines and to output registered C/A signals in response to the input C/A signals and to output module control signals, as illustrated in the example below.





Ex. 7 (M386AAK40B40 Datasheet) at 10; *see also id.* at 42.



*Id.* at 11-12.

45. The accused DDR4 LRDIMMs also each include memory devices arranged in multiple ranks on the module board and coupled to the module control device (*e.g.*, RCD) via module C/A signal lines that conduct the registered C/A signals, as illustrated in the examples below.

### 9.1  128GB, 16Gx72 Module
### (Populated as 2 physical ranks / 4 logical ranks of x4 DDR4 SDRAM



*Id.* at 10; *see also id.* at 42.

46.    In each accused DDR4 LRDIMM's memory devices, the registered C/A signals cause a selected rank of the multiple ranks to perform the memory read operation by outputting read data and read strobes associated with the memory read operation, and a first memory device in the selected rank is configurable to output at least a first section of the read data and at least a

first read strobe.  For example, each accused DDR4 LRDIMM follows the timing sequence for a

READ command shown below.



Ex. 9 (JEDEC JESD82-32A Standard), at 14 (annotated); *see also*, *e.g.*, Ex. 8 (M386A8K40BM1

Datasheet) at 11-12 (functional block for a representative product).



Ex. 8 (M386A8K40BM1 Datasheet) at 11-12.

47.     The accused DDR4 LRDIMMs further each include data buffers on the module board and coupled between the edge connections and the memory devices, wherein a respective data buffer of the data buffers is coupled to at least one respective memory device in each of the multiple ranks and is configurable to receive the module control signals from the module control device, as illustrated below.



Ex. 6 at 2 (depiction of a Samsung DDR4 LRDIMM).



Ex. 8 (M386A8K40BM1 Datasheet) at 11-12 (annotated to illustrate data buffers coupled between the plurality of 72-bit wide ranks and the 72-bit wide data bus).

48. In each accused DDR4 LRDIMM, a first data buffer on the data buffers is coupled to the first memory device and is configurable to, in response to one or more of the module control signals: delay the first read strobe by a first predetermined amount to generate a first delayed read strobe; sample the first section of the read data using the first delayed read strobe; and transmit the first section of the read data to a first section of the data bus; wherein the first predetermined amount is determined based at least on signals received by the first data buffer during one or more previous operations. For example, the strobes MDQSO_t and MDQSO_c are delayed by a variable delay circuitry and produce DQS0_t, DQS1_t and DQS0_c, DQS1_c. The predetermined amount of delay is determined based on training.



Ex. 7 (M386AAK40B40 Datasheet) at 11-12.

49. On information and belief, Samsung also indirectly infringes the '506 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States. For example, on information

and belief, Samsung has induced, and currently induces, the infringement of the '506 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR4 LRDIMM and other materially similar products that infringe the '506 Patent. On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR4 LRDIMM products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

50. On information and belief, Samsung also indirectly infringes the '506 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '506 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR4 LRDIMM and other materially similar products that infringe the '506 Patent. On information and belief, the accused DDR4 LRDIMM products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Samsung is aware that the product or process that includes the accused DDR4 LRDIMM and other materially similar products would be covered by one or more claims of the '506 Patents. On information and belief, the use of the product or process that includes the accused DDR4 LRDIMM and other materially similar products infringes at least one claim of the '506 Patent.

51. Samsung's infringement of the '506 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '506 Patent since at least August 2, 2021. Samsung's infringement of the '506 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement,

and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## V.    SECOND CLAIM FOR RELIEF – '339 PATENT

52.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

53.    On information and belief, Defendants directly infringed and are currently infringing at least one claim of the '339 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts.   For example and as shown below, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts infringe at least claim 1 of the '339 Patent.

54.    For example, to the extent the preamble is limiting, each of the accused DDR4 LRDIMMs comprise a N-bit-wide memory module (*e.g.*, 72-bit-wide) mountable in a memory socket of a computer system and configurable to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, each set of data signal lines is a byte wide.   For instance, each LRDIMM includes "a register for enhancing clock, command and control signals" as well as data buffers for "[e]nhanced data signal."   Ex. 6 at 2.   It communicates with a server's memory controller via control and address signal lines in a memory bus as well as a data bus.



# LRDIMM

**Load Reduced DIMM**

- Include a register for enhancing clock, command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

*Id.* at 2 (depiction of a Samsung DDR4 LRDIMM).

55.    In the configuration above, there are 9 sets of byte-wide data signal lines for a 72-bit wide data signal lines.  For example:



Ex. 8 (M386A8K40BM1 Datasheet) at 11-12.

- 28 -

## 9.1 128GB, 16Gx72 Module
## (Populated as 2 physical ranks / 4 logical ranks of x4 DDR4 SDRAM



Ex. 7 (M386AAK40B40 Datasheet) at 10; *see also id.* at 42.

56.     The accused DDR4 LRDIMMs each comprise a printed circuit board (PCB) having

an edge connector comprising a plurality of electrical contacts which are positioned on an edge of

the PCB and configured to be releasably coupled to corresponding contacts of the memory socket.

For example:



**LRDIMM**

**Load Reduced DIMM**

- Include a register for enhancing clock, command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

Edge connector

Ex. 6 at 2 (depiction of a Samsung DDR4 LRDIMM).

57.     The accused DDR4 LRDIMMs each include double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks.  As shown above, each DDR4 LRDIMM module includes 9 ranks of memory devices.

58.     The accused DDR4 LRDIMMs further comprise a module controller (such as a register clock driver, RCD) coupled to the PCB and operatively coupled to the DDR DRAM devices.  For example:



Ex. 7 (M386AAK40B40 Datasheet) at 10; *see also id.* at 42.

59.     The module controller is configurable to receive from the memory controller via the address and control signal lines (e.g., red lines above) input address and control signals for a

memory write operation to write N-bit-wide write data from the memory controller into a first N-bit-wide rank of the multiple N-bit-wide ranks, and to output registered address and control signals in response to receiving the input address and control signals, wherein the registered address and control signals cause the first N-bit-wide rank to perform the memory write operation (when BCOM [3:0] is 1000) by receiving the N-bit-wide write data, wherein the module controller is further configurable to output module control signals in response to at least some of the input address and control signals. For example, a Write burst operation results in a burst of data and data strobes received by the DDR4 LRDIMM via the DQS/DQ pins of the memory bus, and to write the data via data buffers into a memory device as determined by input address and control signal (e.g., CS signal).

### 4.25.5 Write Burst Operation

The following write timing diagram is to help understanding of each write parameter's meaning and just examples. The details of the definition of each parameter will be defined separately.
In these write timing diagram, CK and DQS are shown aligned and also DQS and DQ are shown center aligned for illustration purpose.



NOTE 1  BL = 8, WL = 9, AL = 0, CWL = 9, Preamble = 1tCK
NOTE 2  DIN n = data-in to column n.
NOTE 3  DES commands are shown for ease of illustration; other commands may be valid at these times.
NOTE 4  BL8 setting activated by either MR0[A1:A0 = 0:0] or MR0[A1:A0 = 0:1] and A12 = 1 during WRITE command at T0.
NOTE 5  CA Parity = Disable, CS to CA Latency = Disable, Write DBI = Disable.

**Figure 128 — WRITE Burst Operation WL = 9 (AL = 0, CWL = 9, BL8)**

*See, e.g.*, Ex. 10 (JESD79-4C DDR4 SDRAM Standard), at 122.

4.24.2 READ Burst Operation (cont'd)



NOTE 1 BL = 8, RL = 11 (CL = 11, AL = 0), Read Preamble = 1tCK, WL =9 (CWL = 9, AL = 0), Write Preamble = 1tCK

NOTE 2 DOUT n = data-out from column n, DIN b = data-in to column b.

NOTE 3 DES commands are shown for ease of illustration; other commands may be valid at these times.

NOTE 4 BL8 setting activated by either MR0[A1:A0 = 0:0] or MR0[A1:A0 = 0:1] and A12 = 1 during READ command at T0 and WRITE command at T8.

NOTE 5 CA Parity = Disable, CS to CA Latency = Disable, Read DBI = Disable, Write DBI = Disable, Write CRC = Disable.

**Figure 98 — READ (BL8) to WRITE (BL8) with 1tCK Preamble in Same or Different Bank Group**

*See, e.g.*, *id.* at 105 (annotated) (showing burst operations used by various ranks in the Accused

Instrumentality).



Ex. 8 (M386A8K40BM1 Datasheet) at 11-12.

## 9.1 128GB, 16Gx72 Module
### (Populated as 2 physical ranks / 4 logical ranks of x4 DDR4 SDRAM



Ex. 7 (M386AAK40B40 Datasheet) at 10; *see also id.* at 42.

60.    Further, as illustrated above and below, the accused DDR4 LRDIMMs also each comprise a plurality of byte-wise buffers coupled to the PCB and configured to receive the module control signals, wherein each respective byte-wise buffer of the plurality of byte-wise buffers has a first side configured to be operatively coupled to a respective set of data signal lines, a second

side that is operatively coupled to at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks via respective module data lines, and a byte-wise data path between the first side and the second side, wherein the each respective byte-wise buffer is disposed on the PCB at a respective position corresponding to the respective set of the plurality of sets of data signal lines.



Figure 3 — LRDIMM Topologies

Ex. 11 (JEDEC 21C Standard), at 4.20.27-17.

61.     In each of the accused DDR4 LRDIMMs, the each respective byte-wise buffer further includes logic configurable to control the byte-wise data path in response to the module control signals and the byte-wise data path includes first tristate buffers, and the logic in response to the module control signals is configured to enable the first tristate buffers to drive the respective byte-wise section of the N-bit wide write data to the respective module data lines during the first time period.  For example:

4.61   Logic Diagram



Figure 15 — Logic Diagram

Ex. 9 (JESD82-32A Standard), at 95.

62.     The MDQ/MDQS driver can be disabled or enabled based on DRAM Interface MDQ Driver control word, such as DA[3:0] = 0xxx (enabled) and 1xxx (disabled).

63.     In each of the accused DDR4 LRDIMMs, the byte-wise data path is enabled for a first time period in accordance with a latency parameter to actively drive a respective byte-wise section of the N-bit wide write data associated with the memory operation from the first side to the second side during the first time period.  For example:



*Id.* at 13.



**Figure 56 — tPDM_WR Latency Measurement**

*Id.* at 165.

Table 146 — WRITE Output Timings

| Parameter | Symbol | DDR4-1600/ 1866/2133 | | DDR4-2400/ 2666 | | DDR4- 2933 | | DDR4-3200 | | Units | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Min | Max | Min | Max | Min | Max | Min | Max | | |
| **Data Timing** | | | | | | | | | | | |
| tDVB | Data valid before MDQS | 0.38 | - | 0.36 | - | 0.36 | - | 0.36 | - | UI | |
| tDVA | Data valid after MDQS | 0.38 | - | 0.36 | - | 0.36 | - | 0.36 | - | UI | |
| **Data Strobe Timing** | | | | | | | | | | | |
| MDQS_t - MDQS_c differential output low time | tMQSL | 0.46 | - | 0.46 | - | 0.46 | - | 0.46 | - | tCK | 1, 3 |
| MDQS_t - MDQS_c differential output high time | tMQSH | 0.46 | - | 0.46 | - | 0.46 | - | 0.46 | - | tCK | 2, 3 |

Unit  UI = tCK(avg).min/2
NOTE 1: tMQSL describes the instantaneous differential output low pulse width on MDQS_t - MDQS_c, as measured from on falling edge to the next consecutive rising edge
NOTE 2: tMQSH describes the instantaneous differential output high pulse width on MDQS_t - MDQS_c, as measured from on rising edge to the next consecutive falling edge
NOTE 3: The specification values are affected by the amount of clock jitter applied (i.e. tJIT(per), tJIT(cc), etc.). However, these parameters should be met whether clock jitter is present or not.

*Id.* at 169.

64.     On information and belief, Samsung also indirectly infringes the '339 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '339 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR4 LRDIMM products and other materially similar products that infringe the '339 Patent.  On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR4 LRDIMM products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

65.     On information and belief, Samsung also indirectly infringes the '339 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on

information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '339 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR4 LRDIMM products and other materially similar products that infringe the '339 Patent. On information and belief, the accused DDR4 LRDIMM and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Samsung is aware that the product or process that includes the accused DDR4 LRDIMM products and other materially similar products would be covered by one or more claims of the '339 Patent. On information and belief, the use of the product or process that includes the accused DDR4 LRDIMM products infringes at least one claim of the '339 Patent.

66.    Samsung's infringement of the '339 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '339 Patent since at least August 2, 2021. Samsung's infringement of the '339 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VI.    THIRD CLAIM FOR RELIEF – '918 PATENT

67.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

68.    On information and belief, Defendants directly infringed and are currently infringing at least one claim of the '918 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR5 LRDIMMs, DDR5 RDIMMs, DDR5 SODIMMs, DDR5 UDIMMs, and other products with materially the same structures in relevant parts. For example, and as

shown below, the accused DDR5 memory modules and other products with materially the same structures in relevant parts infringe at least one claim of the '918 patent.

69. For example, the accused DDR5 products comprise a memory module comprising: a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system, as illustrated below.



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).



*Id.* at 3 (depiction of a Samsung DDR5 RDIMM).

70.     The accused DDR5 products further comprise a first buck converter configured to provide a first regulated voltage having a first voltage amplitude; a second buck converter configured to provide a second regulated voltage having a second voltage amplitude; a third buck converter configured to provide a third regulated voltage having a third voltage amplitude; and a converter circuit configured to provide a fourth regulated voltage having a fourth voltage amplitude.  For example, Samsung notes on its web site that its DDR5 modules include an "on-DIMM PMIC" that "further boosts power management efficiency and power supply stability." Ex. 12 at 5; *see also* Ex. 13 at 2 ("One major design improvement to the newest generation DRAM solution involves integrating the PMIC into the memory module — previous generations placed the PMIC on the motherboard — offering increased compatibility and signal integrity, and providing a more reliable and sustained performance.").

71.     Samsung's PMIC for DDR5 includes a high-efficiency hybrid gate driver and an asynchronous-based dual-phase buck control scheme.  *Id.*  The dual-phase buck control scheme "allows the DC voltage to step down from high to low with a fast transient response to changes in the output load current and adapts the conversion accordingly to efficiently regulate its output voltage at near-constant levels."  *Id.*

72.     The PMIC provides the required regulated voltages, in accordance with the latest DDR5 standards.



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).



Figure 9 — Dual Phase Regulator Example Schematic

Ex. 14 (JEDEC Power Management Specification for DDR5) (annotated), at 19; *see also id.* at 20.

73.    The accused DDR5 products further comprise a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising: a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and at least one circuit (*e.g.*, RCD) coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices, as illustrated below.



Ex. 5 at 3 (depiction of a Samsung DDR5 RDIMM).



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).

## 2.4    DDR5 SDRAM X4/8 Ballout using MO-210

Table 1 provides the ballout for DDR5 SDRAM X4/8 using MO-210.

### Table 1 — DDR5 SDRAM X4/8 Ballout Using MO-210

| AN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | |
| A | DNU | LBDQ | VSS | VPP | | | | ZQ | VSS | LBDQS | DNU | A |
| B | | VDD | VDDQ | DQ2 | | | | DQ3 | VDDQ | VDD | | B |
| C | | VSS | DQ0 | DQS_t | | | | DM_n, TDQS_t | DQ1 | VSS | | C |
| D | | VDDQ | VSS | DQS_c | | | | TDQS_c | VSS | VDDQ | | D |
| E | | VDD | DQ4 | DQ6 | | | | DQ7 | DQ5 | VDD | | E |
| F | | VSS | VDDQ | VSS | | | | VSS | VDDQ | VSS | | F |
| G | | CA_ODT | MIR | VDD | | | | CK_t | VDDQ | TEN | | G |
| H | | ALERT_n | VSS | CS_n | | | | CK_c | VSS | VDD | | H |
| J | | VDDQ | CA4 | CA0 | | | | CA1 | CA5 | VDDQ | | J |
| K | | VDD | CA6 | CA2 | | | | CA3 | CA7 | VDD | | K |
| L | | VDDQ | VSS | CA8 | | | | CA9 | VSS | VDDQ | | L |
| M | | CAI | CA10 | CA12 | | | | CA13 | CA11 | RESET_n | | M |
| N | DNU | VDD | VSS | VDD | | | | VPP | VSS | VDD | DNU | N |

Ex. 15 (JEDEC 79-5 DDR5 SDRAM Standard), at 3.

**Table 3 — Pinout Description (Continued)**

| Symbol | Type | Function |
|--------|------|----------|
| LBDQ | Output | Loopback Data Output: The output of this device on the Loopback Output Select defined in MR53:OP[4:0]. When Loopback is enabled, it is in driver mode using the default RON described in the Loopback Function section. When Loopback is disabled, the pin is either terminated or HiZ based on MR36:OP[2:0]. |
| LBDQS | Output | Loopback Data Strobe: This is a single ended strobe with the Rising edge-aligned with Loopback data edge, falling edge aligned with data center. When Loopback is enabled, it is in driver mode using the default RON described in the Loopback Function section. When Loopback is disabled, the pin is either terminated or HiZ based on MR36:OP[2:0]. |
| RFU | Input/Output | Reserved for future use |
| NC | | No Connect: No internal electrical connection is present. |
| VDDQ | Supply | DQ Power Supply: 1.1 V |
| VDD | Supply | Power Supply: 1.1 V |
| VSS | Supply | Ground |
| VPP | Supply | DRAM Activating Power Supply: 1.8V |
| ZQ | Reference | Reference Pin for ZQ calibration. This ball is tied to an external 240 ohm resistor(RZQ), which is tied to $V_{SS}$. |

*Id.* at 5.

### 10.1    Operating Electrical Characteristics

The DDR5RCD01 parametric values are specified for the device default control word settings, unless otherwise stated.

**Table 189 — Operating Electrical Characteristics**

| Symbol | Parameter | Condition | Min | Nom | Max | Unit |
|--------|-----------|-----------|-----|-----|-----|------|
| $V_{DD}$ | DC Supply voltage[1] | 1.1 V Operation | 1.067 (-3%) | 1.1 | 1.166 (+6%) | V |
| $V_{DDIO}$ | DDR5RCD01 Sideband Interface I/O Supply Voltage | | 0.95 | 1.0 | 1.05 | V |
| | | | | | ... | |

Ex. 16 (JEDEC DDR5 RCD Standard, JESD 82-511), at 176.

74.    The at least one circuit (e.g., RCD) is operable to (i) receive a first plurality of address and control signals via the first portion of the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices.  For example:

### 3.1    Description

The DDR5RCD01 is a registering clock driver used on DDR5 RDIMMs and LRDIMMs. Its primary function is to buffer the Command/Address (CA) bus, chip selects, and clock between the host controller and the DRAMs. It also creates a BCOM bus which controls the data buffers for LRDIMMs.

*Id.* at 5.

75.     The at least one circuit is coupled to both the second regulated voltage and the fourth regulated voltage.  For example, the RCD receives both 1.0V VDDIO and 1.1V VDD input, with the amplitude of VDDIO being less than the amplitude of VDD.



*Id.* at 3.



*Id.* at 176.

76.     On information and belief, Samsung also indirectly infringes the '918 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '918 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR5 products and other materially similar products that infringe the '918

Patent. On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR5 memory modules and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

77. On information and belief, Samsung also indirectly infringes the '918 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '918 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR5 memory modules and other materially similar products that infringe the '918 Patent. On information and belief, the accused DDR5 products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Samsung is aware that the product or process that includes the accused DDR5 products and other materially similar products may be covered by one or more claims of the '918 Patent. On information and belief, the use of the product or process that includes the accused DDR5 products and other materially similar products infringes at least one claim of the '918 Patent.

78. Samsung's infringement of the '918 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '918 Patent since at least August 2, 2021. Samsung's infringement of the '506 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VII.    DEMAND FOR JURY TRIAL

79.    Pursuant to Federal Rule of Civil Procedure 38(b), Netlist hereby demands a trial by jury on all issues triable to a jury.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A.    that Samsung infringes the Patents-in-Suit;

B.    all equitable relief the Court deems just and proper as a result of Samsung's infringement;

C.    an award of damages resulting from Samsung's acts of infringement in accordance with 35 U.S.C. § 284;

D.    that Samsung's infringement of the Patents-in-Suit is willful;

E.    enhanced damages pursuant to 35 U.S.C. § 284;

F.    that this is an exceptional case and awarding Netlist its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.    an accounting for acts of infringement and supplemental damages, without limitation, prejudgment and post-judgment interest; and

H.    such other equitable relief which may be requested and to which Netlist is entitled.

Dated: December 20, 2021

Respectfully submitted,

_/s/ Sam Baxter_

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com

Co-Counsel:

**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

**IRELL & MANELLA LLP**

Jason Sheasby (CA #205455)
Annita Zhong (CA #266924)
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

**Attorneys for Plaintiff Netlist, Inc.**

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **NETLIST, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **SAMSUNG ELECTRONICS CO., LTD.,** | ) | |
| **SAMSUNG ELECTRONICS AMERICA,** | ) | |
| **INC., SAMSUNG SEMICONDUCTOR,** | ) | Civil Action No. 2:21-CV-463-JRG |
| **INC.** | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

1.      Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, for its First Amended Complaint against defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Semiconductor, Inc. ("SSI") (collectively, "Samsung" or "Defendants"), states as follows, with knowledge as to its own acts, and on information and belief as to the acts of others:

2.      Netlist filed its initial complaint against Defendants on December 20, 2021.  Dkt. 1 ("Initial Complaint").   In its Initial Complaint, Netlist presented allegations regarding Defendants' infringement of three of Netlist's patents: U.S. Patent Nos. 10,860,506 (the "'506 Patent," Ex. 1), 10,949,339 (the "'339 Patent," Ex. 2), and 11,016,918 (the "'918 Patent," Ex. 3). Netlist also indicated its intent to assert then pending U.S. Pat. No. 11,232,054 (the "'054 Patent," Ex. 4) upon issuance.  On December 28, 2021, Defendants filed an unopposed motion confirming

the parties' agreement to waive service for SEC, and set the deadline for Defendants' answer to the Initial Complaint as April 12, 2022.  Dkt. 10.  Defendants collectively filed an answer on April 12, 2022 (Dkt. 16) without moving to dismiss the Initial Complaint.  Netlist now enters its First Amended Complaint as a matter of course pursuant to Fed. R. Civ. Proc., Rule 15(a)(1)(B).

3.     Upon the entry of this First Amended Complaint, this action now involves six of Netlist's patents: the '506 Patent, the '339 Patent, the '918 Patent, the '054 Patent, and U.S. Patent Nos. 8,787,060 (the "'060 Patent," Ex. 5), and 9,318,160 (the "'160 Patent," Ex. 6) (collectively, the "Patents-in-Suit").

## I.     **THE PARTIES**

4.     Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Drive, Suite 100, Irvine, CA 92617.

5.     On information and belief, SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi, 16677, Republic of Korea.  On information and belief, SEC is the worldwide parent corporation for SEA and SSI, and is responsible for the infringing activities identified in this First Amended Complaint.  On information and belief, SEC's Device Solutions division is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, SEC is also involved in the design, manufacture, and provision of products sold by SEA.

6.     On information and belief, SEA is a corporation organized and existing under the laws of the State of New York.  On information and belief, SEA, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale

and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below. Defendant SEA maintains facilities at 6625 Excellence Way, Plano, Texas 75023. SEA may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. SEA is a wholly owned subsidiary of SEC.

7.      On information and belief, SSI is a corporation organized and existing under the laws of the State of California. On information and belief, SSI, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below. On information and belief, Defendant SSI maintains facilities at 6625 Excellence Way, Plano, Texas 75023. Defendant SSI may be served with process through its registered agent National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136. On information and belief, SSI is a wholly owned subsidiary of SEA.

8.      On information and belief, Defendants have used, sold, or offered to sell products and services, including the Accused Instrumentalities, in this judicial district.

## II.    <u>JURISDICTION AND VENUE</u>

9.      Subject matter jurisdiction is based on 28 U.S.C. § 1338, in that this action arises under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*).

10.     Each Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

11.     Personal jurisdiction exists generally over the Defendants because each Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Eastern District of Texas. Personal jurisdiction also exists over each Defendant because each, directly or through

subsidiaries, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products within the State of Texas and the Eastern District of Texas that infringe one or more claims of the Patents-in-Suit.  Further, on information and belief, Defendants have placed or contributed to placing infringing products into the stream of commerce knowing or understanding that such products would be sold and used in the United States, including in this District.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).  For example, SEC maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.   As another example, SEA maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.  Venue is also proper for SSI because it maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.

13.     Defendants have not contested proper venue in this District.  *See, e.g.*, Answer at ¶ 10, *Arbor Global Strategies LLC v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-333, Dkt. 43 (E.D. Tex. Apr. 27, 2020); Answer at ¶ 29, *Acorn Semi, LLC v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-347, Dkt. 14 (E.D. Tex. Feb. 12, 2020).

## III.     FACTUAL ALLEGATIONS

### Background

14.     Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies.  Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets.  Netlist's technology enables users to derive useful information from vast

amounts of data in a shorter period of time. These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.

15.     Netlist has a long history of being the first to market with disruptive new products such as the first load-reduced dual in-line memory module ("LR-DIMM"), HyperCloud®, based on Netlist's distributed buffer architecture later adopted by the industry for DDR4 LRDIMM. Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM. These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via quad-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

16.     In many commercial products, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs). The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system. A memory module is typically installed into a memory slot on a computer motherboard.

17.     Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications. The structure, function, and operation of memory modules is defined, specified, and standardized by the JEDEC Solid State Technology Association ("JEDEC"), the standard-setting body for the microelectronics industry. Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR5, DDR4, DDR3) and the type of module (*e.g.*, RDIMM, LRDIMM).

**The Asserted Netlist Patents**

**The '506 Patent**

18.     The '506 Patent is entitled "Memory Module With Timing-Controlled Data Buffering."  Netlist owns the '506 Patent by assignment from the listed inventors Hyun Lee and Jayesh R. Bhakta.  The '506 Patent was filed as Application No. 16/391,151 on April 22, 2019, issued as a patent on December 8, 2020, and claims priority to, among others, a utility application filed on July 27, 2013 (No. 13/952,599) and a provisional application filed on July 27, 2012 (No. 61/676,883).

19.     Samsung had knowledge of the '506 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket.  Samsung has also gained knowledge of the '506 Patent via the Initial Complaint filed on December 20, 2021.

20.     As described in the '506 Patent, in conventional memory modules, the "distribution of control signals and a control clock signal in the memory module is subject to strict constraints" to ensure that memory devices on the memory module can be properly accessed.  Ex. 1 at 2:16-17.  For example, in some conventional memory modules, "control wires are routed so there is an equal length to each memory component, in order to eliminate variation of the timing of the control signals and the control clock signal between different memory devices in the memory modules."  *Id.* at 2:20-24.  But as noted in the '506 Patent, "[t]he balancing of the length of the wires to each memory devices compromises system performance, limits the number of memory devices, and complicates their connections."  *Id.* at 2:24-27.  In yet other conventional memory systems, the memory controller includes mechanisms such as read or write leveling for compensating for unbalanced wire lengths on the memory module.  *Id.* at 2:30-32.  However, with increasing memory operating speed and memory density "such leveling mechanisms are also insufficient to

ensure proper timing of the control and/or data signals received and/or transmitted by the memory modules." *Id.* at 2:32-36.

21.　　The '506 Patent discloses a memory module operable in a memory system with a memory controller that includes memory devices, a module control circuit, and a plurality of buffer circuits coupled between respective sets of data signal lines in a data bus and respective sets of the memory devices.  As summarized in the Abstract, "[e]ach respective buffer circuit is configured to receive the module control signals and the module clock signal, and to buffer a respective set of data signals in response to the module control signals and the module clock signal. Each respective buffer circuit includes a delay circuit configured to delay the respective set of data signals by an amount determined based on at least one of the module control signals." *Id.*, Abstract.

22.　　The buffer circuits (118, highlighted below) are associated with respective groups of memory devices and are distributed across the memory module at positions corresponding to the respective groups of memory devices as illustrated in the exemplary configuration of Figure 2A.



FIG. 2A

23. However, because the buffer circuits—or "isolation devices"—are distributed across the memory module, at high speeds of operation, the same set of module control signals sent by the module control circuit in the module may reach different buffer circuits at different times across one cycle of the system clock. *Id.* at 9:51-62 ("Because the isolation devices 118 are distributed across the memory module 110, during high speed operations, it may take more than one clock cycle time of the system clock MCK for the module control signals to travel along the module control signals lines 230 from the module control device 116 to the farthest positioned isolation devices 118, such as isolation device ID-1 and isolation device ID-(n−1) in the exemplary configuration shown in FIG. 2."). The '506 Patent discloses an embodiment wherein "each isolation devices includes signal alignment circuits that determine, during a write operation, a time interval between a time when one or more module control signals are received from the module control circuit 116 and a time when a write strobe or write data signal is received from the MCH 101. This time interval is used during a subsequent read operation to time the transmission of read data to the MCH 101, such that the read data follows a read command by a read latency value associated with the system 100." *Id.* at 10:11-21.

**The '339 Patent**

24. The '339 Patent is entitled "Memory Module With Controlled Byte-Wise Buffers." Netlist owns the '339 Patent by assignment from the listed inventors Hyun Lee and Jayesh R. Bhakta. The '339 Patent was filed as Application No. 15/470,856 on March 27, 2017, issued as a patent on March 16, 2021, and claims priority to U.S. Patent Application No. 12/504,131 filed on July 16, 2009, U.S. Patent Application No. 12/761,179 filed on April 15, 2010 and U.S. Application No. 13/970,606 filed on August 20, 2013.

25.     Samsung had knowledge of the '339 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket.  Samsung has also gained knowledge of the '339 Patent via the Initial Complaint filed on December 20, 2021.

26.     As described in the '339 Patent, in optimizing performance of memory subsystems (e.g. memory modules) "consideration is always given to memory density, power dissipation (or thermal dissipation, speed, and cost."  Ex. 2 at 2:5-7.   The '339 Patent further explains that "[g]enerally, these attributes are not orthogonal to each other, meaning that optimizing one attribute may detrimentally affect another attribute. For example, increasing memory density typically causes higher power dissipation, slower operational speed, and higher costs." *Id.* at 2:7-12.  The '339 Patent is generally directed to a memory module optimized to reduce the load experienced by a system memory controller via the use of configurable data transmission circuits.

27.     The '339 Patent discloses a memory module configured to communicate with a memory controller that includes DDR DRAM devices arranged in multiple ranks each of the same width as the memory module, and a module controller configured to receive and register input control signals for a read or write operation from the memory controller and to output registered address and control signals.  As summarized in the Abstract, "[t]he registered address and control signals selects one of the multiple ranks to perform the read or write operation. The module controller further outputs a set of module control signals in response to the input address and control signals. The memory module further comprises a plurality of byte-wise buffers controlled by the set of module control signals to actively drive respective byte-wise sections of each data signal associated with the read or write operation between the memory controller and the selected rank." *Id.*, Abstract.

28.     Figure 3A illustrates an example of a memory subsystem consistent with embodiments disclosed in the '339 Patent.



**FIG. 3A**

29.     As shown above, Figure 3A depicts a memory subsystem 400 including memory modules 402 comprising memory devices 412, data transmission circuits 416 (highlighted above), and module control circuits 430.  The data transmission circuits 416 operate to reduce the load experienced by the memory controller 420 to improve performance of a read or write operation. *Id.* at 17:14-44 ("Referring again to FIG. 3A, when the memory controller 420 executes read or write operations, each specific operation is targeted to a specific one of the ranks A, B, C, and D of a specific memory module 402. The data transmission circuit 416 on the specifically targeted one of the memory modules 402 functions as a bidirectional repeater/multiplexor, such that it drives the data signal when connecting from the system memory controller 420 to the memory devices 412. The other data transmission circuits 416 on the remaining memory modules 402 are disabled for the specific operation. . . . Thus, the memory controller 420, when there are four four-rank memory modules, sees four load-reducing switching circuit loads, instead of sixteen memory device loads. The reduced load on the memory controller 420 enhances the performance and reduces the power requirements of the memory system . . . .").  In certain embodiments, "the data

transmission circuit 416 comprises or functions as a byte-wise buffer. In certain such embodiments, each of the one or more data transmission circuits 416 has the same bit width as does the associated memory devices 412 per rank to which the data transmission circuit 416 is operatively coupled." *Id.* at 13:31-36.

**The '918 Patent**

30.     The '918 Patent is entitled "Flash-DRAM Hybrid Memory Module." Netlist owns the '918 Patent by assignment from the listed inventors Chi-She Chen, Jeffrey C. Solomon, Scott H. Milton, and Jayesh Bhakta. The '918 Patent was filed as Application No. 17/138,766 on December 30, 2020, issued as a patent on May 25, 2021, and claims priority to, among others, U.S. Application No. 13/559,476 filed on July 26, 2012; U.S. Application No. 12/240,916 filed on September 29, 2008; U.S. Application No. 12/131,873 filed on June 2, 2008; as well as to two provisional applications, filed on June 1, 2007 (No. 60/941,586) and July 28, 2011 (No. 61/512,871).

31.     Samsung had knowledge of the '918 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket via notice of U.S. Patent Application No. 12/240,916 and U.S. Patent Application No. 12/131,873 on August 2, 2021. Samsung has also gained knowledge of the '918 Patent via the Initial Complaint filed on December 20, 2021.

32.     As summarized in the Abstract, the '918 Patent discloses a memory module that includes a printed circuit board with an interface that couples it to a host system for provision of power, data, address and control signals, and additionally features "[f]irst, second, and third buck converters [that] receive a pre-regulated input voltage and produce first, second and third regulated voltages. A converter circuit reduces the pre-regulated input voltage to provide a fourth regulated voltage. Synchronous dynamic random access memory (SDRAM) devices are coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, and a voltage

monitor circuit monitors an input voltage and produces a signal in response to the input voltage having a voltage amplitude that is greater than a threshold voltage."  Ex. 3, Abstract.

33.      The '918 Patent discloses, *inter alia*, a power module that provides power to various components of the memory system as depicted in Figure 16, shown below.



FIG. 16

34.      The '918 Patent explains that "[t]he power module 1100 provides a plurality of voltages to the memory system 1010 comprising non-volatile and volatile memory subsystems 1030, 1040. The plurality of voltages comprises at least a first voltage 1102 and a second voltage 1104. The power module 1100 comprises an input 1106 providing a third voltage 1108 to the power module 1100 and a voltage conversion element 1120 configured to provide the second voltage 1104 to the memory system 1010. The power module 1100 further comprises a first power element 1130 configured to selectively provide a fourth voltage 1110 to the conversion element 1120. In certain embodiments, the first power element 1130 comprises a pulse-width modulation power controller."  *Id.* at 28:3-15.  "The conversion element 1120 can comprise one or more buck converters and/or one or more buck-boost converters."  *Id.* at 29:18-19.

- 12 -

35.     This design represents a fundamental departure from prior generations of DDR modules for which the voltage regulation was provided by power management units located on motherboards, external to the DDR modules.   In contrast, the '918 Patent (as well as its continuation, the '054 Patent, discussed below), moves the voltage regulation and many other power management functions into the DDR modules themselves, therefore allowing for more precise and accurate regulation of voltages and more efficient power management.

36.     The inventions of the '918 Patent provide for the effective operation of DDR5 memory modules, by enabling, among other benefits, greater power efficiency than previous generations of DDR technology.   The DDR5 standard is characterized by the use of an on-module power management system.   Samsung itself notes "[t]he on-DIMM PMIC further boosts power management efficiency and power supply stability."  Ex. 12 at 5.

**The '054 Patent**

37.     The '054 Patent is entitled "Flash-DRAM Hybrid Memory Module."  Netlist owns the '054 Patent by assignment from the listed inventors Chi-She Chen, Jeffrey C. Solomon, Scott H. Milton, and Jayesh Bhakta. The '054 Patent was filed as Application No. 17/328,019 on May 24, 2021, issued as a patent on January 25, 2022, and claims priority to, among others, U.S. Application No. 13,559,476 filed on July 26, 2012; U.S. Application No. 12/240,916 filed on September 29, 2008; U.S. Application No. 12/131,873 filed on June 2, 2008; as well as to two provisional applications, filed on June 1, 2007 (No. 60/941,586) and July 28, 2011 (No. 61/512,871).

38.     Samsung has had knowledge of the application leading to the '054 Patent no later than December 20, 2021, and the patent itself no later than January 25, 2022.

39.     As summarized in the Abstract, the '054 Patent discloses a memory module that includes a printed circuit board with an interface that couples it to a host system for provision of

power, data, address and control signals, and additionally features "[f]irst, second, and third buck converters [that] receive a pre-regulated input voltage and produce first, second and third regulated voltages. A converter circuit reduces the pre-regulated input voltage to provide a fourth regulated voltage. Synchronous dynamic random access memory (SDRAM) devices are coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, and a voltage monitor circuit monitors an input voltage and produces a signal in response to the input voltage having a voltage amplitude that is greater than a threshold voltage."  Ex. 4, Abstract.

40.     The '054 Patent discloses, *inter alia*, a power module that provides power to various components of the memory system as depicted in Figure 16, shown below.



FIG. 16

41.     Like the inventions of the '918 Patent, the inventions of the '054 Patent provide for the effective operation of DDR5 memory modules, by enabling, among other benefits, greater power efficiency than previous generations of DDR technology.  *See supra* ¶¶ 35-36.

**The '060 and '160 Patents**

42.     The '060 Patent is entitled "Method and Apparatus for Optimizing Driver Load in a Memory Package."  Netlist owns the '060 Patent by assignment from listed inventor Hyun Lee. The '060 Patent was filed as Application No. 13/288,850 on November 3, 2011, issued as a patent on July 22, 2014, and claims priority to a provisional application filed on November 3, 2010 (No. 61/409,893).

43.     The '160 Patent is a continuation of the '060 patent and is entitled "Memory Package with Optimized Driver Load and Method of Operation."  Netlist owns the '160 Patent by assignment from listed inventor Hyun Lee.  The '160 Patent was filed as Application No. 14/337,168 on July 21, 2014, issued as a patent on April 19, 2016, and claims priority to, among others, a utility application filed on November 3, 2011 (No. 13/288,850, which issued as the '060 patent) and a provisional application filed on November 3, 2010 (No. 61/409,893).

44.     Samsung had knowledge of the '060 and '160 Patents no later than August 2, 2021 via its access to Netlist's patent portfolio docket.  Samsung also has knowledge of the two patents as of the filing of this First Amended Complaint.

45.     The '060 and '160 Patents disclose systems and methods for optimizing a load in a memory package featuring a control die, array dies, and numerous die interconnects.  In contrast to traditional DDR modules in which different DRAM devices are packaged individually and then assembled on a common printed circuit boards, the inventions of the '060 and '160 Patents are directed to DDR modules each having multiple vertically stacked DRAM devices interconnected to a common control circuit, all packaged in a same package.

46.     For example, as summarized in the Abstract, the memory package features at least two die interconnects, where "[t]he first die interconnect is in electrical communication with a data port of a first array die and a data port of a second array die and not in electrical communication

with data ports of a third array die. The second die interconnect is in electrical communication with a data port of the third array die and not in electrical communication with data ports of the first array die and the second array die." Ex. 5, Abstract; Ex. 6, Abstract. The memory package's control die includes "a first data conduit configured to transmit a data signal to the first die interconnect and not to the second die interconnect, and at least a second data conduit configured to transmit the data signal to the second die interconnect and not to the first die interconnect." *Id.*

47.     The '060 and '160 Patents explain that in conventional memory packages, the die interconnects are in communication with ***each*** of the array dies, which disadvantageously increases the load on the data conduit. Ex. 5, at 11:32-40. To address this problem, the '060 and '160 Patents disclose memory packages with multiple die interconnects in electrical communication with ***some***, but not all of the array dies, as illustrated below. *Id.* at 5:46-6:36.



48.     As the '060 and '160 Patents explain, in the disclosed memory packages "[e]ach of these die interconnects 320 may be coupled to, or in electrical communication with at least one

port of at least one of the array dies 310. As with the memory package 200, in certain embodiments, at least one of the die interconnects 320 is in electrical communication with at least one port from each of at least two array dies 310 *without being in electrical communication with a port from at least one array die 310*, which may be in electrical communication with a different die interconnect 320.  *Id.* at 5:54-62 (emphasis added). This enables the memory packages to be designed with smaller form factor in mind, and lowers power consumption.  *See id.* at 7:22-8:62.

**Samsung's Infringing Activities**

49.     Samsung is a global technology company and one of the largest manufacturers of semiconductor memory products such as DRAM, NAND Flash, and MCP (Multi-Chip Package) such as high-bandwidth memories ("HBM").  Samsung develops, manufactures, sells, offers to sell, and imports into the United States memory components and memory modules designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.

50.     Samsung and Netlist were initially partners under a 2015 Joint Development and License Agreement ("JDLA"), which granted Samsung a 5-year paid-up license to Netlist's patents "having an effective first filing date on or prior to" November 12, 2020.  *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 20-cv-993, Dkt. 186 at 20-21 (C.D. Cal. Oct. 14, 2021).  On information and belief, Samsung used Netlist's technologies to develop products both in the mature markets such as DDR4 memory modules and the emerging market for new generations of DRAM technologies, including DDR5 and HBMs.  Under the JDLA, Samsung was obligated to supply Netlist certain memory products at competitive prices.  Samsung, however, did not honor its promises and repeatedly failed to fulfill Netlist's product orders.  As a result, Netlist terminated the JDLA on July 15, 2020, which termination was found effective by a federal district court in the Central District of California on October 14, 2021.  *Id.*

51.     On February 15, 2022 the Central District Court entered judgement in favor of Netlist on all three of its contract claims.  *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 20-cv-993, Dkt. 306 (C.D. Cal. Feb. 15, 2022).

52.     In entering judgement in favor of Netlist on all its claims, Judge Scarsi stated explicitly that "Netlist terminated the JDLA pursuant to JDLA § 13.2, and Samsung's licenses and rights under the JDLA have ceased."  *Id.* at 2.

53.     Following the entry of Judgment in the Central District, Defendants responded to Netlist's Initial Complaint in this action by submitting themselves to the jurisdiction of this Court via answer.  *See* Dkt. 16.

**DDR4 Memory Modules**

54.     On information and belief, Samsung makes, uses, sells, offers to sell, and/or imports within this District and elsewhere in the United States, without authority, infringing DDR4 LRDIMMs, DDR5 LRDIMMs, DDR5 RDIMMs, DDR5 SODIMMs, DDR5 UDIMMs, HBM2 and HBM2E products, and other products that have materially the same structures and designs in relevant parts (the "Accused Instrumentalities").

55.     The accused DDR4 LRDIMMs include, without limitation, any Samsung DDR4 LRDIMM products made, sold, offered for sale, used and/or imported into the United States by Samsung.  By way of non-limiting example, the accused DDR4 LRDIMMs products include Samsung products having the following part numbers:  M386A4K40BB0-CRC, M386A8K40BM1-CRC, M386A8K40BM2-CTD, M386A8K40BMB-CRC, M386A8K40CM2-CRC,     M386A8K40CM2-CTD,     M386A8K40CM2-CVF,     M386A8K40DM2-CTD, M386A8K40DM2-CVF,        M386A8K40DM2-CWE,        M386AAG40AM3-CWE, M386AAG40MM2-CVF, M386AAG40MMB-CVF, M386AAK40B40-CUC, M386AAK40B40-CWD, M386ABG40M50-CYF, M386ABG40M51-CAE, M386ABG40M5B-CYF.     Further

examples of Samsung's DDR4 LRDIMM products can be found via Samsung's module-selector web page. *See Module: Memory Modules For Extensive Use*, Samsung, *available at* https://www.samsung.com/semiconductor/dram/module.

**DDR5 Memory Modules**

56.     The accused DDR5 products include, without limitation, any Samsung DDR5 products made, sold, offered for sale, used and/or imported into the United States by Samsung.  By way of non-limiting example, the accused DDR5 products include Samsung products having the following part numbers: M323R2GA3BB0-CQK0D, M321R8GA0BB0-CQK, M321R4GA0BB0-CQKEG, and M323R2GA3BB0-CQK0D.

57.     As further example, the Accused Instrumentalities include, without limitation, any DDR5 products made, sold, offered for sale, used and/or imported into the United States by Samsung, including those modules utilizing Samsung's own power management IC (including at least PMIC components having part numbers: S2FPC01, S2FPD01, and S2FPD02) that Samsung confirms "fully support JEDEC standards."  Ex. 17 (S2FPC01); Ex. 18 (S2FPD01).

58.     By way of non-limiting example, the accused DDR5 products also include products marketed and publicized in an October 12, 2021 Samsung Press release, as shown below.



Ex. 8 at 1 (depiction of a Samsung DDR5 LRDIMM).



*Id.* at 2 (depiction of a Samsung DDR5 RDIMM).

59.     An example of a Samsung DDR5 RDIMM obtainable in the U.S. is shown below:



60.     As further example, the Accused Instrumentalities include, without limitation, any Samsung DDR5 UDIMM and DDR5 SODIMMs products made, sold, offered for sale, used and/or imported into the United States by Samsung.   An example of a Samsung DDR5 UDIMM obtainable in the U.S. is shown below:



**High Bandwidth Memory ("HBM")**

61.     HBM is a type of high-speed computer memory technology that relies in part on vertically-stacked memory dies and differs from the DDR4 or DDR5 DIMM formats described in the paragraphs above. Samsung is a major supplier of HBM. Samsung itself confirms that its HBM products are "optimized for high-performance computing (HPC), and offer the performance needed to power next-generation technologies, such as artificial intelligence (AI)." Ex. 20 at 2.

62.     The Accused HBM Products include, without limitation, any Samsung HBM2, HBM2E and newer products with 8 or more stacked DRAM dies made, sold, used, offered for sale, and/or imported into the United States by Samsung.  By way of non-limiting example, the Accused HBM Products include Samsung's HBM2 Flarebolt, including, without limitation, the following product: KHA883901B-MC12.  *See HBM2 Flarebolt*, Samsung, *available at* https://semiconductor.samsung.com/dram/hbm/hbm2-flarebolt/.



63.    The Accused HBM Products further include Samsung's HBM2 Aquabolt, including, without limitation, products having the following part numbers: KHA884901X-MC12, KHA884901X-MC13, KHA884901X-MN12, KHA884901X-MN13. *See* HBM2 Aquabolt, Samsung, *available at* https://semiconductor.samsung.com/dram/hbm/hbm2-aquabolt/.



*See also, e.g.*, Ex. 21 at 2-3:

> To achieve HBM2 Aquabolt's unprecedented performance, Samsung has applied new technologies related to TSV design and thermal control. A single 8GB HBM2 package consists of eight 8Gb HBM2 dies, which are vertically interconnected using over 5,000 TSVs (Through Silicon Via's) per die. While using so many TSVs can cause collateral clock skew, Samsung succeeded in minimizing the skew to a very modest level and significantly enhancing chip performance in the process.

64.     The Accused HBM Products further include Samsung's HBM2E Flashbolt, including, without limitation, products having the following part numbers: KHAA44801B-MC17, KHAA84901B-MC17, KHAA44801B-MC16, KHAA84901B-JC16, KHAA84901B-JC17, KHAA84901B-MC16.   Further examples of Samsung's HBM2E products can be found via Samsung's part-selector web page.   *See HBM2E Flashbolt*, Samsung, *available at* https://semiconductor.samsung.com/dram/hbm/hbm2e-flashbolt/ (representative product depicted below); *see also, e.g.*,

*New HBM2E stacks eight 16Gb DRAM dies to achieve 16GB package capacity and ensures a stable data transfer speed at 3.2Gbps*





HBM2E Flashbolt offers about twice the capacity of the previous generation HBM solution by stacking eight layers of 10nm-class 16 Gb DRAM dies. A larger capacity allows the development of deeper neural networks that greatly improves the speed of acquiring results for Big Data analytics.

※ Source from Samsung Datasheet (Available upon request)

## IV.    FIRST CLAIM FOR RELIEF – '506 PATENT

65.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

66.    On information and belief, Samsung directly infringed and is currently infringing at least one claim of the '506 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts.  For example, and as shown below, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts infringe at least claim 1 of the '506 Patent.[1]

---

[1] The theories set forth herein are based on Netlist's present understanding of the Samsung Accused Instrumentalities. Netlist reserves the right to supplement or amend these contentions as permitted by the Local Rules and any Orders of the Court as discovery progresses.  Further, Netlist's contentions contain images and examples illustrating Netlist's infringement theories.  As such, the images and examples are not intended, and should not be read, as narrowing or limiting the scope of these contentions.

67.     For example, to the extent the preamble is limiting, each of the accused DDR4 LRDIMMs comprise a memory module operable in a computer system to communicate with a memory controller of the computer system via a memory bus including control and address (C/A) signal lines and a data bus.  As an example, Samsung's website markets and contains datasheets for the accused DDR4 LRDIMMs.



# LRDIMM

## Load Reduced DIMM

- Include a register for enhancing clock, command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

Ex. 19 at 2 (depiction of a Samsung DDR4 LRDIMM).

68.     Each LRDIMM includes "a register for enhancing clock, command and control signals" as well as data buffers for "[e]nhanced data signal." *Id.*  It communicates with a server's memory controller via control and address signal lines in a memory bus as well as a data bus.  For example:

## 5. Pin Description

| Pin Name | Description | Pin Name | Description |
|---|---|---|---|
| A0–A17[1] | SDRAM address input | SCL | I2C serial bus clock for SPD-TSE |
| BA0, BA1 | SDRAM bank select | SDA | I2C serial bus data line for SPD-TSE |
| BG0, BG1 | SDRAM bank group select | SA0–SA2 | I2C slave address select for SPD-TSE |
| RAS_n[2] | SDRAM row address strobe | PAR | SDRAM parity input |
| CAS_n[3] | SDRAM column address strobe | VDD | SDRAM core power supply |
| WE_n[4] | SDRAM write enable | C0, C1, C2 | Chip ID lines for 3DS SDRAMs |
| CS0_n, CS1_n, CS2_n, CS3_n | DIMM Rank Select Lines | VREFCA | SDRAM command/address reference supply |
| CKE0, CKE1 | SDRAM clock enable lines | VSS | Power supply return (ground) |
| ODT0, ODT1 | Register on-die termination control lines | VDDSPD | Serial SPD-TSE positive power supply |
| ACT_n | Register input for activate | ALERT_n | SDRAM ALERT_n |
| DQ0–DQ63 | DIMM memory data bus | VPP | SDRAM Supply |
| CB0–CB7 | DIMM ECC check bits | RESET_n | Set DRAMs to a Known State |
| DQS0_t–DQS17_t | SDRAM data strobes (positive line of differential pair) | EVENT_n | SPD-TSE signals a thermal event has occurred. |
| DQS0_c–DQS17_c | SDRAM data strobes (negative line of differential pair) | VTT | SDRAM I/O termination supply |
| CK0_t, CK1_t | SDRAM clocks (positive line of differential pair) | RFU | Reserved for future use |
| CK0_c, CK1_c | SDRAM clocks (negative line of differential pair) | | |

NOTE :
1. Address A17 is only valid for 16 Gb x4 based SDRAMs.
2. RAS_n is a multiplexed function with A16.
3. CAS_n is a multiplexed function with A15.
4. WE_n is a multiplexed function with A14.

Ex. 7 (M386AAK40B40 Datasheet) at 6.





Address, Command and Control lines

NOTE :
1. CK0_t, CK0_c terminated with 120Ω ± 5% resistor.
2. CK1_t, CK1_c terminated with 120Ω ± 5% resistor but not used.
3. Unless otherwise noted resistors are 22Ω ± 5%.

- 10 -

**SAMSUNG**

*Id.* at 10 (red lines in original).

69.     The accused DDR4 LRDIMMs further each comprise a module board having edge connections to be coupled to respective signal lines in the memory bus, as illustrated in the examples below.



Ex. 19 at 2 (depiction of a Samsung DDR4 LRDIMM); *see also* Ex. 7 (M386AAK40B40 Datasheet) at 42.

70.     The accused DDR4 LRDIMMs further each comprise a module control device (*e.g.*, a registering clock driver, or "RCD") on the module board configurable to receive input C/A signals corresponding to a memory read operation via the C/A signal lines and to output registered C/A signals in response to the input C/A signals and to output module control signals, as illustrated in the example below.







NOTE :
1. CK0_t, CK0_c terminated with 120Ω ± 5% resistor.
2. CK1_t, CK1_c terminated with 120Ω ± 5% resistor but not used.
3. Unless otherwise noted resistors are 22Ω ± 5%.

- 10 -

**SAMSUNG**

Ex. 7 (M386AAK40B40 Datasheet) at 10 (red lines in original); *see also id.* at 42.



*Id.* at 11-12.

71.    The accused DDR4 LRDIMMs also each include memory devices arranged in multiple ranks on the module board and coupled to the module control device (*e.g.*, RCD) via module C/A signal lines that conduct the registered C/A signals, as illustrated in the examples below.

## 9.1 128GB, 16Gx72 Module
## (Populated as 2 physical ranks / 4 logical ranks of x4 DDR4 SDRAM



*Id.* at 10 (red lines in original); *see also id.* at 42.

72.    In each accused DDR4 LRDIMM's memory devices, the registered C/A signals cause a selected rank of the multiple ranks to perform the memory read operation by outputting read data and read strobes associated with the memory read operation, and a first memory device in the selected rank is configurable to output at least a first section of the read data and at least a

- 30 -

first read strobe.  For example, each accused DDR4 LRDIMM follows the timing sequence for a

READ command shown below.



Ex. 9 (JEDEC JESD82-32A Standard), at 14 (annotated); *see also, e.g.*, Ex. 7 (M386AAK40B40

Datasheet) at 11-12 (functional block for a representative product, depicted above).

73.    The accused DDR4 LRDIMMs further each include data buffers on the module

board and coupled between the edge connections and the memory devices, wherein a respective

data buffer of the data buffers is coupled to at least one respective memory device in each of the

multiple ranks and is configurable to receive the module control signals from the module control

device, as illustrated below.



Ex. 19 at 2 (depiction of a Samsung DDR4 LRDIMM).



Ex. 7 (M386AAK40B40 Datasheet) at 11-12 (annotated to illustrate data buffers coupled between at least one respective memory device in each of the multiple ranks).

74.     In each accused DDR4 LRDIMM, a first data buffer on the data buffers is coupled to the first memory device and is configurable to, in response to one or more of the module control signals: delay the first read strobe by a first predetermined amount to generate a first delayed read

strobe; sample the first section of the read data using the first delayed read strobe; and transmit the first section of the read data to a first section of the data bus; wherein the first predetermined amount is determined based at least on signals received by the first data buffer during one or more previous operations. For example, the strobes MDQS0_t and MDQS0_c are delayed by a variable delay circuitry and produce a first delayed read strobe. The data buffer determines the predetermined amount of delay based on, for example, BCOM signals received from the memory controller of the host in one or more previous operations, which signals in turn are in response to information sent by the memory module as part of MRD training.



Ex. 7 (M386AAK40B40 Datasheet) at 11-12.

75.    On information and belief, Samsung also indirectly infringes the '506 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '506 Patent

through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR4 LRDIMM and other materially similar products that infringe the '506 Patent. On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR4 LRDIMM products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

76. On information and belief, Samsung also indirectly infringes the '506 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '506 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR4 LRDIMM and other materially similar products that infringe the '506 Patent. On information and belief, the accused DDR4 LRDIMM products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Samsung is aware that the product or process that includes the accused DDR4 LRDIMM and other materially similar products would be covered by one or more claims of the '506 Patents. On information and belief, the use of the product or process that includes the accused DDR4 LRDIMM and other materially similar products infringes at least one claim of the '506 Patent.

77. Samsung's infringement of the '506 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '506 Patent since at least August 2, 2021. Samsung's infringement of the '506 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement,

and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## V.   SECOND CLAIM FOR RELIEF – '339 PATENT

78.   Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

79.   On information and belief, Defendants directly infringed and are currently infringing at least one claim of the '339 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts.   For example and as shown below, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts infringe at least claim 1 of the '339 Patent.

80.   For example, to the extent the preamble is limiting, each of the accused DDR4 LRDIMMs comprise a N-bit-wide memory module (*e.g.*, 64-bit-wide) mountable in a memory socket of a computer system and configurable to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, each set of data signal lines is a byte wide.   For instance, each LRDIMM includes "a register for enhancing clock, command and control signals" as well as data buffers for "[e]nhanced data signal."   Ex. 19 at 2.   It communicates with a server's memory controller via control and address signal lines in a memory bus as well as a data bus.



# LRDIMM

**Load Reduced DIMM**

- Include a register for enhancing clock,
  command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

*Id.* at 2 (depiction of a Samsung DDR4 LRDIMM).

81.     In the configuration above, there are 9 sets of byte-wide signal lines including 64-bit wide data signal lines (DQ0-DQ63) and 8-bit wide check bits signal lines (CB0-CB7).   For example:



Ex. 7 (M386AAK40B40 Datasheet) at 11-12.

82.     The accused DDR4 LRDIMMs each comprise a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and configured to be releasably coupled to corresponding contacts of the memory socket. For example:

- 36 -



## LRDIMM

**Load Reduced DIMM**

- Include a register for enhancing clock, command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

Edge connector

Ex. 19 at 2 (depiction of a Samsung DDR4 LRDIMM).

83.    The accused DDR4 LRDIMMs each include double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks.  As shown above, each DDR4 LRDIMM module includes multiple ranks of memory devices.

84.    The accused DDR4 LRDIMMs further comprise a module controller (*e.g.*, RCD) coupled to the PCB and operatively coupled to the DDR DRAM devices.  For example:

## 9.1 128GB, 16Gx72 Module
### (Populated as 2 physical ranks / 4 logical ranks of x4 DDR4 SDRAM



Ex. 7 (M386AAK40B40 Datasheet) at 10 (red lines in original); *see also id.* at 42.

85.    The module controller (*e.g.*, RCD) is configurable to receive from the memory controller via the address and control signal lines (*e.g.*, red lines above) input address and control signals for a memory write operation to write N-bit-wide write data from the memory controller into a first N-bit-wide rank of the multiple N-bit-wide ranks, and to output registered address and

control signals in response to receiving the input address and control signals, wherein the registered

address and control signals cause the first N-bit-wide rank to perform the memory write operation

by receiving the N-bit-wide write data (*e.g.*, by using a registered chip-select signal to select a

target rank for performing the memory write operation), wherein the module controller is further

configurable to output module control signals (*e.g.*, during a first clock cycle when BCOM [3:0]

is 1000, the module control signals would correspond to a write WR command) in response to at

least some of the input address and control signals.  For example, a Write burst operation results

in a burst of data and data strobes received by the DDR4 LRDIMM via the DQS/DQ pins of the

memory bus, and to write the data via data buffers into a memory device as determined by input

address and control signal (*e.g.*, CS signal).  *See, e.g.*, Ex. 10 (JESD79-4C DDR4 SDRAM

Standard), at 122.



### 4.25.5  Write Burst Operation
The following write timing diagram is to help understanding of each write parameter's meaning and just examples. The details of the definition of each parameter will be defined separately.
In these write timing diagram, CK and DQS are shown aligned and also DQS and DQ are shown center aligned for illustration purpose.

NOTE 1  BL = 8, WL = 9, AL = 0, CWL = 9, Preamble = 1tCK
NOTE 2  DIN n = data-in to column n.
NOTE 3  DES commands are shown for ease of illustration; other commands may be valid at these times.
NOTE 4  BL8 setting activated by either MR0[A1:A0 = 0:0] or MR0[A1:A0 = 0:1] and A12 = 1 during WRITE command at T0.
NOTE 5  CA Parity = Disable, CS to CA Latency = Disable, Write DBI = Disable.

**Figure 128 — WRITE Burst Operation WL = 9 (AL = 0, CWL = 9, BL8)**



Ex. 7 (M386AAK40B40 Datasheet) at 11-12 (annotated to illustrate plurality of byte-wise buffers).



Ex. 7 (M386AAK40B40 Datasheet) at 10 (red lines in original); *see also id.* at 42.

86.     Further, as illustrated above and below, the accused DDR4 LRDIMMs also each

comprise a plurality of byte-wise buffers coupled to the PCB and configured to receive the module

control signals, wherein each respective byte-wise buffer of the plurality of byte-wise buffers has

a first side configured to be operatively coupled to a respective set of data signal lines, a second

side that is operatively coupled to at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks via respective module data lines, and a byte-wise data path between the first side and the second side, wherein the each respective byte-wise buffer is disposed on the PCB at a respective position corresponding to the respective set of the plurality of sets of data signal lines.



Figure 3 — LRDIMM Topologies

Ex. 11 (JEDEC 21C Standard), at 4.20.27-17.

87.    In each of the accused DDR4 LRDIMMs, the each respective byte-wise buffer further includes logic configurable to control the byte-wise data path in response to the module control signals and the byte-wise data path includes first tristate buffers, and the logic in response to the module control signals is configured to enable the first tristate buffers, *e.g.*, via the MDQ_OE signal associated with a particular TX for a particular MDQ bit, to drive the respective byte-wise section of the N-bit wide write data to the respective module data lines during the first time period. For example:



Figure 15 — Logic Diagram

Ex. 9 (JESD82-32A Standard), at 95 (showing an example of a byte-wise data path (upper nibble and lower nibble), highlighted in green, between the first side at DQ and the second side at MDQ).

  88.  In each of the accused DDR4 LRDIMMs, the byte-wise data path is enabled for a first time period in accordance with a latency parameter to actively drive a respective byte-wise section of the N-bit wide write data associated with the memory operation from the first side to the second side during the first time period.  For example:

Figure 2 shows the timing sequence for a Write command.



**Figure 2 — WRITE Timing**

*Id.* at 13.



**Figure 56 — tPDM_WR Latency Measurement**

*Id.* at 165.

Table 146 — WRITE Output Timings

| Parameter | Symbol | DDR4-1600/1866/2133 | | DDR4-2400/2666 | | DDR4-2933 | | DDR4-3200 | | Units | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Min | Max | Min | Max | Min | Max | Min | Max | | |
| **Data Timing** | | | | | | | | | | | |
| tDVB | Data valid before MDQS | 0.38 | - | 0.36 | - | 0.36 | - | 0.36 | - | UI | |
| tDVA | Data valid after MDQS | 0.38 | - | 0.36 | - | 0.36 | - | 0.36 | - | UI | |
| **Data Strobe Timing** | | | | | | | | | | | |
| MDQS_t - MDQS_c differential output low time | tMQSL | 0.46 | - | 0.46 | - | 0.46 | - | 0.46 | - | tCK | 1, 3 |
| MDQS_t - MDQS_c differential output high time | tMQSH | 0.46 | - | 0.46 | - | 0.46 | - | 0.46 | - | tCK | 2, 3 |

Unit  UI = tCK(avg).min/2

NOTE 1: tMQSL describes the instantaneous differential output low pulse width on MDQS_t - MDQS_c, as measured from on falling edge to the next consecutive rising edge

NOTE 2: tMQSH describes the instantaneous differential output high pulse width on MDQS_t - MDQS_c, as measured from on rising edge to the next consecutive falling edge

NOTE 3: The specification values are affected by the amount of clock jitter applied (i.e. tJIT(per), tJIT(cc), etc.). However, these parameters should be met whether clock jitter is present or not.

*Id.* at 169.

89.    On information and belief, Samsung also indirectly infringes the '339 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '339 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR4 LRDIMM products and other materially similar products that infringe the '339 Patent.  On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR4 LRDIMM products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

90.    On information and belief, Samsung also indirectly infringes the '339 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on

information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '339 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR4 LRDIMM products and other materially similar products that infringe the '339 Patent.  On information and belief, the accused DDR4 LRDIMM and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, Samsung is aware that the product or process that includes the accused DDR4 LRDIMM products and other materially similar products would be covered by one or more claims of the '339 Patent.  On information and belief, the use of the product or process that includes the accused DDR4 LRDIMM products infringes at least one claim of the '339 Patent.

91.     Samsung's infringement of the '339 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '339 Patent since at least August 2, 2021.  Samsung's infringement of the '339 Patent has been continuing and willful.  Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VI.   THIRD CLAIM FOR RELIEF – '918 PATENT

92.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

93.     On information and belief, Defendants directly infringed and are currently infringing at least one claim of the '918 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR5 LRDIMMs, DDR5 RDIMMs, DDR5 SODIMMs, DDR5 UDIMMs, and other products with materially the same structures in relevant parts.  For example, and as

shown below, the accused DDR5 memory modules and other products with materially the same structures in relevant parts infringe at least one claim of the '918 Patent.

94.    For example, the accused DDR5 products comprise a memory module comprising: a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system, as illustrated below.



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).



*Id.* at 2 (depiction of a Samsung DDR5 RDIMM).



(Image of a Samsung DDR5 RDIMM obtained in the U.S.).



(Image of a Samsung DDR5 UDIMM obtained in the U.S.).

95.    The accused DDR5 products further comprise a first buck converter configured to
provide a first regulated voltage having a first voltage amplitude; a second buck converter
configured to provide a second regulated voltage having a second voltage amplitude; a third buck
converter configured to provide a third regulated voltage having a third voltage amplitude; and a
converter circuit configured to provide a fourth regulated voltage having a fourth voltage
amplitude.  For example, Samsung notes on its web site that its DDR5 modules include an "on-
DIMM PMIC" that "further boosts power management efficiency and power supply stability."
Ex. 12 at 5; *see also* Ex. 13 at 2 ("One major design improvement to the newest generation DRAM
solution involves integrating the PMIC into the memory module — previous generations placed

the PMIC on the motherboard — offering increased compatibility and signal integrity, and providing a more reliable and sustained performance.").

96.    Samsung's PMIC for DDR5 includes a high-efficiency hybrid gate driver and an asynchronous-based dual-phase buck control scheme.  *Id.*  The dual-phase buck control scheme "allows the DC voltage to step down from high to low with a fast transient response to changes in the output load current and adapts the conversion accordingly to efficiently regulate its output voltage at near-constant levels."  *Id*.

97.    The PMIC provides the required regulated voltages, in accordance with the latest DDR5 standards.  For example:



Figure 10 — Single Phase Regulator Example Schematic



Figure 9 — Dual Phase Regulator Example Schematic

Ex. 14 (JEDEC Power Management Specification for DDR5) (annotated), at 19-20.

98.     The accused DDR5 products further comprise a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising: a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and at least one circuit (*e.g.*, RCD) coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices, as illustrated below.



Ex. 8 at 2 (depiction of a Samsung DDR5 RDIMM).



*Id.* at 1 (depiction of a Samsung DDR5 LRDIMM).

## 2.4   DDR5 SDRAM X4/8 Ballout using MO-210

Table 1 provides the ballout for DDR5 SDRAM X4/8 using MO-210.

**Table 1 — DDR5 SDRAM X4/8 Ballout Using MO-210**

| AN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | |
| A | DNU | LBDQ | VSS | VPP | | | | ZQ | VSS | LBDQS | DNU | A |
| B | | VDD | VDDQ | DQ2 | | | | DQ3 | VDDQ | VDD | | B |
| C | | VSS | DQ0 | DQS_t | | | | DM_n, TDQS_t | DQ1 | VSS | | C |
| D | | VDDQ | VSS | DQS_c | | | | TDQS_c | VSS | VDDQ | | D |
| E | | VDD | DQ4 | DQ6 | | | | DQ7 | DQ5 | VDD | | E |
| F | | VSS | VDDQ | VSS | | | | VSS | VDDQ | VSS | | F |
| G | | CA_ODT | MIR | VDD | | | | CK_t | VDDQ | TEN | | G |
| H | | ALERT_n | VSS | CS_n | | | | CK_c | VSS | VDD | | H |
| J | | VDDQ | CA4 | CA0 | | | | CA1 | CA5 | VDDQ | | J |
| K | | VDD | CA6 | CA2 | | | | CA3 | CA7 | VDD | | K |
| L | | VDDQ | VSS | CA8 | | | | CA9 | VSS | VDDQ | | L |
| M | | CAI | CA10 | CA12 | | | | CA13 | CA11 | RESET_n | | M |
| N | DNU | VDD | VSS | VDD | | | | VPP | VSS | VDD | DNU | N |

Ex. 15 (JEDEC 79-5 DDR5 SDRAM Standard), at 3.

**Table 3 — Pinout Description (Continued)**

| Symbol | Type | Function |
|---|---|---|
| LBDQ | Output | Loopback Data Output: The output of this device on the Loopback Output Select defined in MR53:OP[4:0]. When Loopback is enabled, it is in driver mode using the default RON described in the Loopback Function section. When Loopback is disabled, the pin is either terminated or HiZ based on MR36:OP[2:0]. |
| LBDQS | Output | Loopback Data Strobe: This is a single ended strobe with the Rising edge-aligned with Loopback data edge, falling edge aligned with data center. When Loopback is enabled, it is in driver mode using the default RON described in the Loopback Function section. When Loopback is disabled, the pin is either terminated or HiZ based on MR36:OP[2:0]. |
| RFU | Input/Output | Reserved for future use |
| NC | | No Connect: No internal electrical connection is present. |
| VDDQ | Supply | DQ Power Supply: 1.1 V |
| VDD | Supply | Power Supply: 1.1 V |
| VSS | Supply | Ground |
| VPP | Supply | DRAM Activating Power Supply: 1.8V |
| ZQ | Reference | Reference Pin for ZQ calibration. This ball is tied to an external 240 ohm resistor(RZQ), which is tied to $V_{SS}$. |

*Id.* at 5.

**10.1   Operating Electrical Characteristics**

The DDR5RCD01 parametric values are specified for the device default control word settings, unless otherwise stated.

**Table 189 — Operating Electrical Characteristics**

| Symbol | Parameter | Condition | Min | Nom | Max | Unit |
|---|---|---|---|---|---|---|
| $V_{DD}$ | DC Supply voltage[1] | 1.1 V Operation | 1.067 (-3%) | 1.1 | 1.166 (+6%) | V |
| $V_{DDIO}$ | DDR5RCD01 Sideband Interface I/O Supply Voltage | | 0.95 | 1.0 | 1.05 | V |
| | | | | | | |

Ex. 16 (JEDEC DDR5 RCD Standard, JESD 82-511), at 176.

99.     The at least one circuit (*e.g.*, RCD) is operable to (i) receive a first plurality of address and control signals via the first portion the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices.  For example:

**3.1   Description**

The DDR5RCD01 is a registering clock driver used on DDR5 RDIMMs and LRDIMMs. Its primary function is to buffer the Command/Address (CA) bus, chip selects, and clock between the host controller and the DRAMs. It also creates a BCOM bus which controls the data buffers for LRDIMMs.

*Id.* at 5.

100.     The at least one circuit is coupled to both the second regulated voltage and the fourth regulated voltage.  For example, the RCD receives both VDDIO and VDD or VDDQ input,

- 52 -

with the amplitude of VDDIO (*e.g.*, 1.0V) being less than the amplitude of VDD (*e.g.*, 1.1V) or

VDDQ (*e.g.*, 1.1V).

Fourth regulated
voltage VDDIO

Second regulated
voltage VDD or VDDQ

**Table 1 — Ball Assignment -240 ball FCBGA, 14 x 19 Grid, TOP VIEW**

|   | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |   |
|---|---|---|---|---|---|---|---|---|---|----|----|----|----|----|---|
| A | NU | QB_CAT_A | QB_CAY_A | QB_CAIS_A | QB_CAII_A | QB_CAI2_A | QB_CAI0_A | QB_CAI0_B | QB_CAII_B | QB_CAII_B | QB_CAI3_B | QB_CAI3_B | QB_CAY_B | NU | A |
| B | QB_CAI_A | V_SS | QB_CAP_A | V_SS | V_SS | V_SS | V_DD | V_DD | V_SS | V_SS | V_SS | QB_CAP_B | V_SS | QB_CAI_B | B |
| C | QB_CAE_A | V_SS | QB_CAE_A | V_DD | ZQ_CAL | SCL | DERROR_DI_A_A | DERROR_DI_B_A | SDA | VDDIO | V_DD | QB_CAE_B | V_SS | QB_CAE_B | C |
| D | QB_CAI_A | V_SS | QB_CAI_A | V_DD | V_DD | V_DD |  |  | V_DD | V_DD | V_DD | QB_CAI_B | V_SS | QB_CAI_B | D |
| E | QB_CAI_A | V_SS | QB_CAI_A | V_DD | QBCK_A_r | QBCK_A_t | V_SS | V_SS | QBCK_B_r | QBCK_B_t | V_DD | QB_CAI_B | V_SS | QB_CAI_B | E |

*Id.* at 3.

## 10.1    Operating Electrical Characteristics

The DDR5RCD01 parametric values are specified for the device default control word settings, unless otherwise stated.

**Table 189 — Operating Electrical Characteristics**

| Symbol | Parameter | Condition | Min | Nom | Max | Unit |
|--------|-----------|-----------|-----|-----|-----|------|
| $V_{DD}$ | DC Supply voltage[1] | 1.1 V Operation | 1.067 (-3%) | 1.1 | 1.166 (+6%) | V |
| $V_{DDIO}$ | DDR5RCD01 Sideband Interface I/O Supply Voltage |  | 0.95 | 1.0 | 1.05 | V |

*Id.* at 176.

101.    Testing confirms the relative amplitude.  For example, voltmeters connected to

VDD, VDDQ, and VDDIO (VIO) of a Samsung RDIMM recorded 1.1V, 1.1V, and 1.0V

respectively.



102.    On information and belief, Samsung also indirectly infringes the '918 Patent, as

provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers

and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '918 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR5 products and other materially similar products that infringe the '918 Patent.  On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR5 memory modules and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

103.    On information and belief, Samsung also indirectly infringes the '918 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '918 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR5 memory modules and other materially similar products that infringe the '918 Patent.  On information and belief, the accused DDR5 products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, Samsung is aware that the product or process that includes the accused DDR5 products and other materially similar products may be covered by one or more claims of the '918 Patent.  On information and belief, the use of the product or process that includes the accused DDR5 products and other materially similar products infringes at least one claim of the '918 Patent.

104.    Samsung's infringement of the '918 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '918 Patent since at least August 2, 2021.  Samsung's infringement of the '918 Patent has been continuing and willful.  Samsung continues

to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VII.   FOURTH CLAIM FOR RELIEF – '054 PATENT

105.   Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

106.   On information and belief, Defendants directly infringed and are currently infringing at least one claim of the '054 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR5 LRDIMMs, DDR5 RDIMMs, DDR5 SODIMMs, DDR5 UDIMMs, and other products with materially the same structures in relevant parts.  For example, and as shown below, the accused DDR5 memory modules and other products with materially the same structures in relevant parts infringe at least one claim of the '054 Patent.

107.   For example, the accused DDR5 products comprise a memory module comprising a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, as illustrated below using a representative UDIMM and RDIMM.





(Images of a Samsung DDR5 UDIMM obtained in the U.S. and inserted into a host system).







(Images of a Samsung DDR5 RDIMM obtained in the U.S. for testing).

108.    The accused DDR5 products further comprise a voltage conversion circuit coupled to the PCB and configured to provide a plurality of regulated voltages, wherein the voltage conversion circuit includes three buck converters each of which is configured to produce a regulated voltage of the plurality of regulated voltages.  For example, Samsung notes on its website

that its DDR5 modules include an "on-DIMM PMIC" that "further boosts power management efficiency and power supply stability."   Ex. 12 at 5; *see also* Ex. 13 at 2 ("One major design improvement to the newest generation DRAM solution involves integrating the PMIC into the memory module — previous generations placed the PMIC on the motherboard — offering increased compatibility and signal integrity, and providing a more reliable and sustained performance.").

109.   Samsung's PMIC for DDR5 includes a high-efficiency hybrid gate driver and an asynchronous-based dual-phase buck control scheme. *Id.*   The dual-phase buck control scheme "allows the DC voltage to step down from high to low with a fast transient response to changes in the output load current and adapts the conversion accordingly to efficiently regulate its output voltage at near-constant levels." *Id.  See also, e.g.*,



(Zoomed-in view of Samsung voltage conversion and power control circuits on the above Samsung DDR5 UDIMM).





(View of Samsung voltage conversion and power control circuits on the above Samsung DDR5 RDIMM).

110.   The voltage conversion circuit, which includes the relevant parts of PMIC, *e.g.*, the inductors, capacitors, and other necessary elements that comprise at least three buck converters, provides the at least three required regulated voltages.  The regulated voltages include VDD, VDDQ, VPP, among others.  On information and belief, the magnitude of these regulated voltages are programmable.  For example, VDD and VDDQ can be programmed to have an amplitude of 1.1V.  As another example, VPP can be a regulated voltage at 1.8V.  DRAMs on the PCB are each coupled to the VDD, VDDQ and VPP regulated voltages.  The voltage conversion circuit can also have other voltage regulators, including linear voltage regulators.  Outputs from these other voltage regulators include, *e.g.*, a 1.8V output for powering components such as SPD, and where applicable, a 1.0V output for powering components such as RCD that is present in RDIMMs and

LRDIMMs.  The observed voltages and behavior are consistent with the latest DDR5 standards, within error tolerance.  *See supra* ¶¶ 97-100.



(Input and output voltages for a Samsung UDIMM)





(Input and output voltages for a Samsung RDIMM)

111.   The accused DDR5 products further comprise a plurality of components (such as DRAM devices, thermal sensors, SPD and, where applicable, RCD and data buffers) coupled to the PCB, each component of which is coupled to at least one regulated voltage of the plurality of regulated voltages, including a plurality of SDRAM devices coupled to a first regulated voltage of the plurality of regulated voltages.  *See*, *e.g.*, *supra* ¶ 98.

112.   The accused DDR5 products further comprise a controller coupled to the PCB, which includes a voltage monitor circuit coupled to an input voltage, such as VIN_BULK or where applicable, VIN_MGMT, received from the host system via the interface.  The controller and the voltage monitoring circuit may be part of the PMIC.  In response to the voltage monitor detecting an amplitude change in the input voltage (*e.g.*, an over- or under-voltage condition on the input

power pins), the memory module transitions from a first operable state (*e.g.*, with all components operating normally) to a second operable state (*e.g.*, with the PMIC, thermal sensors, and/or SPD still operating, but not necessarily all components operating).

113.    Furthermore, in response to the detected over- or under- voltage, the controller is configured to perform operations such as a write operation that records predefined bit value(s) in a register.  The register is a non-volatile memory because the information written to the register by the controller is retained even after power-off.

114.    On information and belief, Samsung also indirectly infringes the '054 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '054 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR5 products and other materially similar products that infringe the '054 Patent.  On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR5 memory modules and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

115.    On information and belief, Samsung also indirectly infringes the '054 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '054 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR5 memory modules and other materially similar products that infringe the '054 Patent.  On information and

belief, the accused DDR5 products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, Samsung is aware that the product or process that includes the accused DDR5 products and other materially similar products may be covered by one or more claims of the '054 Patent.  On information and belief, the use of the product or process that includes the accused DDR5 products and other materially similar products infringes at least one claim of the '054 Patent.

116.    Samsung's infringement of the '054 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '054 Patent since at least August 2, 2021.  Samsung's infringement of the '054 Patent has been continuing and willful.  Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VIII.   FIFTH CLAIM FOR RELIEF – '060 PATENT

117.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

118.    On information and belief, Defendants directly infringed and are currently infringing at least claim 20 of the '060 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused HBM Products, and other products with materially the same structure in relevant part.  For example, and as shown below, the Accused HBM Products and other products with materially the same structure and operating mechanisms in relevant part infringe at least one claim of the '060 Patent.

119.    The Accused HBM Products also each include a plurality of array dies arranged in a stack (*e.g.*, 8 stacked DRAM dies).  The plurality of array dies can be divided into at least two groups of array dies.  The dies are interconnected via TSVs and associated bumps and bond pads.



120.    The Accused HBM Products have also at least two die interconnects.  For example, some TSVs only electrically interconnect some of the DRAM dies (first group of array die(s), selected from the group of DRAM dies that Samsung annotates each individually as a "Core Die"), while others may electrically bypass this first group of array dies and electrically connect with the active transceiver logic of at least one of the other DRAM dies (second group of array die(s)).

121.    The Accused HBM Products also includes a control die (*e.g.*, the bottom die in the image below, labeled by Samsung as a "Buffer Die"), with a plurality of input/output terminals, such as terminals for data and control/address signals via which the memory die stack communicates data and control/address signals with a CPU, GPU, FPGA, or other external dies. The control die also includes a first driver that drives data signal via the first die interconnects and a second driver that drives data signal via the second die interconnects.



Ex. 22 at 4 (Samsung White Paper).

122.    The operation of the Accused HBM Products includes a step of receiving a data signal at a first terminal (*e.g.*, a data terminal) of the input/output terminals and a step of receiving a control signal at second terminals (*e.g.*, control/address terminals) of the input/output terminals.

123.    Chip select signals, which may be encoded in the received stack ID ("SID") signals, each select an array die to which data signals are to be driven by the corresponding data driver via the corresponding die interconnects.  The Accused HBM Products select one of the first driver and the second driver in accordance with the chip select signal(s) to drive the data signal to the selected array die via the corresponding first or second die interconnect.

124.    On information and belief, Samsung also indirectly infringes the '060 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '060 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the Accused HBM Products and other materially similar products that infringe the '060 Patent.  On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the Accused HBM

Products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

125.    On information and belief, Samsung also indirectly infringes the '060 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '060 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the Accused HBM Products and other materially similar products that infringe the '060 Patent.  On information and belief, the Accused HBM Products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, Samsung is aware that the product or process that includes the Accused HBM Products and other materially similar products may be covered by one or more claims of the '060 Patent.  On information and belief, the use of the product or process that includes the Accused HBM Products and other materially similar products infringes at least one claim of the '060 Patent.

126.    Samsung's infringement of the '060 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '060 Patent since at least August 2, 2021.  Samsung's infringement of the '060 Patent has been continuing and willful.  Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## IX.    SIXTH CLAIM FOR RELIEF – '160 PATENT

127.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

128.    On information and belief, Defendants directly infringed and are currently infringing at least claim 1 of the '160 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused HBM Products, and other products with materially the same structure in relevant part.  For example, and as shown below, the Accused HBM Products and other products with materially the same structure in relevant part infringe at least one claim of the '160 Patent.

129.    For example, the Accused HBM Products include terminals for data and terminals for control signals (*e.g.*, command and address signals).

130.    The Accused HBM Products also each include stacked array dies (*e.g.*, 8 stacked DRAM dies) including at least two groups of array dies.  The dies are interconnected via TSVs and associated bumps and bond pads.



131.    The Accused HBM Products have also at least two interconnects, each in electrical communication with one group of array dies but not in communication with a second group of array dies.  For example, first die interconnects are in electrical communication with a first group

of array dies and not in electrical communication with a second group of at least one array die; and second die interconnects are in electrical communication with the second group of at least one array die and not in electrical communication with the first group of array dies. This may be achieved by electrically coupling certain TSVs with active transceiver logic for only a subset of the dies. For example, some TSVs may only interconnect some of the DRAM dies (first group of array dies) and some may bypass this first group of DRAM dies and electrically connect with the active transceiver logic of at least some of the other DRAM dies (second group of array dies).

132. The Accused HBM Products also each include a control die (*e.g.*, the bottom "Buffer Die" in the image above, *supra* ¶ 121). The control die includes first data conduits between the first die interconnects and the data terminals, and second data conduits between the second die interconnects and the data terminals. The data conduit includes first drivers each having a first driver size and configured to drive a data signal from a corresponding data terminal to the first group of array dies; and the second data conduit include second drivers each having a second driver size and configured to drive a data signal from a corresponding data terminal to the second group of at least one array die. The second driver size is different from the first driver size, for example, to account for the different distances data signals have to travel to reach the respective array dies in the stack.

133. On information and belief, Samsung also indirectly infringes the '160 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '160 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the Accused HBM Products and other materially similar products that infringe the '160 Patent. On information and belief, Samsung provides specifications, datasheets, instruction

manuals, and/or other materials that encourage and facilitate infringing use of the Accused HBM Products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

134.    On information and belief, Samsung also indirectly infringes the '160 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '160 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the Accused HBM Products and other materially similar products that infringe the '160 Patent.  On information and belief, the Accused HBM Products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, Samsung is aware that the product or process that includes the Accused HBM Products and other materially similar products may be covered by one or more claims of the '160 Patent.  On information and belief, the use of the product or process that includes the Accused HBM Products and other materially similar products infringes at least one claim of the '160 Patent.

135.    Samsung's infringement of the '160 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '160 Patent since at least August 2, 2021. Samsung's infringement of the '160 Patent has been continuing and willful.  Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

X.      **DEMAND FOR JURY TRIAL**

136.    Pursuant to Federal Rule of Civil Procedure 38(b), Netlist hereby demands a trial by jury on all issues triable to a jury.

XI.     **PRAYER FOR RELIEF**

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A.      that Samsung infringes the Patents-in-Suit;

B.      all equitable relief the Court deems just and proper as a result of Samsung's infringement;

C.      an award of damages resulting from Samsung's acts of infringement in accordance with 35 U.S.C. § 284;

D.      that Samsung's infringement of the Patents-in-Suit is willful;

E.      enhanced damages pursuant to 35 U.S.C. § 284;

F.      that this is an exceptional case and awarding Netlist its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.      an accounting for acts of infringement and supplemental damages, without limitation, prejudgment and post-judgment interest; and

H.      such other equitable relief which may be requested and to which Netlist is entitled.

Dated: May 3, 2022                           Respectfully submitted,

                                             */s/ Jason Sheasby*
                                             _____

                                             Samuel F. Baxter
                                             Texas State Bar No. 01938000
                                             sbaxter@mckoolsmith.com
                                             Jennifer L. Truelove
                                             Texas State Bar No. 24012906
                                             jtruelove@mckoolsmith.com
                                             **MCKOOL SMITH, P.C.**
                                             104 East Houston Street Suite 300
                                             Marshall, TX 75670
                                             Telephone: (903) 923-9000
                                             Facsimile: (903) 923-9099

                                             Jason Sheasby (CA #205455)
                                             jsheasby@irell.com
                                             Annita Zhong (CA #266924)
                                             hzhong@irell.com
                                             **IRELL & MANELLA LLP**
                                             1800 Avenue of the Stars, Suite 900
                                             Los Angeles, CA 90067
                                             Tel. (310) 277-1010
                                             Fax (310) 203-7199

                                             **Attorneys for Plaintiff Netlist, Inc.**

EXHIBIT 10

FILED
CLERK, U.S. DISTRICT COURT

DEC 23 2009

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1  **PRUETZ LAW GROUP LLP**
2  Adrian M. Pruetz (Bar No. 118215)
   ampruetz@pruetzlaw.com
3  Erica J. Pruetz (Bar No. 227712)
4  ejpruetz@pruetzlaw.com
   200 N. Sepulveda Blvd., Suite 1525
5  El Segundo, CA 90245
6  Phone:  310.765.7650
   Fax:    310.765.7641
7
8  **LEE TRAN & LIANG APLC**
   Enoch H. Liang (Bar No. 212324)
9  ehl@ltlcounsel.com
   Steven R. Hansen (Bar No. 198401)
10 srh@ltlcounsel.com
11 601 S. Figueroa Street, Suite 4025
   Los Angeles, CA 90017
12 Phone:  213.612.3737
13 Fax:    213.612.3773
14
   *Attorneys for Plaintiff*
15 Netlist, Inc.

16                 UNITED STATES DISTRICT COURT
17                CENTRAL DISTRICT OF CALIFORNIA
18                      WESTERN DIVISION
19

20 NETLIST, INC., A Delaware          | CASE NO.  CV 09-6900 DSF (RNBx)
21 Corporation,                       |
                                      | **PLAINTIFF NETLIST, INC.'S**
22                      Plaintiff,    | **FIRST AMENDED COMPLAINT**
                                      | **FOR PATENT INFRINGEMENT**
23                                    |
24      vs.                           | **[DEMAND FOR JURY TRIAL]**
25 INPHI CORPORATION, A Delaware      |
   Corporation,                       |
26                                    |
27                      Defendant.    |
28 _____

                    FIRST AMENDED COMPLAINT

Plaintiff Netlist, Inc. ("Netlist" or "Plaintiff") as and for its First Amended Complaint against Defendant Inphi Corporation ("Inphi" or "Defendant") alleges as follows:

### JURISDICTION AND VENUE

1.     This Complaint arises under the patent laws of the United States, 35 U.S.C. § 1, et seq., including but not limited to 35 U.S.C. § 271.

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3.     Venue is proper in this district pursuant to 28 U.S.C. §1400(b) because the defendant has a regular and established place of business in this District and the acts of infringement occurred in this District and elsewhere.

### PARTIES

4.     Netlist is a corporation organized and existing under the laws of the state of Delaware, authorized to do business in the state of California, with its principal place of business at 51 Discovery in Irvine, California 92618.

5.     Inphi Corporation is a corporation organized and existing under the laws of the state of Delaware, authorized to do business in the state of California, with its principal place of business at 2393 Townsgate, Suite 101, in Westlake Village, California 91361.

### FACTS RELEVANT TO ALL CLAIMS

6.     Netlist provides computer memory modules and technology to major computer manufacturers and users.  Netlist pioneered ideas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via 4-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

-1-

FIRST AMENDED COMPLAINT

7. Prior to 2004, Netlist invested significant research and development time and money in technology that would make computer memory modules less expensive and more energy-efficient. In 2005 and 2006, realizing that it had made significant advances on both fronts, Netlist filed applications that led to the issuance of United States Patent No. 7,532,537 (the "'537 Patent"), entitled Memory Module with a Circuit Providing Load Isolation and Memory Domain Translation, on May 12, 2009; United States Patent No. 7,619,912 (the "'912 Patent"), entitled Memory Module Decoder, on November 17, 2009; and United States Patent No. 7,636,274, (the "'274 Patent"), entitled "Memory Module with a Circuit Providing Load Isolation and Memory Domain Translation," on December 22, 2009. Netlist is the owner of the entire right, title, and interest in and to the '537 Patent, the '912 Patent, and the '274 Patent. True and correct copies of the '537 Patent, '912 Patent, and '274 Patent are attached hereto as Exhibits 1, 2 and 3, respectively.

8. On information and belief, Inphi manufactures, sells and offers for sale components used in computer memory modules that incorporate the Netlist technology claimed in the '537 Patent, '912 Patent, and '274 Patent. Inphi's infringing products include but are not limited to Inphi's Isolation Memory Buffer or "iMB".

## FIRST CAUSE OF ACTION

## (Patent Infringement of the '537 Patent under 35 U.S.C. § 271)

9. Plaintiff realleges the allegations of Paragraphs 1 through 8 as though fully set forth herein.

10. On information and belief, Inphi has infringed and continues to infringe; has induced and continues to induce others to infringe; and/or has committed and continues to commit acts of contributory infringement of, one or more claims of the '537 Patent. Inphi's infringing activities in the United States and

-2-

FIRST AMENDED COMPLAINT

1 this District include the development, manufacture, use, importation, sale, and/or
2 offer for sale of components which act as memory module decoders and load
3 isolation devices, and contributing to the incorporation of and inducing others to
4 incorporate such components into memory modules. Such components have no
5 substantial non-infringing use. Inphi's infringing activities violate 35 U.S.C. § 271.

6       11. On information and belief, Inphi's infringement has been, and
7 continues to be, willful and deliberate, and has caused substantial damage to Netlist.

8       12. On information and belief, Inphi's infringement in violation of the
9 patent laws will continue to injure Netlist unless otherwise enjoined by this Court.

10
11       **SECOND CAUSE OF ACTION**
12       **(Patent Infringement of the '912 Patent under 35 U.S.C. § 271)**

13       13. Plaintiff realleges the allegations of Paragraphs 1 through 12 as though
14 fully set forth herein.

15       14. On information and belief, Inphi has infringed and continues to
16 infringe; has induced and continues to induce others to infringe; and/or has
17 committed and continues to commit acts of contributory infringement of, one or
18 more claims of the '912 Patent. Inphi's infringing activities in the United States and
19 this District include the development, manufacture, use, importation, sale, and/or
20 offer for sale of components which act as memory module decoders, and
21 contributing to the incorporation of and inducing others to incorporate such
22 components into memory modules. Such components have no substantial non-
23 infringing use. Inphi's infringing activities violate 35 U.S.C. § 271.

24       15. On information and belief, Inphi's infringement has been, and
25 continues to be, willful and deliberate, and has caused substantial damage to Netlist.

26       16. On information and belief, Inphi's infringement in violation of the
27 patent laws will continue to injure Netlist unless otherwise enjoined by this Court.

28

-3-

**THIRD CAUSE OF ACTION**

**(Patent Infringement of the '274 Patent under 35 U.S.C. § 271)**

17.    Plaintiff realleges the allegations of Paragraphs 1 through 16 as though fully set forth herein.

18.    On information and belief, Inphi has infringed and continues to infringe; has induced and continues to induce others to infringe; and/or has committed and continues to commit acts of contributory infringement of, one or more claims of the '274 Patent. Inphi's infringing activities in the United States and this District include the development, manufacture, use, importation, sale, and/or offer for sale of components which act as memory module decoders and load isolation devices, and contributing to the incorporation of and inducing others to incorporate such components into memory modules. Such products have no substantial non-infringing use. Inphi's infringing activities violate 35 U.S.C. § 271.

19.    On information and belief, Inphi's infringement has been, and continues to be, willful and deliberate, and has caused substantial damage to Netlist.

20.    On information and belief, Inphi's infringement in violation of the patent laws will continue to injure Netlist unless otherwise enjoined by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Netlist prays for the following relief:

1.    That the Court render judgment declaring that Inphi has infringed, induced the infringement of, and contributorily infringed the '537 Patent, the '912 Patent, and the '274 Patent in violation of 35 U.S.C. § 271;

2.    That the Court render judgment declaring that Inphi's infringement of the '537 patent, the '912 Patent, and the '274 Patent is willful and deliberate;

3.    That Netlist be awarded damages adequate to compensate Netlist for Inphi's infringement of the '537 Patent, the '912 Patent, and the '274 Patent;

-4-

FIRST AMENDED COMPLAINT

1        4.     That the Court preliminarily and permanently enjoin Inphi, its

2 successors, assigns, subsidiaries and transferees, officers, directors, agents and

3 employees as follows:

4        a.     from selling or offering for sale any product falling within the

5 scope of the claims of the '537 Patent, the '912 Patent, and/or the '274 Patent;

6        b.     from importing any product into the United States which falls

7 within the scope of the '537 Patent, the '912 Patent, and/or the '274 Patent;

8        c.     from manufacturing any product falling within the scope of the

9 claims of the '537 Patent, the '912 Patent, and/or the '274 Patent;

10        d.     from using any product or method falling within the scope of any

11 of the claims of the '537 Patent, the '912 Patent, and/or the '274 Patent;

12        e.     from inducing others to infringe any of the claims of the '537

13 Patent, the '912 Patent, and/or the '274 Patent;

14        f.     from engaging in acts constituting contributory infringement of

15 any of the claims of the '537 Patent, the '912 Patent, and/or the '274 Patent; and

16        g.     from all other acts of infringement of any of the claims of the

17 '537 Patent, the '912 Patent, and/or the '274 Patent;

18      5.     that the Court award treble damages to Netlist for the unlawful

19            practices described in this Complaint;

20      6.     that the Court enter judgment against Inphi for the maximum penalties

21            determined by the Court to be just and proper;

22      7.     that the Court render judgment declaring this to be an exceptional case;

23      8.     that Netlist be awarded its costs of suit, including reasonable attorneys'

24            fees; and

25      9.     that Netlist be awarded such other and further relief as the Court deems

26            just and proper.

27

28

-5-

FIRST AMENDED COMPLAINT

DATED:  December 23, 2009        **PRUETZ LAW GROUP LLP**


By: _Adrian M. Pruetz_
       Adrian M. Pruetz
       Attorneys for Plaintiff
       Netlist, Inc.

-6-

FIRST AMENDED COMPLAINT

1  **JURY TRIAL DEMAND**

2  Plaintiff requests a trial by jury on all issues and claims so triable.

3

4

5

6  DATED: December 23, 2009     **PRUETZ LAW GROUP LLP**

7

8  By: _Adrian M. Pruetz_

9  Adrian M. Pruetz
   Attorneys for Plaintiff
10  Netlist, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-